1   LINDA J. SMITH (S.B. # 78238)
    MARVIN S. PUTNAM (S.B. # 212839)
2   AMY R. LUCAS (S.B. # 264034)
    O'MELVENY & MYERS LLP
3   1999 Avenue of the Stars, 7th Floor
    Los Angeles, California 90067-6035
4   Telephone:    (310) 553-6700
    Facsimile:    (310) 246-6779
5
    Attorneys for Plaintiff
6   Hollywood Foreign Press Association

7

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 7 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11  HOLLYWOOD FOREIGN PRESS      Case No **CV1 0 - 8 8 3 3** VBF
    ASSOCIATION, a California                               (FMOx)
12  Corporation,
                                 **COMPLAINT FOR
13              Plaintiff,       (1) TRADEMARK
                                 INFRINGEMENT; (2) FALSE
14      v.                       ASSOCIATION; (3) DECLARATION
                                 OF COPYRIGHT CO-OWNERSHIP;
15  RED ZONE CAPITAL PARTNERS    (4) BREACH OF CONTRACT;
    II, L.P., a Delaware Limited (5) DECLARATORY RELIEF;
16  Partnership; DICK CLARK      (6) ACTION FOR AN
    PRODUCTIONS, INC., a Delaware ACCOUNTING; (7) BREACH OF
17  Corporation; DOES 1 through 10, THE IMPLIED COVENANT OF
    inclusive,                   GOOD FAITH AND FAIR
18                               DEALING; (8) BREACH OF
                Defendants.      FIDUCIARY DUTY; (9) UNFAIR
19                               COMPETITION UNDER CAL. BUS.
                                 & PROF. CODE § 17200 AND
20                               CALIFORNIA COMMON LAW;
                                 (10) INTENTIONAL
21                               INTERFERENCE WITH
                                 PROSPECTIVE ECONOMIC
22                               ADVANTAGE; AND
                                 (11) REFORMATION**
23
                                 **JURY DEMANDED**
24

25

26

27

28

1       Plaintiff Hollywood Foreign Press Association ("HFPA"), by and through its

2    undersigned counsel, for its claims for relief against Defendants dick clark

3    productions, inc. ("dcp") and Red Zone Capital Partners II, L.P. ("Red Zone

4    Capital") (collectively, "Defendants") alleges as follows:

5                  **NATURE OF THE DISPUTE**

6        1.    For the past 67 years HFPA, a nonprofit organization dedicated to

7    bridging the international and entertainment communities, has hosted the Golden

8    Globe Awards to recognize outstanding achievements in foreign and domestic

9    motion pictures and television.  The intellectual property and contract rights to the

10    Golden Globes are HFPA's primary assets, and HFPA uses proceeds from the

11    Awards to fund its annual philanthropic grant program, through which it distributes

12    millions of dollars to support arts-related scholarships and charities, educational

13    film programs, and cultural preservation foundations.

14        2.    Since their inception in 1944, the Golden Globe Awards have become

15    one of the most watched awards programs in the world.  HFPA is the registered and

16    indisputably exclusive owner of federally protected intellectual property rights in

17    the Golden Globe marks and Golden Globe statuette.

18        3.    In 1983, HFPA engaged Dick Clark and his company, dcp, to produce

19    the television production of the Golden Globe Awards show and to help license the

20    rights to a broadcaster for telecast.  The parties entered into a new agreement four

21    years later, and through later amendments extended that agreement to 2011,

22    (collectively, "the Awards Agreement").  In return for its services, dcp received a

23    handsome share of the revenue generated by the show.

24        4.    Since 2001, ownership of dcp has changed hands twice.  In 2002, it

25    was acquired by Mosaic Media Group, Inc., and in 2007 by, on information and

26    belief, Red Zone Capital (a private equity firm owned by dcp board member Daniel

27    Snyder, and managed by dcp Chief Executive Officer Mark Shapiro), Six Flags

28    Theme Parks, Inc., and an unidentified third party investor.  Over the last decade,

1   dcp has taken great liberties with its accounting for revenue generated by the

2   Golden Globe Awards shows.  More recently, dcp has begun pursuing agreements

3   to produce, create, or exploit digital rights, ancillary shows, sponsorships, and

4   promotional campaigns, even though it lacks the rights to do so.  And now, dcp has

5   dropped all pretense of cooperation or good faith, and is attempting to assume

6   complete control over the rights to the show.

7        5.     HFPA brings this lawsuit because on October 29, 2010, dcp

8   surreptitiously signed a television broadcast license agreement with NBC

9   Entertainment ("NBC") for the Golden Globe Awards shows through 2018, without

10   HFPA's consent or authorization.  In fact, dcp did not even notify or consult with

11   HFPA before entering into the NBC agreement, in marked contrast with all prior

12   extensions of the NBC agreement.  Rather, dcp proceeded in stealth.  Months

13   earlier, HFPA had specifically instructed dcp not to discuss television broadcast

14   rights with anyone unless and until HFPA and dcp were able to consummate a new

15   deal to extend their soon-to-expire contractual relationship.  dcp assured HFPA that

16   it would never do such a thing, but then broke that commitment by commencing

17   and completing broadcast rights negotiations with NBC—all behind HFPA's back,

18   and all while pretending to negotiate a new contract with HFPA.

19        6.     dcp acts as though it has the unilateral right to license the broadcast

20   rights for the Golden Globe Awards show on whatever terms it pleases, without

21   HFPA's knowledge or authorization.  And dcp claims that, so long as it grants the

22   television broadcast rights for the awards show to NBC—regardless of whether it

23   does so in good faith or at market value—dcp can control the television production

24   and broadcast rights to the Awards in perpetuity.  dcp's actions fly in the face of

25   representations that its executives made to HFPA at the time the original Awards

26   Agreement and later amendments were negotiated and signed.  dcp never bargained

27   for such unlimited and unchecked rights; indeed, it strains credulity to imagine

28

2

1    what dcp could have given to induce HFPA to interminably abdicate its most

2    valuable asset.

3         7.      dcp has absolutely no right under the Awards Agreement to grant

4    television broadcast licenses for future Golden Globe Awards shows without

5    HFPA's knowledge and authorization.  Nor does dcp have the right to unilaterally

6    exploit the Golden Globe-related marks, license the digital and other ancillary

7    rights, create promotional campaigns, or sell sponsorships.  HFPA never

8    surrendered these rights, and dcp is now trying to steal them.

9         8.      dcp's motivation for this betrayal is clear.  This is a brazen attempt by

10   dcp not only to extend its television production and licensing rights beyond the

11   terms of the parties' agreement, but to do so in perpetuity.  dcp contends that any

12   unilateral agreement with NBC—even one that involves licensing fees substantially

13   below current market rates—permits dcp to remain as HFPA's licensee and to

14   usurp HFPA's control over the production and broadcast rights for future Golden

15   Globe Awards shows.  dcp is wrong.  Its agreement with NBC has no force or

16   effect because dcp has no broadcast rights to grant.  Even if dcp's view of its rights

17   were to be credited, at most it would have had options.  But those options would

18   have been revocable, and <u>HFPA revoked</u> them in February 2010.

19        9.      Although ineffective, dcp's actions have economic consequences for

20   HFPA.  dcp's bad-faith conduct creates uncertainty about the broadcast rights for

21   the Golden Globe Awards show and severely compromises HFPA's ability to

22   exploit its property.  Until the cloud of this non-agreement, with sub-market rates,

23   is removed, HFPA will be unable to obtain a fair market value for the production

24   and broadcast of the Golden Globes Awards show—its primary asset.

25       10.     HFPA seeks a judgment confirming the invalidity of dcp's recent

26   actions.  HFPA also seeks injunctive relief preventing any marketing, promotion, or

27   other exploitation of its intellectual property and contractual rights in the Golden

28

1   Globe Awards show without HFPA's permission, and asks that damages be

2   awarded to redress dcp's numerous contractual breaches and bad-faith conduct.

3   <u>**JURISDICTION AND VENUE**</u>

4       11.    This Court has subject matter jurisdiction under the Lanham Act, 15

5   U.S.C. § 1121, and the Copyright Act, 17 U.S.C. § 201(a), and pursuant to 28

6   U.S.C. §§ 1331 and 1338.  This Court has supplemental jurisdiction of California

7   claims under 28 U.S.C. § 1367(a).

