RONALD L. OLSON (State Bar No. 44597)
Ron.Olson@mto.com
BRADLEY S. PHILLIPS (State Bar No. 85263)
Brad.Phillips@mto.com
MANUEL F. CACHAN (State Bar No. 216987)
Manuel.Cachan@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

MARTIN D. KATZ (State Bar No. 110681)
mkatz@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars
Suite 1600
Los Angeles, CA 90067
Telephone:  (310) 228-3700
Facsimile:   (310) 228-3701

Attorneys for Defendants,
RED ZONE CAPITAL PARTNERS II, L.P.
and DICK CLARK PRODUCTIONS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>RED ZONE CAPITAL PARTNERS II, L.P., a Delaware Limited Partnership; DICK CLARK PRODUCTIONS, INC., a Delaware Corporation; DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.: CV 10-8833 VBF (FMOx)<br><br>**[1] DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT UNDER FRCP 12(B)(6)**<br><br>**[2] MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial Notice, Declaration Of Maria E. Hernandez-Kruspodin, and [Proposed] Order filed concurrently]<br><br>Date:      March 7, 2011<br>Time:      1:30 p.m.<br>Judge:     Hon. Valerie Baker Fairbank<br>Ctrm:      9<br><br>Complaint Filed November 17, 2010 |

1

## NOTICE OF MOTION AND MOTION

2   Defendants Red Zone Capital Partners II, L.P. and dick clark productions,

3   inc. (collectively, "Defendants"), by and through their counsel of record, Munger,

4   Tolles & Olson LLP and Sheppard, Mullin Richter & Hampton LLP, hereby move

5   this Court under Federal Rule of Civil Procedure 12(b)(6) for an order dismissing

6   the following claims brought by Plaintiff Hollywood Foreign Press Association

7   ("HFPA"), on the ground they fail to state any claim upon which relief may be

8   granted:

9   • trademark infringement (First Cause of Action);

10   • false association (Second Cause of Action);

11   • breach of contract (Fourth Cause of Action), in part (*see* Compl. ¶¶

12   78(a)-(b));

13   • declaratory relief (Fifth Cause of Action);

14   • breach of fiduciary duty (Eighth Cause of Action);

15   • unfair competition (Ninth Cause of Action); and

16   • reformation (Eleventh Cause of Action).

17   This Motion is made following the conference of counsel under L.R. 7-3,

18   which took place on December 29, 2010.  This Motion is based on this Notice and

19   Motion, the attached Memorandum of Points and Authorities, the Request for

20   Judicial Notice in Support of Defendants' Motion to Dismiss (filed concurrently),

21   and such further written and oral argument as this Court may receive in connection

22   with this Motion.

23

24

25

26

27

28

NOTICE OF MOTION & MOTION TO DISMISS
UNDER FRCP 12(B)(6)

1    DATED: January 7, 2011          Munger, Tolles & Olson LLP
                                        RONALD L. OLSON
2                                       BRADLEY S. PHILLIPS
                                        MANUEL F. CACHÁN
3
                                     Sheppard, Mullin, Richter & Hampton LLP
4                                       MARTIN D. KATZ

5

6                                    By:    _____/s/ Ron L. Olson_____
                                            RONALD L. OLSON
7
                                     Attorneys for Defendants,
8                                    RED ZONE CAPITAL PARTNERS II, L.P., and
                                     DICK CLARK PRODUCTIONS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION & MOTION TO DISMISS
                                                         UNDER FRCP 12(B)(6)

1

**TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

4   II.    BACKGROUND: THE CONTRACTS ........................................................ 5

5         A.   The Main Show Agreement ..................................................... 5

6         B.   The 1989 Amendment............................................................. 6

7         C.   The 1993 Amendment............................................................. 7

8         D.   The 2001 Exercise of Options................................................. 8

9         E.   The Pre-Show Agreement ....................................................... 9

10  III.   ARGUMENT ...................................................................................... 10

11        A.   The HFPA's Claims Based On dcp's 2010 Exercise Of Its Options To Acquire The Golden Globes Fail As A Matter Of

12             Law............................................................................................ 10

13             1.    The HFPA's Breach Of Contract Claim (4th Cause Of Action, Compl. ¶ 78(a)-(b)) Fails ............................... 11

14

15                  a.    There Is No Basis For The HFPA's Contract Claims To Proceed Beyond The Pleading Stage .......... 13

16                      (1)   Extrinsic Evidence Cannot Be Used To Contradict The Terms Of A Fully Integrated

17                            Contract................................................................ 14

18                      (2)   Extrinsic Evidence Cannot Be Used To Assert Generalized Intent Divorced From

19                            The Words And Phrases Contained In A Written Agreement............................................... 15

20             2.    The Declaratory Relief Claim (5th Cause Of Action) Fails..... 18

21             3.    The Trademark Infringement (1st Cause Of Action) And False Association Claims (2d Cause Of Action) Fail............... 19

22

23             4.    The HFPA's Unfair Competition Claim (9th Cause of Action) Fails As A Matter Of Law........................................ 20

24         B.   The HFPA's Reformation Claim (11th Cause of Action) Fails ......... 20

25         C.   The HFPA's Breach of Fiduciary Duty Claim (8th Cause of Action) Fails As a Matter Of Law ...................................... 23

26

27  IV.   CONCLUSION .......................................................................... 25

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### FEDERAL CASES

4

*Anthony v. Yahoo, Inc.,*
    421 F. Supp. 2d 1257 (N.D. Cal. 2006) ............................................................ 12

5

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ........................................................................ 4, 10, 18

6

7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................... 10, 18

8

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.,*
    971 F.2d 272 (9th Cir. 1992) ........................................................ 15, 16, 18, 19

9

10

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,*
    896 F.2d 1542 (9th Cir. 1990) ...................................................................... 21, 22

11

*Johnson v. Riverside Healthcare Sys., LP,*
    534 F.3d 1116 (9th Cir. 2008) ............................................................................ 10

12

13

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ............................................................................ 5

14

*Portney v. CIBA Vision Corp.,*
    No. 07-0854 AG, 2008 WL 5505517 (C.D. Cal. July 17, 2008) ...................... 24

15

16

*Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.,*
    No. 09-06741 DMG, 2010 WL 4829614 (C.D. Cal. Nov. 16, 2010) ............... 18

17

*Trident Ctr. v. Conn. Gen. Life Ins., Co.,*
    847 F.2d 564 (9th Cir. 1988) .............................................................................. 18

18

*Velazquez v. GMAC Mortgage Corp.,*
    605 F. Supp. 2d 1049 (C.D. Cal. 2008) ............................................................ 11

19

20

### STATE CASES

21

*ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co.,*
    17 Cal. App. 4th 1773 (1993) ...................................................................... 16, 18

22

*Banco Do Brasil, S.A. v. Latian, Inc.,*
    234 Cal. App. 3d 973 (1991) ........................................................................ 14, 18

23

24

*Bank of the West v. Super. Ct.,*
    2 Cal. 4th 1254 (1992) ........................................................................................ 11

25

*Bradbury v. Higginson,*
    167 Cal. 553 (1914) .............................................................................. 21, 22, 23

26

27

*Cerritos Valley Bank v. Stirling,*
    81 Cal. App. 4th 1108 (2000) ............................................................................ 17

28

1

**TABLE OF AUTHORITIES**

2

(continued)

