1  LINDA J. SMITH (S.B. # 78238)
   lsmith@omm.com
2  ROBIN M. WALL (S.B. # 235690)
   rwall@omm.com
3  AMY R. LUCAS (S.B. # 264034)
   alucas@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, California 90067-6035
   Telephone:   (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff
   Hollywood Foreign Press Association

```
                    FILED
          CLERK, U.S. DISTRICT COURT

             MAR - 9 2011

     CENTRAL DISTRICT OF CALIFORNIA
     BY                        DEPUTY
```

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Corporation, | Case No. CV10-8833 VBF (FMOx) |
| 13 | **FIRST AMENDED COMPLAINT FOR (1) TRADEMARK** |
| 14                      Plaintiff, | **INFRINGEMENT; (2) FALSE ASSOCIATION; (3) DECLARATION** |
| 15       v. | **OF COPYRIGHT CO-OWNERSHIP; (4) BREACH OF CONTRACT;** |
| 16  RED ZONE CAPITAL PARTNERS | **(5) DECLARATORY RELIEF; (6) ACTION FOR AN** |
| 17  II, L.P., a Delaware Limited Partnership; DICK CLARK | **ACCOUNTING; (7) BREACH OF THE IMPLIED COVENANT OF** |
| 18  PRODUCTIONS, INC., a Delaware Corporation; RED ZONE CAPITAL | **GOOD FAITH AND FAIR DEALING; (8) BREACH OF** |
| 19  GP, LLC, a Delaware Limited Liability Company; RED ZONE | **FIDUCIARY DUTY; (9) UNFAIR COMPETITION UNDER CAL. BUS.** |
| 20  CAPITAL MANAGEMENT COMPANY, LLC, a Delaware | **& PROF. CODE § 17200 AND CALIFORNIA COMMON LAW;** |
| 21  Limited Liability Company; DOES 1 through 10, inclusive, | **(10) INTENTIONAL INTERFERENCE WITH** |
| 22                      Defendants. | **PROSPECTIVE ECONOMIC ADVANTAGE; AND** |
| 23 | **(11) REFORMATION** |
| 24 | **JURY DEMANDED** |

25

26

27

28

Plaintiff Hollywood Foreign Press Association ("HFPA"), by and through its undersigned counsel, for its claims for relief against Defendants dick clark productions, inc. ("dcp"), Red Zone Capital Partners II, L.P. ("Red Zone Capital Partners"), Red Zone Capital GP, LLC ("Red Zone Capital GP"), and Red Zone Capital Management Company ("Red Zone Capital Management") (collectively, "Defendants") alleges as follows:

## NATURE OF THE DISPUTE

1.  For the past 67 years HFPA, a nonprofit organization dedicated to bridging the international and entertainment communities, has hosted the Golden Globe Awards to recognize outstanding achievements in foreign and domestic motion pictures and television. The intellectual property and contract rights to the Golden Globes are HFPA's primary assets, and HFPA uses proceeds from the Awards to fund its annual philanthropic grant program, through which it distributes millions of dollars to support arts-related scholarships and charities, educational film programs, and cultural preservation foundations.

2.  Since their inception in 1944, the Golden Globe Awards have become one of the most watched awards programs in the world. HFPA is the registered and indisputably exclusive owner of federally protected intellectual property rights in the Golden Globe marks and Golden Globe statuette.

3.  In 1983, HFPA engaged Dick Clark and his company, dcp, to produce the television production of the Golden Globe Awards show and to help license the rights to a broadcaster for telecast. The parties entered into a new agreement four years later, and through later amendments extended that agreement to 2011, (collectively, "the Awards Agreement"). In return for its services, dcp received a handsome share of the revenue generated by the show.

4.  Since 2001, ownership of dcp has changed hands twice. In 2002, it was acquired by Mosaic Media Group, Inc., and in 2007 by Red Zone Capital Partners (a private equity firm under the control and management of Red Zone

1  Capital GP, Red Zone Capital Management, and dcp board members Daniel

2  Snyder, Dwight Schar, and Norman Chirite), Six Flags Theme Parks, Inc., ("Six

3  Flags") and an unidentified third-party investor.  Over the last decade, dcp has

4  taken great liberties with its accounting for revenue generated by the Golden Globe

5  Awards shows.  More recently, dcp has begun pursuing agreements to produce,

6  create, or exploit digital rights, ancillary shows, sponsorships, and promotional

7  campaigns, even though it lacks the rights to do so.  And now, dcp has dropped all

8  pretense of cooperation or good faith, and is attempting to assume complete control

9  over the rights to the show.

10       5.     HFPA brings this lawsuit because on October 29, 2010, dcp

11  surreptitiously signed a television broadcast license agreement with NBC

12  Entertainment ("NBC") for the Golden Globe Awards shows through 2018, without

13  HFPA's consent or authorization.  In fact, dcp did not even notify or consult with

14  HFPA before entering into the NBC agreement, in marked contrast with all prior

15  extensions of the NBC agreement.  Rather, dcp proceeded in stealth.  Months

16  earlier, HFPA had specifically instructed dcp not to discuss television broadcast

17  rights with anyone unless and until HFPA and dcp were able to consummate a new

18  deal to extend their soon-to-expire contractual relationship.  dcp assured HFPA that

19  it would never do such a thing, but then broke that commitment by commencing

20  and completing broadcast rights negotiations with NBC—all behind HFPA's back,

21  and all while pretending to negotiate a new contract with HFPA.

22       6.     dcp acts as though it has the unilateral right to license the broadcast

23  rights for the Golden Globe Awards show on whatever terms it pleases, without

24  HFPA's knowledge or authorization.  And dcp claims that, so long as it grants the

25  television broadcast rights for the awards show to NBC—regardless of whether it

26  does so in good faith or at market value—dcp can control the television production

27  and broadcast rights to the Awards in perpetuity.  dcp's actions fly in the face of

28  representations that its executives made to HFPA at the time the original Awards

1   Agreement and later amendments were negotiated and signed.  dcp never bargained

2   for such unlimited and unchecked rights; indeed, it strains credulity to imagine

3   what dcp could have given to induce HFPA to interminably abdicate its most

4   valuable asset.

5       7.      dcp has absolutely no right under the Awards Agreement to grant

6   television broadcast licenses for future Golden Globe Awards shows without

7   HFPA's knowledge and authorization.  Nor does dcp have the right to unilaterally

8   exploit the Golden Globe-related marks, license the digital and other ancillary

9   rights, create promotional campaigns, or sell sponsorships.  HFPA never

10  surrendered these rights, and dcp is now trying to steal them.

11      8.      dcp's motivation for this betrayal is clear.  This is a brazen attempt by

12  dcp not only to extend its television production and licensing rights beyond the

13  terms of the parties' agreement, but to do so in perpetuity.  dcp contends that any

14  unilateral agreement with NBC—even one that involves licensing fees substantially

15  below current market rates—permits dcp to remain as HFPA's licensee and to

16  usurp HFPA's control over the production and broadcast rights for future Golden

17  Globe Awards shows.  dcp is wrong.  Its agreement with NBC has no force or

18  effect because dcp has no broadcast rights to grant.  Even if dcp's view of its rights

19  were to be credited, at most it would have had options.  But those options would

20  have been revocable, and HFPA revoked them in February 2010.

21      9.      Although ineffective, dcp's actions have economic consequences for

22  HFPA.  dcp's bad-faith conduct creates uncertainty about the broadcast rights for

23  the Golden Globe Awards show and severely compromises HFPA's ability to

24  exploit its property.  Until the cloud of this non-agreement, with sub-market rates,

25  is removed, HFPA will be unable to obtain a fair market value for the production

26  and broadcast of the Golden Globes Awards show—its primary asset.

27      10.     HFPA seeks a judgment confirming the invalidity of dcp's recent

28  actions.  HFPA also seeks injunctive relief preventing any marketing, promotion, or

1  other exploitation of its intellectual property and contractual rights in the Golden

2  Globe Awards show without HFPA's permission, and asks that damages be

3  awarded to redress dcp's numerous contractual breaches and bad-faith conduct.

## JURISDICTION AND VENUE

5      11.   This Court has subject matter jurisdiction under the Lanham Act, 15

6  U.S.C. § 1121, and the Copyright Act, 17 U.S.C. § 201(a), and pursuant to 28

7  U.S.C. §§ 1331 and 1338.  This Court has supplemental jurisdiction of California

8  claims under 28 U.S.C. § 1367(a).

9      12.   Defendant dcp is based in Los Angeles County and is subject to the

10  personal jurisdiction of this Court.  Defendants Red Zone Capital Partners, Red

11  Zone Capital GP, and Red Zone Capital Management (collectively, "the Red Zone

12  entities") are based in Virginia and are subject to the personal jurisdiction of this

13  Court because they operate as a single enterprise and are the alter egos of dcp,

14  because HFPA is informed and believes that the Red Zone entities conduct

15  substantial business in California, and because the Red Zone entities engaged in

16  intentional wrongful conduct directed at HFPA, which they knew to be a resident of

17  California.

18      13.   Venue is proper under 28 U.S.C. § 1391 as dcp is a resident of this

19  district, and has its principal place of business in this district; Red Zone Capital

20  Partners, Red Zone Capital GP, and Red Zone Capital Management are corporate

21  entities subject to the personal jurisdiction of this Court, and therefore are deemed

22  residents of this judicial district; and actions giving rise to this dispute occurred in

23  this judicial district.

## THE PARTIES

25      14.   Plaintiff Hollywood Foreign Press Association is a nonprofit

26  corporation organized and existing under the laws of the State of California, with its

27  principal place of business at 646 N. Robertson Blvd., West Hollywood, California

28  90069.

15.     Defendant dick clark productions, inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2900 Olympic Blvd., Santa Monica, California 90404.

16.     Defendant Red Zone Capital Partners II, L.P. is a limited partnership organized and existing under the laws of the state of Delaware, with its principal place of business at 1800 Tysons Boulevard, Suite 500, McLean, Virginia, 22102.

17.     Defendant Red Zone Capital GP, LLC is a limited liability company organized and existing under the laws of the state of Delaware with, on information and belief, its principal place of business at 1800 Tysons Boulevard, Suite 500, McLean, Virginia, 22102.

18.     Defendant Red Zone Capital Management Company LLC is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business at 1800 Tysons Boulevard, Suite 500, McLean, Virginia, 22102.

19.     Since acquiring a controlling majority ownership interest in dcp in 2007, the Red Zone entities have abused the corporate form, exploited dcp for their own gain, and intentionally saddled dcp with over $165 million in debt in order to secure over $105 million of that money for themselves.

20.     The Red Zone entities all have beneficial ownership interests in, and the ability to control, dcp. dcp was acquired when Red Zone Capital Partners purchased all outstanding shares of holding company dcp LLC though CP Investment Holdings, LLC, a holding company that Red Zone Capital Partners formed for tax reasons to acquire dcp. CPIH LLC, another holding company that Red Zone Capital Partners created, is the parent of CP Investment Holdings, LLC. Red Zone Capital Partners owns the controlling majority 58.5% interest in CPIH LLC. dcp President Orly Adelson owns 3% restricted common unit interest in CPIH LLC. Red Zone Capital GP, in turn, is the general partner of Red Zone Capital Partners. On information and belief, Red Zone Capital GP caused Red

Zone Capital Partners to be managed by Red Zone Capital Management, which has an interest in Red Zone Capital Partners through a management agreement with Red Zone Capital Partners. Red Zone Capital Management also manages dcp. dcp entered into two separate executive management services agreements with Red Zone Capital Management in both 2007 and 2010. Plaintiff is informed and believes that, under these agreements, dcp pays Red Zone Capital Management $1.1 million per year in management, consulting, monitoring and advisory fees, up to $750,000 in expenses, and an advisory fee of up to 2% of the value of any transaction structured involving dcp. Dan Snyder and Dwight Schar are the managing members of both Red Zone Capital Management and Red Zone Capital Partners' general partner, Red Zone Capital GP. They are also both members of dcp's board of directors. Indeed, Plaintiff is informed and believes that Red Zone Capital Partners has the power to install seven of the nine members of the board of directors that controls dcp ("dcp directors"). As a result, the Red Zone entities claim the power to control all major decisions concerning dcp.

21. Further, HFPA is informed and believes that: employees of the Red Zone entities direct and perform important functions at dcp; the Red Zone entities' operations and dcp's operations are conducted out of the same offices in both Santa Monica, California and McLean, Virginia; employees do not distinguish between the Red Zone entities and dcp in performing work related to major awards show event management, digital and marketing strategy, and licensing.