8       12.    Defendant dcp is based in Los Angeles County and is subject to the

9   personal jurisdiction of this Court.  Defendant Red Zone Capital is based in

10   Virginia and is subject to the personal jurisdiction of this Court because dcp is its

11   alter ego, because HFPA is informed and believes that Red Zone Capital conducts

12   substantial business in California, and because Red Zone Capital engaged in

13   intentional wrongful conduct directed at HFPA, which it knew to be a resident of

14   California.

15       13.    Venue is proper under 28 U.S.C. § 1391 as dcp is a resident of this

16   district, and has its principal place of business in this district; Red Zone Capital is a

17   corporate entity subject to the personal jurisdiction of this Court, and therefore is

18   deemed a resident of this judicial district; and actions giving rise to this dispute

19   occurred in this judicial district.

20   <u>**THE PARTIES**</u>

21       14.    Plaintiff Hollywood Foreign Press Association is a nonprofit

22   corporation organized and existing under the laws of the State of California, with its

23   principal place of business at 646 N. Robertson Blvd., West Hollywood, California

24   90069.

25       15.    Defendant dick clark productions, inc. is a corporation organized and

26   existing under the laws of the State of Delaware, with its principal place of business

27   at 2900 Olympic Blvd., Santa Monica, California 90404.

28

16.     Defendant Red Zone Capital Partners II, L.P. is a limited partnership organized and existing under the laws of the state of Delaware, with its principal place of business at 1800 Tysons Boulevard, Suite 500, McLean, Virginia, 22102.

17.     Since acquiring a controlling majority ownership interest in dcp in 2007, Red Zone Capital has abused the corporate form and exploited dcp for its own gain. HFPA is informed and believes that: Red Zone Capital employees direct and perform important functions at dcp; Red Zone Capital and dcp operations are conducted out of the same offices in both Santa Monica, California and McLean, Virginia; employees do not distinguish between Red Zone Capital and dcp in performing work related to major awards show event management, digital and marketing strategy, and licensing; the managing members and directors of Red Zone Capital are also directors and officers of dcp, and Red Zone Capital has knowingly abused this overlap to HFPA's detriment; Red Zone Capital caused dcp to put up an intellectual property library that includes all of the copyrights to the Golden Globe Awards shows and Pre-Shows as security to obtain a $165 million high-interest short-term loan, which will be used not to invest in dcp, but to repay dcp's already-existing $51 million bank loans and to obtain for Red Zone Capital a $90 million distribution. HFPA is further informed and believes that dcp will be unable to answer for any judgment in favor of HFPA against dcp, in part because of the debt that Red Zone Capital has directed dcp to assume in order to benefit Red Zone Capital. In sum, a unity of interest and ownership exists between Red Zone Capital and dcp such that Red Zone Capital has relegated dcp to the status of a mere instrumentality and conduit for Red Zone Capital, and is manipulating its control to drain dcp of its assets. Red Zone Capital is abusing dcp's corporate form to its own benefit and to HFPA's detriment, and unless dcp's acts are treated as those of Red Zone Capital's, an inequitable outcome will befall HFPA.

18.     The identities and capacities of Defendants Does 1 to 10 are unknown to Plaintiff. Plaintiff therefore sues these defendants by fictitious names. As to all

1  defendants sued by fictitious names, Plaintiff will provide notice of this complaint

2  and their true identities and capacities when ascertained.  Plaintiff is informed and

3  believes, and based thereon alleges, that Does 1 to 10 are, and at all relevant times

4  were, other corporate or business entities, agents, successors in interest, assigns,

5  representatives, principals and/or employees of dcp and Red Zone Capital or its

6  affiliates and are responsible for the acts and omissions resulting in the causes of

7  action alleged in this complaint.  Plaintiff is further informed and believes, and

8  based thereon alleges, that each defendant was the agent, employee, servant, partner

9  and/or co-conspirator of each of the other defendants and/or is in some other

10  manner legally liable for the conduct and damages at issue in this action and was

11  acting within the course and scope of one or more of such relationships and with the

12  direct or implied knowledge, consent and/or ratification of each of the other

13  defendants.

## THE HOLLYWOOD FOREIGN PRESS AND
## THE GOLDEN GLOBE AWARDS

16      19.    Founded during World War II, HFPA was originally comprised of a

17  handful of Los Angeles-based overseas journalists seeking to connect the

18  international community with Hollywood and hoping to provide a welcome

19  distraction from the hardships of war through film.  Nearly seven decades later,

20  HFPA members today represent some of the world's most respected publications in

21  55 countries, with a combined readership of 250 million people.  Each year HFPA

22  members view more than 300 films and interview over 400 actors, directors, writers

23  and producers.  The organization's first awards presentation for distinguished

24  achievements in the film industry was held in early 1944 with an informal

25  ceremony at 20th Century Fox.  The next year, the now-famous globe statuette was

26  adopted, and in early 1945 the first official Golden Globe Awards presentation was

27  held at the Beverly Hills Hotel.

28

COMPLAINT

20.    HFPA holds multiple federally registered trademarks and service marks in the Golden Globe name (United States Patent & Trademark Registration Nos. 2,424,703; 2,422,897; and 2,381,145), as well as the HFPA name printed on a design of the Golden Globe statuette (United States Patent & Trademark Registration Nos. 2,427,833 and 2,427,955).  Those trademarks and service marks are valid and enforceable.  In addition, the Golden Globe statuette is the copyrighted property of HFPA.  HFPA also owns several Internet domain names incorporating its marks, including www.goldenglobeawards.org.  (Copies of these trademark and service mark registrations are attached hereto as Exhibit A.)

21.    HFPA uses proceeds from the Golden Globe Awards to achieve two of its organizational missions: (1) contributing to other nonprofit organizations connected with the entertainment industry through educational, cultural, and humanitarian activities; and (2) promoting interest in the study of the arts through scholarships to major learning institutions.  HFPA donates millions of dollars in fellowships and grants to, among other things, help film students complete their thesis projects, fund educational and health videos for residents of Kenyan refugee camps, and provide feature films to entertain hospitalized children.

## THE AGREEMENTS WITH DCP

22.    In 1983, HFPA entered into an agreement granting dcp the exclusive rights to produce and license a live television broadcast of the 40th Golden Globe Awards.  The parties agreed that dcp would pay HFPA 50% of the net profits it derived from the rights granted under the agreement.  In addition, HFPA granted dcp four (4) consecutive and exclusive options to acquire from HFPA the same television production and exploitation rights for the 1984, 1985, 1986, and 1987 Golden Globe Awards.  dcp licensed the television broadcast rights to Turner Broadcasting System ("TBS") in 1983.

23.    In 1987, dcp drafted a new agreement to replace the 1983 contract between it and HFPA (the "1987 Awards Agreement").  (A copy of the 1987

COMPLAINT

1    Awards Agreement is attached as Exhibit B.)  The 1987 Awards Agreement granted
2    dcp five (5) consecutive and exclusive options to acquire the rights to produce a
3    live television broadcast of and to produce on tape or film the Golden Globe
4    Awards presentations for 1988, 1989, 1990, 1991, and 1992, and to exploit such
5    live television, tape, or film productions.  dcp, in turn, agreed that it would attempt
6    in good faith to arrange for the Golden Globe Awards show to be licensed for live,
7    syndicated, or network domestic television broadcast.  A central objective and
8    common purpose of the 1987 Awards Agreement was to maximize the revenue
9    each party would receive through the broadcast and exploitation of the televised
10   Awards show.  The parties recognized that obtaining the highest broadcast license
11   fee possible for the Awards show telecast was critical to achieving that objective
12   and purpose.  As under the 1983 contract, the 1987 Awards Agreement required
13   dcp to pay HFPA 50% of the net profits it derived from the rights granted under the
14   agreement; required each party to bear certain costs related to the event and
15   television production; allowed HFPA to maintain creative control over the
16   presentation and certain elements of the television production; and provided for
17   HFPA and dcp sharing a joint copyright interest in the produced television
18   programs.  In 1989, HFPA and dcp amended their agreement to grant dcp five (5)
19   additional options (for the years 1993 through 1997).