Page(s)

3

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
  43 Cal. 4th 375 (2008) ......................................................................... 23, 24

4

*FPI Dev., Inc. v. Nakashima*,
  231 Cal. App. 3d 367 (1991) ............................................................... 18

5

6

*Heller v. Pillsbury Madison & Sutro*,
  50 Cal. App. 4th 1367 (1996) .............................................................. 14

7

*Hervey v. Mercury Cas. Co.*,
  185 Cal. App. 4th 954 (2010) ......................................................... 16, 18

8

9

*Marani v. Jackson*,
  183 Cal. App. 3d 695 (1986) ............................................................... 15

10

*Recorded Pictures Co. Ltd. v. Nelson Entm't, Inc.*,
  53 Cal. App. 4th 350 (1997) .......................................................... 23, 24

11

12

*Wagner v. Columbia Pictures Indus., Inc.*,
  146 Cal. App. 4th 586 (2007) .................................................. 11, 16, 17, 18

13

*Winet v. Price*,
  4 Cal. App. 4th 1159 (1992) ........................................................... 16, 18

14

15

*Wolf v. Super. Ct.*,
  107 Cal. App. 4th 25 (2003) .......................................................... 23, 24

16

*Wolf v. Walt Disney Pictures & Television*,
  162 Cal. App. 4th 1107 (2008) ............................................................ 11

17

18

*Worldvision v. Am. Broad. Cos., Inc.*,
  142 Cal. App. 3d 589 (1983) ............................................................... 24

19

**STATUTES AND RULES**

20

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ................................................ 20

21

Cal. Civ. Code § 1625 ................................................................................ 15

22

Cal. Civ. Code § 1636 ................................................................................ 11

23

Cal. Civ. Proc. Code § 1856(a) .................................................................. 15

24

Cal. Code Civ. Proc. § 338(d) .................................................................... 21

25

Fed. R. Civ. P. 12(b)(6) ...................................................................... 3, 10, 18

26

**OTHER AUTHORITIES**

27

Restatement (Second) of Contracts § 157 cmt. b ...................................... 22

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2          Through its Complaint in this action, the Hollywood Foreign Press

3    Association ("HFPA") seeks to renege on the bargain it struck with dick clark

4    productions, inc. ("dcp") in 1993 and under which the parties have operated for

5    nearly two decades.[1]  Because the HFPA no longer likes the deal it made, it alleges

6    that the parties' agreement means something other than what it plainly says.

7    Perhaps recognizing the futility of that allegation, the HFPA also asks the Court (by

8    way of a reformation cause of action) to rewrite the agreement.

9          The HFPA's claims are flatly contradicted by the parties' agreement, and the

10   HFPA alleges no basis for this Court to alter the parties' bargain, which is

11   unambiguously set forth in their fully integrated contract.  As explained below, the

12   bulk of the HFPA's Complaint should therefore be dismissed with prejudice.

13   **I.     INTRODUCTION AND SUMMARY OF ARGUMENT**[2]

14         Since 1983, dcp has been the sole producer and distributor of the Golden

15   Globes Awards show.  In that almost 30-year period, dcp has entered into contracts

16   licensing the awards show for broadcast on television (for the last 17 years on the

17   NBC television network), increasing the show's prominence to the point that it is

18   now, as even the HFPA's Complaint concedes, "one of the most watched awards

19   programs in the world."

20         Since 1983, the business relationship between dcp and the HFPA has been

21   governed by a comprehensive contract.  The initial agreement between the parties

22   was followed by a second comprehensive contract in 1987—referred to here as the

23   "Main Show Agreement"—that gives dcp "*exclusive*" and "*irrevocable*" options to

24

---

25   [1] Although the HFPA has also sued Red Zone Capital Partners II, L.P. ("Red Zone"), the
     Complaint contains no substantive allegations of its involvement, outside boilerplate agency

26   allegations.  *See* Compl. ¶ 17.  References in this Memorandum to "Defendants" refer to both dcp
     and Red Zone, without prejudice to Red Zone's contention that it is not a proper defendant in this

27   action.

     [2] All factual contentions in the Introduction are taken from the Complaint, except where

28   otherwise noted, and are assumed to be true for purposes of this motion only.

MEMORANDUM OF POINTS AND AUTHORITIES
                                                         IN SUPPORT OF MOTION TO DISMISS

1   acquire rights to produce the Golden Globes show and to license it for broadcast.

2   The Golden Globes Awards show has aired on NBC since 1993.  In that year, NBC

3   and dcp entered into a multi-year deal which has been extended twice—once in

4   2001, to push back the deal's scheduled expiration date from 2005 to 2011, and

5   most recently this year, to push back its expiration date again, from 2011 to 2018.

6       In 1993, the same year that dcp and NBC entered into an agreement for NBC

7   to broadcast the Golden Globes on NBC, the Main Show Agreement between dcp

8   and the HFPA was amended to give dcp the right to continue exercising options to

9   produce the Golden Globes for as long as dcp continued its broadcast agreement

10  with NBC.  The relevant contract language is unambiguous:

> HFPA grants to dcp eight (8) additional, consecutive,
> exclusive, and irrevocable options to acquire the exclusive
> right to produce a live television broadcast of and to
> produce on tape or film the Awards for each of the years
> 1998 through and including 2005, *and for any extensions,*
> *renewals, substitutions or modifications of the NBC*
> *Agreement*, and to exploit such productions in all media
> throughout the world in perpetuity.

16  (Emphasis added).

17      For the last 17 years, the parties have operated under this provision.  In 2001,

18  when dcp and NBC extended the end date of their existing broadcast agreement

19  from 2005 to 2011, dcp unilaterally exercised its options under the "extensions,

20  renewals, substitutions or modifications of the NBC Agreement" clause, stating in

21  its Exercise of Options that "the [Main Show] Agreement is deemed extended for

22  any extension of the NBC/dcp Agreement."

23      The HFPA has apparently decided it is unhappy with the bargain it struck in

24  the Main Show Agreement, and particularly with the "extensions, renewals,

25  substitutions or modifications of the NBC Agreement" clause of the 1993

26  Amendment.  That clause, the HFPA now says, applies only if the "extension[],

27  renewal[], substitution[] or modification[]" is "entered into with HFPA's approval."

28  Since the clause clearly *does not* say that, HFPA demands its "reformation" to that

- 2 -

1   effect.  But the language the HFPA seeks to add to the 1993 Amendment not only

2   appears nowhere in the parties' agreement (which is why the HFPA is forced to

3   plead reformation), it runs directly contrary to the language that *is* in the contracts,

4   which grants dcp alone the right to exercise "*exclusive*" and "*irrevocable*" options;

5   gives dcp, not the HFPA, "control over all matters relating to the distribution and

6   exploitation of the rights granted to it pursuant to this agreement"; and gives dcp

7   the "*sole right* to administer and exploit the rights therein and to execute in dcp's

8   name any and all distribution agreements, license agreements and such other

9   agreements as may related to the production and exploitation of dcp's television

10  production(s) of the Awards presentation(s) . . . ."  (Main Show Agreement ¶¶ 1, 7

11  (emphases added).)