22. The Red Zone entities have knowingly abused the above overlaps in ownership and control to HFPA's detriment; in August 2010, the Red Zone entities caused dcp to put up an intellectual property library that includes all of the copyrights to the Golden Globe Awards shows and Pre-Shows as security to obtain a $165 million high-interest short-term loan, which will be used not to reinvest in dcp, but to repay $51 million in bank loans and $800,000 in swap breakage fees, pay $8.2 million in transaction fees and expenses (including 2% of the transaction

1   value to Red Zone Capital Management), and fund a $105 million distribution to

2   dcp's parent and the Red Zone entities.  Due to this crushing debt that the Red Zone

3   entities have directed dcp to guarantee and secure in order to benefit Red Zone

4   Capital, HFPA is further informed and believes that dcp will be unable to answer

5   for any judgment in favor of HFPA against dcp.

6          23.    In sum, a unity of interest and ownership exists between the Red Zone

7   entities and dcp such that they are a single enterprise.  The Red Zone entities have

8   relegated dcp to the status of their mere instrumentality and conduit, and they are

9   manipulating their ownership and control to drain dcp of its assets.  The Red Zone

10  entities are abusing dcp's corporate form to their own benefit and to HFPA's

11  detriment, and unless dcp's acts are treated as those of the Red Zone entities', an

12  inequitable outcome will befall HFPA.

13         24.    The identities and capacities of Defendants Does 1 to 10 are unknown

14  to Plaintiff.  Plaintiff therefore sues these defendants by fictitious names.  As to all

15  defendants sued by fictitious names, Plaintiff will provide notice of this complaint

16  and their true identities and capacities when ascertained.  Plaintiff is informed and

17  believes, and based thereon alleges, that Does 1 to 10 are, and at all relevant times

18  were, other corporate or business entities, agents, successors in interest, assigns,

19  representatives, principals and/or employees of dcp and the Red Zone entities or

20  their affiliates and are responsible for the acts and omissions resulting in the causes

21  of action alleged in this complaint.  Plaintiff is further informed and believes, and

22  based thereon alleges, that each defendant was the agent, employee, servant, partner

23  and/or co-conspirator of each of the other defendants and/or is in some other

24  manner legally liable for the conduct and damages at issue in this action and was

25  acting within the course and scope of one or more of such relationships and with the

26  direct or implied knowledge, consent and/or ratification of each of the other

27  defendants.

28

# THE HOLLYWOOD FOREIGN PRESS AND
# THE GOLDEN GLOBE AWARDS

25.     Founded during World War II, HFPA was originally comprised of a handful of Los Angeles-based overseas journalists seeking to connect the international community with Hollywood and hoping to provide a welcome distraction from the hardships of war through film. Nearly seven decades later, HFPA members today represent some of the world's most respected publications in 55 countries, with a combined readership of 250 million people. Each year HFPA members view more than 300 films and interview over 400 actors, directors, writers and producers. The organization's first awards presentation for distinguished achievements in the film industry was held in early 1944 with an informal ceremony at 20th Century Fox. The next year, the now-famous globe statuette was adopted, and in early 1945 the first official Golden Globe Awards presentation was held at the Beverly Hills Hotel.

26.     HFPA holds multiple federally registered trademarks and service marks in the Golden Globe name (United States Patent & Trademark Registration Nos. 2,424,703; 2,422,897; and 2,381,145), as well as the HFPA name printed on a design of the Golden Globe statuette (United States Patent & Trademark Registration Nos. 2,427,833 and 2,427,955). Those trademarks and service marks are valid and enforceable. In addition, the Golden Globe statuette is the copyrighted property of HFPA. HFPA also owns several Internet domain names incorporating its marks, including www.goldenglobeawards.org. (Copies of these trademark and service mark registrations are attached hereto as Exhibit A.)

27.     HFPA uses proceeds from the Golden Globe Awards to achieve two of its organizational missions: (1) contributing to other nonprofit organizations connected with the entertainment industry through educational, cultural, and humanitarian activities; and (2) promoting interest in the study of the arts through scholarships to major learning institutions. HFPA donates millions of dollars in

1   fellowships and grants to, among other things, help film students complete their

2   thesis projects, fund educational and health videos for residents of Kenyan refugee

3   camps, and provide feature films to entertain hospitalized children.

## THE AGREEMENTS WITH DCP

5       28.   In 1983, HFPA entered into an agreement granting dcp the exclusive

6   rights to produce and license a live television broadcast of the 40th Golden Globe

7   Awards.  The parties agreed that dcp would pay HFPA 50% of the net profits it

8   derived from the rights granted under the agreement.  In addition, HFPA granted

9   dcp four (4) consecutive and exclusive options to acquire from HFPA the same

10   television production and exploitation rights for the 1984, 1985, 1986, and 1987

11   Golden Globe Awards.  dcp licensed the television broadcast rights to Turner

12   Broadcasting System ("TBS") in 1983.

13       29.   In 1987, dcp drafted a new agreement to replace the 1983 contract

14   between it and HFPA (the "1987 Awards Agreement").  (A copy of the 1987

15   Awards Agreement is attached as Exhibit B.)  The 1987 Awards Agreement granted

16   dcp five (5) consecutive and exclusive options to acquire the rights to produce a

17   live television broadcast of and to produce on tape or film the Golden Globe

18   Awards presentations for 1988, 1989, 1990, 1991, and 1992, and to exploit such

19   live television, tape, or film productions.  dcp, in turn, agreed that it would attempt

20   in good faith to arrange for the Golden Globe Awards show to be licensed for live,

21   syndicated, or network domestic television broadcast.  A central objective and

22   common purpose of the 1987 Awards Agreement was to maximize the revenue

23   each party would receive through the broadcast and exploitation of the televised

24   Awards show.  The parties recognized that obtaining the highest broadcast license

25   fee possible for the Awards show telecast was critical to achieving that objective

26   and purpose.  As under the 1983 contract, the 1987 Awards Agreement required

27   dcp to pay HFPA 50% of the net profits it derived from the rights granted under the

28   agreement; required each party to bear certain costs related to the event and

9

1    television production; allowed HFPA to maintain creative control over the

2    presentation and certain elements of the television production; and provided for

3    HFPA and dcp sharing a joint copyright interest in the produced television

4    programs. In 1989, HFPA and dcp amended their agreement to grant dcp five (5)

5    additional options (for the years 1993 through 1997).

6         30.    The rights granted to dcp under the 1987 Awards Agreement did not

7    include the right to produce or license a digital internet stream of the Awards show,

8    and did not cover any ancillary pre- or post-Awards shows, promotional campaigns

9    surrounding the Awards show, or sponsorship opportunities. Nor did the contract

10   grant dcp the right to use HFPA's trademarks and service marks for anything

11   beyond advertising and publicity for the live television, tape, or film productions of

12   the Awards. And even then, the 1987 Awards Agreement required dcp to obtain

13   HFPA's prior approval before issuing any publicity relating to the Awards.

14        31.    The Golden Globe Awards grew in popularity while on TBS in the

15   1980s and early 1990s, and on April 8, 1993, HFPA met with dcp and authorized it

16   to proceed with negotiations for the purpose of obtaining a multi-year broadcasting

17   agreement with NBC for the Golden Globe Awards. At that meeting, dcp had

18   asked HFPA to extend its relationship with dcp, which was ending in 1997. HFPA

19   stated that any additional options to produce a television broadcast and license the

20   show would be dependant on dcp negotiating and securing a firm broadcast

21   licensing commitment from NBC.

22        32.    On September 22, 1993, dcp representatives attended HFPA's general

23   membership meeting. During that meeting, Dick Clark, Francis La Maina, and

24   Gene Weed of dcp described an opportunity to move the television broadcast from

25   TBS to the NBC. The dcp team stated that NBC wanted to enter into a multi-year

26   broadcasting license under which it would broadcast the awards show starting in

27   1996 through 1999, with options through 2005.

28

---

10

33.    At that same meeting, dcp representatives proposed an amendment to the 1987 Awards Agreement that would provide dcp with the necessary additional options to produce and license the Golden Globe Awards television broadcasts for the duration of the proposed NBC broadcast license. HFPA members asked how long it would be potentially extending its agreement with dcp under such an arrangement. The dcp representatives stated that the amendment to the 1987 Awards Agreement would be finite, and that once NBC's broadcasts began in 1996 it would be effective for no longer than 10 years.

34.    HFPA's general membership and board of directors understood that dcp was seeking through this amendment a finite number of additional options to conform to the proposed broadcast license that dcp was negotiating with NBC, and that in no event was HFPA making a commitment to either dcp or NBC beyond 2005.

35.    On information and belief, dcp was fully aware of HFPA's understanding of the proposed amendment to the 1987 Awards Agreement. To the extent that any dcp representative understood the proposed amendment would afford dcp unilateral options to license the television broadcast rights for the Golden Globe Awards show to NBC in perpetuity and to remain as producer in perpetuity under the same terms, that understanding was never disclosed to HFPA. Nor would it have made any sense for HFPA to grant options to dcp in perpetuity: such an arrangement would have been unheard of in the television industry.

36.    Based on the interactions and discussions between the parties, dcp was well aware of HFPA's understanding of the 1993 Amendment. On information and belief, dcp understood the 1993 Agreement to have the same meaning as HFPA at the time of contracting. Indeed, dcp executives Gene Weed and Francis La Maina told HFPA that dcp had always and would always come to HFPA for prior approval before negotiating towards a broadcast license of the Awards show telecast, or any other like efforts.

37.   Based on its understanding of the proposed terms of the broadcast license agreement with NBC, and of the amendment to the 1987 Awards Agreement, HFPA approved proceeding with both the extension of dcp's options as licensee and with the NBC broadcast license pursuant to the proposed amendment to the 1987 Awards Agreement (hereafter referred to as the "1993 Amendment"). (A copy of the 1993 Amendment is attached as Exhibit C.)  Specifically, HFPA approved the 1993 Amendment and the NBC broadcast agreement with the understanding—based on dcp's representations—that HFPA's prior informed approval would be required for: (1) any extension, renewal, substitution, or modification of the broadcast license with NBC; and (2) any further options for dcp to remain as producer of the television program and licensee of the television broadcast rights for the Awards show.

38.   In 1999, the parties negotiated a now-expired contract under which HFPA granted dcp the right to "produce, distribute, promote, advertise and exploit" a one-hour pre-awards show (the "Pre-Show") to be telecast by NBC on the same day as a lead-in to the 2000 Awards, which was to feature "the arrival of celebrities" and "pre-taped segments about dinner menus, gift packages, pressroom interviews in prior years, planning of parties, [and] scenes of celebrities entering (but not inside) the ballroom." (A copy of the 1999 Pre-Show Agreement is attached as Exhibit D.)  HFPA also granted dcp one option to produce the 2001 Pre-Show, and the parties amended the Pre-Show Agreement in 2001 and again in 2003 for HFPA to grant dcp options to produce the Pre-Show in 2002 through 2006.  The Pre-Show Agreement has since expired.

39.   In 2001, NBC expressed interest in broadcasting the Golden Globe Awards through 2011.  In the spring of 2001, representatives of dcp once again made a presentation to HFPA about extending the NBC broadcast license agreement and granting to dcp further options to produce and license the television broadcast of the Awards show.  HFPA decided in favor of both extending the

12

1    broadcast license and granting to dcp further options.  Thereafter, the NBC

2    broadcast license was amended to extend through the 2011 Golden Globe Awards

3    show telecast, and dcp exercised the options that would allow it to remain involved

4    through the January 2011 Golden Globe Awards show.

5                **DCP ATTEMPTS TO ASSUME CONTROL OVER THE GLOBES**

6           40.    On information and belief, in 2002, Dick Clark sold his majority stake

7    in dcp to a group of investors led by Mosaic Media Group, Inc., and in June 2007,

8    Red Zone Capital Partners (one of several similarly named entities owned and

9    controlled by Daniel Snyder), along with Six Flags, purchased, through various

10   entities, dcp for $184 million.  Six Flags represented in its 2009 bankruptcy

11   disclosure filings that an unidentified third-party investor purchased approximately

12   2.0% of dcp from Six Flags and Red Zone Capital Partners in late 2007.  (On

13   information and belief, Red Zone LLC had acquired control of Six Flags in 2005

14   through a successful proxy contest.  Snyder and Schar owned Red Zone LLC, and

15   Mark Shapiro was Red Zone LLC's CEO.  After Red Zone LLC's acquisition of

16   control over Six Flags, Snyder and Dwight Schar became directors and Mark

17   Shapiro became CEO; Six Flags filed for Chapter 11 bankruptcy in 2009 under

18   their control.)  Snyder and Schar, who are both dcp directors and the managing

19   members of Red Zone Capital GP and Red Zone Capital Management, installed

20   Shapiro as Executive Vice Chairman of dcp, and Shapiro holds himself out as Chief

21   Executive Officer of dcp.

22          41.    Unbeknownst to HFPA, dcp and its new corporate parents have been

23   systematically attempting both to assert proprietary interests in the Golden Globe

24   Awards shows, and to encumber the rights to those shows in return for financial

25   benefit that is not being reported to, or shared with, HFPA.  HFPA is informed and

26   believes that dcp has repeatedly represented to third parties that it owns the rights to

27   the Golden Globe Awards show and that it has the unilateral ability to grant all or

28   pieces of those rights without the involvement or consent of HFPA.