20          24.    The rights granted to dcp under the 1987 Awards Agreement did not
21   include the right to produce or license a digital internet stream of the Awards show,
22   and did not cover any ancillary pre- or post-Awards shows, promotional campaigns
23   surrounding the Awards show, or sponsorship opportunities.  Nor did the contract
24   grant dcp the right to use HFPA's trademarks and service marks for anything
25   beyond advertising and publicity for the live television, tape, or film productions of
26   the Awards.  And even then, the 1987 Awards Agreement required dcp to obtain
27   HFPA's prior approval before issuing any publicity relating to the Awards.
28

25.    The Golden Globe Awards grew in popularity while on TBS in the 1980s and early 1990s, and on April 8, 1993, HFPA met with dcp and authorized it to proceed with negotiations for the purpose of obtaining a multi-year broadcasting agreement with NBC for the Golden Globe Awards. At that meeting, dcp had asked HFPA to extend its relationship with dcp, which was ending in 1997. HFPA stated that any additional options to produce a television broadcast and license the show would be dependant on dcp negotiating and securing a firm broadcast licensing commitment from NBC.

26.    On September 22, 1993, dcp representatives attended HFPA's general membership meeting. During that meeting, Dick Clark, Francis La Maina, and Gene Weed of dcp described an opportunity to move the television broadcast from TBS to the NBC. The dcp team stated that NBC wanted to enter into a multi-year broadcasting license under which it would broadcast the awards show starting in 1996 through 1999, with options through 2005.

27.    At that same meeting, dcp representatives proposed an amendment to the 1987 Awards Agreement that would provide dcp with the necessary additional options to produce and license the Golden Globe Awards television broadcasts for the duration of the proposed NBC broadcast license. HFPA members asked how long it would be potentially extending its agreement with dcp under such an arrangement. The dcp representatives stated that the amendment to the 1987 Awards Agreement would be finite, and that once NBC's broadcasts began in 1996 it would be effective for no longer than 10 years.

28.    HFPA's general membership and board of directors understood that dcp was seeking through this amendment a finite number of additional options to conform to the proposed broadcast license that dcp was negotiating with NBC, and that in no event was HFPA making a commitment to either dcp or NBC beyond 2005.

COMPLAINT

29.   On information and belief, dcp was fully aware of HFPA's understanding of the proposed amendment to the 1987 Awards Agreement. To the extent that any dcp representative understood the proposed amendment would afford dcp unilateral options to license the television broadcast rights for the Golden Globe Awards show to NBC in perpetuity and to remain as producer in perpetuity under the same terms, that understanding was never disclosed to HFPA. Nor would it have made any sense for HFPA to grant options to dcp in perpetuity: such an arrangement would have been unheard of in the television industry.

30.   Based on the interactions and discussions between the parties, dcp was well aware of HFPA's understanding of the 1993 Amendment. On information and belief, dcp understood the 1993 Agreement to have the same meaning as HFPA at the time of contracting. Indeed, dcp executives Gene Weed and Francis La Maina told HFPA that dcp had always and would always come to HFPA for prior approval before negotiating towards a broadcast license of the Awards show telecast, or any other like efforts.

31.   Based on its understanding of the proposed terms of the broadcast license agreement with NBC, and of the amendment to the 1987 Awards Agreement, HFPA approved proceeding with both the extension of dcp's options as licensee and with the NBC broadcast license pursuant to the proposed amendment to the 1987 Awards Agreement (hereafter referred to as the "1993 Amendment"). (A copy of the 1993 Amendment is attached as Exhibit C.) Specifically, HFPA approved the 1993 Amendment and the NBC broadcast agreement with the understanding—based on dcp's representations—that HFPA's prior informed approval would be required for: (1) any extension, renewal, substitution, or modification of the broadcast license with NBC; and (2) any further options for dcp to remain as producer of the television program and licensee of the television broadcast rights for the Awards show.

COMPLAINT

32.     In 1999, the parties negotiated a now-expired contract under which HFPA granted dcp the right to "produce, distribute, promote, advertise and exploit" a one-hour pre-awards show (the "Pre-Show") to be telecast by NBC on the same day as a lead-in to the 2000 Awards, which was to feature "the arrival of celebrities" and "pre-taped segments about dinner menus, gift packages, pressroom interviews in prior years, planning of parties, [and] scenes of celebrities entering (but not inside) the ballroom."  (A copy of the 1999 Pre-Show Agreement is attached as Exhibit D.)  HFPA also granted dcp one option to produce the 2001 Pre-Show, and the parties amended the Pre-Show Agreement in 2001 and again in 2003 for HFPA to grant dcp options to produce the Pre-Show in 2002 through 2006.  The Pre-Show Agreement has since expired.

33.     In 2001, NBC expressed interest in broadcasting the Golden Globe Awards through 2011.  In the spring of 2001, representatives of dcp once again made a presentation to HFPA about extending the NBC broadcast license agreement and granting to dcp further options to produce and license the television broadcast of the Awards show.  HFPA decided in favor of both extending the broadcast license and granting to dcp further options.  Thereafter, the NBC broadcast license was amended to extend through the 2011 Golden Globe Awards show telecast, and dcp exercised the options that would allow it to remain involved through the January 2011 Golden Globe Awards show.

## DCP ATTEMPTS TO ASSUME CONTROL OVER THE GLOBES

34.     On information and belief, in 2002, Dick Clark sold his majority stake in dcp to a group of investors led by Mosaic Media Group, Inc., and in 2007, Red Zone Capital (one of several similarly named private equity companies owned and operated by Daniel Snyder), along with Six Flags, Inc., purchased dcp for $175 million.  Six Flags represented in its 2009 bankruptcy disclosure filings that an unidentified third-party investor purchased approximately 2.0% of dcp from Six Flags and Red Zone Capital in late 2007.  (On information and belief, Red Zone

1    LLC had acquired control of Six Flags in 2005 through a successful proxy contest.

2    Snyder and Schar owned Red Zone LLC, and Mark Shapiro was Red Zone LLC's

3    CEO.  After Red Zone LLC's acquisition of control over Six Flags, Snyder and

4    Dwight Schar became directors and Mark Shapiro became CEO.  Six Flags filed for

5    Chapter 11 bankruptcy in 2009.)  HFPA is informed and believes that Red Zone

6    Capital now holds the controlling majority interest in dcp, that Snyder and Schar

7    are managing members of Red Zone Capital and directors of dcp, and that Snyder

8    and Schar installed Shapiro as Director and Executive Vice Chairman of dcp.

9        35.    Unbeknownst to HFPA, dcp and its new corporate parents have been

10   systematically attempting both to assert proprietary interests in the Golden Globe

11   Awards shows, and to encumber the rights to those shows in return for financial

12   benefit that is not being reported to, or shared with, HFPA.  HFPA is informed and

13   believes that dcp has repeatedly represented to third parties that it owns the rights to

14   the Golden Globe Awards show and that it has the unilateral ability to grant all or

15   pieces of those rights without the involvement or consent of HFPA.

16       36.    For example, HFPA recently hired digital consultants to negotiate with

17   third parties with respect to the digital rights surrounding the Golden Globe

18   Awards.  dcp has no license from HFPA for digital rights.  HFPA's digital

19   consultants had commenced discussions with senior employees at Facebook

20   regarding an online component to complement the live telecast of the Awards show.

21   On information and belief, Facebook was eager to have involvement with HFPA

22   and the Golden Globe Awards, and invited HFPA's consultants to meet in Los

23   Angeles.

24       37.    On information and belief, dcp was aware of HFPA's interest in

25   forming a business relationship with Facebook, and expressly and knowingly

26   prevented HFPA and Facebook executives from meeting by telling Facebook that

27   dcp owns all digital rights associated with the Golden Globe Awards—even though

28   dcp had never been granted such rights by HFPA.

COMPLAINT

38.     HFPA is informed and believes that Facebook terminated its discussions with HFPA under the mistaken belief—created by dcp's misrepresentations—that dcp had the exclusive authority to license Golden Globe digital rights to Facebook.

39.     Further, HFPA is informed and believes that several other companies are now involved in dcp's supposed digital plans, and that dcp falsely informed those companies that it owns or otherwise controls digital rights related to the Golden Globe Awards show.