12      Abandoning the plain language of the Main Show Agreement and the 1993

13  Amendment, the HFPA now alleges that extrinsic evidence will show the contract

14  has a meaning directly opposite to its plain language; namely, that dcp and the

15  HFPA knew at the moment of contracting for the "extensions, renewals,

16  substitutions or modifications" clause that any extension of the Main Show

17  Agreement would require the HFPA's "prior approval."  But even if true (which

18  dcp denies), these allegations would not be enough to prevent dismissal under

19  FRCP 12(b)(6).  The Main Show Agreement is a fully integrated contract

20  negotiated by two sophisticated parties, and it provides expressly that "[n]either

21  party has entered into this agreement in reliance upon any promise or representation

22  not contained in this agreement."  Extrinsic evidence cannot be used to supplement,

23  let alone contradict, the plain meaning of an integrated contract.

24      Moreover, reliance on generalized extrinsic evidence such as what the HFPA

25  alleges here (*i.e.*, that the parties simply *knew* the contract meant something other

26  than what it actually says, but over the course of almost two decades never changed

27  its language to reflect their purported common understanding) is improper in the

28  absence of a specific textual ambiguity in the contract; that is, a word or phrase that

- 3 -

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  could plausibly be read to have more than one meaning.  The HFPA points to no

2  such ambiguity, because none exists.  The Supreme Court's recent decision in

3  *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), requires that a complaint be dismissed if

4  it is based on a theory that is not plausible.  *Id*. at 1949.  The HFPA's allegation that

5  its agreement with dcp means the opposite of what it says is not plausible.

6      In sum, the central contractual theory on which the bulk of the HFPA's

7  lawsuit rests fails as a matter of law on the face of the contract.  All claims based on

8  that flawed contractual theory—including the HFPA's claims for breach of contract

9  (in part), and declaratory relief, trade infringement, false association, and unfair

10  trade practices—must be dismissed.

11      The HFPA's reformation and breach of fiduciary duty claims must also be

12  dismissed based on the unambiguous language of the contract.  The Main Show

13  Agreement and its various amendments not only do not create a fiduciary duty, but

14  actively *disclaim* such a duty.  For example, in the first page of the 1997

15  Amendment to the Main Show Agreement, the parties agreed (in language the

16  Amendment itself states that *the HFPA* requested): "The [Main Show] Agreement

17  is a contractual relationship between dcp and HFPA and does not create a

18  partnership, joint venture, or other similar arrangement among the parties."  The

19  HFPA's reformation claim, meanwhile—its attempt to rewrite a central contract

20  term that has been in effect for 17 years—also fails because it is time-barred (and

21  has been for years).[3]

22      For these reasons, explained below, Defendants respectfully request that the

23  Court grant their motion to dismiss, with prejudice.

24

25  [3] Defendants do not at this stage seek dismissal of the HFPA's claims that are ancillary to its central contractual theory attacking the "extensions, renewals, substitutions or modifications of

26  the NBC Agreement" clause—*i.e.*, the claims for an accounting, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective economic advantage;

27  or the HFPA's claims for breach of contract and declaratory relief, to the extent these are unrelated to the HFPA's flawed reading of the "extensions" clause in the 1993 Amendment.  *See*

28  Compl. ¶¶ 78(c)-(h), 86-91, 92-99, 113-120.

## II.    **BACKGROUND: THE CONTRACTS**

In connection with their work on the Golden Globe Awards show over the decades, dcp and the HFPA have entered into various agreements.  The governing agreements are pled in and/or attached to the HFPA's Complaint and may therefore be considered on a motion to dismiss.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  They are all subject to California law.[4]

### A.    **The Main Show Agreement**

In 1987, dcp and HFPA entered into the Main Show Agreement (attached as Exhibit B to the Complaint) granting dcp the right to produce and distribute the Golden Globe Awards show.  Compl. ¶ 23.  The Main Show Agreement grants dcp "consecutive, *exclusive*, [and] *irrevocable* options" to acquire and exploit the Golden Globe Awards show from 1988 through 1992, as follows:

> HFPA now grants to dcp five (5) consecutive, exclusive, irrevocable options to acquire the exclusive rights to produce a live television broadcast of and to produce on tape or film the Awards presentations for 1988, 1989, 1990, 1991 and 1992, and to exploit such productions in all media throughout the world in perpetuity.

(Main Show Agreement ¶ 1.)

The Main Show Agreement further gives dcp "control over all matters relating to the distribution and exploitation of the rights granted to it pursuant to this agreement," as well as the "sole right to administer and exploit the rights therein and to execute in dcp's name any and all distribution agreements, license agreements and such other agreements as may related to the production and exploitation of dcp's television production(s) of the Awards presentation(s) and the copyright(s) relating thereto."  (*Id.* ¶ 7.)

---

[4] *See* Main Show Agreement ¶ 19 (applying California law); 1989 Amendment at 2 (providing that "[e]xcept as stated above, all of the terms of the [Main Show] Agreement shall remain in full force and effect," including the California choice-of-law provision) 1993 Amendment at 2 (same).  The 2001 Exercise of Options was exercised under the 1993 Amendment, which is subject to California Law.  *See* 1993 Amendment at 1.

The Main Show Agreement also described when the parties should negotiate a new or amended contract, after the final contracted-for awards show had been broadcast in 1992:

> The Negotiating Period shall commence thirty (30) days after the date of first broadcast of the 1992 Awards presentation.  Such Negotiating Period may be mutually extended for so long as the parties continue to negotiate in good faith.

(*Id.* at ¶ 1(a).)

With respect to the parties' anticipated negotiations following the final broadcast of the Golden Globes in 1992, the Main Show Agreement provided:

> If after the Negotiating Period dcp and HFPA shall not have agreed upon applicable terms and conditions with respect to the production of such subsequent Awards presentations, HFPA shall be free to offer such rights to any third party, but HFPA will not grant such rights to any third party on terms and conditions less favorable than those contained in dcp's last offer to HFPA during said Negotiating Period without first offering in good faith to contract with dcp on such terms, in which event dcp shall have a period of five (5) business days to accept such offer. . . . Notwithstanding anything to the contrary contained herein, the foregoing shall be applicable until such time as HFPA shall have entered into an agreement with a third party pursuant to all of the foregoing provisions or July 15, 1992, whichever first occurs.

(*Id.* at ¶ 1(b).)

## B.   The 1989 Amendment

In 1989, well before the last option under the Main Show Agreement was set to expire in 1992 (*see* Main Show Agreement ¶ 1(a)-(b)), the "HFPA and dcp amended their [Main Show] agreement to grant dcp five (5) additional options" to acquire and exploit the Golden Globes "for the years 1993 through 1997" (the "1989 Amendment").  Compl. ¶ 23.  The 1989 Amendment (attached as Exhibit A to the Defendants' Request For Judicial Notice ("RFJN")) changes references to the year "1992" in the Main Show Agreement—the last year in which dcp would have had an option to acquire the Golden Globes under the Main Show Agreement—to 1997, which was the new final option year under the 1989 Amendment.  The 1989

- 6 -

1   Amendment therefore states:  "[T]he reference in Paragraph 1(a) to '1992' shall be

2   changed to '1997' and the reference to July 15, 1992 in Paragraph 1(b) of the

3   Agreement shall be changed to 'July 15, 1997.'"  (1989 Amendment at 1.)

4        "Except as stated above," the 1989 Amendment concludes, "all of the terms