42.     For example, HFPA recently hired digital consultants to negotiate with third parties with respect to the digital rights surrounding the Golden Globe Awards.  dcp has no license from HFPA for digital rights.  HFPA's digital consultants had commenced discussions with senior employees at Facebook regarding an online component to complement the live telecast of the Awards show. On information and belief, Facebook was eager to have involvement with HFPA and the Golden Globe Awards, and invited HFPA's consultants to meet in Los Angeles.

43.     On information and belief, dcp was aware of HFPA's interest in forming a business relationship with Facebook, and expressly and knowingly prevented HFPA and Facebook executives from meeting by telling Facebook that dcp owns all digital rights associated with the Golden Globe Awards—even though dcp had never been granted such rights by HFPA.

44.     HFPA is informed and believes that Facebook terminated its discussions with HFPA under the mistaken belief—created by dcp's misrepresentations—that dcp had the exclusive authority to license Golden Globe digital rights to Facebook.

45.     Further, HFPA is informed and believes that several other companies are now involved in dcp's supposed digital plans, and that dcp falsely informed those companies that it owns or otherwise controls digital rights related to the Golden Globe Awards show.

46.     After Red Zone LLC, Snyder, Schar, and Shapiro took control of Six Flags and dcp, Six Flags made public statements about its supposed rights to leverage the Golden Globe Awards show.  In a 2009 bankruptcy filings, Six Flags stated that it "leveraged the dcp library, which includes the Golden Globe Awards . . . to provide additional product offerings in its parks" and that it "believes that its investment in dcp provides it with additional sponsorship and promotional opportunities."  And HFPA recently discovered that dcp claimed for itself copyright

14

1   ownership over the 2007 and 2009 Pre-Shows, even though HFPA is a rightful co-

2   owner of those copyrights.

3       47.    At the same time, dcp has claimed questionable items as production

4   costs, has sold sponsorships without telling HFPA or sharing the revenue, and has

5   neglected to provide regular accounting statements as required under the Awards

6   Agreement.  For example, HFPA discovered after the 2010 Golden Globe Awards

7   that dcp secretly entered into a verbal $200,000 promotional deal with a corporate

8   third party whose representatives believed HFPA had been informed of the deal.

9   But dcp did not inform HFPA of the agreement, and accounted to HFPA for the

10   revenue only after HFPA discovered what had happened from the corporate third

11   party and confronted dcp.

12       48.    By 2010, the Golden Globe Awards—which is HFPA's primary asset

13   and the revenue source for its philanthropic grants—had become one of the most

14   popular, most watched, and most recognized film and television awards programs

15   in the world.  Although the Awards Agreement only required HFPA to negotiate

16   with dcp after the agreement's expiration (following the 2011 Golden Globe

17   Awards show), HFPA representatives broached with dcp in early 2010 the

18   possibility of beginning such talks early in order to give the parties additional time

19   to discuss their relationship.

20       49.    On February 8, 2010, Philip Berk (President of HFPA) sent dcp's

21   Mark Shapiro an email stating that the 2011 Golden Globe Awards show was the

22   "last show" under the existing agreement between HFPA and dcp, and offering to

23   "begin exploring the nature of our relationship after the January 2011 Globes."

24   Mr. Berk noted that entering into discussions early may "provide us with the

25   necessary time to secure the best possible licensing deal."  Mr. Berk was clear that

26   dcp had no right to license any further Golden Globe Awards show beyond the

27   2011 show, and should not pursue any broadcast license involving the Awards

28   show "until we agree upon the nature of any such future relationship."  Thus,

1   Mr. Berk emphasized that "I want to ensure that dcp does not seek or agree to any

2   subsequent broadcast licensing agreement with NBC (or anyone else, for that

3   matter) as dcp's options obviously also expire with that last broadcast in January

4   2011."

5       50.    The following day, Mr. Shapiro responded to Mr. Berk by email,

6   agreeing to early discussions between dcp and HFPA.  Mr. Shapiro noted that there

7   was "no need to remind me or ask me not to seek a new license agreement for the

8   property.  I would never make a move on a network renewal or new home without

9   your involvement."

10      51.    Over the months that followed, HFPA and dcp representatives entered

11  into substantial negotiations over a new agreement that would allow dcp to remain

12  involved in the Golden Globe Awards show after the 2011 broadcast.  The parties

13  and counsel had multiple in-person discussions, telephone conversations, and email

14  exchanges, and made proposals for terms of a new agreement between HFPA and

15  dcp.

16      52.    Joseph Calabrese (outside counsel and lead negotiator for HFPA) met

17  with Shapiro in person on July 14, and spoke again on July 29 and August 7.  On

18  August 13, 2010, Calabrese sent a letter to Shapiro once again noting that the

19  existing Awards Agreement between HFPA and dcp would shortly be expiring, and

20  that without a new agreement dcp's involvement with the Golden Globe Awards

21  show come to an end.  Calabrese stated: "HFPA would very much like to make a

22  new deal with dcp to ensure its continued involvement with the Golden Globe

23  Awards show after 2011.  At this point, dcp has the right to be involved with only

24  one remaining main Awards show . . . .  I appreciate the fact that dcp would like to

25  continue on the same terms as they understand were originally agreed over 13 years

26  ago, but those terms will be expiring soon and are not acceptable to HFPA."

27      53.    That same day, HFPA sent dcp proposed terms for a new agreement.

28  Shapiro called Calabrese on August 16 to discuss moving forward with talks, and

FAC
CASE NO. CV10-8833 VBF (FMOx)

1  on August 19 Shapiro assured Calabrese that dcp wanted to schedule meetings in

2  early September in order to close a deal between dcp and HFPA by September 30.

3  On September 8, Calabrese again met with dcp to negotiate terms of the new

4  agreement.  HFPA and dcp continued to negotiate into late September, and on

5  September 27 they again discussed the potential deal.  Shapiro told HFPA he

6  needed to discuss the matter with his board of directors.  Believing that they were

7  close to reaching a new deal with dcp, HFPA waited for dcp to respond with an

8  acceptance or counter-proposals, following up with dcp twice to inquire as to the

9  status of dcp's response, the last time on October 21.  The response HFPA was

10  waiting for never arrived.

11      54.    Instead, on October 29, 2010, dcp sent Berk a letter informing HFPA

12  that dcp had executed an agreement with NBC that same day under which dcp

13  purported to grant NBC a license for the exclusive broadcast rights to the Golden

14  Globe Awards through 2018.  dcp also sent HFPA a notice, attached hereto as

15  Exhibit E, that dcp was now attempting to exercise the seven options it would have

16  needed in order enter into that agreement—options dcp never had in the first place,

17  options that dcp never bargained for, and (to the extent they ever existed) options

18  that were revocable and had been unequivocally revoked through HFPA's February

19  8, 2010 and August 13, 2010 letters as well as other statements.  In short, dcp

20  granted NBC a broadcasting license for rights that were not dcp's to grant.

21      55.    dcp's announcement of this purported broadcast agreement and its

22  purported exercise of non-existent options blindsided HFPA.  HFPA had not

23  authorized dcp to negotiate over the broadcast rights for any further Golden Globe

24  Awards shows.  In fact, quite the opposite.  HFPA had explicitly informed dcp that

25  it was not empowered to even discuss the broadcast rights with any third parties.

26  Nor did HFPA offer dcp any further options to extend its role in producing the

27  television broadcast of the Golden Globes Award show.  Once again, the opposite

28

17

1  was true:  HFPA had made clear that its relationship with dcp was coming to an end

2  in January 2011 absent the parties reaching a new agreement.

3      56.    dcp's attempt in October 2010 to unilaterally license the television

4  broadcast rights to NBC, and on that basis to attempt exercising options to extend

5  its agreement with HFPA, was the first time in the parties' history that dcp had

6  taken actual and affirmative steps inconsistent with HFPA's understanding that dcp

7  needed its consent before entering into any license agreement for the Golden Globe

8  Awards show broadcast rights.

9      57.    dcp followed a similar pattern with respect to the Pre-Show

10  Agreement.  HFPA repeatedly informed dcp that the Pre-Show Agreement had

11  expired, and the parties engaged in what HFPA believed were good faith

12  negotiations to enter into a new agreement.  All the while, dcp was misleading

13  HFPA, and instead attempted to arrogate HFPA's rights for itself.

14      58.    On information and belief, the license fees that dcp accepted from

15  NBC are well below market rates.  HFPA is informed and believes that dcp entered

16  into the agreement with NBC in the belief that dcp would be able to secure for itself

17  a continuing role as HFPA's licensee, at the expense of acquiring market-level

18  license fees for the broadcast rights and to HFPA's detriment.

19      59.    The timing was not a coincidence.  On information and belief, the Red

20  Zone entities have been quietly seeking buyers for dcp, while in August 2010 they

21  sold $165 million of senior secured first-lien notes in the 144a private placement

22  market to Banc of America Securities LLC and SunTrust Robinson Humphrey, Inc.

23  HFPA is informed and believes that the notes—commonly known as high-risk junk

24  bonds—are due to be repaid in 2015.  HFPA is informed and believes that

25  Defendants secured this money by causing dcp to guarantee the notes on a senior

26  secured basis and placing a first-tier lien on dcp's assets and copyright library that

27  includes all of the Golden Globe Awards shows and Pre-Shows.  No one informed

28  HFPA that its copyright interests were being pledged, nor was HFPA's consent

18

1   obtained.  On information and belief, Defendants will be using the $165 million

2   that must be repaid in just five years to pay back $51 million in existing bank loans,

3   pay $800,000 in swap breakage fees, pay $8.2 million in transaction fees and

4   expenses (including 2% of the transaction value to Red Zone Capital Management),

5   and fund a $105 million distribution to dcp's parent and the Red Zone entities.

## FIRST CLAIM FOR RELIEF

### (Trademark Infringement under 15 U.S.C. § 1114)

8       60.    Plaintiff realleges and incorporates herein by reference, each and every

9   allegation contained in paragraphs 1 through 59, inclusive, of the complaint as

10  though set forth at length.

11      61.    HFPA is the sole owner of multiple federally registered trademarks

12  and service marks in the Golden Globe name (PTO Registration Nos. 2424703,

13  2422897, 2381145), as well as the HFPA name printed on a design of the Golden

14  Globe statuette (PTO Registration Nos. 2427833, 2427955).  HFPA also owns

15  several Internet domain names incorporating its trade and service marks, including

16  www.goldenglobeawards.org.

17      62.    dcp has used HFPA's trademarks and service marks in commerce,

18  without HFPA's knowledge or authorization.  Among other things, on September

19  30, 2010, dcp entered into an agreement with NBC purporting to license the right to

20  broadcast the 2012 to 2018 Golden Globe Awards shows throughout the United

21  States.  dcp is capitalizing, to its great financial benefit, on the fame and goodwill in

22  HFPA's marks, without HFPA's permission or approval.  dcp has the right to use

23  HFPA's marks only in connection with the Golden Globes Awards shows through

24  the 2011 show.  It has no right to license the use of those marks in connection with

25  future shows.

26      63.    In addition, the agreement between dcp and NBC is predicated on, and

27  expressly anticipates, dcp further infringing HFPA's marks and dcp causing NBC

28  to infringe the marks.  The agreement was made for the express purpose of

19

1   imminently exploiting plaintiff's registered marks in interstate commerce by

2   marketing, advertising, producing, and broadcasting the 2012 Golden Globe

3   Awards show (as well as shows in later years).  On information and belief, those

4   efforts in connection with the 2012 Awards show have already begun, and further

5   efforts will commence shortly.

6          64.    On information and belief, dcp has also generally claimed to third

7   parties to have the exclusive right to license, and empower others to make

8   commercial use of, HFPA's Golden Globe-related marks.  For example, on

9   information and belief, dcp falsely represented to Facebook that dcp owned all

10  digital rights associated with the Golden Globe Awards and that it had exclusive

11  authority to license those rights.  dcp made these false representations even though

12  HFPA never granted dcp any authority, let alone exclusive authority, to license

13  such rights.