40.     After Snyder, Schar, and Shapiro took control of Six Flags and dcp, Six Flags made public statements about its supposed rights to leverage the Golden Globe Awards show.  In a 2009 bankruptcy filings, Six Flags stated that it "leveraged the dcp library, which includes the Golden Globe Awards . . . to provide additional product offerings in its parks" and that it "believes that its investment in dcp provides it with additional sponsorship and promotional opportunities."  And HFPA recently discovered that dcp claimed for itself copyright ownership over the 2007 and 2009 Pre-Shows, even though HFPA is a rightful co-owner of those copyrights.

41.     At the same time, dcp has claimed questionable items as production costs, has sold sponsorships without telling HFPA or sharing the revenue, and has neglected to provide regular accounting statements as required under the Awards Agreement.  For example, HFPA discovered after the 2010 Golden Globe Awards that dcp secretly entered into a verbal $200,000 promotional deal with a corporate third party whose representatives believed HFPA had been informed of the deal.  But dcp did not inform HFPA of the agreement, and accounted to HFPA for the revenue only after HFPA discovered what had happened from the corporate third party and confronted dcp.

42.     By 2010, the Golden Globe Awards—which is HFPA's primary asset and the revenue source for its philanthropic grants—had become one of the most

13

1   popular, most watched, and most recognized film and television awards programs

2   in the world.  Although the Awards Agreement only required HFPA to negotiate

3   with dcp after the agreement's expiration (following the 2011 Golden Globe

4   Awards show), HFPA representatives broached with dcp in early 2010 the

5   possibility of beginning such talks early in order to give the parties additional time

6   to discuss their relationship.

7        43.    On February 8, 2010, Philip Berk (President of HFPA) sent dcp's

8   Mark Shapiro an email stating that the 2011 Golden Globe Awards show was the

9   "last show" under the existing agreement between HFPA and dcp, and offering to

10  "begin exploring the nature of our relationship after the January 2011 Globes."

11  Mr. Berk noted that entering into discussions early may "provide us with the

12  necessary time to secure the best possible licensing deal."  Mr. Berk was clear that

13  dcp had no right to license any further Golden Globe Awards show beyond the

14  2011 show, and should not pursue any broadcast license involving the Awards

15  show "until we agree upon the nature of any such future relationship."  Thus,

16  Mr. Berk emphasized that "I want to ensure that dcp does not seek or agree to any

17  subsequent broadcast licensing agreement with NBC (or anyone else, for that

18  matter) as dcp's options obviously also expire with that last broadcast in January

19  2011."

20       44.    The following day, Mr. Shapiro responded to Mr. Berk by email,

21  agreeing to early discussions between dcp and HFPA.  Mr. Shapiro noted that there

22  was "no need to remind me or ask me not to seek a new license agreement for the

23  property.  I would never make a move on a network renewal or new home without

24  your involvement."

25       45.    Over the months that followed, HFPA and dcp representatives entered

26  into substantial negotiations over a new agreement that would allow dcp to remain

27  involved in the Golden Globe Awards show after the 2011 broadcast.  The parties

28  and counsel had multiple in-person discussions, telephone conversations, and email

14

1    exchanges, and made proposals for terms of a new agreement between HFPA and

2    dcp.

3         46.    Joseph Calabrese (outside counsel and lead negotiator for HFPA) met

4    with Shapiro in person on July 14, and spoke again on July 29 and August 7.  On

5    August 13, 2010, Calabrese sent a letter to Shapiro once again noting that the

6    existing Awards Agreement between HFPA and dcp would shortly be expiring, and

7    that without a new agreement dcp's involvement with the Golden Globe Awards

8    show come to an end.  Calabrese stated:  "HFPA would very much like to make a

9    new deal with dcp to ensure its continued involvement with the Golden Globe

10   Awards show after 2011.  At this point, dcp has the right to be involved with only

11   one remaining main Awards show . . . .  I appreciate the fact that dcp would like to

12   continue on the same terms as they understand were originally agreed over 13 years

13   ago, but those terms will be expiring soon and are not acceptable to HFPA."

14        47.    That same day, HFPA sent dcp proposed terms for a new agreement.

15   Shapiro called Calabrese on August 16 to discuss moving forward with talks, and

16   on August 19 Shapiro assured Calabrese that dcp wanted to schedule meetings in

17   early September in order to close a deal between dcp and HFPA by September 30.

18   On September 8, Calabrese again met with dcp to negotiate terms of the new

19   agreement.  HFPA and dcp continued to negotiate into late September, and on

20   September 27 they again discussed the potential deal.  Shapiro told HFPA he

21   needed to discuss the matter with his board of directors.  Believing that they were

22   close to reaching a new deal with dcp, HFPA waited for dcp to respond with an

23   acceptance or counter-proposals, following up with dcp twice to inquire as to the

24   status of dcp's response, the last time on October 21.  The response HFPA was

25   waiting for never arrived.

26        48.    Instead, on October 29, 2010, dcp sent Berk a letter informing HFPA

27   that dcp had executed an agreement with NBC that same day under which dcp

28   purported to grant NBC a license for the exclusive broadcast rights to the Golden

COMPLAINT

1     Globe Awards through 2018. dcp also sent HFPA a notice, attached hereto as

2     Exhibit E, that dcp was now attempting to exercise the seven options it would have

3     needed in order enter into that agreement—options dcp never had in the first place,

4     options that dcp never bargained for, and (to the extent they ever existed) options

5     that were revocable and had been unequivocally revoked through HFPA's February

6     8, 2010 and August 13, 2010 letters as well as other statements. In short, dcp

7     granted NBC a broadcasting license for rights that were not dcp's to grant.

8         49.     dcp's announcement of this purported broadcast agreement and its

9     purported exercise of non-existent options blindsided HFPA. HFPA had not

10    authorized dcp to negotiate over the broadcast rights for any further Golden Globe

11    Awards shows. In fact, quite the opposite. HFPA had explicitly informed dcp that

12    it was not empowered to even discuss the broadcast rights with any third parties.

13    Nor did HFPA offer dcp any further options to extend its role in producing the

14    television broadcast of the Golden Globes Award show. Once again, the opposite

15    was true: HFPA had made clear that its relationship with dcp was coming to an end

16    in January 2011 absent the parties reaching a new agreement.

17        50.     dcp's attempt in October 2010 to unilaterally license the television

18    broadcast rights to NBC, and on that basis to attempt exercising options to extend

19    its agreement with HFPA, was the first time in the parties' history that dcp had

20    taken actual and affirmative steps inconsistent with HFPA's understanding that dcp

21    needed its consent before entering into any license agreement for the Golden Globe

22    Awards show broadcast rights.

23        51.     dcp followed a similar pattern with respect to the Pre-Show

24    Agreement. HFPA repeatedly informed dcp that the Pre-Show Agreement had

25    expired, and the parties engaged in what HFPA believed were good faith

26    negotiations to enter into a new agreement. All the while, dcp was misleading

27    HFPA, and instead attempted to arrogate HFPA's rights for itself.

28

COMPLAINT

52.   On information and belief, the license fees that dcp accepted from NBC are well below market rates.  HFPA is informed and believes that dcp entered into the agreement with NBC in the belief that dcp would be able to secure for itself a continuing role as HFPA's licensee, at the expense of acquiring market-level license fees for the broadcast rights and to HFPA's detriment.

53.   The timing was not a coincidence.  On information and belief, Red Zone Capital has been quietly seeking buyers for dcp.  At the same time, on information and belief, dcp recently sold $165 million of senior secured first-lien notes in the 144a private placement market to Banc of America Securities LLC and SunTrust Robinson Humphrey, Inc.  HFPA is informed and believes that the notes—commonly known as junk bonds—are due to be repaid in 2015.  HFPA is informed and believes that dcp secured this money by placing the first-tier lien on a copyright library that includes all of the Golden Globe Awards shows and Pre-Shows.  No one from dcp or Dick Clark Film Group informed HFPA that its copyright interests were being pledged, nor was HFPA's consent obtained.  Reuters recently reported that dcp will be using the $165 million that it borrowed and that it must repay in just five years "to repay about $51 million in bank loans and fund a $90 million distribution to the company's parent"—Red Zone Capital.

## FIRST CLAIM FOR RELIEF

### (Trademark Infringement under 15 U.S.C. § 1114)

54.   Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 53, inclusive, of the complaint as though set forth at length.