5   of the [Main Show] Agreement shall remain in full force and effect."  (1989

6   Amendment at 2.)

7        **C.    The 1993 Amendment**

8        The Main Show Agreement was amended again in 1993 (the "1993

9   Amendment").  Compl. ¶¶ 27-28.  Like the 1989 Amendment, the 1993

10  Amendment (attached as Exhibit B to Defendants' RFJN) extends dcp's

11  "consecutive, exclusive, and irrevocable options" to acquire and exploit the Golden

12  Globes from 1997 (the final option year under the 1989 Amendment) through 2005.

13  Unlike the 1989 Amendment, however, the 1993 Amendment also extends dcp's

14  options *beyond* 2005 "for any extensions, renewals, substitutions or modifications"

15  of dcp's agreement with NBC to televise the Golden Globe Awards.  The 1993

16  Amendment reads, in relevant portion:

17
        This will confirm that the [Main Show] Agreement is
18      hereby further amended to provide that HFPA grants to
        dcp eight (8) additional, consecutive, exclusive, and
19      irrevocable options to acquire the exclusive right to
        produce a live television broadcast of and to produce on
20      tape or film the Awards for each of the years 1998
        through and including 2005, *and for any extensions,*
21      *renewals, substitutions or modifications of the NBC*
        *Agreement*, and to exploit such productions in all media
22      throughout the world in perpetuity.

23  (*See* 1993 Amendment at 1 (emphasis added).)

24        Like the 1989 Amendment, the 1993 Amendment updated references in the

25  Main Show Agreement to the last year dcp could exercise its options.  But unlike

26  the 1989 Amendment, the 1993 Amendment could not change such references

27  merely by replacing the old final option year with the new, later year (*i.e.*, 2005)

28  because, under the "extensions, renewals, substitutions or modifications" clause, the

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  Main Show Agreement would now continue not merely for a specified number of

2  years, but for so long as the agreement between NBC and dcp to broadcast the

3  Golden Globes was extended.  The 1993 Amendment therefore states:

> This will also confirm that the reference to "1997" in Paragraph 1(a) of the [Main Show] Agreement as amended [by the 1989 Amendment] shall be changed to, "2005, *or the date of the broadcast of the last Awards under the NBC Agreement, whichever is later . . .*"

> This will also confirm that the reference to "July 15, 1997" in paragraph 1(b) of the [Main Show] Agreement as amended [by the 1989 Amendment] shall be changed to read:  "July 15, 2005, *or July 15 after the last broadcast of the Awards under the NBC Agreement, whichever is later.*"

11  (*Id.* at 1-2 (emphases added).)  The italicized language in these two provisions—

12  and particularly the words "whichever is later"—make no sense unless the 1993

13  Amendment granted dcp options to produce the Awards *beyond 2005* if dcp's

14  agreement with NBC was extended beyond 2005.

15      The Complaint concedes that the HFPA understands this provision to

16  "anticipate the possibility of [the] HFPA extending further options to dcp to remain

17  involved in the Golden Globe Awards show in the event that the NBC broadcast

18  license is extended, renewed, substituted, or modified," but only, the Complaint

19  adds, "with HFPA's approval."  Compl. ¶ 123 (emphasis in original).  The

20  Complaint does not identify any contractual language that conditions the

21  "extensions, renewals, substitutions or modifications" clause of the 1993

22  Amendment on the HFPA's approval.

23      **D.    The 2001 Exercise of Options**

24      The Complaint alleges that, at the time the 1993 Amendment was negotiated,

25  the HFPA's "general membership and board of directors understood . . . that in no

26  event was HFPA making a commitment [under the 1993 Amendment's

27  "extensions, renewals, substitutions or modifications of the NBC Agreement"

28  clause] to either dcp or NBC beyond 2005."  Compl. ¶ 28.  The Complaint

- 8 -

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1   concedes, however, that in 2001, when dcp extended its agreement with NBC

2   through 2011, dcp in fact exercised its options to acquire the Golden Globe Awards

3   beyond 2005, all the way "through [to] the January 2011 Golden Globe Awards

4   show." *Id.* ¶ 33.

5       The 2001 Exercise of Options which the Complaint pleads (but does not

6   attach, and which Defendants have attached as Exhibit D to their RFJN) states:

7           WHEREAS, *the [Main Show] Agreement is
            deemed extended for any extension of the NBC/dcp
8           Agreement*;

9           NOW, THEREFORE, dcp exercises its options
            under the Agreement for each of the years through the
10          2010/2011 broadcast year; provided that NBC performs
            under the NBC/dcp Agreement . . . .
11

12  (2001 Exercise of Options (emphasis added).)

13      **E.    The Pre-Show Agreement**

14      Finally, as the HFPA alleges, "[i]n 1999, the parties negotiated a . . . contract

15  [the "Pre-Show Agreement" (attached to the Complaint as Exhibit E)] under which

16  HFPA granted dcp the right to 'produce, distribute, promote, advertise and exploit'

17  a one-hour pre-awards show (the 'Pre-Show') to be telecast by NBC on the same

18  day as a lead-in to the 2000 Awards . . . ."  Compl. ¶ 32.

19      The Pre-Show Agreement also expressly states that:

20          *So long as NBC is the broadcaster of the Awards
            Program and the HFPA has licensed the Awards
21          Program to dcp,* (a) if the HFPA does a preview show, it
            shall be with dcp and NBC, and (b) if the HFPA decides
22          not to do a preview show with dcp and NBC, the HFPA
            shall not do a preview show with any other producer or
23          network.

24  (Pre-Show Agreement ¶ 6 (emphasis added).)  Paragraph 6 of the Pre-Show

25  Agreement states that "[a]ll future preview shows with dcp and NBC shall be

26  pursuant to the terms of this Agreement."  Nevertheless, the HFPA seeks a

27  declaration that the Pre-Show Agreement "has expired, and has no further force and

28  effect."  Compl. ¶ 82(e).

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

### III.   **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Any factual allegations must be sufficient "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570. For purposes of FRCP 12(b)(6), "claim" means a set of facts that, if established, entitle the pleader to relief.  *Id.* at 555.  Dismissal may be based on either "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).  The contractual theory that the HFPA now offers runs contrary to the Main Show Agreement's language, is not plausible, and therefore cannot satisfy *Iqbal*.

### A.   **The HFPA's Claims Based On dcp's 2010 Exercise Of Its Options To Acquire The Golden Globes Fail As A Matter Of Law**

The HFPA's Complaint has one idea at its core—that the Main Show Agreement expires in 2011 of its own force and that, consequently, dcp's 2010 deal with NBC, extending NBC's right to broadcast the Golden Globes Awards show through 2018, is invalid.  On the basis of this theory, HFPA claims:  that dcp has breached the Main Show Agreement in a variety of ways, including by "attempting to sell rights to the Golden Globe Awards show [to NBC through 2018] that it did not own" (Fourth Cause of Action); that HFPA is entitled to a declaration that "dcp's agreement with NBC, executed on October 29, 2010, purporting to license the right to telecast the 2012 through 2018 Golden Globe Awards shows is invalid and ineffective" (Fifth Cause of Action); that dcp is infringing the HFPA's trademark to the Golden Globes by "enter[ing] into an agreement with NBC purporting to license the right to broadcast the 2012 to 2018 Golden Globe Awards show" and has "false[ly] associated" itself with the Golden Globes by "purporting

- 10 -

1  to empower NBC to use HFPA's Golden Globe-related marks to market and

2  advertise the Awards shows" (First and Second Causes of Action); and that dcp

3  committed unfair business practices by entering into its "agreement with NBC for

4  the period commencing in 2012" (Ninth Cause of Action).