14         65.    Defendants' unauthorized use of HFPA's marks has already caused

15  and is likely to continue to cause confusion, mistake, and deception.

16         66.    Defendants acted willfully, with the intent to trade upon the goodwill

17  and reputation of HFPA and the Golden Globe Awards show, and with the intent to

18  cause confusion, to cause mistake, or to deceive.

19         67.    On information and belief, the Red Zone entities were aware of dcp's

20  actions, and dcp was acting at their direction and under their control.

21         68.    Defendants' acts, as alleged above, have caused damage and

22  irreparable injury to HFPA in an amount to be determined at trial.  By making

23  unauthorized use of HFPA's marks and creating uncertainty and confusion about

24  the broadcast rights for the Golden Globe Awards show, dcp has, among other

25  things, severely compromised HFPA's ability to exploit its rights in the Golden

26  Globes.  While the cloud of uncertainty hovers, HFPA cannot effectively make any

27  effort to seek fair market rates for the production and broadcast of the Awards

28  show.  Any other potential broadcaster would be "buying a lawsuit."  Defendants'

1   acts will result in further damage and irreparable injury to HFPA if Defendants are

2   not restrained by this Court from further violation of HFPA's rights, for which

3   HFPA has no adequate remedy at law.

4        69.    As a result of the harm suffered as alleged herein, HFPA is entitled to

5   all of the remedies available under the Lanham Act, including actual damages, an

6   accounting of Defendants' profits, treble damages, costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (False Association under 15 U.S.C. § 1125)

9        70.    Plaintiff realleges and incorporates herein by reference, each and every

10  allegation contained in paragraphs 1 through 69, inclusive, of the complaint as

11  though set forth at length.

12       71.    dcp has unilaterally attempted to license the right to broadcast the

13  Golden Globe Awards shows for 2012 through 2018, and is purporting to empower

14  NBC to use HFPA's Golden Globe-related marks to market and advertise the

15  Awards shows, and then to broadcast the unique Golden Globe Awards shows

16  using HFPA's Golden Globe-related marks.  On information and belief, dcp has

17  also generally claimed to third parties to have the right to license and empower

18  others (for example, Facebook) to make commercial use of HFPA's Golden Globe-

19  related marks.  These acts, among others, constitute a false association, a false

20  designation of origin, and a false description or representation of goods and

21  services, tending wrongfully and falsely to describe or represent a connection

22  between both dcp and its purported licensees, on the one hand, and HFPA and the

23  Golden Globe Awards show, on the other hand.  By these acts, Defendants have

24  infringed HFPA's marks in violation of 15 U.S.C. § 1125(a).

25       72.    The impressions of affiliation created by Defendants' use of Plaintiffs'

26  marks are false.  This false impression of association has created and will continue

27  to create confusion as to the continued connection between both dcp and its

28

1   purported licensees, on the one hand, and HFPA and the Golden Globe Awards

2   show, on the other hand.

3       73.   HFPA is informed and believes, and on that basis alleges, that

4   Defendants acted willfully, with the intent to trade upon the goodwill and

5   reputation of HFPA and the Golden Globe Awards show, and with the intent to

6   cause confusion, to cause mistake, or to deceive.

7       74.   On information and belief, the Red Zone entities were aware of dcp's

8   actions, and dcp was acting at their direction and under their control.

9       75.   HFPA has suffered, and will continue to suffer, irreparable damage to

10  its business, reputation, and goodwill resulting from the confusion of potential

11  licensees and the general public regarding the continued association between both

12  dcp and NBC, on the one hand, and HFPA and the Golden Globe Awards show, on

13  the other hand.  As a result, HFPA is entitled to injunctive relief preventing dcp

14  from creating a false impression of association between both dcp and its purported

15  licensees, on the one hand, and HFPA and the Golden Globe Awards show, on the

16  other hand.

17      76.   As a result of the harm suffered as alleged herein, HFPA is also

18  entitled to all of the other remedies available under the Lanham Act, including

19  actual damages, an accounting of Defendants' profits, treble damages, and costs

20  and attorneys' fees.

21                   **THIRD CLAIM FOR RELIEF**

22            **(Declaration of Copyright Co-Ownership)**

23      77.   Plaintiff realleges and incorporates herein by reference, each and every

24  allegation contained in paragraphs 1 through 76, inclusive, of the complaint as

25  though set forth at length.

26      78.   An actual controversy has arisen and now exists between HFPA, on

27  the one hand, and Defendants, on the other hand, relating to their respective rights

28

FAC
CASE NO.  CV10-8833 VBF (FMOx)

1   regarding ownership of the 1990, 1993, 1998, and 1999 Golden Globe Awards, and
2   the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows.  HFPA contends:

3          a)     The 1990, 1993, 1998, and 1999 Golden Globe Awards, as well
4                 as the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Show
5                 productions, are copyrightable as motion pictures or other
6                 audiovisual works.  The agreements between HFPA and dcp
7                 contemplate that HFPA and dcp are co-authors of the Awards
8                 shows and Pre-Shows.  HFPA made substantial and valuable
9                 contributions to these works by exercising creative control and
10                input over the Awards presentations, script content, the identity
11                of presenters and performers appearing on the Golden Globe
12                Awards show, as well as the Pre-Show set decoration, and
13                casting of the Pre-Show hosts.  HFPA and dcp intended that
14                their respective contributions to the 1990, 1993, 1998, and 1999
15                Golden Globe Awards, as well as the 2003, 2004, 2005, 2006,
16                2007 and 2009 Pre-Shows, would be merged into inseparable or
17                interdependent parts of a unitary whole.  Accordingly, each of
18                these motion pictures constitute a "joint work" within the
19                meaning of 17 U.S.C. § 101 and, pursuant to 17 U.S.C. § 201(a),
20                HFPA and dcp are co-owners of the copyright in each of them.
21         b)     dcp listed itself as the sole copyright claimant to the above-
22                mentioned works in violation of HFPA's rights as the owner of a
23                joint work.  Upon information and belief, dcp has derived, and
24                will continue to derive, substantial revenues from the use of the
25                1990, 1993, 1998, and 1999 Golden Globe Awards, and the
26                2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows.
27         c)     As a co-owner of these Awards shows and Pre-Shows, HFPA is
28                entitled, under 17 U.S.C. § 201(a), and to a full and proper

1    accounting with respect to revenue derived from the shows, and

2    to half of all profits attributable to them.

3        79.   HFPA is informed and believes, based on dcp's willful failure to

4    disclose HFPA's status as co-owner of these works to the Copyright Office and

5    dcp's purported transfer of its rights in the above-mentioned works to obtain $165

6    million by selling senior secured first-lien notes in the 144a private placement

7    market to Banc of America Securities LLC and SunTrust Robinson Humphrey,

8    Inc., that dcp disputes these contentions and contends to the contrary.

9        80.   Plaintiff desires a judicial determination of its rights under the

10   Copyright Act of 1976, and a declaration that its contentions, as set forth above, are

11   correct.  Such a declaration is necessary and appropriate in order to set at rest the

12   respective rights and obligations of the parties and to avoid a multiplicity of actions.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract)

15       81.   Plaintiff realleges and incorporates herein by reference, each and every

16   allegation contained in paragraphs 1 through 80, inclusive, of the complaint as

17   though set forth at length.

18       82.   As described above, HFPA and dcp entered into the valid, binding

19   Awards Agreement in 1987, as amended in 1989 and 1993, that expires in January

20   2011.

21       83.   Plaintiff has fully performed all obligations required of it under the

22   Awards Agreement, except for those obligations waived, excused or prevented by

23   dcp.

24       84.   Defendants have materially breached the provisions of the Awards

25   Agreement by, among other things:

26       a)    pursuing agreements to produce, create, or exploit digital internet

27             streams of the Awards show, ancillary shows, promotional

28             campaigns surrounding the Awards show, and sponsorship

24

1  campaigns, and by otherwise trading on the Golden Globe

2  Awards without HFPA's knowledge and consent, in violation of,

3  *inter alia,* the limited grant of rights to dcp under Section 1 of the

4  1987 Awards Agreement (which includes only the right to

5  produce a live television broadcast of, and to produce on tape or

6  film, the Golden Globe Awards, and to exploit such recorded

7  television broadcast, tape, or film productions), and the

8  requirement that dcp not interfere with HFPA's rights pursuant to

9  Section 18 of the 1987 Awards Agreement;

10  b)  unilaterally attempting to sell rights to the Golden Globe Awards

11  show that it did not own, without HFPA's knowledge or consent;

12  c)  encumbering or transferring HFPA's copyright interests in the

13  1990, 1993, 1998, and 1999 Golden Globe Awards without

14  HFPA's knowledge or consent;

15  d)  failing to cause HFPA to be listed as a proper copyright claimant

16  and co-owner of the 1990, 1993, 1998, and 1999 Golden Globe

17  Awards, as required by Section 7 of the 1987 Awards

18  Agreement;

19  e)  entering into at least one sponsorship agreement (with a

20  corporate third party) without HFPA's knowledge or consent and

21  thereafter failing to properly account for HFPA with written

22  documentation thereof, in violation of, *inter alia,* Section 1 of the

23  Awards Agreement's limited grant of rights, and Section 3's

24  requirement that dcp account to HFPA for all profits;

25  f)  taking impermissible deductions of expenses as production costs

26  in violation of, *inter alia,* Section 3 of the 1987 Award

27  Agreement's requirement for accounting to HFPA;

28

g)   improperly apportioning licensing fees when selling the Awards show as part of a "package" with dcp's other, less popular, shows in violation of, *inter alia*, Section 3 of the 1987 Award Agreement's requirement for accounting to HFPA; and

h)   failing to disclose and pay the full compensation owed to HFPA by virtue of any licenses granted to Six Flags or any other entities, in violation of, *inter alia*, Section 3 of the 1987 Award Agreement requirement that dcp account to HFPA for all profits.

85.   On information and belief, the Red Zone entities were aware of dcp's actions, and dcp was acting at their direction and under their control.

86.   As a direct and proximate result of the foregoing and other breaches of the Awards Agreement, Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief)

87.   Plaintiff realleges and incorporate herein by reference, each and every allegation contained in paragraphs 1 through 86, inclusive, of the complaint as though set forth at length.

88.   An actual controversy has arisen, and now exists, between Plaintiff and Defendants concerning their respective rights and duties under the Awards Agreement.  HFPA contends:

a)   dcp had no right to enter into a broadcast license agreement with NBC (or any other broadcaster) for the right to telecast the Golden Globe Awards show for any years after 2011, without HFPA's express knowledge and consent.  Therefore, dcp's agreement with NBC, executed on October 29, 2010, purporting to license the right to telecast the 2012 through 2018 Golden Globes Awards shows is invalid and ineffective.

b)     dcp's exercise in October 2010 of purported options to extend its agreement with HFPA beyond 2011 was not valid or effective. HFPA did not grant dcp such options, and dcp never bargained for such options. To the extent that such options existed, they were revocable based on lack of additional consideration and were revoked by HFPA on February 8, 2010—prior to dcp attempting to exercise them or even attempt to provide any consideration to merit them. Moreover, after HFPA made clear that no options existed for dcp to exercise, dcp agreed to enter into negotiations over a new agreement with HFPA.

c)     The 1993 Amendment does not permit dcp to extend, renew, substitute, or modify the broadcast license agreement with NBC without HFPA's prior knowledge and approval.

d)     The Awards Agreement—including without limitation, the first paragraph of Section 1 of the 1987 Awards Agreement—does not grant dcp the right to produce, create, or exploit digital internet streams of the Awards show, ancillary shows, promotional campaigns surrounding the Awards show, and sponsorship campaigns.

e)     The Pre-Show Agreement has expired, and has no further force and effect.

89.     Based on statements made by dcp's representatives, and on dcp's actions as described above, HFPA is informed and believes, and based thereon alleges, that dcp disputes these contentions and contends to the contrary.

90.     HFPA desires a judicial determination of its and dcp's respective rights and duties under the Awards Agreement, a judicial determination of the parties' rights and duties under the Pre-Show Agreement, and a declaration that HFPA's contentions, as set forth above, are correct.

91.    Such a judicial declaration is necessary and appropriate at this time under the circumstances in order to set at rest the respective rights and obligations of the parties and to avoid a multiplicity of actions.  At present, the parties cannot agree on their respective rights and duties, creating a financial burden and uncertainty regarding future Golden Globe Awards shows.

## SIXTH CLAIM FOR RELIEF

### (Action For an Accounting)

92.    Plaintiff realleges and incorporate herein by reference, each and every allegation contained in paragraphs 1 through 91, inclusive, of the complaint as though set forth at length.