55.   HFPA is the sole owner of multiple federally registered trademarks and service marks in the Golden Globe name (PTO Registration Nos. 2424703, 2422897, 2381145), as well as the HFPA name printed on a design of the Golden Globe statuette (PTO Registration Nos. 2427833, 2427955).  HFPA also owns

1   several Internet domain names incorporating its trade and service marks, including

2   www.goldenglobeawards.org.

3         56.    dcp has used HFPA's trademarks and service marks in commerce,

4   without HFPA's knowledge or authorization.  Among other things, on September

5   30, 2010, dcp entered into an agreement with NBC purporting to license the right to

6   broadcast the 2012 to 2018 Golden Globe Awards shows throughout the United

7   States.  dcp is capitalizing, to its great financial benefit, on the fame and goodwill in

8   HFPA's marks, without HFPA's permission or approval.  dcp has the right to use

9   HFPA's marks only in connection with the Golden Globes Awards shows through

10  the 2011 show.  It has no right to license the use of those marks in connection with

11  future shows.

12        57.    In addition, the agreement between dcp and NBC is predicated on, and

13  expressly anticipates, dcp further infringing HFPA's marks and dcp causing NBC

14  to infringe the marks.  The agreement was made for the express purpose of

15  imminently exploiting plaintiff's registered marks in interstate commerce by

16  marketing, advertising, producing, and broadcasting the 2012 Golden Globe

17  Awards show (as well as shows in later years).  On information and belief, those

18  efforts in connection with the 2012 Awards show have already begun, and further

19  efforts will commence shortly.

20        58.    On information and belief, dcp has also generally claimed to third

21  parties to have the exclusive right to license, and empower others to make

22  commercial use of, HFPA's Golden Globe-related marks.  For example, on

23  information and belief, dcp falsely represented to Facebook that dcp owned all

24  digital rights associated with the Golden Globe Awards and that it had exclusive

25  authority to license those rights.  dcp made these false representations even though

26  HFPA never granted dcp any authority, let alone exclusive authority, to license

27  such rights.

28

COMPLAINT

59.     Defendants' unauthorized use of HFPA's marks has already caused and is likely to continue to cause confusion, mistake, and deception.

60.     Defendants acted willfully, with the intent to trade upon the goodwill and reputation of HFPA and the Golden Globe Awards show, and with the intent to cause confusion, to cause mistake, or to deceive.

61.     On information and belief, Red Zone Capital was aware of dcp's actions, and dcp was acting at Red Zone Capital's direction and under its control.

62.     Defendants' acts, as alleged above, have caused damage and irreparable injury to HFPA in an amount to be determined at trial.  By making unauthorized use of HFPA's marks and creating uncertainty and confusion about the broadcast rights for the Golden Globe Awards show, dcp has, among other things, severely compromised HFPA's ability to exploit its rights in the Golden Globes.  While the cloud of uncertainty hovers, HFPA cannot effectively make any effort to seek fair market rates for the production and broadcast of the Awards show.  Any other potential broadcaster would be "buying a lawsuit."  Defendants' acts will result in further damage and irreparable injury to HFPA if Defendants are not restrained by this Court from further violation of HFPA's rights, for which HFPA has no adequate remedy at law.

63.     As a result of the harm suffered as alleged herein, HFPA is entitled to all of the remedies available under the Lanham Act, including actual damages, an accounting of Defendants' profits, treble damages, costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (False Association under 15 U.S.C. § 1125)

64.     Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 63, inclusive, of the complaint as though set forth at length.

65.     dcp has unilaterally attempted to license the right to broadcast the Golden Globe Awards shows for 2012 through 2018, and is purporting to empower

COMPLAINT

1  NBC to use HFPA's Golden Globe-related marks to market and advertise the

2  Awards shows, and then to broadcast the unique Golden Globe Awards shows

3  using HFPA's Golden Globe-related marks. On information and belief, dcp has

4  also generally claimed to third parties to have the right to license and empower

5  others (for example, Facebook) to make commercial use of HFPA's Golden Globe-

6  related marks. These acts, among others, constitute a false association, a false

7  designation of origin, and a false description or representation of goods and

8  services, tending wrongfully and falsely to describe or represent a connection

9  between both dcp and its purported licensees, on the one hand, and HFPA and the

10  Golden Globe Awards show, on the other hand. By these acts, Defendants have

11  infringed HFPA's marks in violation of 15 U.S.C. § 1125(a).

12      66.    The impressions of affiliation created by Defendants' use of Plaintiffs'

13  marks are false. This false impression of association has created and will continue

14  to create confusion as to the continued connection between both dcp and its

15  purported licensees, on the one hand, and HFPA and the Golden Globe Awards

16  show, on the other hand.

17      67.    HFPA is informed and believes, and on that basis alleges, that

18  Defendants acted willfully, with the intent to trade upon the goodwill and

19  reputation of HFPA and the Golden Globe Awards show, and with the intent to

20  cause confusion, to cause mistake, or to deceive.

21      68.    On information and belief, Red Zone Capital was aware of dcp's

22  actions, and dcp was acting at Red Zone Capital's direction and under its control.

23      69.    HFPA has suffered, and will continue to suffer, irreparable damage to

24  its business, reputation, and goodwill resulting from the confusion of potential

25  licensees and the general public regarding the continued association between both

26  dcp and NBC, on the one hand, and HFPA and the Golden Globe Awards show, on

27  the other hand. As a result, HFPA is entitled to injunctive relief preventing dcp

28  from creating a false impression of association between both dcp and its purported

COMPLAINT

1   licensees, on the one hand, and HFPA and the Golden Globe Awards show, on the

2   other hand.

3        70.   As a result of the harm suffered as alleged herein, HFPA is also

4   entitled to all of the other remedies available under the Lanham Act, including

5   actual damages, an accounting of Defendants' profits, treble damages, and costs

6   and attorneys' fees.

7                        **THIRD CLAIM FOR RELIEF**

8                    **(Declaration of Copyright Co-Ownership)**

9        71.   Plaintiff realleges and incorporates herein by reference, each and every

10  allegation contained in paragraphs 1 through 70, inclusive, of the complaint as

11  though set forth at length.

12       72.   An actual controversy has arisen and now exists between HFPA, on

13  the one hand, and Defendants, on the other hand, relating to their respective rights

14  regarding ownership of the 1990, 1993, 1998, and 1999 Golden Globe Awards, and

15  the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows.  HFPA contends:

16            a)   The 1990, 1993, 1998, and 1999 Golden Globe Awards, as well

17                 as the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Show

18                 productions, are copyrightable as motion pictures or other

19                 audiovisual works.  The agreements between HFPA and dcp

20                 contemplate that HFPA and dcp are co-authors of the Awards

21                 shows and Pre-Shows.  HFPA made substantial and valuable

22                 contributions to these works by exercising creative control and

23                 input over the Awards presentations, script content, the identity

24                 of presenters and performers appearing on the Golden Globe

25                 Awards show, as well as the Pre-Show set decoration, and

26                 casting of the Pre-Show hosts.  HFPA and dcp intended that

27                 their respective contributions to the 1990, 1993, 1998, and 1999

28                 Golden Globe Awards, as well as the 2003, 2004, 2005, 2006,

21

2007 and 2009 Pre-Shows, would be merged into inseparable or interdependent parts of a unitary whole. Accordingly, each of these motion pictures constitute a "joint work" within the meaning of 17 U.S.C. § 101 and, pursuant to 17 U.S.C. § 201(a), HFPA and dcp are co-owners of the copyright in each of them.

b)   dcp listed itself as the sole copyright claimant to the above-mentioned works in violation of HFPA's rights as the owner of a joint work. Upon information and belief, dcp has derived, and will continue to derive, substantial revenues from the use of the 1990, 1993, 1998, and 1999 Golden Globe Awards, and the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows.

c)   As a co-owner of these Awards shows and Pre-Shows, HFPA is entitled, under 17 U.S.C. § 201(a), and to a full and proper accounting with respect to revenue derived from the shows, and to half of all profits attributable to them.

73.   HFPA is informed and believes, based on dcp's willful failure to disclose HFPA's status as co-owner of these works to the Copyright Office and dcp's purported transfer of its rights in the above-mentioned works to obtain $165 million by selling senior secured first-lien notes in the 144a private placement market to Banc of America Securities LLC and SunTrust Robinson Humphrey, Inc., that dcp disputes these contentions and contends to the contrary.