5       Because the HFPA's theory finds no support in the text of the contracts

6  themselves, even when viewed in light of the so-called extrinsic evidence alleged in

7  the Complaint, the various claims based on that theory fail to satisfy the

8  "plausibility" threshold of *Iqbal* and must be dismissed.

9       **1.     The HFPA's Breach Of Contract Claim (4th Cause Of**

10              **Action, Compl. ¶ 78(a)-(b)) Fails**

11      Contract interpretation is generally a matter of law for courts to decide.  *See*

12  *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1125 (2008).

13  If contractual language is clear and explicit, it controls.  *See Bank of the West v.*

14  *Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992) (citing Cal. Civ. Code § 1636); *see also*

15  Cal. Civ. Code § 1636.  Resolution of contractual claims on a motion to dismiss is

16  therefore proper if the terms of the contract are unambiguous.  *Velazquez v. GMAC*

17  *Mortgage Corp.*, 605 F. Supp. 2d 1049, 1069 (C.D. Cal. 2008).  On the other hand,

18  if—but only if—courts confront a provision that is "reasonably susceptible" to

19  competing interpretations, then extrinsic evidence may be used to resolve the

20  ambiguity.  *Wagner v. Columbia Pictures Indus., Inc.,* 146 Cal. App. 4th 586, 590

21  (2007).  Before extrinsic evidence may play any role in contract interpretation,

22  there must first be a plausible ambiguity in the text itself:  "[A]s Justice Holmes

23  explained, parol evidence is not admissible to show that when the parties 'said five

24  hundred feet they agreed it should mean one hundred inches, or that Bunker Hill

25  Monument should signify the Old South Church.'"  *See id.* at 592.

26      The HFPA alleges that dcp breached the Main Show Agreement by

27  "unilaterally attempting to sell rights to the Golden Globe Awards show that it did

28  not own, without HFPA's knowledge or consent."  Compl. ¶ 78(b).  The HFPA also

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1   alleges that dcp breached the Main Show Agreement by "pursuing agreements to

2   produce, create, or exploit digital internet streams of the [Golden Globes Award]

3   show, ancillary shows, promotional campaigns surrounding the Awards show, and

4   sponsorship campaigns . . . ."  Compl. ¶ 78(a).  These claims not only lack support

5   in the text of the governing contract documents, they directly contradict it.

6          First, the Main Show Agreement, as amended by the 1993 Amendment,

7   extends dcp's "consecutive, exclusive, and irrevocable options" to acquire the

8   Golden Globes beyond 2005, "for any extensions, renewals, substitutions or

9   modifications" of dcp's agreement with NBC.  *See supra* at II.C.  There is no

10  mention of dcp being required to seek the HFPA's "approval" as a condition to

11  exercising its options.  As the 2001 Exercise of Options states:  "[T]he [Main

12  Show] Agreement is deemed extended for any extension of the NBC/dcp

13  Agreement."  (2001 Exercise of Options.)  Moreover, Paragraph 7 of the Main

14  Show Agreement gives dcp "the sole right to administer and exploit the rights [to

15  the Golden Globes] and to execute in dcp's name any and all distribution

16  agreements, license agreements, and such other agreements as may relate to the

17  production and exploitation of dcp's television production(s) of the Awards

18  presentation(s) and the copyright(s) relating thereto."

19         Second, the Complaint does not allege, as it must (*see Anthony v. Yahoo,

20  Inc.*, 421 F. Supp. 2d 1257, 1260 (N.D. Cal. 2006)), *which* contract provision dcp

21  allegedly breached by "sell[ing] rights to the Golden Globe Awards show that it did

22  not own, without HFPA's knowledge or consent."  Compl. ¶ 78(b).  That is, the

23  HFPA does not point to language in the Main Show Agreement, or any of its

24  various amendments, showing that dcp lacks "rights to the Golden Globes" after

25  2011 even if its contract with NBC to broadcast the Golden Globes Awards show is

26  extended beyond that date, or that dcp is required to obtain the HFPA's "approval"

27  before extending its contract with NBC.  The omission is telling.  In fact, there is no

28  language in the Main Show Agreement—or any other contract between the

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  parties—on which the HFPA can base its claim that dcp has no right to extend the

2  Main Show Agreement beyond 2011, even if NBC agrees to extend its broadcast

3  contract with dcp.  The "extensions, renewals, substitutions or modifications"

4  clause of the 1993 Amendment, and Paragraph 7 of the Main Show Agreement,

5  address this issue squarely, and they say precisely the opposite of what the HFPA

6  now claims.  Moreover, other clauses in the 1993 Amendment, which extend

7  various material dates to "the later of" 2005 or the last broadcast of the Awards

8  under the NBC Agreement, are, along with the 2001 Exercise of Options' statement

9  that "the [Main Show] Agreement is deemed extended for any extension of the

10  NBC/dcp Agreement," flatly inconsistent with the HFPA's interpretation.

11          a.      There Is No Basis For The HFPA's Contract Claims To

12                  Proceed Beyond The Pleading Stage

13      In the absence of any textual support for its contract theory, the HFPA alleges

14  extrinsic evidence in an effort to create an ambiguity that will permit its claims to

15  survive dismissal.  Specifically, the HFPA alleges that, during negotiations over the

16  "extensions, renewals, substitutions or modifications" clause in the 1993

17  Amendment, unnamed "dcp representatives stated that the amendment to the 1987

18  Awards Agreement would be finite" (Compl. ¶ 27); that "HFPA's general

19  membership and board of directors understood that dcp was seeking through this

20  amendment a finite number of additional options to conform to the proposed

21  broadcast license that dcp was negotiating with NBC" (*id.* ¶ 28); that "[o]n

22  information and belief, dcp was fully aware of HFPA's understanding of the

23  proposed amendment to the 1987 Awards Agreement" (Compl. ¶29); and that,

24  again "on information and belief," "dcp understood the 1993 [Amendment] to have

25  the same meaning as [did] HFPA at the time of contracting" (*id.* ¶ 30).

26      The HFPA further alleges that it first confirmed its purported understanding

27  of the "extensions, renewals, substitutions or modifications" clause in an email sent

28  by the HFPA's president to dcp in February, 2010—17 years after the parties had

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

agreed to the clause (Compl. ¶ 43); that dcp responded it would not (not that it could not) "make a move on a network renewal or new home" without the HFPA's "involvement" (not "approval") (*id.* ¶ 44); and that the HFPA's trial counsel in this matter sent dcp a "lawyer letter" approximately six months later, about three months before filing this lawsuit, reiterating the position hinted at by the HFPA in its February, 2010 email (*see id.* ¶ 46).

While it is difficult to discern the legal basis on which the HFPA may assert that the allegations quoted above support its case, it is clear for the reasons set forth below that the HFPA cannot rely on these allegations to save its contract claim.

(1)    Extrinsic Evidence Cannot Be Used To Contradict The Terms Of A Fully Integrated Contract

To the extent the HFPA is contending that the allegations in Paragraphs 27-30 of the Complaint support a claim that the parties orally or otherwise separately agreed to an additional term—namely, that the "extensions, renewals, substitutions or modifications" clause would be "subject to HFPA approval"—that claim is easily dismissed under the parol evidence rule, because the Main Show Agreement is a fully integrated contract.