93.    Under the Awards Agreement, HFPA is entitled to 50% of the net profits from the exploitation of the Awards show, as defined under terms that agreement.  Under Section 3 of the Awards Agreement, dcp has a contractual duty to account to HFPA with respect to HFPA's share of net profits on a quarterly basis, and HFPA is entitled to audit the information underlying those accounting statements.

94.    HFPA is also entitled to an accounting of revenue generated by each of the Golden Globe Awards shows based on its status as a copyright co-owner in all Award shows and Pre-Shows produced with dcp.

95.    Defendants have taken impermissible deductions of expenses as production costs in violation of the Awards Agreement to HFPA's material detriment.  Defendants have also failed to properly account for the revenue from at least one sponsorship agreement, which was entered into without HFPA's knowledge or consent, in violation of the Awards Agreement.  HFPA also is informed and believes that Defendants failed to properly account for, among other things:  additional foreign revenue generated through exploitation of Golden Globe Awards shows; revenue generated (and improperly apportioned) by bundling rights to Awards shows in license agreements with Defendants' other, less popular,

1   shows; and benefits it derived, and that were derived, by its affiliated and parent

2   entities, through licensing, transferring or otherwise encumbering rights to the

3   Golden Globes Award shows.  On information and belief, Defendants are also

4   continuing to pursue ancillary agreements that trade on the Golden Globe Awards

5   show, without HFPA's knowledge and consent.

6        96.    On information and belief, the Red Zone entities were aware of dcp's

7   actions, and dcp was acting at their direction and under their control.

8        97.    HFPA requests an order from the Court compelling dcp to account

9   under GAAP for all expenses, costs, revenue, advances, and royalties relating to the

10  distribution, sale, release, display, broadcasting, and licensing of the Golden Globe

11  Awards show, related pre- and post-shows, and any other sources of revenue related

12  to the Golden Globe Awards.

13                    **SEVENTH CLAIM FOR RELIEF**

14      **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

15       98.    Plaintiff realleges and incorporates herein by reference, each and every

16  allegation contained in paragraphs 1 through 97, inclusive, of the complaint as

17  though set forth at length.

18       99.    As described above, HFPA and dcp entered into a valid, binding

19  agreement in 1987, as amended in 1989 and 1993.

20       100.   Pursuant to the covenant of good faith and fair dealing attendant to the

21  parties' agreement, dcp was required to act in good faith in the performance of its

22  obligations, to deal fairly with HFPA, and to refrain from any acts or omissions that

23  would frustrate the purpose of the agreement or deny HFPA the benefit of its

24  agreement, including HFPA's right and interest in maximizing revenue generated

25  through licensing broadcast rights for the Golden Globe Awards show.

26       101.   Defendants knowingly and willfully breached the covenant of good

27  faith and fair dealing by, among other things, failing to take reasonable steps to

28  maximize the license fee for the Golden Globe Awards show.  On information and

29

1    belief, dcp did not solicit license offers from any networks other than NBC, did not

2    consult experts regarding the market value of the license, and did not take other

3    reasonable steps to determine and ensure that NBC's proposed terms for licensing

4    the broadcast rights for the Golden Globe Awards show were above, at, or even

5    near market rates for such rights.

6         102.   On information and belief, the negotiation between dcp and NBC was

7    necessarily compromised because it believed it could only guarantee itself

8    continued rights and interests in the Golden Globe Awards show by entering into an

9    extension, renewal, substitution or modification of the 2001 NBC/dcp Agreement,

10   and as a result dcp:  failed to take reasonable steps towards assessing the fair market

11   value of the rights to broadcast the Golden Globes Award show; acted to benefit

12   itself to the detriment of HFPA by seeking only to explore a license agreement with

13   NBC; and expressly misled HFPA into believing that it was not engaging in

14   negotiations over the broadcast rights with any broadcast networks. Moreover, on

15   information and belief, dcp conducted an abbreviated, hurried negotiation with

16   NBC in order to quickly secure a deal.

17        103.   On information and belief, Defendants have further breached the

18   implied covenant of good faith and fair dealing by, among other things, more

19   generally falsely representing its rights with respect to the Golden Globe Awards

20   show, and ancillary pre- and post-shows.  This includes dcp's false representation

21   that it has the right to enter into a license agreement covering Award shows after

22   2011 and that it has the exclusive right to license the digital rights for the 2011

23   Award show.

24        104.   On information and belief, the Red Zone entities were aware of dcp's

25   actions, and dcp was acting at their direction and under their control.

26        105.   As a direct and proximate result of Defendants' breaches of the

27   implied covenant of good faith and fair dealing, HFPA has suffered substantial

28   damage in the form of being materially comprised in any efforts to actually and

1    effectively license the rights for those same Awards shows.  And in the event that

2    the Court were to determine that dcp's 2010 agreement with NBC is valid, as a

3    direct and proximate result of Defendants' breaches of the implied covenant of

4    good faith and fair dealing, HFPA has been substantially damaged by dcp's

5    acceptance of a below-market license fee from NBC.  HFPA's ability to fully and

6    fairly exploit its rights has been further compromised as a consequence of dcp's

7    false statements about its ownership or control of rights.  HFPA will establish the

8    exact amount of its damages at trial, but they are in the millions of dollars annually.

9    ## EIGHTH CLAIM FOR RELIEF

10    ### (Breach of Fiduciary Duty)

11    106.   Plaintiff realleges and incorporate herein by reference, each and every

12    allegation contained in paragraphs 1 through 105, inclusive, of the complaint as

13    though set forth at length.

14    107.   As described above, HFPA and dcp entered into a valid, binding

15    agreement in 1987, as amended in 1989 and 1993.  Pursuant to the agreement,

16    HFPA entrusted dcp to properly register and maintain the copyrights for the

17    television broadcasts of the Golden Globe Awards shows, and to use HFPA's

18    trademarks and intellectual property only to promote or advertise the Awards

19    television productions.  Consequently, HFPA relied on dcp not to improperly

20    exploit these rights.

21    108.   The trust and confidence HFPA placed in dcp, with regard to its

22    intellectual property rights, created a fiduciary relationship under which dcp owed a

23    fiduciary duty to HFPA.

24    109.   Pursuant to this fiduciary duty, dcp was required to deal fairly with

25    HFPA and to refrain from committing any acts or omissions that would

26    compromise HFPA's intellectual property rights and interests in the Golden Globes.

27    110.   On information and belief, Defendants have breached their fiduciary

28    duty through dcp falsely representing its rights with respect to the Golden Globe

1   Awards show, ancillary pre- and post-shows, and improperly bundling rights to the

2   Award shows with dcp's other, less popular broadcasts.  Also among the breaches

3   are dcp's false representation to NBC that it had the right to enter into a television

4   broadcast license agreement covering Award shows after 2011, and its false

5   representations that it had the exclusive right to license the digital rights associated

6   with the 2011 Awards show.

7       111.   On information and belief, the Red Zone entities were aware of dcp's

8   actions, and dcp was acting at their direction and under their control.

9       112.   As a direct and proximate result of dcp's breaches of fiduciary duties,

10  HFPA has suffered substantial damage in the form of being materially comprised in

11  any subsequent efforts to actually and effectively license the rights for those same

12  award shows, pre- and post- shows, and ancillary rights.  Among other things,

13  HFPA has been substantially damaged by dcp's acceptance of below-market license

14  fees from NBC.  HFPA will establish the exact amount of its damages at trial, but

15  are in the millions of dollars annually.

## NINTH CLAIM FOR RELIEF

**(Unfair Competition Under Cal. Bus. & Prof. Code § 17200 and California**

**Common Law)**

19      113.   Plaintiff realleges and incorporate herein by reference, each and every

20  allegation contained in paragraphs 1 through 112, inclusive, of the complaint as

21  though set forth at length.

22      114.   Defendants' unauthorized use of HFPA's trademarks and service

23  marks, and its related misrepresentations about controlling HFPA's intellectual

24  property, constitute unfair, unlawful, and fraudulent business acts, prohibited by the

25  California Business and Professions Code Sections § 17200 *et seq*. and by the

26  common law of California.

27      115.   Defendants' unfair, unlawful, and fraudulent acts are more specifically

28  alleged above, but include dcp's representations to and agreement with NBC for the

1   period commencing in 2012, dcp's purported empowerment of NBC to exploit

2   HFPA's Golden Globe-related intellectual property, and on information and belief,

3   dcp's misrepresentations to other third parties (including Facebook). By these acts,

4   among others, dcp has violated the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and

5   has committed unlawful, unfair and fraudulent business acts in violation of

6   California Business and Professions Code Sections 17200 *et seq.* dcp's acts also

7   constitute unfair competition in violation of California common law.

8        116.   Defendants'' misconduct has already caused and will continue to cause

9   confusion, mistake, and deception. Defendants acted willfully, with the intent to

10  trade upon the goodwill and reputation of HFPA and the Golden Globe Awards

11  show, and with the intent to cause confusion, to cause mistake, or to deceive.

12       117.   On information and belief, the Red Zone entities were aware of dcp's

13  actions, and dcp was acting at their direction and under their control.

14       118.   Defendants' commission of unfair competition, unlawful business acts,

15  and unfair business acts have caused damage and irreparable injury to HFPA in an

16  amount to be determined at trial, and such acts will result in further damage and

17  irreparable injury to HFPA if Defendants are not restrained by this Court. All

18  profits generated by dcp through its acts of unfair competition should also be

19  ordered disgorged.

20              **TENTH CLAIM FOR RELIEF**

21        **(Intentional Interference with Prospective Economic Advantage)**

22       119.   Plaintiff realleges and incorporate herein by reference, each and every

23  allegation contained in paragraphs 1 through 118, inclusive, of the complaint as

24  though set forth at length.

25       120.   The Golden Globe Awards shows is one of the most anticipated

26  broadcasts of the season. In prepare for another successful Awards show, HFPA

27  and Facebook began conversations regarding the potential for a digital initiative to

28  complement and bolster the Golden Globes Awards show for the 2011 broadcast.

FAC
CASE NO. CV10-8833 VBF (FMOx)

1    In exchange for the rights to host Golden Globes-related content, Facebook was

2    going to pay HFPA a license fee and a share of revenue generated.

3         121.   The agreement with Facebook would have generated substantial

4    revenue for HFPA.  As such, HFPA had a reasonable probability of future

5    economic benefit from this economic relationship with Facebook.

6         122.   On information and belief, dcp began negotiating with Facebook in

7    order to license Golden Globe rights that dcp did not rightfully possess, and

8    wrongly represented to Facebook that dcp had the exclusive right to grant digital

9    rights for the 2011 Golden Globe Awards show.  dcp did so behind HFPA's back,

10   and without its consent or authorization.  As a direct result of dcp conduct,

11   Facebook cut off communications with HFPA's consultants and has since dealt

12   exclusively with dcp.

13        123.   On information and belief, dcp was aware of HFPA's ongoing

14   discussions with Facebook.  HFPA's consultants and Facebook discussed a meeting

15   that Facebook had with dcp, and only after that meeting did Facebook cut off

16   communications with HFPA.

17        124.   Defendants' conduct was otherwise wrongful as a false representation

18   constituting, among other things, unfair competition under California Business &

19   Professions Code section 17200.

20        125.   On information and belief, the Red Zone entities were aware of dcp's

21   actions, and dcp was acting at their direction and under their control.

22        126.   As a direct and proximate result of Defendants' wrongful conduct, it

23   disrupted HFPA's economic relationship with Facebook and its ability to enter into

24   a licensing agreement.  HFPA has consequently been substantially damaged in an

25   amount to be proven at trial.

26

27

28

34

## ELEVENTH CLAIM FOR RELIEF

### (Reformation)

127.   Plaintiff realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 126, inclusive, of the complaint as though set forth at length.

128.   dcp claims to be empowered by the 1993 Amendment to extend or renew the broadcast license with NBC forever, without HFPA's specific consent or authorization.  dcp points to the provision that states:  "This will confirm that the [1987 Awards] Agreement is hereby further amended to provide that HFPA grants to dcp eight (8) additional, consecutive, exclusive, and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, and for any extensions, renewals, substitutions or modifications of the NBC Agreement, and to exploit such productions in all media through the world in perpetuity."

129.   Based on its own reading of the words of the 1993 Amendment, and on statements by dcp representatives in 1993, HFPA understood at the time of contracting (and still understands) that provision to merely anticipate the possibility of HFPA extending further options to dcp to remain involved in the Golden Globe Awards show in the event that the NBC broadcast license is extended, renewed, substituted, or modified with HFPA's approval.  Neither the language of the 1993 Amendment, nor any other operative document executed by both parties, affords dcp the right to unilaterally enter into a license agreement with NBC, without HFPA's knowledge and approval, in order to trigger further contractual options for dcp under the Awards Agreement.