74.   Plaintiff desires a judicial determination of its rights under the Copyright Act of 1976, and a declaration that its contentions, as set forth above, are correct. Such a declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties and to avoid a multiplicity of actions.

# FOURTH CLAIM FOR RELIEF

## (Breach of Contract)

75.     Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 74, inclusive, of the complaint as though set forth at length.

76.     As described above, HFPA and dcp entered into the valid, binding Awards Agreement in 1987, as amended in 1989 and 1993, that expires in January 2011.

77.     Plaintiff has fully performed all obligations required of it under the Awards Agreement, except for those obligations waived, excused or prevented by dcp.

78.     Defendants have materially breached the provisions of the Awards Agreement by, among other things:

       a)     pursuing agreements to produce, create, or exploit digital internet streams of the Awards show, ancillary shows, promotional campaigns surrounding the Awards show, and sponsorship campaigns, and by otherwise trading on the Golden Globe Awards without HFPA's knowledge and consent, in violation of, *inter alia*, the limited grant of rights to dcp under Section 1 of the 1987 Awards Agreement (which includes only the right to produce a live television broadcast of, and to produce on tape or film, the Golden Globe Awards, and to exploit such recorded television broadcast, tape, or film productions), and the requirement that dcp not interfere with HFPA's rights pursuant to Section 18 of the 1987 Awards Agreement;

       b)     unilaterally attempting to sell rights to the Golden Globe Awards show that it did not own, without HFPA's knowledge or consent;

COMPLAINT

c)   encumbering or transferring HFPA's copyright interests in the 1990, 1993, 1998, and 1999 Golden Globe Awards without HFPA's knowledge or consent;

d)   failing to cause HFPA to be listed as a proper copyright claimant and co-owner of the 1990, 1993, 1998, and 1999 Golden Globe Awards, as required by Section 7 of the 1987 Awards Agreement;

e)   entering into at least one sponsorship agreement (with a corporate third party) without HFPA's knowledge or consent and thereafter failing to properly account for HFPA with written documentation thereof, in violation of, *inter alia*, Section 1 of the Awards Agreement's limited grant of rights, and Section 3's requirement that dcp account to HFPA for all profits;

f)   taking impermissible deductions of expenses as production costs in violation of, *inter alia*, Section 3 of the 1987 Award Agreement's requirement for accounting to HFPA;

g)   improperly apportioning licensing fees when selling the Awards show as part of a "package" with dcp's other, less popular, shows in violation of, *inter alia*, Section 3 of the 1987 Award Agreement's requirement for accounting to HFPA; and

h)   failing to disclose and pay the full compensation owed to HFPA by virtue of any licenses granted to Six Flags or any other entities, in violation of, *inter alia*, Section 3 of the 1987 Award Agreement requirement that dcp account to HFPA for all profits.

79.   On information and belief, Red Zone Capital was aware of dcp's actions, and dcp was acting at Red Zone Capital's direction and under its control.

COMPLAINT

80.     As a direct and proximate result of the foregoing and other breaches of the Awards Agreement, Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief)

81.     Plaintiff realleges and incorporate herein by reference, each and every allegation contained in paragraphs 1 through 80, inclusive, of the complaint as though set forth at length.

82.     An actual controversy has arisen, and now exists, between Plaintiff and Defendants concerning their respective rights and duties under the Awards Agreement.  HFPA contends:

a)     dcp had no right to enter into a broadcast license agreement with NBC (or any other broadcaster) for the right to telecast the Golden Globe Awards show for any years after 2011, without HFPA's express knowledge and consent.  Therefore, dcp's agreement with NBC, executed on October 29, 2010, purporting to license the right to telecast the 2012 through 2018 Golden Globes Awards shows is invalid and ineffective.

b)     dcp's exercise in October 2010 of purported options to extend its agreement with HFPA beyond 2011 was not valid or effective.  HFPA did not grant dcp such options, and dcp never bargained for such options.  To the extent that such options existed, they were revocable based on lack of additional consideration and were revoked by HFPA on February 8, 2010—prior to dcp attempting to exercise them or even attempt to provide any consideration to merit them.  Moreover, after HFPA made clear that no options existed for dcp to exercise, dcp agreed to enter into negotiations over a new agreement with HFPA.

COMPLAINT

c)    The 1993 Amendment does not permit dcp to extend, renew, substitute, or modify the broadcast license agreement with NBC <u>without</u> HFPA's prior knowledge and approval.

d)    The Awards Agreement—including without limitation, the first paragraph of Section 1 of the 1987 Awards Agreement—does not grant dcp the right to produce, create, or exploit digital internet streams of the Awards show, ancillary shows, promotional campaigns surrounding the Awards show, and sponsorship campaigns.

e)    The Pre-Show Agreement has expired, and has no further force and effect.

83.    Based on statements made by dcp's representatives, and on dcp's actions as described above, HFPA is informed and believes, and based thereon alleges, that dcp disputes these contentions and contends to the contrary.

84.    HFPA desires a judicial determination of its and dcp's respective rights and duties under the Awards Agreement, a judicial determination of the parties' rights and duties under the Pre-Show Agreement, and a declaration that HFPA's contentions, as set forth above, are correct.

85.    Such a judicial declaration is necessary and appropriate at this time under the circumstances in order to set at rest the respective rights and obligations of the parties and to avoid a multiplicity of actions.  At present, the parties cannot agree on their respective rights and duties, creating a financial burden and uncertainty regarding future Golden Globe Awards shows.

COMPLAINT

## SIXTH CLAIM FOR RELIEF

### (Action For an Accounting)

86.    Plaintiff realleges and incorporate herein by reference, each and every allegation contained in paragraphs 1 through 85, inclusive, of the complaint as though set forth at length.

87.    Under the Awards Agreement, HFPA is entitled to 50% of the net profits from the exploitation of the Awards show, as defined under terms that agreement.  Under Section 3 of the Awards Agreement, dcp has a contractual duty to account to HFPA with respect to HFPA's share of net profits on a quarterly basis, and HFPA is entitled to audit the information underlying those accounting statements.

88.    HFPA is also entitled to an accounting of revenue generated by each of the Golden Globe Awards shows based on its status as a copyright co-owner in all Award shows and Pre-Shows produced with dcp.

89.    Defendants have taken impermissible deductions of expenses as production costs in violation of the Awards Agreement to HFPA's material detriment.  Defendants have also failed to properly account for the revenue from at least one sponsorship agreement, which was entered into without HFPA's knowledge or consent, in violation of the Awards Agreement.  HFPA also is informed and believes that Defendants failed to properly account for, among other things:  additional foreign revenue generated through exploitation of Golden Globe Awards shows; revenue generated (and improperly apportioned) by bundling rights to Awards shows in license agreements with Defendants' other, less popular, shows; and benefits it derived, and that were derived, by its affiliated and parent entities, through licensing, transferring or otherwise encumbering rights to the Golden Globes Award shows.  On information and belief, Defendants are also continuing to pursue ancillary agreements that trade on the Golden Globe Awards show, without HFPA's knowledge and consent.

COMPLAINT

90.   On information and belief, Red Zone Capital was aware of dcp's actions, and dcp was acting at Red Zone Capital's direction and under its control.

91.   HFPA requests an order from the Court compelling dcp to account under GAAP for all expenses, costs, revenue, advances, and royalties relating to the distribution, sale, release, display, broadcasting, and licensing of the Golden Globe Awards show, related pre- and post-shows, and any other sources of revenue related to the Golden Globe Awards.

## SEVENTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

92.   Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 91, inclusive, of the complaint as though set forth at length.

93.   As described above, HFPA and dcp entered into a valid, binding agreement in 1987, as amended in 1989 and 1993.

94.   Pursuant to the covenant of good faith and fair dealing attendant to the parties' agreement, dcp was required to act in good faith in the performance of its obligations, to deal fairly with HFPA, and to refrain from any acts or omissions that would frustrate the purpose of the agreement or deny HFPA the benefit of its agreement, including HFPA's right and interest in maximizing revenue generated through licensing broadcast rights for the Golden Globe Awards show.