Whether the parol evidence rule applies so as to exclude any collateral oral agreement is a question of law. *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal. App. 3d 973, 1001 (1991). While an express integration clause is not necessary to a determination that an agreement is integrated (*see Heller v. Pillsbury Madison & Sutro*, 50 Cal. App. 4th 1367, 1382 (1996)), a merger clause is generally conclusive on the issue of integration (*Banco Do Brasil, S.A.*, 234 Cal. App. 3d at 1001). The Main Show Agreement in fact has just such a provision, stating that that the Agreement "contains the entire agreement of the parties, supersedes all prior negotiations and/or agreements, and may only be amended or modified by written instrument signed by the party to be charged. *Neither party has entered into this*

- 14 -

*agreement in reliance upon any promise or representation not contained in this agreement*."  (Main Show Agreement ¶ 19 (emphasis added).)[5]

When an agreement is, like the Main Show Agreement, fully integrated, no "evidence of additional oral understandings" is relevant or admissible to supplement or contradict the meaning of the contractual language, "*no matter how persuasive*" it may be (though the extrinsic evidence alleged here is, in any case, unpersuasive).  *Marani v. Jackson*, 183 Cal. App. 3d 695, 701 (1986) (emphasis in original).  *See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 277 (9th Cir. 1992) ("[P]arol evidence of terms not specifically included in [a completely integrated] written contract is not admissible.").

The HFPA's proffered extrinsic evidence, even if true and construed in the manner suggested by the HFPA, would impermissibly contradict the language in the parties' contractual documents and, therefore, cannot prevent dismissal of its claims.  *See* Cal. Civ. Code § 1625 ("The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."); Cal. Civ. Proc. Code § 1856(a) ("Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.").

(2)     Extrinsic Evidence Cannot Be Used To Assert Generalized Intent Divorced From The Words And Phrases Contained In A Written Agreement

To the extent the HFPA seeks to avoid the import of the parol evidence rule by offering extrinsic evidence in the hope of establishing an ambiguity in the

---

[5] The integration clause in the Main Show Agreement was incorporated by reference into the 1989 Amendment (*see* 1989 Amendment at 2) and the 1993 Amendment (*see* 1993 Amendment at 2 ("Except as stated above, all of the terms of the [Main Show] Agreement shall remain in full force and effect.")).

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  "extensions, renewals, substitutions or modifications" clause—*i.e.*, to the effect that

2  such "extensions, renewals, substitutions or modifications" are "subject to HFPA's

3  approval"—that effort also fails.  Courts turn to extrinsic evidence in interpreting

4  contracts only when the specific words or phrases of a contract are "reasonably

5  susceptible" to more than one understanding—when, for example, the word

6  "dozen" might plausibly be understood to mean either twelve *or* thirteen (as in a

7  "baker's dozen").  *See Brinderson-Newberg Joint Venture*, 971 F.2d at 277 ("'The

8  test of admissibility of extrinsic evidence to explain the meaning of a written

9  instrument is . . . whether the offered evidence is relevant to prove a meaning to

10  which the language of the instrument is reasonably susceptible.'" (citation

11  omitted)); *ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th

12  1773, 1793-94 (1993) ("[C]ourts should allow parol evidence to explain *special*

13  meanings which the individual parties to a contract may have given certain

14  words."); *Hervey v. Mercury Cas. Co.*, 185 Cal. App. 4th 954, 962 (2010) ("When

15  the complaint fails to allege that the terms of the contract have any special meaning,

16  the court can construe the language of the document on its face to determine

17  whether as a matter of law the contract is reasonably subject to a construction

18  sufficient to sustain a cause of action in response to a demurrer.").

19      The trial court's threshold determination of "ambiguity" (whether the

20  proffered evidence is relevant to prove a meaning to which the language is

21  "reasonably susceptible") is a question of law.  *Winet v. Price*, 4 Cal. App. 4th

22  1159, 1165 (1992).  The HFPA  points to no words or phrases in the "extensions,

23  renewals, substitutions or modifications" clause that might plausibly be read to

24  require the HFPA's "prior approval."

25      *Wagner v. Columbia Pictures* is on point.  Plaintiff there, actor Robert

26  Wagner, and Natalie Wood, entered into a contract that "entitled [them] to 50

27  percent of the net profits [defendant] received as consideration 'for the right to

28  exhibit photoplays of the [*Charlie's Angels* television] series and from the

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  exploitation of all ancillary, music and subsidiary rights in connection therewith.'"
2  146 Cal. App. 4th at 588.  In 2000 and 2003, defendant produced and distributed
3  two *Charlie's Angels* films based on the TV series.  *Id.*  Wagner claimed that the
4  "subsidiary rights" provision in their contract entitled them to 50 percent of the net
5  profits from the films.  *Id.*  The defendant countered that its production of the
6  *Charlie's Angels* movies did not constitute exploitation of  "subsidiary rights in
7  connection" with the "right to exhibit photoplays of the series."  *Id.*  In support of
8  his reading, Wagner offered extrinsic evidence, including a statement from the
9  defendant's own attorney, "who acknowledged the Wagners were entitled to
10  receive 'income *from any and all sources* and it is my opinion that the agreement so
11  states this'" (*id.* at 592 (emphasis in original)), as well as a deal memorandum from
12  a related contract between the Wagners and the defendant, containing the exact
13  same "subsidiary rights" provision, which stated the defendant's intent that "there
14  be an equal split of all revenues 'derived from all sources'" (*id.* at 590).

15       The trial court rejected  the use of such extrinsic evidence.  The Court of
16  Appeal affirmed, holding: "[E]xtrinsic evidence is not admissible to contradict
17  express terms in a written contract or to explain what the agreement was.  The
18  agreement is the writing itself.  Parol evidence cannot be admitted to show intention
19  independent of an unambiguous written instrument.'"  *Wagner*, 146 Cal. App. 4th
20  at 592, *citing Cerritos Valley Bank v. Stirling*, 81 Cal. App. 4th 1108, 1115-16
21  (2000).  "Even if the Wagners and [the defendant] intended the Wagners would
22  share in the net profits 'from any and all sources[,]'" said the court, "they did not
23  say so in their contract."  *Id.*  "The problem with Wagner's extrinsic evidence is
24  that it does not *explain* the contract language, it *contradicts* it."  *Id.* at 592
25  (emphasis added).