130.   However, to the extent that the Court were to interpret the 1993 Amendment to empower dcp to extend, renew, substitute, or modify an existing broadcast license with NBC, without HFPA's knowledge and authorization, then

1   reformation of the 1993 Amendment to add the words "entered into with HFPA's

2   approval" is necessary and proper on one or more of the following grounds:

3         a)    The absence of the phrase "entered into with HFPA's approval"

4           after the word "Agreement" on the ninth line of the third

5           paragraph of the 1993 Amendment is a result of a mutual

6           mistake, and it is contrary to the parties' intent to interpret the

7           1993 Amendment as only permitting dcp to extend, renew,

8           substitute, or modify an existing broadcast license with NBC

9           with HFPA's specific approval and authorization.  To grant dcp

10          the ability to license HFPA's intellectual property without any

11          authorization from HFPA would reverse the parties' basic

12          assumptions about the effect of the 1993 Amendment, and

13          would have a material effect on the parties' agreed-upon

14          exchange.

15        b)    dcp knew HFPA did not intend to waive all future approval

16          rights of a proposed extension, renewal, substitution or

17          modification of the license of its intellectual property, and dcp

18          did not express to HFPA its understanding that the 1993

19          amendment should or could be interpreted in that manner at the

20          time of contracting.  To the extent that dcp knew or believed at

21          the time of contracting that the 1993 amendment would allow

22          dcp to extend, renew, substitute, or modify an existing broadcast

23          license with NBC without HPFA's specific approval and

24          authorization, the 1993 Amendment should be reformed because

25          it does not accurately reflect HFPA's intent by reason of

26          HFPA's unilateral mistake coupled with fraudulent or

27          inequitable conduct by dcp in that it was or should have been

28          aware of HFPA's mistake.

       c)    Irrespective of dcp's intent, the 1993 amendment should be reformed because the interests of justice so require, since construing amendment as a waiver of HFPA's future approval rights of any extension, renewal, substitution, or modification of an existing broadcast license with NBC does not reflect HFPA's intent.

131.    With respect to all grounds for reformation, HFPA did not undertake the risk of mistake under the 1993 Amendment and only came to learn of this mistake on October 29, 2010, when dcp for the first time took actual and affirmative steps that were inconsistent with HFPA's understanding that its consent was required for any license of the Golden Globe Awards show broadcast rights.

132.    Whether based on mutual mistake, on unilateral mistake coupled with fraudulent or inequitable conduct, on the interests of justice, or on some combination thereof, the phrase "entered into with HFPA's approval" should be added to the ninth line of the third paragraph of the 1993 Amendment. Such reformation will conform the language of the 1993 Amendment to reflect the parties' true intent at the time of contracting.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For actual and compensatory damages in an amount to be determined at the trial of this action;

2.    For disgorgement of all profits generated by Defendants through their wrongful acts;

3.    An order directing Defendants to account to HFPA for all revenue and profits generated by each of the Golden Globe Awards shows;

4.    For a declaration of the parties' contractual rights and obligations as alleged herein above;

5. For a preliminary and permanent injunction against Defendants enjoining them and their officers, agents, employees, and representatives from using HFPA's trademarks and service marks for any purpose other than the promotion, advertising, and broadcast of the 2011 Golden Globe Awards show;

6. A declaration that HFPA is a co-owner of all rights, title, and interest in the copyrights to the 1990, 1993, 1998, and 1999 Golden Globe Awards, and the 2003, 2004, 2005, 2006, 2007 and 2009 Pre-Shows;

7. For exemplary and punitive damages;

8. For costs of suit herein incurred;

9. For reasonable attorneys' fees in accordance with Section 19 of the 1987 Awards Agreement and the Lanham Act, 15 U.S.C. § 1117, and the Copyright Act, 17 U.S.C. § 505;

10. For all allowable interest on any monetary award to HFPA at the legal rate;

11. For any other orders necessary to accomplish complete justice between the parties; and

12. For such other and further relief as this Court may deem just and proper.

Dated:  March 9, 2010

LINDA J. SMITH
ROBIN M. WALL
AMY R. LUCAS
O'MELVENY & MYERS LLP


By: _Linda J. Smith_
LINDA J. SMITH
Attorneys for Plaintiff
Hollywood Foreign Press Association

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, HFPA hereby demands a trial by jury for all issues triable to a jury.


Dated:   March 9, 2011

LINDA J. SMITH
ROBIN M. WALL
AMY R. LUCAS
O'MELVENY & MYERS LLP


By: _Linda J Smith_
LINDA J. SMITH
Attorneys for Plaintiff
Hollywood Foreign Press Association

FAC
CASE NO. CV10-8833 VBF (FMOx)

**EXHIBIT A**

Int. Cl.: **41**

Prior U.S. Cls.: **100, 101 and 107**

## United States Patent and Trademark Office

Reg. No. 2,424,703

Registered Jan. 30, 2001

### SERVICE MARK
### PRINCIPAL REGISTER

## GOLDEN GLOBE

HOLLYWOOD FOREIGN PRESS ASSOCIATION (CALIFORNIA CORPORATION)
292 SOUTH LA CIENEGA BLVD., SUITE 316
BEVERLY HILLS, CA 90211

FOR: ENTERTAINMENT IN THE NATURE OF AN AWARD CEREMONY PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT; PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT THROUGH THE ISSUANCE AND PRESENTATION OF AWARDS; ENTERTAINMENT SERVICES, NAMELY, PROVIDING INFORMATION IN THE FIELD OF ENTERTAINMENT AND INDUSTRIES VIA TELEVISION AND VIA A GLOBAL COMMUNICATIONS NETWORK; PRODUCTION OF TELEVISION SHOWS AND CABLE TELEVISION PROGRAMS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 0–0–1943; IN COMMERCE 0–0–1943.

SER. NO. 75–749,028, FILED 8–10–1998.

TRICIA SONNEBORN, EXAMINING ATTORNEY

Exhibit A
40

Int. Cl.: 16

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38 and 50

**United States Patent and Trademark Office**

Reg. No. 2,422,897

Registered Jan. 23, 2001

## TRADEMARK
### PRINCIPAL REGISTER

## GOLDEN GLOBE

HOLLYWOOD FOREIGN PRESS ASSOCIATION (CALIFORNIA CORPORATION)
292 SOUTH LA CIENEGA BLVD., SUITE 316
BEVERLY HILLS, CA 90211

FOR: PRINTED MATTER, NAMELY, BOOKS, BOOKLETS, PAMPHLETS, GUIDES, INTERVIEW TRANSCRIPTS AND INFORMATIONAL FLYERS IN THE FIELDS OF THE ENTERTAINMENT INDUSTRY AND JOURNALISM, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 0–0–1943; IN COMMERCE 0–0–1943.

SER. NO. 75–749,030, FILED 8–10–1998.

TRICIA SONNEBORN, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 2,381,145

Registered Aug. 29, 2000

### SERVICE MARK
### PRINCIPAL REGISTER

## GOLDEN GLOBE

HOLLYWOOD FOREIGN PRESS ASSOCIATION (CALIFORNIA CORPORATION)
292 SOUTH LA CIENEGA BLVD., SUITE 316
BEVERLY HILLS, CA 90211

FOR: ASSOCIATION SERVICES, NAMELY PRO-MOTING THE PROGRESS AND ACHIEVEMENT OF PROFESSIONALS IN THE FIELDS OF POPULAR EN-TERTAINMENT AND JOURNALISM, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 0–0–1943; IN COMMERCE 0–0–1943.

SER. NO. 75–749,029, FILED 8–10–1998.

TRICIA SONNEBORN, EXAMINING ATTORNEY

Int. Cls.: 35 and 41

Prior U.S. Cls.: 100, 101, 102 and 107

Reg. No. 2,427,833

## United States Patent and Trademark Office

Registered Feb. 13, 2001

## SERVICE MARK
### PRINCIPAL REGISTER



HOLLYWOOD FOREIGN PRESS ASSOCIATION (CALIFORNIA CORPORATION)
292 SOUTH LA CIENEGA BLVD.
SUITE 316
BEVERLY HILLS, CA 90211

FOR: ARRANGING AND CONDUCTING TRADE SHOW EXHIBITIONS IN THE FIELDS OF POPULAR ENTERTAINMENT AND JOURNALISM; PROMOTING THE SALE OF GOODS AND SERVICES OF OTHERS THROUGH THE PREPARATION AND DISSEMINATION OF PRINTED MATERIALS, IN PRINTED PROMOTIONAL MATERIALS OF OTHERS, AND BY DISSEMINATION OF ADVERTISING FOR OTHERS THROUGH TELEVISION PROGRAMMING, MOTION PICTURES, AND A GLOBAL COMMUNICATIONS NETWORK; PROMOTING THE GOODS AND SERVICES OF OTHERS BY ARRANGING FOR

SPONSORS TO AFFILIATE THEIR GOODS AND SERVICES WITH AN AWARDS PROGRAM WHICH ACKNOWLEDGES THE PROGRESS AND ACHIEVEMENT OF PROFESSIONALS IN THE FIELDS OF POPULAR ENTERTAINMENT AND JOURNALISM; PUBLIC RELATIONS; PROVIDING TRADE INFORMATION AND CONSULTATION IN CONNECTION THEREWITH, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 0-0-1944; IN COMMERCE 0-0-1944.

FOR: ENTERTAINMENT IN THE NATURE OF AN AWARD CEREMONY PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT; PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT THROUGH THE ISSUANCE AND PRESENTATION OF AWARDS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 0-0-1944; IN COMMERCE 0-0-1944.

Int. Cls.: 35 and 41

Prior U.S. Cls.: 100, 101, 102 and 107

**United States Patent and Trademark Office**

Reg. No. 2,427,955

Registered Feb. 13, 2001

## SERVICE MARK
### PRINCIPAL REGISTER



HOLLYWOOD FOREIGN PRESS ASSOCIATION (CALIFORNIA CORPORATION)
292 SOUTH LA CIENEGA BLVD., SUITE 316
BEVERLY HILLS, CA 90211

FOR: ARRANGING AND CONDUCTING TRADE SHOW EXHIBITIONS IN THE FIELDS OF POPULAR ENTERTAINMENT AND JOURNALISM; PROMOTING THE SALE OF GOODS AND SERVICES OF OTHERS THROUGH THE PREPARATION AND DISSEMINATION OF PRINTED MATERIALS, IN PRINTED PROMOTIONAL MATERIALS OF OTHERS, AND BY THE DISSEMINATION OF ADVERTISING FOR OTHERS THROUGH TELEVISION PROGRAMMING, MOTION PICTURES, AND A GLOBAL COMMUNICATIONS NETWORK; PROMOTING THE GOODS AND SERVICES OF OTHERS BY ARRANGING FOR SPONSORS TO AFFILIATE THEIR GOODS AND SERVICES WITH AN AWARDS PROGRAM WHICH ACKNOWLEDGES THE PROGRESS AND ACHIEVEMENT OF PROFESSIONALS IN THE FIELDS OF POPULAR ENTERTAINMENT AND JOURNALISM; PUBLIC RELATIONS; PROVIDING TRADE INFORMATION AND CONSULTATION IN CONNECTION THEREWITH, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 0-0-1952; IN COMMERCE 0-0-1952.

FOR: ENTERTAINMENT IN THE NATURE OF AN AWARD CEREMONY PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT; PROMOTING EXCELLENCE IN THE FIELD OF POPULAR ENTERTAINMENT THROUGH THE ISSUANCE AND PRESENTATION OF AWARDS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 0-0-1952; IN COMMERCE 0-0-1952.

THE LINING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

**EXHIBIT  B**

FULLY EXECUTED ORIGINAL

**productions, Inc.**

As of March 13, 1987
Revised July 15, 1987

Hollywood Foreign Press Association
292 South La Cienega Boulevard
Beverly Hills, California  90211

Re:  "GOLDEN GLOBE AWARDS"

Gentlemen:

This letter will serve to confirm the agreement reached between dick clark productions, inc. ("dcp") and Hollywood Foreign Press Association ("HFPA") relating to the Golden Globe Awards ("Awards") as follows:

    1.   dcp has previously produced Awards presentations in accordance with the agreement between HFPA and dcp dated as of January 7, 1983, as revised.  HFPA now grants to dcp five (5) consecutive, exclusive, irrevocable options to acquire the exclusive rights to produce a live television broadcast of and to produce on tape or film the Awards presentations for 1988, 1989, 1990, 1991 and 1992, and to exploit such productions in all media throughout the world in perpetuity.