95.   Defendants knowingly and willfully breached the covenant of good faith and fair dealing by, among other things, failing to take reasonable steps to maximize the license fee for the Golden Globe Awards show.  On information and belief, dcp did not solicit license offers from any networks other than NBC, did not consult experts regarding the market value of the license, and did not take other reasonable steps to determine and ensure that NBC's proposed terms for licensing the broadcast rights for the Golden Globe Awards show were above, at, or even near market rates for such rights.

96.     On information and belief, the negotiation between dcp and NBC was necessarily compromised because it believed it could only guarantee itself continued rights and interests in the Golden Globe Awards show by entering into an extension, renewal, substitution or modification of the 2001 NBC/dcp Agreement, and as a result dcp:  failed to take reasonable steps towards assessing the fair market value of the rights to broadcast the Golden Globes Award show; acted to benefit itself to the detriment of HFPA by seeking only to explore a license agreement with NBC; and expressly misled HFPA into believing that it was not engaging in negotiations over the broadcast rights with any broadcast networks. Moreover, on information and belief, dcp conducted an abbreviated, hurried negotiation with NBC in order to quickly secure a deal.

97.     On information and belief, Defendants have further breached the implied covenant of good faith and fair dealing by, among other things, more generally falsely representing its rights with respect to the Golden Globe Awards show, and ancillary pre- and post-shows.  This includes dcp's false representation that it has the right to enter into a license agreement covering Award shows after 2011 and that it has the exclusive right to license the digital rights for the 2011 Award show.

98.     On information and belief, Red Zone Capital was aware of dcp's actions, and dcp was acting at Red Zone Capital's direction and under its control.

99.     As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, HFPA has suffered substantial damage in the form of being materially comprised in any efforts to actually and effectively license the rights for those same Awards shows.  And in the event that the Court were to determine that dcp's 2010 agreement with NBC is valid, as a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, HFPA has been substantially damaged by dcp's acceptance of a below-market license fee from NBC.  HFPA's ability to fully and

1    fairly exploit its rights has been further compromised as a consequence of dcp's

2    false statements about its ownership or control of rights.  HFPA will establish the

3    exact amount of its damages at trial, but they are in the millions of dollars annually.

### EIGHTH CLAIM FOR RELIEF

#### (Breach of Fiduciary Duty)

6    100.   Plaintiff realleges and incorporate herein by reference, each and every

7    allegation contained in paragraphs 1 through 99, inclusive, of the complaint as

8    though set forth at length.

9    101.   As described above, HFPA and dcp entered into a valid, binding

10   agreement in 1987, as amended in 1989 and 1993.  Pursuant to the agreement,

11   HFPA entrusted dcp to properly register and maintain the copyrights for the

12   television broadcasts of the Golden Globe Awards shows, and to use HFPA's

13   trademarks and intellectual property only to promote or advertise the Awards

14   television productions.  Consequently, HFPA relied on dcp not to improperly

15   exploit these rights.

16   102.   The trust and confidence HFPA placed in dcp, with regard to its

17   intellectual property rights, created a fiduciary relationship under which dcp owed a

18   fiduciary duty to HFPA.

19   103.   Pursuant to this fiduciary duty, dcp was required to deal fairly with

20   HFPA and to refrain from committing any acts or omissions that would

21   compromise HFPA's intellectual property rights and interests in the Golden Globes.

22   104.   On information and belief, Defendants have breached their fiduciary

23   duty through dcp falsely representing its rights with respect to the Golden Globe

24   Awards show, ancillary pre- and post-shows, and improperly bundling rights to the

25   Award shows with dcp's other, less popular broadcasts.  Also among the breaches

26   are dcp's false representation to NBC that it had the right to enter into a television

27   broadcast license agreement covering Award shows after 2011, and its false

28

COMPLAINT

1    representations that it had the exclusive right to license the digital rights associated

2    with the 2011 Awards show.

3          105.   On information and belief, Red Zone Capital was aware of dcp's

4    actions, and dcp was acting at Red Zone Capital's direction and under its control.

5          106.   As a direct and proximate result of dcp's breaches of fiduciary duties,

6    HFPA has suffered substantial damage in the form of being materially comprised in

7    any subsequent efforts to actually and effectively license the rights for those same

8    award shows, pre- and post- shows, and ancillary rights.  Among other things,

9    HFPA has been substantially damaged by dcp's acceptance of below-market license

10   fees from NBC.  HFPA will establish the exact amount of its damages at trial, but

11   are in the millions of dollars annually.

## NINTH CLAIM FOR RELIEF

### (Unfair Competition Under Cal. Bus. & Prof. Code § 17200 and California Common Law)

15         107.   Plaintiff realleges and incorporate herein by reference, each and every

16   allegation contained in paragraphs 1 through 106, inclusive, of the complaint as

17   though set forth at length.

18         108.   Defendants' unauthorized use of HFPA's trademarks and service

19   marks, and its related misrepresentations about controlling HFPA's intellectual

20   property, constitute unfair, unlawful, and fraudulent business acts, prohibited by the

21   California Business and Professions Code Sections § 17200 *et seq.* and by the

22   common law of California.

23         109.   Defendants' unfair, unlawful, and fraudulent acts are more specifically

24   alleged above, but include dcp's representations to and agreement with NBC for the

25   period commencing in 2012, dcp's purported empowerment of NBC to exploit

26   HFPA's Golden Globe-related intellectual property, and on information and belief,

27   dcp's misrepresentations to other third parties (including Facebook).  By these acts,

28   among others, dcp has violated the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and

1   has committed unlawful, unfair and fraudulent business acts in violation of

2   California Business and Professions Code Sections 17200 *et seq.* dcp's acts also

3   constitute unfair competition in violation of California common law.

4        110.   Defendants'' misconduct has already caused and will continue to cause

5   confusion, mistake, and deception.  Defendants acted willfully, with the intent to

6   trade upon the goodwill and reputation of HFPA and the Golden Globe Awards

7   show, and with the intent to cause confusion, to cause mistake, or to deceive.

8        111.   On information and belief, Red Zone Capital was aware of dcp's

9   actions, and dcp was acting at Red Zone Capital's direction and under its control.

10        112.   Defendants' commission of unfair competition, unlawful business acts,

11   and unfair business acts have caused damage and irreparable injury to HFPA in an

12   amount to be determined at trial, and such acts will result in further damage and

13   irreparable injury to HFPA if Defendants are not restrained by this Court.  All

14   profits generated by dcp through its acts of unfair competition should also be

15   ordered disgorged.

16                    **TENTH CLAIM FOR RELIEF**

17        **(Intentional Interference with Prospective Economic Advantage)**

18        113.   Plaintiff realleges and incorporate herein by reference, each and every

19   allegation contained in paragraphs 1 through 112, inclusive, of the complaint as

20   though set forth at length.

21        114.   The Golden Globe Awards shows is one of the most anticipated

22   broadcasts of the season.  In prepare for another successful Awards show, HFPA

23   and Facebook began conversations regarding the potential for a digital initiative to

24   complement and bolster the Golden Globes Awards show for the 2011 broadcast.

25   In exchange for the rights to host Golden Globes-related content, Facebook was

26   going to pay HFPA a license fee and a share of revenue generated.

27

28

115.   The agreement with Facebook would have generated substantial revenue for HFPA.  As such, HFPA had a reasonable probability of future economic benefit from this economic relationship with Facebook.

116.   On information and belief, dcp began negotiating with Facebook in order to license Golden Globe rights that dcp did not rightfully possess, and wrongly represented to Facebook that dcp had the exclusive right to grant digital rights for the 2011 Golden Globe Awards show.  dcp did so behind HFPA's back, and without its consent or authorization.  As a direct result of dcp conduct, Facebook cut off communications with HFPA's consultants and has since dealt exclusively with dcp.

117.   On information and belief, dcp was aware of HFPA's ongoing discussions with Facebook.  HFPA's consultants and Facebook discussed a meeting that Facebook had with dcp, and only after that meeting did Facebook cut off communications with HFPA.

118.   Defendants' conduct was otherwise wrongful as a false representation constituting, among other things, unfair competition under California Business & Professions Code section 17200.

119.   On information and belief, Red Zone Capital was aware of dcp's actions, and dcp was acting at Red Zone Capital's direction and under its control.