26       Like the plaintiff in *Wagner*, the HFPA points to no ambiguity anywhere in
27  the governing contract documents, much less in the "extensions, renewals,
28  substitutions or modifications" clause it is challenging.  Moreover, here, like in

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1  *Wagner*, the HFPA alleges extrinsic evidence not to explain any ambiguous term,

2  but to add a provision that would fundamentally change the meaning of the

3  language that actually appears in the contract.  The Court should not consider it:

4  "Whatever else extrinsic evidence may be used for, it may not be used to show that

5  words in contracts mean the exact opposite of their ordinary meaning."  *ACL*

6  *Techs., Inc.*, 17 Cal. App. 4th at 1791.  *See Brinderson-Newberg Joint Venture*, 971

7  F.2d at 277 ("To avoid completely eviscerating the parol evidence rule . . . there

8  must be reasonable harmony between the parol evidence and the integrated contract

9  for the evidence to be admissible."); *Winet*, 4 Cal. App. 4th at 1167 (extrinsic

10  evidence cannot be used "to flatly contradict the express terms of an agreement").[6]

11  **2.   The Declaratory Relief Claim (5th Cause Of Action) Fails**

12  The HFPA's claim for declaratory relief (Compl. ¶¶ 81-85) is likewise based

13  on its theory that dcp is not entitled to extend its contract with NBC beyond 2011

14  without the HFPA's prior consent.  *See* Compl. ¶ 82(a)-(d).  Because that theory

15  fails, the HFPA's claim for declaratory judgment necessarily also fails.  *See*

16  *Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*, No. CV 09-06741 DMG, 2010

17  WL 4829614, at *6 (C.D. Cal. Nov. 16, 2010) ("Plaintiff's third cause of action for

18  declaratory relief survives only to the extent Plaintiff's claim for breach of contract

19
20
21
22
23
24
25
26
27
28

---

[6] The HFPA may be expected to rely on *Trident Center v. Connecticut General Life Ins., Co.*, 847 F.2d 564 (9th Cir. 1988), which interprets California law as providing that "it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence."  *See id.* at 569.  This standard cannot be squared, however, with the United States Supreme Court's subsequent pronouncement in *Iqbal* that, for the purposes of FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" (129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570)), and that factual allegations must be sufficient "to raise a right to relief above the speculative level" (*Twombly*, 550 U.S. at 570).  California courts since *Trident Center* have interpreted the relevant California Supreme Court decisions on parol evidence in a manner fully consistent with *Iqbal*'s strict plausibility standard.  *Banco Do Brasil, S. A.*, 234 Cal. App. 3d at 1011; *Hervey*, 185 Cal. App. 4th at 962; *ACL Techs., Inc.*, 17 Cal. App. 4th 1773, 1793 (1993); *FPI Dev., Inc. v. Nakashima*, 231 Cal. App. 3d 367, 390 (1991).  Moreover, the Complaint already alleges precisely what the HFPA claims the extrinsic evidence would reveal.  Even accepting these allegations as true, there would be no ambiguity in the words or phrases contained in the governing contractual documents.  *See Wagner*, 146 Cal. App. 4th at 592.  Accordingly, the Court can decide this issue as a matter of law.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1   warrants such relief.  Given the failure of Plaintiff's breach of contract claim, it
2   follows that Plaintiff also fails to establish a basis for declaratory relief.").

3        Similarly, the HFPA's request for a declaration that the Pre-Show Agreement
4   "has expired[] and has no further force and effect," Compl. ¶ 82(e), fails as a matter
5   of law on the face of the contracts.  The Pre-Show Agreement expressly states that
6   "[s]o long as NBC is the broadcaster of the Awards Program and the HFPA has
7   licensed the Awards Program to dcp, (a) if the HFPA does a preview show, it shall
8   be with dcp and NBC, and (b) if the HFPA decides not to do a preview show with
9   dcp and NBC, the HFPA shall not do a preview show with any other producer or
10  network."  Pre-Show Agreement ¶ 6.  *See also id.* ("All future preview shows with
11  dcp and NBC shall be pursuant to the terms of this Agreement.").  The HFPA
12  points to no contrary language and alleges no ambiguity in the Pre-Show
13  Agreement.  The Pre-Show Agreement also contains a merger clause, making
14  extrinsic evidence doubly inappropriate.  Pre-Show Agreement ¶ 7.  *See generally*
15  *Brinderson-Newberg Joint Venture*, 971 F.2d at 277.

16       **3.**    **The Trademark Infringement (1st Cause Of Action) And**
17       **False Association Claims (2d Cause Of Action) Fail**

18       The HFPA's causes of action for trademark infringement and false
19  association assert that "dcp has the right to use HFPA's marks only in connection
20  with the Golden Globe Awards shows through the 2011 show" (Compl. ¶ 56
21  (Trademark Infringement)), and that "dcp has unilaterally attempted to license the
22  right to broadcast the Golden Globe Awards shows for 2012 through 2018, and is
23  purporting to empower NBC to use HFPA's Golden Globe-related marks to market
24  and advertise the Awards shows, and then to broadcast the unique Golden Globe
25  Award shows using HFPA's Golden-Globe related marks" (*id.* at ¶ 65 (False
26  Association)).
27       These claims depend on the HFPA's flawed theory that the Main Show
28  Agreement is now expired.  If the HFPA's theory is wrong—that is, if the Main

Show Agreement remains in effect (which it does, because dcp has extended its existing contract with NBC through 2018 under the "extensions, renewals, substitutions or modifications" clause of the 1993 Amendment, *see supra* at II.C)— then these claims must fail under Paragraph 14 of the Main Show Agreement, which grants dcp the "nonexclusive right to use . . . proprietary names, trademarks, trade names and copyrightable materials as may be controlled by HFPA in connection with advertising and publicity for dcp's production(s) pursuant to this agreement."

### 4.      The HFPA's Unfair Competition Claim (9th Cause of Action) Fails As A Matter Of Law

The HFPA bases its claim under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, on its unsupported contract theory—*i.e.*, on "dcp's representations to and agreement with NBC for the period commencing in 2012"; "dcp's purported empowerment of NBC to exploit HFPA's Golden Globe-related intellectual property"; and dcp's supposed "misrepresentation[s] to other third parties" about its rights to the Golden Globes trademarks, which the HFPA casts in its first and second causes of action as claims for trademark infringement and false association, respectively.  Compl. ¶ 109.

As explained above, the HFPA's reading of the parties' contract is wrong as a matter of law, and it follows that all these claims must fail as well.

### B.      The HFPA's Reformation Claim (11th Cause of Action) Fails

In light of the weakness of its contract-based claims, the HFPA's final cause of action seeks reformation of the Main Show Agreement (*see* Compl. ¶¶ 121-26), and specifically of the "extensions, renewals, substitutions or modifications" clause, to add language that would give that clause the meaning the HFPA maintains elsewhere in its Complaint the clause already possesses.  *See* Compl. ¶ 124.  The HFPA's reformation claim is time barred.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

Claims for reformation are subject to a three-year statute of limitations. *See* Cal. Code Civ. Proc. § 338(d); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1548-49 (9th Cir. 1990). The statute begins to run from the time a plaintiff discovers or should in the exercise of reasonable diligence have discovered its claim. *Bradbury v. Higginson*, 167 Cal. 553, 558 (1914). The HFPA alleges it did not learn of the contract's true meaning until October 29, 2010, "when dcp for the first time took actual and affirmative steps that were inconsistent with HFPA's understanding that its consent was required . . . ." Compl. ¶ 125. That argument fails as a matter of law because a party to a contract is presumed to have knowledge of the contract's terms and cannot later claim ignorance of them or their meaning in order to avoid the statute of limitations.

*Bradbury v. Higginson* is instructive. The defendant in that case leased certain land on the understanding it would be provided with water by the plaintiff-owner. When the parties executed the lease, the provision setting out the plaintiff's responsibility in this respect was omitted by mutual mistake. The defendant claimed not to have discovered the mistake until the statute of limitations had elapsed and only then sought a reformation of the parties' (by-then four-year-old) agreement. 167 Cal. at 554-56. The California Supreme Court affirmed dismissal on the ground there was no well-pleaded basis for permitting an exception to the limitations period:

> The only ground assigned for [the] failure to discover that the [parties' contract] did not include the agreement to furnish water is that the lease was prepared by plaintiff's attorney. This is no sufficient excuse for the defendant's alleged ignorance of the terms of a writing executed and accepted by him. No reason appearing to the contrary, he must be deemed to have known the precise terms of the lease when he signed it. If it omitted a provision which it should have contained, his right to compel a reformation accrued at once and should have been asserted within three years.