Each respective option shall be exercised, if at all, by written notice to HFPA not later than July 15 of the year immediately preceding the Awards presentation with respect to which such option is exercised.  If dcp fails to exercise any of these options hereinabove stated, all options, except those previously exercised, shall be null and void and of no legal effect, and the agreement shall be terminated.  However, the sharing agreement between the parties for previously completed productions shall remain operative.

If dcp has exercised all of its options under this agreement, dcp and HFPA shall negotiate with respect to the production of subsequent Awards presentations in the manner set forth below:

**dick clark**

Exhibit B
45

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 2

    a.  dcp and HFPA shall negotiate exclusively for a period of thirty (30) days (hereinafter referred to as the "Negotiating Period") with respect to the terms and conditions relating to production of such subsequent Awards presentations.  The Negotiating Period shall commence thirty (30) days after the date of first broadcast of the 1992 Awards presentation.  Such Negotiating Period may be mutually extended for so long as the parties continue to negotiate in good faith. Prior to and during the Negotiating Period, HFPA shall not discuss with any third party the production, sale, or licensing of any additional Awards presentations.

    b.  If after the Negotiating Period dcp and HFPA shall not have agreed upon applicable terms and conditions with respect to the production of such subsequent Awards presentations, HFPA shall be free to offer such rights to any third party, but HFPA will not grant such rights to any third party on terms and conditions less favorable than those contained in dcp's last offer to HFPA during said Negotiating Period without first offering in good faith to contract with dcp on such terms, in which event dcp shall have a period of five (5) business days to accept such offer.  It is understood that dcp has to meet only those terms and conditions in such offer which relate solely to the production of the Awards presentations and which shall readily be reducible to a payment of a determinable sum of money.  If dcp fails to accept such offer, HFPA shall be free to offer such rights to a third party; provided, however, that in each instance HFPA shall make a similar offer, as aforesaid, to dcp before granting such rights to others on terms and conditions less favorable than those last offered by dcp during said Negotiating Period. Notwithstanding anything to the contrary contained herein, the foregoing shall be applicable until such time as HFPA shall have entered into an agreement with a third party pursuant to all of the foregoing provisions or July 15, 1992, whichever first occurs.

    2.  dcp agrees to endeavor in good faith to cause the Awards to be licensed for live, syndicated or network domestic television broadcast.  In the event a license for a live

Exhibit B
46

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 3

broadcast cannot be obtained, dcp agrees that it will tape
and/or film the Awards and that it will endeavor in good faith
to cause such production to be exploited by means of television
syndication and otherwise.  dcp agrees that its production will
be consistent in quality with prior productions and HFPA's
professional stature and suitable for television broadcast in
the United States according to prevailing broadcast standards
for comparable programs, with due regard for the approximate
cost of production, timing requirements and HFPA's creative
controls as hereinafter set forth.

    3.    dcp shall pay to HFPA sums equal to fifty percent
(50%) of one hundred percent (100%) of net profits, if any,
derived from the exploitation of dcp's rights pursuant to this
agreement.  Net profits shall be defined as the balance
remaining after the deduction from gross receipts of the
following:

        a.   Distribution fees and sales commissions
    (provided, however that dcp shall not be entitled to
    receive any distribution fees or sales commissions);

        b.   Distribution expenses; and

        c.   Cost of production, provided however that dcp
    shall not be entitled to an overhead fee, whether
    percentage or flat.

dcp will account to HFPA with respect to its share of net
profits on a quarterly basis beginning after the first
exploitation of its rights under this agreement.  dcp agrees to
use best efforts to require quarterly accountings from its
licensor with interest at twelve percent (12%) per annum on all
payments not made by Licensor when due.  Both dcp and HFPA
shall be entitled to customary audit and inspection rights.

    4.    If dcp exercises one or more of its options, dcp
shall be deemed to have acquired the rights specified in this
agreement, subject to the following:

        a.   The 1988 broadcast will be three (3) hours in
    length.   Thereafter, for subsequent Awards presentations
    HFPA will notify dcp not later than April 15 of the

Exhibit B
47

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 4

year preceeding the Awards presentation as to the length of the next year's broadcast.

b. If dcp licenses the broadcast of a two (2) hour Awards presentation for live network broadcast by ABC, CBS or NBC, or by any other television network the gross license fee for which is equal to or exceeds the sum of One Million Two Hundred Thousand Dollars ($1,200,000), then dcp shall pay to HFPA a sum equal to five percent (5%) of the gross network license fee. Such sum shall be deemed to constitute an element of the cost of production for the applicable Awards presentation production. In the event net profits are derived from such production, dcp shall be entitled to receive, as an additional element of the cost of production, an amount equal to the five percent (5%) fee paid to HFPA out of sums which would otherwise constitute first net profits, and thereafter HFPA shall be entitled to its fifty percent (50%) share of remaining net profits. (In the event dcp licenses the broadcast of a three (3) hour network presentation, the license fee must equal or exceed One Million Eight Hundred Thousand Dollars ($1,800,000).)

c. In the event dcp has not recouped the entire cost of production for the Awards presentation in any given year, then dcp shall be entitled to recoup any such deficit(s) from fifty percent (50%) of HFPA's fifty percent (50%) share of net profits derived from subsequent Awards presentations produced by dcp, if any. The other fifty percent (50%) of HFPA's share of net profits shall be paid to HFPA. The balance of dcp's share of net profits shall be applied toward recoupment.

d. The awards presentations shall be scheduled for the last Saturday in January; provided, however, that if HFPA desires to reschedule any specified date, it shall first consult with dcp in good faith.

5. dcp shall be responsible for, and shall pay, all costs attributable to the performance of its television production obligations under this agreement. Except as expressly provided to the contrary in this agreement, the costs of production for which dcp shall be responsible shall not include costs which HFPA would otherwise have incurred (i.e.,

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 5

rental for the banquet room, food, beverages, insurance for the banquet and like banquet expenses) in the absence of television coverage of the Awards presentation, and HFPA shall be responsible for and shall pay all such costs. It is expressly understood that dcp shall contract for, and shall pay compensation, including union required fees (or in excess of union scale if dcp so elects), fringes and residuals, as applicable, for the producer(s), host(s), presenters, performers, musicians, television writer(s) and director, the cost of customary television production insurance, the cost of audio facilities for the awards banquet and such other costs as shall be required as a result of production for television broadcast (as contrasted to costs which would be incurred if the awards banquet were not the subject of a television production), including television crew, equipment, cue cards and the like. (It is understood that although HFPA has creative control rights as hereinafter set forth, dcp shall have a right of reasonable approval with regard to the selection and number of such persons in light of its financial responsibilities relating thereto.)

dcp agrees to pay, as elements of cost of production the following:

    a.   HFPA's third party publicist (not to exceed Two Thousand Dollars ($2,000);

    b.   Banquet tickets, at HFPA's actual cost, for approximately fifty-two (52) persons, including host(s), performers and presenters, the exact number to be determined by mutual agreement of the parties. Provided, however, that tickets for dcp's invited guests will be paid for by dcp at HFPA's actual cost. HFPA guarantees that at least ten (10) tickets will be available for dcp's invited guests;

    c.   Hotel rooms (provided, however, that HFPA will provide two (2) suites and two (2) rooms without charge to dcp);

    d.   All firemen;

    e.   All security personnel; and

    f.   Limousine transportation for the host(s), presenters and performers appearing at the Awards presentation.

Exhibit B
49

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 6


dcp shall also pay, as an element of the cost of production one
half (1/2) of the costs attributed to the counting of the
Awards ballots payable by HFPA to the firm of certified public
accountants.  dcp agrees that for the 1988 broadcast that firm
shall be Arthur Young and Company.  For subsequent years HFPA
will consult with dcp before entering into any agreement with
an accounting firm for such services.

6.    HFPA shall have creative control over the Awards
live presentations; provided, however, that HFPA shall not
exercise such control in a manner which would frustrate the
purposes of this agreement and shall cause such presentations
to be conducted in a manner creatively consistent with
television broadcast standards and requirements.  In the event
dcp licenses any production for national television network
broadcast, then dcp and HFPA shall have mutual creative control
in connection with dealings relating to creative matters with
the network.

7.    dcp shall have control over the television
production aspects of the Awards insofar as the performance of
dcp's responsibilities are concerned and shall, in addition,
have control over all matters relating to the distribution and
exploitation of the rights granted to it pursuant to this
agreement.  In this regard, dcp shall cause the television
production of the Awards to be copyrighted jointly in the names
of dcp and HFPA.  dcp shall have the sole right to administer
and exploit the rights therein and to execute in dcp's name any
and all distribution agreements, license agreements and such
other agreements as may relate to the production and exploita-
tion of dcp's television production(s) of the Awards
presentation(s) and the copyright(s) relating thereto.  dcp
shall have the sole right to intiate proceedings to enforce its
rights, including without limitation the rights to
copyright(s), and in the event that dcp initiates proceedings
to enforce any such copyright, any recoveries (i.e., after
deduction of attorneys' fees and costs, which will be advanced
by dcp and recoupable by dcp from gross receipts) shall be
deemed included in the calculation of HFPA's profit
participation.


Exhibit B
50

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 7

8.   dcp shall have no obligation to bear or pay any agency commissions, packaging, or otherwise, to the William Morris Agency or any other agency which HFPA has engaged or may engage for any reason, and HFPA shall defend and indemnify dcp against any claims, actions, liabilities, damages, costs or expenses (including attorneys' fees) relating thereto.

9.   dcp agrees to provide copies of all contracts relating to the exercise of its rights pursuant to this agreement to a designated representative of HFPA for informational purposes, including without limitation, television syndication agreements, network license agreements and the like.  Similarly, HFPA will, upon request, furnish dcp with copies of agreements relating to the business of conducting the Awards presentations, including, but not limited to, facilities agreements, agreements with accountants and the like.

10.   dcp will not issue publicity relating to the Awards without HFPA's prior approval.  Similarly, HFPA will not issue publicity concerning dcp's participation in the Awards television production without dcp's prior approval.

11.   HFPA represents that it will not include the use of clips or excerpts from motion pictures or television programs in the Awards presentations without dcp's prior written consent.  HFPA will use its best efforts in assisting dcp to obtain clearances for use of clips or excerpts without cost.

12.   dcp will furnish to HFPA one (1) video-cassette, at dcp's expense, of its completed television production of the Awards presentation.

13.   dcp and HFPA agree that television production credits will be accorded in connection with the Awards presentation(s) as follows:

     a.   An audio presentation credit will be accorded to HFPA at the opening of the program substantially in the following form:  "The Hollywood Foreign Press Association presents...."

     b.   A production credit will be accorded to dcp.

Exhibit B
51

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 8

    c.  Credit will be accorded to Dick Clark as the
Executive Producer.

    d.  Credit will be accorded to The Hollywood
Foreign Press Association as Executive Producer of the
Golden Globe Awards Event.

    e.  Credit will be accorded to Francis C. La Maina
as the Executive in Charge of Production.

    f.  dcp will accord credits to not more than five
(5) individuals designated by HFPA in a timely manner
substantially as follows:  "For The Hollywood Foreign
Press Association (insert names of not more than five (5)
individuals)."

    g.  Other credits will be reasonably consistent
with those credits which were accorded in connection with
the television production of prior Awards presentations.

    h.  Credits will in all events be customary and
consistent with television broadcast standards and
requirements, and if any production is licensed to a
television network for broadcast, such credits shall be
consistent with the standards and requirements of such
network.

14.  HFPA grants to dcp the nonexclusive right to use
the names "Golden Globe," "Golden Globe Awards," "Hollywood
Foreign Press Association," "The F.P.A. Association" and such
other proprietary names, trademarks, trade names and
copyrightable materials as may be controlled by HFPA in
connection with advertising and publicity for dcp's
production(s) pursuant to this agreement.

15.  HFPA agrees to cooperate with dcp in procuring
signed written releases, in form satisfactory to dcp, by all
persons appearing on camera during the course of the Awards.
In addition, HFPA agrees to furnish signed written agreements,
in form satisfactory to dcp, authorizing the use of any
facilities utilized by HFPA for the Awards on television and
the use of any firm or trade names utilized during the course
of the Awards, including without limitation, the name(s) of the
certified public accountants whose services are utilized by
HFPA in connection with the counting of ballots.

16.  All revenue derived by HFPA from the sale of
tickets for the Awards banquet(s) shall be the sole property of
HFPA.

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 9

17.   dcp and HFPA each represent to the other that they are familiar with the terms of Sections 317 and 507 of the Federal Communications Act, and each represents and agrees that it has not violated and will not violate any provisions of such section, nor will either do any act which would require disclosure pursuant to such section.