120.   As a direct and proximate result of Defendants' wrongful conduct, it disrupted HFPA's economic relationship with Facebook and its ability to enter into a licensing agreement.  HFPA has consequently been substantially damaged in an amount to be proven at trial.

COMPLAINT

## ELEVENTH CLAIM FOR RELIEF

### (Reformation)

121.   Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 120, inclusive, of the complaint as though set forth at length.

122.   dcp claims to be empowered by the 1993 Amendment to extend or renew the broadcast license with NBC forever, without HFPA's specific consent or authorization.  dcp points to the provision that states:  "This will confirm that the [1987 Awards] Agreement is hereby further amended to provide that HFPA grants to dcp eight (8) additional, consecutive, exclusive, and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, and for any extensions, renewals, substitutions or modifications of the NBC Agreement, and to exploit such productions in all media through the world in perpetuity."

123.   Based on its own reading of the words of the 1993 Amendment, and on statements by dcp representatives in 1993, HFPA understood at the time of contracting (and still understands) that provision to merely anticipate the possibility of HFPA extending further options to dcp to remain involved in the Golden Globe Awards show in the event that the NBC broadcast license is extended, renewed, substituted, or modified with HFPA's approval.  Neither the language of the 1993 Amendment, nor any other operative document executed by both parties, affords dcp the right to unilaterally enter into a license agreement with NBC, without HFPA's knowledge and approval, in order to trigger further contractual options for dcp under the Awards Agreement.

124.   However, to the extent that the Court were to interpret the 1993 Amendment to empower dcp to extend, renew, substitute, or modify an existing broadcast license with NBC, without HFPA's knowledge and authorization, then

COMPLAINT

1    reformation of the 1993 Amendment to add the words "entered into with HFPA's
2    approval" is necessary and proper on one or more of the following grounds:

3         a)    The absence of the phrase "entered into with HFPA's approval"
4               after the word "Agreement" on the ninth line of the third
5               paragraph of the 1993 Amendment is a result of a mutual
6               mistake, and it is contrary to the parties' intent to interpret the
7               1993 Amendment as only permitting dcp to extend, renew,
8               substitute, or modify an existing broadcast license with NBC
9               with HFPA's specific approval and authorization.  To grant dcp
10              the ability to license HFPA's intellectual property without any
11              authorization from HFPA would reverse the parties' basic
12              assumptions about the effect of the 1993 Amendment, and
13              would have a material effect on the parties' agreed-upon
14              exchange.

15        b)    dcp knew HFPA did not intend to waive all future approval
16              rights of a proposed extension, renewal, substitution or
17              modification of the license of its intellectual property, and dcp
18              did not express to HFPA its understanding that the 1993
19              amendment should or could be interpreted in that manner at the
20              time of contracting.  To the extent that dcp knew or believed at
21              the time of contracting that the 1993 amendment would allow
22              dcp to extend, renew, substitute, or modify an existing broadcast
23              license with NBC without HPFA's specific approval and
24              authorization, the 1993 Amendment should be reformed because
25              it does not accurately reflect HFPA's intent by reason of
26              HFPA's unilateral mistake coupled with fraudulent or
27              inequitable conduct by dcp in that it was or should have been
28              aware of HFPA's mistake.

COMPLAINT

c)   Irrespective of dcp's intent, the 1993 amendment should be reformed because the interests of justice so require, since construing amendment as a waiver of HFPA's future approval rights of any extension, renewal, substitution, or modification of an existing broadcast license with NBC does not reflect HFPA's intent.

125.   With respect to all grounds for reformation, HFPA did not undertake the risk of mistake under the 1993 Amendment and only came to learn of this mistake on October 29, 2010, when dcp for the first time took actual and affirmative steps that were inconsistent with HFPA's understanding that its consent was required for any license of the Golden Globe Awards show broadcast rights.

126.   Whether based on mutual mistake, on unilateral mistake coupled with fraudulent or inequitable conduct, on the interests of justice, or on some combination thereof, the phrase "entered into with HFPA's approval" should be added to the ninth line of the third paragraph of the 1993 Amendment.  Such reformation will conform the language of the 1993 Amendment to reflect the parties' true intent at the time of contracting.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.   For actual and compensatory damages in an amount to be determined at the trial of this action;

2.   For disgorgement of all profits generated by Defendants through their wrongful acts;

3.   An order directing Defendants to account to HFPA for all revenue and profits generated by each of the Golden Globe Awards shows;

4.   For a declaration of the parties' contractual rights and obligations as alleged herein above;

COMPLAINT

1        5.    For a preliminary and permanent injunction against Defendants

2    enjoining them and their officers, agents, employees, and representatives from

3    using HFPA's trademarks and service marks for any purpose other than the

4    promotion, advertising, and broadcast of the 2011 Golden Globe Awards show;

5        6.    A declaration that HFPA is a co-owner of all rights, title, and interest

6    in the copyrights to the 1990, 1993, 1998, and 1999 Golden Globe Awards, and the

7    2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows;

8        7.    For exemplary and punitive damages;

9        8.    For costs of suit herein incurred;

10       9.    For reasonable attorneys' fees in accordance with Section 19 of the

11   1987 Awards Agreement and the Lanham Act, 15 U.S.C. § 1117, and the Copyright

12   Act, 17 U.S.C. § 505;

13       10.    For all allowable interest on any monetary award to HFPA at the legal

14   rate;

15       11.    For any other orders necessary to accomplish complete justice between

16   the parties; and

17       12.    For such other and further relief as this Court may deem just and

18   proper.

19

20       Dated:   November 17, 2010         LINDA J. SMITH

21                                          MARVIN S. PUTNAM

22                                          AMY R. LUCAS

23                                          O'MELVENY & MYERS LLP

24                                          By: _Linda J. Smith_

25                                          LINDA J. SMITH

26                                          Attorneys for Plaintiff
                                         Hollywood Foreign Press Association

27

28

                                                                   COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, HFPA hereby

3 demands a trial by jury for all issues triable to a jury.

4

5   Dated: November 17, 2010

6             LINDA J. SMITH
                MARVIN S. PUTNAM

7             AMY R. LUCAS
                O'MELVENY & MYERS LLP

8

9             By:

10             LINDA J. SMITH
                Attorneys for Plaintiff

11             Hollywood Foreign Press Association

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38                 COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Valerie Baker Fairbank and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV10- 8833 VBF (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

CENTRAL DISTRICT OF CALIFORNIA

HOLLYWOOD FOREIGN PRESS ASSOCIATION,
a California Corporation,

_____
                Plaintiff

v.

RED ZONE CAPITAL PARTNERS II, L.P., a
Delaware Limited Partnership; DICK CLARK
PRODUCTIONS, INC., a Delaware Corporation;
DOES 1 through 10, inclusive,
_____
                Defendant

)
)
)
)
)
)
)
)
)

Civil Action No. CV10-8833 VBF (FMOx)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

DICK CLARK PRODUCTIONS, INC.          RED ZONE CAPITAL PARTNERS II, L.P.
2900 Olympic Blvd.                    1800 Tysons Blvd, Suite 500
Santa Monica, California 90404        McLean, Virginia 22102

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Linda J. Smith  (S.B. # 78238)
Marvin S. Putnam  (S.B. # 212839)
Amy R. Lucas  (S.B. # 264034)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

TANYA DURANT

Date:  11-17-10          _____
                        *Signature of Clerk or Deputy Clerk*


American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
HOLLYWOOD FOREIGN PRESS ASSOCIATION, a
California Corporation

**DEFENDANTS**
RED ZONE CAPITAL PARTNERS II, L.P., a Delaware Limited
Partnership; DICK CLARK PRODUCTIONS, INC., a Delaware
Corporation; DOES 1 through 10, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing
yourself, provide same.)
Linda J. Smith (S.B. # 78238)
Marvin S. Putnam (S.B. # 212839)
Amy R. Lucas (S.B. # 264034)
O'Melveny & Myers LLP (310-553-6700)
1999 Avenue of the Stars, 7th Fl., Los Angeles, CA 90067

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** in excess of 10,000,000.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1114 Trademark Infringement and associated causes of action

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities—Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities—Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

**FOR OFFICE USE ONLY:**   Case Number: CV10-8833

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Dick Clark Productions, Inc. - Los Angeles | Red Zone Capital Partners II, L.P. - Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Tarlon J. Smith_      Date November 17, 2010

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com