*Id.* at 558. *Accord Hal Roach Studios*, 896 F.2d at 1549 ("[A]s of the effective date, Feiner & Co. should have been aware that (under its view of the mutual intent

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

of the parties) a mutual mistake regarding an essential element was apparent on the face of the contract.").  "Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms."  RESTATEMENT (SECOND) OF CONTRACTS § 157 cmt. b (1981)

Thus, it is not enough for the HFPA to plead that it "only came to learn of this mistake . . . when dcp for the first time took actual and affirmative steps that were inconsistent with HFPA's understanding of the contracts."  Compl. ¶ 125.  As in *Bradbury*, the law presumes that the HFPA was familiar with the contract(s) it executed, including "[t]he absence of the phrase 'entered into with HFPA's approval' after the word 'Agreement' on the ninth line of the third paragraph of the 1993 Agreement," Compl. ¶ 124(a); *i.e.*, the "extensions, renewals, substitutions or modifications" clause.  At a minimum, the HFPA must be presumed to have been aware of its reformation claim on October 29, 2001, when the 2001 Exercise of Options (executed on that date) stated expressly that "the [Main Show] Agreement *is deemed extended* for any extension of the NBC/dcp Agreement."  (2001 Exercise of Options (emphasis added).)

Accordingly, the statute of limitations on the HFPA's reformation action began to run either when HFPA executed the 1993 Amendment and had knowledge of its terms—including "[t]he absence of" any provision providing that extensions of dcp's options arising from an extension of the dcp-NBC agreement were subject to "HFPA's approval"—or, at the very latest, when the 2001 Exercise of Options again omitted the same language.  *See Bradbury*, 167 Cal. at 558.  The limitations period has long since run.

## C.   The HFPA's Breach of Fiduciary Duty Claim (8th Cause of Action) Fails As a Matter Of Law

Fiduciary relationships arise in one of two ways: either the parties enter into a recognized *type* of relationship (such as attorney-client, trustee-beneficiary, joint

1   venture, or partnership) in which fiduciary duties are imposed as a matter of law, or

2   they expressly agree to undertake fiduciary duties.  *City of Hope Nat'l Med. Ctr. v.*

3   *Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008).  The HFPA does not allege the

4   existence of a partnership, joint venture, or other traditionally recognized fiduciary

5   relationship—nor could it, as the arms-length contractual agreements between the

6   parties lacked the essential ingredients of a fiduciary relationship.  *Recorded*

7   *Pictures Co. Ltd. v. Nelson Entm't, Inc.,* 53 Cal. App. 4th 350, 370 (1997) (holding

8   that "the typical distribution contract, negotiated at arm's length, does not create a

9   fiduciary relationship between the owner of the product and the distributor").  To

10  plead a fiduciary relationship, therefore, the HFPA must allege that dcp through its

11  conduct "knowingly" undertook the obligations of a fiduciary.  *Id.*

12          The Complaint contains no such allegations.  Instead, the HFPA maintains

13  that "the trust and confidence HFPA placed in dcp, with regard to its intellectual

14  property rights, created a fiduciary relationship under which dcp owed a fiduciary

15  duty to HFPA."  Compl. ¶ 102.  That is an incorrect statement of law.  The mere

16  fact that parties are bound by contract and repose trust in one another as a result

17  does not give rise to a fiduciary obligation.  As the court in *Wolf v. Super. Ct.*, 107

18  Cal. App. 4th 25 (2003), reasoned, a contrary rule would be unworkable; indeed,

19  *every* contract requires the contracting parties to repose trust and confidence in each

20  other.  *Id.* at 31.  Nor does entrusting intellectual property to another for

21  commercial development, as the HFPA alleges it did here, create a fiduciary

22  relationship.  *See Portney v. CIBA Vision Corp.*, No. 07-0854 AG, 2008 WL

23  5505517, at *3-4 (C.D. Cal. July 17, 2008) (agreement licensing technology in

24  exchange for payment of royalties did not create fiduciary relationship); *City of*

25  *Hope*, 43 Cal. 4th at 389; *Wolf*, 107 Cal. App. 4th at 31; *Worldvision v. Am. Broad.*

26  *Cos.*, *Inc.*, 142 Cal. App. 3d 589, 595 (1983) ("The mere fact that in the course of

27  their business relationships the parties reposed trust and confidence in each other

28  does not impose any corresponding fiduciary duty in the absence of an act creating

- 23 -

1  or establishing a fiduciary relationship known to law.");  *Recorded Pictures Co.*
2  *Ltd. v. Nelson Entm't, Inc.*, 53 Cal. App. 4th at 370.

3      To the extent the HFPA's allegations imply that dcp *voluntarily* undertook
4  fiduciary duties towards the HFPA, that claim is (again) contradicted by the Main
5  Show Agreement, which expressly provides that "[n]othing contained in this
6  agreement shall constitute either party the agent of the other."  (Main Show
7  Agreement ¶ 19.)  The 1997 Amendment to the Main Show Agreement (attached to
8  the RFJN as Exhibit C), which states that it was prepared at the HFPA's request,
9  emphatically and unequivocally confirms the point: "The [Main Show] Agreement
10  is a contractual relationship between dcp and HFPA and does not create a
11  partnership, joint venture, or other similar arrangement among the parties."  (1997
12  Amendment at 1.)  Finally, the Pre-Show Agreement states that the "parties [*i.e.*,
13  dcp and the HFPA] are not partners or joint venturers."   (Pre-Show Agreement at ¶
14  7.)

15      Under the clear language of the parties' contracts—language that the HFPA
16  does not and could not claim is ambiguous—the parties not only did not undertake
17  but specifically disclaimed a fiduciary relationship.  *City of Hope*, 43 Cal. 4th at
18  389; *Wolf*, 107 Cal. App. 4th at 31; *Portney*, 2008 WL 5505517, at *3-4.

19  **IV.   CONCLUSION**

20      For the foregoing reasons, Defendants respectfully request that the Court
21  grant their motion to dismiss with prejudice.

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

1    DATED: January 7, 2011                Munger, Tolles & Olson LLP
2                                              RONALD L. OLSON
                                               BRADLEY S. PHILLIPS
3                                              MANUEL F. CACHAN

                                           Sheppard, Mullin, Richter & Hampton, LLP
4                                              MARTIN D. KATZ

5

6                                          By:      /s/ Ron L. Olson
                                                     RONALD L. OLSON
7
                                           Attorneys for Defendants,
8                                          RED ZONE CAPITAL PARTNERS II, L.P.
                                           and DICK CLARK PRODUCTIONS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES
                                           IN SUPPORT OF MOTION TO DISMISS

1

## **CERTIFICATE OF SERVICE**

2

3          I hereby certify that this document(s) filed through the CM/ECF

4    system will be sent electronically to the registered participants as identified on the

5    Notice of Electronic Filing (NEF).

6

     Date: January 7, 2011

7

8                                                 _____
                                                     /s/ *Ron L. Olson*
                                                     RONALD L. OLSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28