18.   HFPA represents that it is exclusive owner of, and controls, all rights granted to dcp, that it has the right to enter into and perform this agreement and grant the rights herein granted to dcp and that it has not done nor will it do any acts which would interfere with the full enjoyment of dcp's rights.  HFPA further represents that none of the material furnished by it in connection with the Awards presentation will violate, nor will its conduct or exercise of rights with respect to the Awards or their presentation violate, any laws or rights of any person, firm or corporation.  dcp represents that it has the right to enter into this agreement and that it has not done nor will it do any act which will interfere with the enjoyment of HFPA's rights.  dcp represents to the best of its ability that none of the material furnished by it in connection with its television coverage of the Awards presentation will violate any laws or rights of any person, firm or corporation.  Each party agrees to defend, indemnify and hold the other (and its licensees, officers and agents) harmless from and against any claims, actions, liabilities, damages, costs and expenses (including reasonable attorneys' fees) arising out of the breach of its respective promises and representation in this agreement.

19.   This agreement contains the entire agreement of the parties, supersedes all prior negotiations and/or agreements, and may only be or amended or modified by written instrument signed by the party to be charged.  Neither party has entered into this agreement in reliance upon any promise or representation not contained in this agreement.  Nothing contained in this agreement shall constitute either party the agent of the other.  Neither dcp nor HFPA shall assign or otherwise transfer this agreement without prior written consent of the other, and any attempted or purported assignment or transfer shall be void.  Each party agrees to sign and deliver to the other such documents as may be reasonably requested to further evidence or effectuate the purposes of this agreement. This agreement shall be governed by California law.  In the

Exhibit B
53

Hollywood Foreign Press Association
March 13, 1987; Revised July 15, 1987
Page 10

event of litigation between the parties, the prevailing party
shall be entitled to recover its attorneys' fees and costs from
the other.

Please signify your agreement to the terms recited in this
letter agreement by signing in the space provided for that
purpose.

Very truly yours,

Michael A. Tenzer
Vice President of
Business Affairs

MAT:hg

AGREED TO AND ACCEPTED:

HOLLYWOOD FOREIGN PRESS ASSOCIATION

By: _Mark Margouk_

Title: _President  7-20-87_

AGREED TO AND ACCEPTED:

dick clark productions, inc.

By: _Michael Tenzer_

Title: _V.P. Business Affairs_

0738F

Exhibit B
54

**EXHIBIT C**

September 22, 1993

Mirjana Van Blaricom
President
Hollywood Foreign Press Association
292 S. La Cienega
Beverly Hills, CA  90211

ORIGINAL



RE: "GOLDEN GLOBE AWARDS"

Dear Mirjana:

Reference is made to the agreement between dick clark productions, inc. ("dcp") and the Hollywood Foreign Press Association ("HFPA") dated as of March 13, 1987 as revised July 15, 1989, and amended November 13, 1989, relating to the Golden Globe Awards (the "Agreement").  The Agreement, as amended, provides that HFPA grants dcp options to acquire the exclusive rights to produce the Golden Globe Awards presentations ("Awards") through 1997.

dcp is entering into an agreement with the National Broadcasting Company, Inc. ("NBC Agreement") for the annual broadcast of the Awards commencing in 1996 and continuing, on an optional basis through 2005, which may be accelerated to commence in 1994.

This will confirm that the Agreement is hereby further amended to provide that HFPA grants to dcp eight (8) additional, consecutive, exclusive, and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, and for any extensions, renewals, substitutions or modifications of the NBC Agreement, and to exploit such productions in all media throughout the world in perpetuity.

This will also confirm that the reference to "1997" in Paragraph 1(a) of the Agreement as amended shall be changed to, "2005, or the date of the broadcast of the last Awards under the NBC Agreement, whichever is later..."

This will also confirm that the reference to "July 15, 1997" in Paragraph 1(b) of the Agreement as amended shall be changed to read:  "July 15, 2005, or

Exhibit C
55

Mirjana Van Blaricom
September 22, 1993
Page 2

July 15 after the last broadcast of the Awards under the NBC Agreement, whichever is later."

   Except as stated above, all of the terms of the Agreement shall remain in full force and effect.

   If this amendment to the Agreement correctly states your understanding, please have an authorized representative of the Hollywood Foreign Press Association sign where indicated and return all copies to me for countersignature.  I will, of course, send you a fully executed copy for your files.

Yours truly,

Francis C. La Maina
President

FLM/de/globes.mc


AGREED TO AND ACCEPTED:

Hollywood Foreign Press
Association

By: _____

Title: _____

Date: _____


AGREED TO AND ACCEPTED:

dick clark productions, inc.

By: _____

Title: _____

Date: _____

Exhibit C
56

**EXHIBIT D**



# HOLLYWOOD FOREIGN PRESS ASSOCIATION

**HELMUT VOSS**
President

**YANI BEGAKIS**
Vice President

**DAGMAR DUNLEVY**
Executive Secretary

**JACK TEWKSBURY**
Treasurer

**BOARD OF DIRECTORS**

**SCOTT ORLIN**
Chairman

**EDMUND BRETTSCHNEIDER**

**KAREN MARTIN**

**LORENZO SORIA**

**NOEMIA YOUNG**

**PHILIP BERK**
Alternate

**MANAGING DIRECTOR**

**CHANTAL DINNAGE**

## AGREEMENT

THIS AGREEMENT is made as of the 1st day of November, 1999 by and between the HOLLYWOOD FOREIGN PRESS ASSOCIATION (HFPA) and dick clark productions, inc. (dcp).

1. The HFPA grants to dcp (a) the right to produce, distribute, promote, advertise and exploit throughout the universe in perpetuity a one (1) hour program (Program) to be telecast during the hour immediately preceding the telecast of the Golden Globe Awards presentation program (Awards Program) on January 23, 2000 and (b) an irrevocable exclusive option (Option) for a second Program during broadcast year 2000/2001. The HFPA consents to the sale of the Program by dcp to NBC for broadcast in the United States, its Territories and Possessions, except Puerto Rico.

2. The Program will feature the arrivals of celebrities and may include pre-taped segments about dinner menus, gift packages, pressroom interviews in prior years, planning of parties, scenes of celebrities entering (but not inside) the ballroom, and the like. dcp shall produce a program consistent with the quality of the Awards Programs in prior years, prevailing broadcast standards for comparable programs, and the professional stature of the HFPA.

3. The Program shall be the only preview show of the Golden Globe Awards sanctioned by the HFPA, and the HFPA will license no other entity to do a preview show during that time or before. For the Program and its titles, the HFPA grants to dcp the right to use the names "Golden Globe", "Golden Globe Awards" and "Hollywood Foreign Press Association" and approves Dick Clark and Nancy O'Dell as the hosts. For the Program, NBC will have access to the area (Primary Area) within the confines of the Beverly Hilton Hotel exterior and interior (but not the ballroom) in which celebrities arrive and congregate. During the Program broadcast, no other entity will be permitted to telecast live within the Primary Area, except for short "cut-aways" in the context of a hard-news broadcast. Other than these, the HFPA will place no restrictions on electronic or print media covering arrivals, unless such restrictions have been imposed in prior years. The HFPA has the right to approve the host and the interviewers of the Program. dcp understands these conditions are vital to protect the HFPA and its journalist members from charges they are preventing other journalists from doing their jobs. If the HFPA discovers a broadcaster other than NBC is violating a trademark of the HFPA by using the Golden Globe Awards designation as part of the title of a preview show implying the show is with the authorization of the HFPA, then the HFPA will use reasonable efforts to stop the unauthorized use to the extent feasible.

4. dcp shall prepare a budget for all production costs (Production Costs) of the Program for approval by the HFPA Board. Budgeting is year-to-year, and the parties recognize there may be inflation in future years. dcp shall advance all Production Costs. Any Production Costs in excess (the Excess) of the budget approved by the HFPA shall be for the account of dcp. The Production Costs not including any Excess shall be deducted from the revenues for the Program (including the license fee paid by NBC, revenues from foreign sales, and revenues for any other exploitation by dcp), and the remainder shall be divided fifty percent (50%) to the HFPA and fifty percent (50%) to dcp. dcp has superior knowledge and shall use the highest professional standards to promote and protect the interests of the HFPA in its payment of Production Costs, collection of revenues, accounting for Production Costs and revenues, and payment to the

646-648 N. ROBERTSON BOULEVARD, W. HOLLYWOOD, CALIFORNIA 90069-5078
(310) 657-1731  FAX (310) 657-5576  E-MAIL HFPA95@AOL.COM  WEBSITE WWW.HFPA.COM

EXHIBID

HFPA. At any reasonable time, the HFPA and its professional advisors may review, audit, and copy the financial records of dcp and all contracts related to the Program.

5. Credits for the Program shall be consistent with the credits for the Awards Program, and the designation of the five (5) individuals by the HFPA under paragraph 13(f) of the agreement between the parties dated as of March 13, 1987, as revised July 15, 1989, as amended (Other Agreement) shall be no later than two (2) weeks before the Program. dcp shall copyright the Program jointly in the names of dcp and the HFPA. At its expense, dcp shall furnish to the HFPA one (1) video cassette of its completed television production of the Program. dcp shall indemnify and hold harmless the HFPA for any claims arising out of the Program or its production. Any rights not expressly granted to dcp in this Agreement shall not be inferred.

6. If dcp chooses to exercise the Option for a second preview show, it shall do so by written notice to the HFPA no later than July 15, 2000. For broadcast years 2001/2002 and later, the HFPA reserves the right whether it will consent to production of a preview program. If the HFPA consents to production of such a program by dcp during broadcast year 2001/2002, the HFPA shall give written notice to dcp by February 15, 2001. If no such notice is given, dcp will have a right of first negotiation and last refusal for such program using the procedures in paragraphs 1(a) and 1(b) of the Other Agreement. So long as NBC is the broadcaster of the Awards Program and the HFPA has licensed the Awards Program to dcp, (a) if the HFPA does a preview show, it shall be with dcp and NBC, and (b) if the HFPA decides not to do a preview show with dcp and NBC, the HFPA shall not do a preview show with any other producer or network. All future preview shows with dcp and NBC shall be pursuant to the terms of this Agreement.

7. This is the entire agreement between the parties. No prior or contemporaneous oral statement or prior writing may be used to interpret this Agreement. The parties are not partners or joint venturers. Neither party may assign its rights or obligations without the prior written consent of the other party. No interpretation may be drawn against the HFPA because it is deemed to be the maker of this Agreement. This Agreement may be amended only by a writing signed by the party to be bound. This Agreement shall be governed by the laws of California except for its choice of law rules. If there is a dispute under this Agreement, the parties shall attempt to resolve it by direct negotiations between their respective senior executives, failing which either party may initiate confidential arbitration in Los Angeles County under the Commercial Rules of the American Arbitration Association. The prevailing party shall be awarded its reasonable attorneys' fees and costs. The decision of the arbitration tribunal shall be binding on the parties and enforceable in any State or federal court in Los Angeles County to whose jurisdiction the parties hereby consent.

HOLLYWOOD FOREIGN PRESS
ASSOCIATION

By _____
Helmut Voss
President

dick clark productions,
inc.

By _____
Francis C. La Maina
President

Exhibit D
58

**EXHIBIT  E**

EXERCISE OF OPTIONS

As of October 29, 2010

WHEREAS, the HOLLYWOOD FOREIGN PRESS ASSOCIATION (HFPA) and dick clark productions, inc. (dcp) made an agreement (the Agreement) dated as of March 13, 1987, as amended November 13, 1989, September 22, 1993, and May 20, 1997 for the licensing and production of Golden Globe Awards programs;

WHEREAS, NBC and dcp made an agreement (the NBC/dcp Agreement) as of September 9, 1993, as revised September 24, 1993, as amended April 20, 2001, as amended June 11, 2001, and as amended as of July 29, 2005, for the Golden Globe Awards programs;

WHEREAS, NBC and dcp made an agreement as of September 30, 2010 to extend the NBC/dcp Agreement for the Golden Globe Awards programs through the 2017/2018 broadcast year;

WHEREAS, the Agreement is deemed extended for any extension of the NBC/dcp Agreement;

NOW, THEREFORE, dcp exercises its options under the Agreement for each of the years through the 2017/2018 broadcast year; provided that NBC performs under the NBC/dcp Agreement; provided further that if, by reason of breach of the NBC/dcp Agreement by NBC, NBC does not perform and this gives rise to a claim by dcp against NBC, dcp shall vigorously prosecute this claim and divide the proceeds (after deducting costs and reasonable attorneys fees) fifty percent (50%) to the HFPA and fifty percent (50%) to dcp; provided further that dcp may compromise and settle such claim so long as it is within the exercise of sound business judgment and with full consideration of the interests of the HFPA.

dick clark productions, inc.

by: _____
Orly Adelson

Title: <u>President</u>