1  LINDA J. SMITH (S.B. # 78238)
   lsmith@omm.com
2  ROBIN M. WALL (S.B. # 235690)
   rwall@omm.com
3  AMY R. LUCAS (S.B. # 264034)
   alucas@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, California 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff and Counter-defendant
   Hollywood Foreign Press Association

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11

12  HOLLYWOOD FOREIGN PRESS        Case No. CV10-8833 VBF (FMOx)
    ASSOCIATION, a California
13  Corporation,                   **PLAINTIFF HOLLYWOOD
                                    FOREIGN PRESS ASSOCIATION'S
                    Plaintiff,      NOTICE OF MOTION AND MOTION
14                                  FOR SUMMARY JUDGMENT ON
         v.                         PHASE ONE**
15
    RED ZONE CAPITAL PARTNERS      Complaint filed:    November 17, 2010
16  II, L.P., a Delaware Limited   Counterclaims filed: March 28, 2011
    Partnership; DICK CLARK
17  PRODUCTIONS, INC., a Delaware  Discovery Cutoff:   May 20, 2011
    Corporation; RED ZONE CAPITAL  Trial Date:         August 30, 2011
18  GP, LLC, a Delaware Limited Liability
    Company; RED ZONE CAPITAL     Hearing Date:       August 1, 2011
19  MANAGEMENT COMPANY, LLC, a    Courtroom:          9
    Delaware Limited Liability Company;
20  DOES 1 through 10, inclusive,  **Honorable Valerie Baker Fairbank**

21                  Defendants.

22
    DICK CLARK PRODUCTIONS,
23  INC., a Delaware Corporation,

24                  Counter-claimant,

25       v.

26  HOLLYWOOD FOREIGN PRESS
    ASSOCIATION, a California
27  Corporation,
                    Counter-defendant.
28

**TO DEFENDANTS AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on August 1, 2011, at 1:30 p.m., Plaintiff and Counter-defendant Hollywood Foreign Press Association ("HFPA") will move, and hereby does move, the Court for an order pursuant to Federal Rule of Civil Procedure 56(a) and Local Rules 56-1 and 56-3 for summary judgment against defendants dick clark productions, inc. ("dcp"), Red Zone Capital Partners II, L.P., Red Zone Capital GP, LLC, and Red Zone Capital Management Company (collectively, "Defendants") on Phase One of this lawsuit and HFPA's claim seeking a judicial declaration that dcp had no right to enter into a broadcast license agreement with NBC (or any other broadcaster) for the rights to telecast the Golden Globe Awards show for any years after 2011 without HFPA's express consent.

This motion is made on the grounds that the following facts are not in genuine dispute: (1) the HFPA officers may contract away rights to the Golden Globes only with the express authorization of the HFPA membership; (2) in 1993, dcp neither sought nor received from the membership an authorization for a contract granting any more than eight options to produce and license for broadcast the Golden Globes programs, let alone potentially perpetual options to produce and license the show for as long as it were broadcast on NBC on terms fixed exclusively by dcp and NBC; (3) dcp knew that the HFPA Bylaws prevented the HFPA's president from executing a contract materially different than that which the membership had approved; and (4) dcp had no other basis to reasonably conclude that the HFPA membership independently authorized their president to make the potentially perpetual deal that dcp now claims to have made in 1993.  The parties have met and conferred in a good-faith attempt to resolve this issue, as required by Local Rule 7-3.  (Declaration of Charles P. Diamond ("Diamond Decl.") ¶ 2.)

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Separate Statement of Uncontroverted Facts, the Declarations of Charles P. Diamond, Elaine Wells-Gilboa, and Chantal Dinnage and the exhibits

1  appended thereto, the files in the action and on such additional submissions and

2  argument as may be presented at or before the hearing on this Motion.

3

4  Dated:   June 20, 2011

LINDA J. SMITH
5  ROBIN M. WALL
AMY R. LUCAS
6  O'MELVENY & MYERS LLP

7

/s/ Linda J. Smith
8  By: Linda J. Smith

9  Attorneys for Plaintiff
Hollywood Foreign Press Association
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ............................................................. 1

II.    SUMMARY OF UNCONTESTED FACTS ......................................... 3

III.   ARGUMENT ...................................................................................... 11

       A.     Is No Genuine Dispute that dcp Neither Sought Nor
              Received HFPA Membership Approval of the
              Potentially Perpetual Options to the Golden Globes that
              dcp Now Claims ................................................................... 12

              1.     *Under the HFPA's Bylaws, Only the Membership Can
                     Authorize a Contract Respecting HFPA Property.* ......... 12

              2.     *Unimpeachable Objective Evidence Establishes That
                     the Deal dcp Made With the HFPA Membership On
                     September 22 Did Not Include Potentially Endless
                     Self-Renewing Options* ................................................... 13

       B.     The HFPA Is Entitled to Summary Judgment Because
              Its President Had Neither Actual Nor Apparent
              Authority To Make a Deal For the Globes Materially
              Different Than What Her Membership Approved ................. 17

              1.     *It Is Undisputed that the HFPA President Lacked the
                     Actual Authority to Grant a Potentially Perpetual
                     License to Option the Golden Globes* ............................. 17

              2.     *Defendants Cannot Claim That The HFPA President
                     Had Ostensible Authority Since dcp Knew That She
                     Lacked Actual Authority* ................................................. 21

IV.    CONCLUSION .................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*1230 Park Associates, LLC v. N. Source, LLC,*
48 A.D.3d 355 (2008) ............................................................................................... 17

*American Title Insurance Company v. Lacelaw Corp.,*
861 F.2d 224 (9th Cir. 1988) .................................................................................. 19

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................................................................. 9, 11, 16

*Bybee Farms, LLC v. Snake River Sugar Co.,*
563 F. Supp. 2d 1184 (E.D. Wash. 2008) ............................................................. 24

*California Viking Sprinkler Co. v. Pacific Indemnity Co.,*
213 Cal. App. 2d 844 (1963) ................................................................................. 11

*Cherne Contracting Corp. v. Marathon Petroleum Co., LLC,*
578 F.3d 735 (8th Cir. 2009) .................................................................................. 16

*Crabbe v. Mires,*
112 Cal. App. 2d 456 (1952) ................................................................................. 14

*DeBoer Construction, Inc. v. Reliance Insurance Co.,*
540 F.2d 486 (10th Cir. 1976) .......................................................................... 20, 22

*Dill v. Berquist Construction Co.,*
24 Cal. App. 4th 1426 (1994) ................................................................................ 12

*Hansen v. Power,*
279 Or. 589 (1977) ................................................................................................. 22

*Lachmiller v. Lachmiller Engineering Co.,*
144 Cal. App. 2d 533 (1956) ................................................................................. 21

*Lindsay-Field v. Friendly,*
36 Cal. App. 4th 1728 (1995) ................................................................ 13, 17, 22, 23

*Lipton Industries, Inc. v. Ralston Purina Co.,*
670 F.2d 1024 (Fed. Cir. 1982) ............................................................................. 19

*Louisville, New Albany & Chicago Railroad Co. v. Louisville Trust Co.,* 174 U.S. 552 (1899) .......................................................................................... 22

*McCullough v. Lennar Corporation,*
2011 WL 1585017 (S.D. Cal. Apr. 26, 2011) .................................................. 22, 24

*Nelson v. New Hampshire Fire Insurance Co.,*
263 F.2d 586 (9th Cir. 1957) .................................................................................. 22

*Omaha Alfalfa Milling Co. v. Pinkham,*
178 N.W. 910 (Neb. 1920) ..................................................................................... 13

*Peasley v. Producers' Market Co.,*
86 Cal. App. 577 (1927) ......................................................................................... 12

*South Sacramento Drayage Company v. Campbell Soup Company,*
220 Cal. App. 2d 851 (1963) ...................................................................... 17, 18, 24

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................................16

4

*Turner v. Citizens National Bank,*
    206 Cal. App. 2d 193 (1962) ........................................................12, 22

5

*Van't Rood v. County of Santa Clara,*
    113 Cal. App. 4th 549 (2003) ............................................11, 17, 20

6

*Walker v. Peake,*
    150 S.E. 756 (1928) ..........................................................................20

7

*Wynn v. Hoffman,*
    203 Ala. 72 (1919) ............................................................................20

8

9

**STATUTES**

10

Fed. R. Civ. P. 8(b) ..................................................................................19

11

Fed. R. Civ. P. 56(a) ................................................................................11

12

Cal. Civ. Code § 2315 ........................................................................12, 17

Cal. Civ. Code § 2316 ........................................................................12, 17

13

Cal. Civ. Code § 2317 ........................................................................12, 21

14

Cal. Civ. Code § 2318 ............................................................................12

15

Cal. Civ. Code § 2333 ..................................................................16, 20, 21

16

**OTHER AUTHORITIES**

17

61A Am. Jur. 2d Pleading § 48 ............................................................19

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.      PRELIMINARY STATEMENT

3      During the afternoon of September 22, 1993, the principals of dick clark

4 productions, inc. ("dcp") traveled from their Burbank offices to the Beverly Hilton

5 Hotel for the sole purpose of presenting to the membership of the Hollywood

6 Foreign Press Association ("HFPA") a proposed broadcasting agreement with NBC

7 (the "NBC Agreement") and an amended deal to extend dcp's rights to the Golden

8 Globe Awards (the "1993 Amendment").  Based on ten years of dealings with the

9 HFPA (this would be dcp's fourth "Globes" contract since 1983), Dick Clark and

10 his business partner, Francis La Maina, knew that HFPA's Bylaws empowered only

11 its members, not its elected officers, to approve contracts concerning the Awards.

12      No one disputes the words that Clark and La Maina spoke to the membership

13 that afternoon.  Consistent with the HFPA's practice for important meetings, the

14 Secretary tape-recorded the September 22, 1993 general membership meeting and

15 had it professionally transcribed.  As recorded in that verbatim transcript, La Maina

16 told the members that NBC wanted to broadcast the Globes for as many as ten years

17 (starting in 1996 with options through 2005) and that, to make the deal, dcp—

18 which at the time had options only through 1997—needed eight additional options

19 from the HFPA to produce and license the show for the term of the NBC deal.  At

20 the end of the meeting, the HFPA's members voted to approve the entire package:

21 the NBC deal and the eight additional options to dcp.  dcp concedes that this act

22 sealed the bargain.

23      The dcp executives had arrived at the meeting with a pre-signed two-page

24 letter agreement—the 1993 Amendment—purporting to memorialize what they

25 were to present to the HFPA membership.  La Maina kept the 1993 Amendment in

26 his briefcase during the meeting, waiting until the membership had approved the

27 deal and the meeting broke up to leave it with the HFPA's president for signature.

28

1    Without the benefit of legal counsel and without discussing it with anyone else at
2    the HFPA, the president signed and returned the document to dcp two days later.

3        The crux of the parties' dispute is whether, as HFPA contends, the two-page
4    1993 Amendment gave dcp eight options to produce and license for broadcast eight
5    additional Golden Globe Awards shows (the number necessary were NBC to fully
6    exercise its rights), or whether, as dcp contends, it gave dcp eight options *plus*
7    additional unlimited options that dcp could unilaterally create by extending the
8    NBC Agreement on any terms that dcp and NBC wanted.  According to the
9    transcript, the dcp executives neither asked that HFPA's members authorize their
10    officers to grant dcp potentially perpetual rights to the Globes, nor described the
11    document that they subsequently left for the president's signature as granting dcp
12    perpetual rights.  Instead, they asked the HFPA membership for—and the HFPA
13    membership authorized—only a grant of options sufficient to allow dcp to produce
14    the Globes for the period of time the NBC Agreement granted NBC broadcast
15    rights, which they repeatedly told the members ended—at the latest—in 2005.

16        To decide this motion, the Court need not weigh conflicting extrinsic
17    evidence or determine whose interpretation of the 1993 Amendment is correct.
18    Under settled principles of agency law, regardless of the deal dcp now *claims* to
19    have made with the HFPA president in the 1993 Amendment, the undisputed
20    evidence establishes that the deal ***authorized by the HFPA membership***—the only
21    contracting party with the legal right to bind the Association—granted dcp only
22    eight options to the Golden Globes.  The express language in the 1993 Amendment
23    confirms that deal.  To the extent dcp argues that the 1993 Amendment grants dcp
24    any more than eight options—let alone the potentially perpetual options dcp
25    claims—the HFPA president had no authority to change the agreement, as Clark
26    and La Maina have admitted they knew.  Only the express grant of eight options
27    may be lawfully enforced against the HFPA, and dcp long ago exercised the last of
28    those options.  Thus, dcp has no continuing rights to produce the Golden Globes,

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1   much less to license the show to NBC through 2018, which it purports to have

2   done.

## II.    SUMMARY OF UNCONTESTED FACTS

4        The HFPA launched the Golden Globe Awards in 1943 as a means of

5   deepening the relationship between foreign journalists and photo-journalists and the

6   television personalities on whom their livelihoods depend.  Over time, the Globes

7   became a premier Hollywood celebrity event and a preeminent awards show, now

8   perhaps second only to the Oscars. With just a half-dozen exceptions, since 1958

9   every show has been broadcast on television, whether by a Los Angeles local

10  station, in national syndication, or on Turner Broadcasting, CBS, or NBC.

11  (Declaration of Chantal Dinnage ("Dinnage Decl."), Ex. A.)[1]  Since 1965, the

12  HFPA has not dealt directly with a broadcaster, but instead has contracted for the

13  production and/or broadcasting with independent producers or packagers to whom

14  it has granted the right to license the program for television for a specified term of

15  years.  (*Id*.)

16       dcp first signed on to produce the 40th Annual Golden Globe Awards show,

17  which was televised on January 29, 1983, after the production team responsible for

18  the 1980 show moved to dcp.  (*Id*., Exs. B, C [Ltr. from Weed to Solomon; Ltr.

19  from La Maina to Solomon].)  The parties negotiated that first contract shortly

20  before the 1983 show, and this set the precedent for the parties' future relationship,

21  including a 50-50 sharing of the profits derived from the program after deduction of

22  dcp's costs and a grant of a specified number of options to produce future Globes

23  programs.  (Undisputed Fact No. 2 [1983 HFPA-dcp Golden Globe Awards

24  Agreement].)  The 1983 contract granted dcp four options for the 1984, 1985, 1986,

25  _____

26  [1] Pursuant to Local Rule 7-6 and Paragraph 5(e) of the Court's Standing Order, all factual
    assertions necessary for the disposition of this motion are accompanied by a citation to
27  HFPA's Separate Statement of Uncontroverted Facts and citations to the appropriate
    portions of the discovery record.  For backgound facts, we supply only citations to the
28  discovery record.

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1   and 1987 shows.  (*Id*. at ¶ 4; Transcript of May 14, 2011 Deposition of Francis La

2   Maina ("La Maina Depo.") at 93:18–97:10.)  That contract was replaced by a new

3   agreement made as of March 13, 1987 (the "Awards Agreement"), which granted

4   dcp five more options (1988 through 1992).  (Undisputed Fact No. 2 [1987 Awards

5   Agreement; La Maina Depo. at 46:19–25; 93:18–97:10].)  Two years later in 1989,

6   the HFPA granted dcp five more options, extending its rights in the Globes through

7   1997.  (Undisputed Fact No. 2 [1989 Amendment to 1987 HFPA-dcp Awards

8   Agreement; La Maina Depo. at 51:4–52:3, 93:18–97:10].)  As to each grant of

9   options, Mr. Clark, Mr. La Maina, and/or Gene Weed (another dcp executive, who

10  is now deceased) appeared before the HFPA membership, described the material

11  terms of the proposed option agreement and, pursuant to the Association's bylaws,

12  the membership would authorize HFPA's officers to enter the contract.[2]

13       Between 1982 and 1988, the television rights to the Golden Globes were

14  nationally syndicated.  In 1988, Turner Broadcasting licensed the Globes for its

15  cable network through 1992, and in 1989, Turner extended its commitment through

16  1995.  (Dinnage Decl., Ex. A [Spreadsheet of Globes Shows].)  The possibility of

17  returning to a broadcast network arose in 1993, when NBC sought to license the

18  Globes for broadcast for up to ten years: three years beginning with the 1996 show

19  (when the existing TBS cable deal expired), with two multi-year options covering

20  the next seven years, 1999–2001 and 2002–2005.[3]

21  _____

22  [2] (Undisputed Fact No. 2 [La Maina Depo. at 54:13–23, 55:5–56:7; Transcript of May 17, 2011 Deposition of Dick Clark ("Clark Depo.") at 18:3–10; Transcript of May 16, 2011

23  Deposition of Judy Solomon ("Solomon Depo.") at 40:12–15; 44:2–12; 60:17–61:3; Minutes of HFPA General Membership Meeting held February 15, 1983, at 20; Minutes

24  of HFPA Board of Directors Meeting held March 23, 1987; Minutes of HFPA Board of Directors Meeting held April 8, 1987; Minutes of HFPA Board of Directors Meeting held

25  June 17, 1987; Minutes of HFPA Board of Directors Meeting held July 2, 1987; Minutes of HFPA General Membership Meeting held November 6, 1989].)

26  [3] (Undisputed Fact No. 7 [Transcripts of September 22, 1993 HFPA Board of Directors ("Sept. 22 BOD Tr.") and General Membership meetings ("Sept. 22 GMM Tr.") at 7-8

27  [BOD], 15-17 [GMM]; La Maina Depo. at 101:3–104:6; Clark Depo. at 18:25–20:10; Transcript of May 12, 2011 Deposition of Philip Berk ("Berk Depo.") at 97:11–25;

28  Transcript of May 20, 2011 Deposition of Lorenzo Soria ("Soria Depo.") at 61:16–25].)

1    At that time, dcp's rights to license the broadcast were slated to expire after

2    the 1997 show, but NBC was seeking to acquire rights potentially through and

3    including the January 2005 show.  In order to close the NBC deal, dcp needed the

4    HFPA to grant it a sufficient number of additional options to see the NBC run

5    through the entire ten years to its latest potential conclusion in 2005.[4]  Thus, dcp

6    needed eight additional options (*i.e.*, 1998–2005).  (*Id.*)

7    Only the HFPA membership, not its president or its Board, may dispense

8    rights in the Golden Globes.  Section 13.2 of HFPA's then-operative Bylaws

9    required that "[a]ll material agreements, contracts or any instruments" affecting the

10   property of the HFPA be approved by the active members before being executed by

11   the HFPA's executive officers.  (Undisputed Fact No. 1 [1991 HFPA Bylaws

12   § 13.2].)[5]  In 1993, Mr. La Maina and Mr. Clark knew they needed general

13   membership approval for a grant of additional options.[6]

14   To this end, Clark and La Maina attended a September 22, 1993 meeting

15   with the HFPA's Board and then met with the general membership at the Beverly

16   Hilton Hotel.[7]  They brought with them a short, pre-signed seven-paragraph letter

17   amendment to the 1987 Awards Agreement that La Maina and the dcp business

18   affairs group had drafted in consultation with dcp's outside entertainment counsel,

19   Joel Behr.[8]  But neither Clark nor La Maina distributed or otherwise made the 1993

20

21   [4] (Undisputed Fact No. 4 [La Maina Depo. at 86:8–23; Defendant dcp's Responses and
     Objections to Plaintiff HFPA's First Set of Interrogatories ("dcp's Interrogatory
22   Responses"), Resp. to Rog. No. 2, at 10:21–27]; Undisputed Fact No. 7 [Sept. 22 GMM
     Tr. at 15-17, 24, 26-27, 29, 32-33; La Maina Depo. at 101:3–104:6].)

23   [5] That provision remains the same today.  (Undisputed Fact No. 1 [1991 HFPA Bylaws
     § 13.2; 2010 HFPA Bylaws § 14.2].)

24   [6] (Undisputed Fact No. 3 [La Maina Depo. at 23:23–24:5; 89:25–90:4; 268:10–13; Clark
     Depo. at 18:3–10].)

25   [7] (Undisputed Fact No. 4 [September 13, 1993 Notice of Extraordinary General
     Membership Meeting; La Maina Depo. at 82:22–84:10; 86:8–23; 90:16–91:7; Clark Depo.
26   at 16:18–25; 18:3–10; dcp's Response to Interrogatory No. 2, at 10:24–27].)

27   [8] (Undisputed Fact No. 5 [La Maina Depo. at 83:22–84:14; 86:24–87:5; dcp's
     Interrogatory Responses, Resp. to Rog. No. 2, at 10:27–11:4]; *see also* Diamond Decl.,
28   Exs. A, C [Behr Depo. at 89:15–22; 90:21–23; La Maina Depo. at 60:24-63:16].)

HFPA'S MOT. FOR SUMMARY
                                                              JUDGMENT ON PHASE ONE
                                                              CASE NO. CV 10-8833 VBF (FMOx)

Amendment available to the Board or members at the meeting; nor did they say anything to the members about the provision on which dcp now bases its claim to potentially perpetual rights.[9]

Instead, over the course of the meeting, Clark and La Maina described the terms of the proposed NBC deal and what dcp needed from the HFPA in order to make it happen.[10]  There is no dispute as to what dcp representatives said at the meeting or what they asked for.  The HFPA's practice was to record all significant meetings like this one and have them professionally transcribed.  (Undisputed Fact No. 6 [Declaration of Elaine Wells-Gilboa ("Wells-Gilboa Decl.") ¶¶ 2–4].)  Nor is there any dispute as to the transcript's accuracy:  When questioned about relevant excerpts, Mr. La Maina admitted making each and every statement attributed to him as it had been transcribed.[11]

The verbatim transcript shows that Mr. La Maina described the NBC proposal as a ten-year deal, with NBC committing to broadcast three Golden Globe shows (1996, 1997, and 1998) and acquiring options for seven more (in bundles of three years and four years, respectively) through 2005.[12]  When quizzed by HFPA members about the length of HFPA's potential commitment to dcp, La Maina assured the members that—at the most—the Association would be tied to dcp for the duration of the NBC Agreement, which he said would expire—at the latest—in 2005.  Here are the relevant excerpts:

> FRAN[CIS LA MAINA]: . . .  Please keep that in mind as I read off the details to you but the deal that we have

---

[9] (Undisputed Fact No. 5 [La Maina Depo. at 88:10–13; 89:19–24; 105:22–24; Berk Depo. at 54:22–25; 58:20–24, 60:21–61:1; dcp's Interrogatory Responses, Resp. to Rog. No. 2, at 10:24-11:13; No. 12, at 22:2–20].)

[10] (Undisputed Fact No. 7 [Sept. 22 GMM Tr. at 15-17, 24, 26-27, 29, 32-33; La Maina Depo. at 101:3–104:6; Clark Depo. at 18:25–20:10; Berk Depo. at 97:11–25; Soria Depo. at 61:16–25].)

[11] (Undisputed Fact No. 6 [La Maina Depo. at 82:12–83:14; 100:5–104:6; 106:8–108:21; 126:1–127:12].)

[12] (Undisputed Fact No. 7 [La Maina Depo. at 101:3–104:6; Sept. 22 GMM Tr. at 15-17, 24, 26-27, 29, 32-33].)

subject to your approval with NBC at this time is a
commitment for a three hour special in primetime. A ten
year deal with NBC. Three years of which are firm on-air
commitments with two options for another three years and
another four years. A total of ten years.

\* \* \*

[MEMBER]: Do you think it was firm for ten years?

FRAN: No, no, not for ten years.

[MEMBER]: It's not firm for ten years.

FRAN: It's three years first -- three, three and four.
Option for three years, option for four years. A ten year
term if they exercise all their options.[13]

Mr. La Maina also explained that dcp was asking the HFPA membership to

extend dcp's options only for so long as necessary to produce the shows that NBC

was then seeking to license or option, and assured the members that this would be

up to a maximum of ten years:

[MEMBER]: How long a contract do you have with us
now? I mean, how long is it

FRAN: I'm asking that the contract be extended for the
period of time necessary to fulfill the NBC agreement.

[MEMBER]: It sounds fair.

\* \* \*

[MEMBER]:  . . . So I'm just curious what is -- how is
our tie-in with Dick Clark working?

FRAN: Our tie-in at the moment as proposed to the
Hollywood Foreign Press is that we're -- we're asking
you to extend our contract for as long as necessary to
satisfy the NBC term and not longer than that.

[MEMBER]: Is that ten years or three years?

FRAN: I hope it's ten years. I hope it's ten years.

\* \* \*

FRAN: The sequence of events that everyone understands
is you execute an amendment with us that says we extend
Dick Clark for so long as necessary to fulfill the NBC
deal. The minute that's signed, I sign an NBC contract
and we're finished. The negotiation is over with.[14]

---

[13] (Undisputed Fact No. 7 [La Maina Depo. at 101:3–103:3; Sept. 22 GMM Tr. at 17].)

[14] (Undisputed Fact No. 7 [La Maina Depo. at 103:4–104:6; Sept. 22 GMM Tr.  at 24, 26,
29].)

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1    The transcript also shows what Mr. La Maina neglected to say.  La Maina

2    failed to disclose to the membership that, by voting to authorize the 1993

3    Amendment with dcp, the HFPA members would divest the HFPA of rights in the

4    Globes for so long as NBC cared to air the show—potentially in perpetuity and on

5    terms that the HFPA could never again control.[15]  La Maina testified at his

6    deposition that, although he purportedly discussed this eventuality with the HFPA's

7    president, he *never* shared it with the members.

8         Q.  I asked you if you told the HFPA membership at the
     meeting that the extension clause had been inserted and

9         bound the Hollywood Foreign -- Hollywood Foreign
     Press Association to give dcp unlimited options so long as

10        NBC was the broadcaster?

11        A.   Did I tell the members this?

          Q.  Yes.
12
          A.  Not in those words.  I told the President this.  I
13   presented this to the President and did not know at that
     time whether it was acceptable or not.

14        Q.  You presented it, sir, to the members, did you not?

15        A.  I presented it to the President of the Hollywood
     Foreign Press.
16
          Q.  And not to the membership?
17
          A.  I did not personally.[16]
18
     And he justified the omission by saying "it was not his job."
19
          Q.  Okay.  And you didn't think that it was important
20   enough to mention to the membership that the extension
     clause in the agreement gave dcp unilateral rights for so
21   long as NBC had the broadcast rights?

22        A.  It was not my job to interpret the contract that I gave
     to them.[17]
23

24   [15] (Undisputed Fact No. 8 [La Maina Depo. at 88:10–13; 98:12–17; 98:21–99:12; 259:16–
     23; 266:19–25; 267:13–19; 267:22–268:4; Sept. 22, 1993 GMM Tr. at 15-17, 24, 26-27,
25   29, 32-33; Clark Depo. at 34:14–20; Berk Depo. at 97:11–25; dcp's Interrogatory
     Responses, Resp. to Rog. No. 2, at 10:24-11:13; No. 12, at 22:2–20].)

26   [16] (Undisputed Fact No. 8 [La Maina Depo. at 98:12–99:12]; *see also* La Maina Depo. at
     259:16-23.)
27
     [17] (Undisputed Fact No. 8 [La Maina Depo. at 267:13–19; *see also* La Maina Depo. at
28   98:12–99:12].)

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

At the conclusion of the meeting, the HFPA members voted almost unanimously in the presence of Clark and La Maina to authorize the package that the two executives had described and, in La Maina's words at the time, to grant "favorable approval to close our deal with NBC."[18]  Only execution of the written 1993 Amendment remained, in La Maina's words at the time, "a formal extension of our contract."  (*Id.*)  As the members filed out, they were asked to signify their approval of the proposed package by so indicating next to their names on the sign-in sheet, and the meeting was adjourned.  The sign-in sheet reflects that thirty-two of the thirty-four active members attending the meeting voted to authorize the 1993 Amendment and the NBC deal.  (Undisputed Fact No. 9 [Sept. 22, 1993 GMM Tr. with sign-in sheet].)  La Maina left behind a pre-signed copy of the 1993 Amendment with the Association's then-president, Mirjana Van Blaricom, whom he knew to be unrepresented by counsel.[19]  Though most of its language tracked earlier extension agreements, buried in the 1993 Amendment was the so-called "extensions" clause which, though never discussed with the membership, dcp now claims automatically renews its rights to the Globes year after year, for as long as dcp wants to produce and NBC chooses to broadcast the show.[20]

---

[18] (Undisputed Fact No. 8 [La Maina Depo. at 126:1–127:10; Sept. 22, 1993 GMM Tr. at 32; *see also* Undisputed Fact No. 8 [Defendants' Answer to First Amended Complaint ("Answer") ¶ 32; September 29, 1993 Letter from Francis La Maina to Mirjana Van Blaricom; Berk Depo. at 58:25–59:11].)

[19] (Undisputed Fact No. 5 [La Maina Depo. at 83:22–84:14; 86:24–87:5; 89:14–24; 105:22–24]; *see also* Diamond Decl., Ex. C [La Maina Depo. at 89:14–24; 267:10–12].)

[20] We maintain that, consistent with the parties' course of dealing, course of performance, and industry practice, the 1993 Amendment can fairly be read only as granting dcp the eight options that Clark and La Maina requested.  We believe that the description of the option-exercise period as "for each of the years 1998 through and including 2005, and *for any extensions*, renewals, substitutions or modifications *of the NBC Agreement*," was intended not to grant additional unlimited options, but to accommodate exigencies that might prevent NBC from broadcasting the eight optioned shows in eight consecutive years (such as postponement or cancellation of a show for an event of force majeure, which was contemplated in the NBC Agreement).  As required at summary judgment, however, this motion concedes *arguendo* that the agreement is susceptible to dcp's contrary construction.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (requiring at summary judgment that "evidence of the non-movant is to be believed").

No additional membership meetings were conducted before the HFPA's president affixed her signature to a copy of the 1993 Amendment and returned it to dcp two days later.[21]  Indeed, dcp concedes that membership's authorization of the 1993 Amendment occurred at the September 22, 1993 meeting.  (Undisputed Fact No. 9 [Answer ¶ 32].)[22]  This admission is consistent with La Maina's contemporaneous correspondence with the HFPA president.  In a letter to her acknowledging receipt of the signed amendment, Mr. La Maina wrote:  "Thank you for sending me the signed extension of the Hollywood Foreign Press agreement with dick clark productions, inc. *as authorized by your membership on September 22, 1993*."[23]

Mid-way through the term of the 1993 Amendment, dcp presented to the HFPA leadership with NBC's proposal to extend its broadcast rights for six years, through the 2011 Awards show, in exchange for additional license fees worth approximately $100 million.  The HFPA Board was enthusiastic.  (Diamond Decl., Ex. C [La Maina Depo. at 186:20–24].)

Though a dispute arose a year later over the source of dcp's rights to produce and license the additional six shows—revealing for the first time the parties' conflicting interpretations of the "extensions" clause of the 1993 Amendment—the HFPA, under a reservation of rights, honored its commitment to allow NBC to broadcast the six additional Awards shows.  (Diamond Decl., Ex. J [dcp's Response to Interrogatory No. 12, at 22:25–27].)  dcp produced and NBC broadcast these six shows, the last of which aired in January 2011.  However, when dcp secretly

---

[21] (Undisputed Fact No. 10 [1993 Amendment to 1987 HFPA-dcp Awards Agreement; La Maina Depo. at 89:25–90:15; 128:2–129:25]; Undisputed Fact No. 11 [Solomon Depo. at 82:14-16].)

[22] Paragraph 32 of dcp's Answer "admit[s] that the HFPA membership held a meeting on or about September 22, 1993, at which it authorized an amendment to the [1987 Awards] Agreement."

[23] (Undisputed Fact No. 9 [September 29, 1993 Letter from Francis La Maina to Mirjana Van Blaricom (emphasis added); La Maina Depo. at 126:1–127:10, 128:2–129:25].)

renewed its broadcast license with NBC for ten additional Golden Globes shows without the HFPA's knowledge or consent, this litigation ensued.

## III.   ARGUMENT

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[24] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

Under California law, "the burden of proving agency, as well as scope of the agent's authority, rests upon the party asserting the existence thereof and seeking thereby to charge the principal upon representations of the agent." *Cal. Viking Sprinkler Co. v. Pac. Indem. Co.*, 213 Cal. App. 2d 844, 850 (1963).  If "the essential facts are not in conflict and the evidence is susceptible to a single inference, the agency determination is a matter of law for the court." *Van't Rood v. County of Santa Clara*, 113 Cal. App. 4th 549, 562 (2003).

As demonstrated in the discussion that follows, these facts are incontrovertible: (1) the HFPA officers may contract away rights to the Golden Globes only with the express authorization of the HFPA membership; (2) dcp neither sought nor received from the membership authorization for a contract granting any more than eight options to produce and license for broadcast the Golden Globes programs, let alone potentially perpetual options to produce and license the show for as long as it were broadcast on NBC on terms fixed

---

[24] "Subdivision (a) [of Rule 56] carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word—genuine 'issue' becomes genuine 'dispute.'"  Fed. R. Civ. P. 56 Advisory Committee's Notes to the 2010 Amendment.

1   exclusively by dcp and NBC; (3) dcp knew that the HFPA Bylaws prevented the

2   HFPA's president from executing a contract materially different than that which the

3   membership had approved; and (4) dcp had no other basis to reasonably conclude

4   that the HFPA membership independently authorized their president to make the

5   potentially perpetual deal that dcp now claims to have made in the 1993

6   Amendment.  Because dcp's options expired under the 1993 Amendment long ago,

7   the HFPA is entitled to judgment as a matter of law.

> **A.   There Is No Genuine Dispute that dcp Neither Sought Nor Received HFPA Membership Approval of the Potentially Perpetual Options to the Golden Globes that dcp Now Claims.**
>
> **1.   *Under the HFPA's Bylaws, Only the Membership Can Authorize a Contract Respecting HFPA Property*.**

As a not-for-profit membership association, the HFPA acts through its

officers, employees, and agents as governed by HFPA's Bylaws.  *See Peasley v.*

*Producers' Mkt. Co.*, 86 Cal. App. 577, 584 (1927) (entities must act through

agents).  While the HFPA, as the corporate principal, depends on various agents to

carry out its business, "[a]gents are not fungible.  A person who is authorized to

perform one function on behalf of a principal may have no authority at all regarding

a different function."  *Dill v. Berquist Constr. Co.*, 24 Cal. App. 4th 1426, 1438

(1994); *see also, e.g.*, Cal. Civ. Code §§ 2315–2318; *Turner v. Citizens Nat'l Bank*,

206 Cal. App. 2d 193, 202 (1962) (existence of agency and extent of agent's

authorities are separate inquiries).

HFPA's Bylaws set forth the authority of the membership, officers, and

directors of the Association and the limits on those powers.  While the HFPA's

governing documents are amended from time to time, those Bylaws provide today,

as they did in 1993, that all material contracts must be submitted to and approved

by the HFPA's membership.  (Undisputed Fact No. 1 [1991 HFPA Bylaws §13.2;

2010 HFPA Bylaws §14.2].)  Section 13.2 sets forth a straightforward procedure

for the execution of material contracts affecting the HFPA's property:  Contracts

1   are submitted for approval to the HFPA Board of Directors and general

2   membership, and only after both approve may the contract be executed by the

3   HFPA's executive officers.  (*Id.*)  On these facts, the members function as

4   principals, and HFPA's executive officers function as agents with circumscribed

5   authority.  *See, e.g.*, *Lindsay-Field v. Friendly*, 36 Cal. App. 4th 1728, 1734-35

6   (1995) (entity's governing documents established membership as principal and

7   manager as agent and the scope of agent's authority).

8          There can be no dispute that the proposed 1993 Amendment and 10-year

9   NBC Agreement were material contracts affecting the production and broadcast

10   rights to the Golden Globe Awards show—the HFPA's principal asset.  For this

11   reason, there can also be no dispute that the Bylaw's requirement of membership

12   approval applied to the 1993 deal.  Indeed, this was the parties' shared

13   understanding at the time, and the reason why Mr. Clark and Mr. La Maina

14   presented the proposed deals to the HFPA's membership on September 22, 1993.[25]

15          2.   ***Unimpeachable Objective Evidence Establishes That the Deal
16          dcp Made With the HFPA Membership On September 22 Did
             Not Include Potentially Endless Self-Renewing Options.***

17          This case is striking in that there is no disputing the deal that the HFPA

18   membership authorized with dcp.  We know it because the HFPA prepared a

19   written transcript setting forth the words dcp executives used to present the deal

20   they asked the HFPA membership to approve.  The transcript makes clear that dcp

21   asked for a finite number of options, and that the HFPA membership never

22   authorized its officers to give dcp the unilateral right to grant itself additional

23   options simply by extending the NBC Agreement on any terms dcp and NBC

24   wanted.[26]

---

[25] (Undisputed Fact No. 4 [La Maina Depo. at 82:22–84:10; 86:8–23; 90:16–91:7; Clark Depo. at 16:18–25; 18:3–10; dcp's Interrogatory Responses, Resp. to Rog. No. 2, at 10:24–27].)

[26] The transcript is indisputably admissible insofar as it is used to show that the HFPA's president lacked authority to make any broader contract.  *See, e.g.*, *Omaha Alfalfa Milling*

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

The September 22, 1993 transcript shows that when dcp brought the proposed 10-year NBC deal to HFPA, dcp asked to extend its own production agreement for eight more years to match the 10-year potential NBC deal.  The HFPA membership was concerned about how long they would be tied to both NBC and dcp under the terms of the proposed deal, and dcp presented at length on these issues.  La Maina twice assured the members that, at most, the Association would be tied to NBC through 2005:

> FRAN: . . .  Please keep that in mind as I read off the details to you but the deal that we have subject to your approval with NBC at this time is a commitment for a three hour special in primetime. A ten year deal with NBC. Three years of which are firm on-air commitments with two options for another three years and another four years. A total of ten years.
>
> * * *
>
> [MEMBER]: Do you think it was firm for ten years?
>
> FRAN: No, no, not for ten years.
>
> [MEMBER]: It's not firm for ten years.
>
> FRAN: It's three years first -- three, three and four. Option for three years, option for four years. A ten year term if they exercise all their options.[27]

Mr. La Maina further explained that the HFPA, in turn, would be tied to dcp for the same period—no later than 2005:

> [MEMBER]: How long a contract do you have with us now? I mean, how long is it.
>
> FRAN: I'm asking that the contract be extended for the period of time necessary to fulfill the NBC agreement.
>
> [MEMBER]: It sounds fair.

*Co. v. Pinkham*, 178 N.W. 910 (Neb. 1920), a case remarkably similar to ours in that plaintiff there also relied on a written contract with the defendant's agent regarding the sale of hay, which plaintiff claimed superseded the earlier oral agreement he had made with the principal.  Writing at a time when courts enforced the parol evidence rule aggressively, the court nonetheless overruled a parol evidence objection, noting: "In this case, however, the defense was that [agent's] authority to make any contract at all, on behalf of [the principal], with reference to the hay, was limited by a condition of which [the plaintiff] had knowledge before the contract was signed…." *Id.* at 23; s*ee also, e.g.*, *Crabbe v. Mires*, 112 Cal. App. 2d 456, 459 (1952) (rejecting parol evidence objection and observing that "[a]n agent's authority may be proved by circumstantial evidence").

[27] (Undisputed Fact No. 7 [La Maina Depo. at 101:3-104:6; Sept. 22 GMM Tr. at 15-17].)

* * *

> [MEMBER]:  . . . So I'm just curious what is -- how is our tie-in with Dick Clark working?
>
> FRAN: Our tie-in at the moment as proposed to the Hollywood Foreign Press is that we're -- we're asking you to extend our contract for as long as necessary to satisfy the NBC term and not longer than that.
>
> [MEMBER]: Is that ten years or three years?
>
> FRAN: I hope it's ten years. I hope it's ten years.[28]

Even more important than what he said at the meeting is what La Maina *did not* say.  In response to pointed membership questions regarding the term of the proposed deal, La Maina never disclosed that, under the proposed 1993 Amendment, dcp would have the right to unilaterally extend the NBC broadcast agreement indefinitely and on any terms dcp wanted, or that dcp could thereby extend its own production options in perpetuity.  La Maina admitted in his deposition that he did not mention these purported terms at the September 22 meeting.  (Undisputed Fact No. 8 [La Maina Depo. at 98:12–99:12; 259:16–23].)  In particular, La Maina admitted that he failed to disclose the so-called "extensions" clause, claiming that it was "not [his] job."  (*Id*. at 267:13–19.)

There is no question regarding the accuracy of the transcript, which was prepared by a professional transcriptionist, Elaine Wells-Gilboa, from an audio recording that the HFPA provided to her.  (Undisputed Fact No. 6 [Wells-Gilboa Decl. ¶ 4].)  Since 1979, Ms. Wells-Gilboa had been providing professional transcription services to the HFPA and its members in the ordinary course of HFPA's business for press conferences, Board meetings, and membership meetings.  (*Id*. ¶¶ 2–4.)  Ms. Wells-Gilboa prepared this particular transcript soon after the meeting and provided a hard copy of it to the HFPA.  (*Id*. ¶ 4.)  The transcript was adopted by the HFPA as the official minutes of the September 22, 1993 Board and general membership meetings.  (Undisputed Fact No. 6 [Sept. 22

---

[28] (Undisputed Fact No. 7 [103:4–104:6; Sept. 22 GMM Tr. at 24, 26].)

GMM Tr. at 12]; *see also* Dinnage Decl. ¶ 19.)  dcp does not question the authenticity or accuracy of the transcript.  Instead, La Maina admitted making the key statements exactly as they are transcribed.  (Undisputed Fact No. 6 [La Maina Depo. at 82:12–83:14; 100:5–104:6; 106:8–108:21; 126:1–127:12].)

There is thus no *genuine* dispute regarding whether La Maina asked the HFPA membership to authorize a deal that included granting dcp the self-renewing rights it now claims were conveyed by the "extensions" clause, or whether the members approved such a deal.  They indisputably did not.  Defendants may now argue otherwise, but the words spoken on September 22, 1993 simply would not permit any rational juror to reach that conclusion.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (in light of unchallenged video that clearly contradicted non-movant's version of events, district and appellate courts erred in adopting that version in deciding summary-judgment motion); *see also, e.g.*, *Liberty Lobby*, 477 U.S. at 252 (summary judgment proper when evidence "is so one-sided that one party must prevail as a matter of law"); *Cherne Contracting Corp. v. Marathon Petroleum Co., LLC*, 578 F.3d 735, 740 (8th Cir. 2009) (observing that "the existence of disputed terms in oral or implied contracts, or ambiguities in written contracts," does not preclude summary judgment "where no reasonable jury could find the facts necessary" for non-moving party to prevail).

The transcript is clear, undisputed, and irrefutable proof that the *only* contract authorized by the HFPA membership on September 22, 1993 was one granting dcp eight options.  As a matter of law, that authorization defined the scope of the HFPA president's authority to enter into the 1993 Amendment on behalf of HFPA.  And that is the only deal that dcp can enforce unless it can show that then-president Mirjana Van Blaricom had actual or ostensible authority to make a

different deal.  *See* Cal. Civ. Code § 2315 ("An agent has such authority as the principal, actually or ostensibly, confers upon him.").  As we show next, she had neither.

**B.    The HFPA Is Entitled to Summary Judgment Because Its President Had Neither Actual Nor Apparent Authority To Make a Deal For the Globes Materially Different Than What Her Membership Approved.**

    1.    *It Is Undisputed that the HFPA President Lacked the Actual Authority to Grant a Potentially Perpetual License to Option the Golden Globes.*

"Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess."  Cal. Civ. Code § 2316; *see also S. Sacramento Drayage Co. v. Campbell Soup Co.*, 220 Cal. App. 2d 851, 856 (1963).  The undisputed facts show that HFPA never intentionally or expressly conferred on its president authority to make the alleged contract that dcp claims she made.

As previously demonstrated, the HFPA's Bylaws provide that the organization's officers have authority only to execute material contracts on behalf of the HFPA that the membership has approved.  (Undisputed Fact No. 1, [1991 HFPA Bylaws § 13.2].)  Nothing in those Bylaws "can be construed as a grant of authority to effect" a different deal that the one approved by the membership.  *Van't Rood*, 113 Cal. App. 4th at 574; *see also Lindsay-Field*, 36 Cal. App. 4th at 1735 (no actual authority where principal's governing documents set forth voting requirements granting such authority and requirements not fulfilled); *1230 Park Assoc., LLC v. N. Source, LLC*, 48 A.D.3d 355, 355-56 (N.Y. App. Div. 2008) (no actual authority where operating agreement required majority vote).  Nor did the membership do anything to give Van Blaricom independent authority to contract with dcp.  To the contrary, the HFPA members consistently and zealously maintained exclusive control over contracts dispensing rights in the Golden Globes.  On the three prior occasions that dcp had sought to option rights in the Globes, its

1   executives made their case and obtained membership approval.[29] *See S.*

2   *Sacramento*, 220 Cal. App. 2d at 856 (no actual authority to unilaterally execute

3   contract where no history of an agent unilaterally executing contract without

4   principal's approval).

5          Nor can Defendants point to Van Blaricom's unilateral and unauthorized act

6   of signing an amendment that purported to grant dcp self-renewing rights as

7   evidence that she must have believed herself to possess the authority to do so.  The

8   law does not permit authority to arise solely from the agent's belief or actions.

9   Were the rule otherwise, every agent would have the means to expand his or her

10  authority without the principal's consent.  The court made this exact point in *South*

11  *Sacramento Drayage*, in which the plaintiff trucking company sued to enforce a

12  fifteen-year exclusive hauling contract made by Campbell Soup's agent, a local

13  Sacramento traffic manager.  220 Cal. App. 2d at 855.  In the past, the agent had

14  contracted only on a day-by-day or load-by-load basis; and his two prior written

15  contracts with the plaintiff had been signed by a Campbell's executive at its New

16  Jersey headquarters.  The trial court granted Campbell's nonsuit, and the appeals

17  court affirmed, holding that, in the absence of proof that Campbell had fostered the

18  agent's belief that he possessed such authority, the plaintiff could not rely on the

19  making of the contract as evidence of the agent's actual authority to enter into

20  fifteen-year exclusive contracts.  Said the court:

21              It must be shown that the belief was engendered by
                conduct of the principal. To hold otherwise would give
22              any agent, not the authority, but the naked power to bind
                his principal to any contract within the general scope of
23

24  _____

25  [29] (Undisputed Fact No. 2 [La Maina Depo. at 46:19–25; 51:4–52:3; 54:13–23; 55:5–56:7;
    93:18–97:10; Clark Depo. at 18:3–10; Minutes of HFPA General Membership Meeting
26  held February 15, 1983; Solomon Depo at 40:12–15; 44:2–12; 60:17-61:3; Minutes of
    HFPA Board of Directors Meeting held March 23, 1987; Minutes of HFPA Board of
27  Directors Meeting held April 8, 1987; Minutes of HFPA Board of Directors Meeting held
    June 17, 1987; Minutes of HFPA Board of Directors Meeting held July 2, 1987; Minutes
28  of HFPA General Membership Meeting held November 6, 1989].)

HFPA'S MOT. FOR SUMMARY
                                                    JUDGMENT ON PHASE ONE
                                                    CASE NO. CV 10-8833 VBF (FMOx)

his duties, however fantastic or detrimental to the principal's interest such contract might be.[30]

One dealing with an agent assumes the responsibility of verifying the agency and determining the scope of the agent's authority to bind the principal. *Id*. at 858. While sometimes the rule can create hardships, none can be claimed here because dcp knew exactly what contract the membership had authorized Van Blaricom to make:  Its own executives were in the room on September 22, 1993 when that authority was granted.  Defendants have admitted in their Answer to HFPA's First Amended Complaint that Van Blaricom's authority to extend dcp's options flowed from the action taken by the HFPA membership on September 22, 1993, not any other meeting.  (Undisputed Fact No. 9 [Answer ¶ 32 (Defendants "admit that the HFPA membership held a meeting on or about September 22, 1993, *at which it authorized an amendment to the Main Show Agreement*." (emphasis added))].)[31] Even were this not legally conclusive as to the source of Van Blaricom's actual authority, La Maina repeatedly testified to the same thing.  He conceded that he attended the September 22, 1993 meeting to get the members to approve execution of a contract granting dcp sufficient additional options to allow it to meet its commitments to NBC for the term of the NBC deal, and that he left with that approval.  (Undisputed Fact No. 4, [La Maina Depo. at 86:8–23; 90:16–25] Undisputed Fact No. 9 [La Maina Depo. at 126:1–127:10; 128:2–129:25].)  And La Maina wrote the same thing to Van Blaricom at the time.  Thanking her for

---

[30] *Id*. at 856-57.

[31] A concession in an Answer is judicial admission, "which ha[s] the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). *See* Fed. R. Civ. P. 8(b)(1)(B), (b)(6).  "No significance can be given [Defendants'] attempted qualification of an admission by use of the words 'on information and belief.'  Equivocal admissions are not permitted under Rule 8 of the Federal Rules." *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1030 (Fed. Cir. 1982) (citing Rule 8(d), now located at 8(b)(6)).  "An answer which attempts to evade the pleading requirements of Rule 8 by the tactic of an equivocal admission or denial is an admission." *Id.*; *see also* 61A Am. Jur. 2d Pleading § 48.

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1    executing a copy of the 1993 Amendment, he acknowledged receipt of the

2    Amendment "*as authorized by your membership on September 22, 1993*."

3    (Undisputed Fact No. 9 [September 29, 1993 Letter from Francis La Maina to

4    Mirjana Van Blaricom].)[32]

5         A "principal cannot be held when an actual agent acts beyond the scope of

6    his actual or ostensible authority." *Van't Rood*, 113 Cal. App. 4th at 573.  When a

7    principal has authorized its agent to execute a contract with specified terms, but the

8    agent exceeds her authority by entering into a contract with different or additional

9    terms, the "principal is bound by his authorized acts so far only as they can be

10   plainly separated from those which are unauthorized."  Cal. Civ. Code § 2333.

11        Courts everywhere routinely apply the rule stated in Civil Code section 2333

12   to limit a contract's enforceability to the terms authorized by a principal.  *See, e.g.*,

13   *DeBoer Const., Inc. v. Reliance Ins. Co.*, 540 F.2d 486, 491–93 (10th Cir. 1976)

14   (affirming trial court's decision to reduce a $925,000 surety contract signed by an

15   agent to $500,000 where principal had limited agent to the latter amount); *Walker v.*

16   *Peake*, 150 S.E. 756, 761–62 (S.C. 1928) (reducing rate on note to 7% interest

17   where agent promised 8% interest on note, but principal had authorized only 7%,

18   and collecting numerous cases applying rule that "[w]here there has been an excess

19   in the execution of a power, it is void so far as the excess is concerned, but good

20   within the limits of the power, unless the valid and invalid parts are inseparably

21   connected"); *Wynn v. Hoffman*, 82 So. 32, 34 (Ala. 1919) ("[I]f authority is only

22   given to do a specific act, the limit of which is known to the person with whom the

23

24   ───────────────

     [32] The transcript of the September 22, 1993 meeting can only fairly be read as showing
25   that having defined the deal they authorized Van Blaricom to make, the HFPA members
     left the Hilton Hotel with no unfinished HFPA business to take up at a later date.  La
26   Maina underscored this point, when he remarked as the meeting was breaking up that the
     only thing remaining "was a ***formal*** extension of our contract."  (Undisputed Fact No. 9
27   [La Maina Depo. at 126:1–127:10; Sept. 22, 1993 GMM Tr. Sign-In sheet at 119-20
     (emphasis added)].)

28

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1   agent contracts, and, notwithstanding this limited authority and its knowledge, the

2   authority is exceeded or materially varied, the principal is bound only to the extent

3   of the specific authority given and exercised by his agent.").

4        This case is indistinguishable from *Lachmiller v. Lachmiller Engineering*

5   *Co.*, 144 Cal. App. 2d 533, 534 (1956), where the plaintiff levied a writ of

6   attachment on defendant's business and bank account to collect a $30,000 debt,

7   posting as security a bond in the amount of $21,000 that had been executed by a

8   corporate surety.  But the surety had limited the authority of the attorney-in-fact

9   who signed the bond on its behalf to $10,000.  *Id.* at 534.  The Court of Appeal

10  affirmed the trial court's order holding that the bond was valid only up to the

11  amount authorized, because it was "obvious that [the agent's] authorized act can be

12  'plainly separated' from his unauthorized act.'"  *Id.* at 535.  Although Ms. Van

13  Blaricom's purported deal with dcp was made in excess of her authority, it is self-

14  evident that the eight options the HFPA membership authorized her to grant (*i.e.*,

15  "eight options . . . for each of the years 1998 through and including 2005") can be

16  "separated" from the additional, self-renewing options that dcp claims the 1993

17  Amendment conveyed, rendering only the former enforceable under Civil Code

18  section 2333.

19       2.    ***Defendants Cannot Claim That The HFPA President Had
              Ostensible Authority Since dcp Knew That She Lacked Actual
20            Authority***.

21       Defendants will undoubtedly argue, as La Maina maintained at his

22  deposition, that dcp's executives reasonably relied on Ms. Van Blaricom to obtain

23  whatever approvals her organization required, and that they justifiably concluded

24  that by signing the 1993 Amendment, Van Blaricom had authority to do so.  If so,

25  they will be invoking the doctrine of "ostensible authority," which "is such

26  [authority] as a principal, intentionally or by want of ordinary care, causes or allows

27  a third person to believe the agent to possess."  Cal. Civ. Code § 2317.

28       Under California law, dcp is foreclosed from arguing that Van Blaricom had

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

ostensible authority to make contracts in excess of what her membership had

approved because, as a matter of law, the theory is unavailable to one having

"actual or constructive notice of the restriction upon [the agent's] authority." *Id.* §

2318; *see, e.g.*, *McCullough v. Lennar Corp.*, 2011 WL 1585017, at *13 (S.D. Cal.

Apr. 26, 2011) (summary judgment proper where plaintiff knew agent had no

authority and failed to inquire with principal); *Lindsay-Field*, 36 Cal. App. 4th at

1734 ("Plaintiffs could not show ostensible authority.  Porter repeatedly admitted

that he knew a vote of the membership was required" to enter the contract); *Turner

v. Citizens Nat'l Bank*, 206 Cal. App. 2d 193, 201-02 (1962) (ostensible authority

unavailable to third party with full notice of limitations).

Defendants had actual knowledge of Van Blaricom's authority and the limits

that the HFPA membership had imposed, and this ends the matter.  dcp knew for a

decade before making the 1993 Amendment that the HPFA's president could not

make deals for the HFPA unless the membership had approved.  During his

deposition, at multiple times Mr. La Maina admitted knowing in 1993 that all

HFPA contracts "have to be approved by the Board and the membership."

(Undisputed Fact No. 3 [La Maina Depo. at 23:23–24:5; 89:25–90:4; 268:10–13].)

Having presented at the September 22, 1993 Board and membership meetings in

order to get the requisite authorizations, Clark and La Maina knew what contracts

Van Blaricom could and could not make.  Defendants are consequently foreclosed

from arguing that Van Blaricom had ostensible authority to do more.  *See also, e.g.*,

*Louisville, N.A. & C Ry. Co. v. Louisville Trust Co.*, 174 U.S. 552, 576 (1899)

(holding unenforceable 45 bonds "which the [third party] took with notice that the

guaranty had not been authorized by a majority of the stockholders"); *Nelson v.

N.H. Fire Ins. Co.*, 263 F.2d 586, 589 (9th Cir. 1959) (ostensible authority "could

not have existed" where third party "knew or should have known of the lack of

authority"); *DeBoer Constr., Inc. v. Reliance Ins. Co.*, 540 F.2d 486, 491 (10th Cir.

1976) ("Knowledge that an agent has limited authority defeats any right to rely on

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)

1  apparent authority."); *Hansen v. Power*, 569 P.2d 573, 574 (Or. 1977) (same).

2      Ostensible authority is unavailable to dcp for another, independent, reason:

3  It must arise from "conduct by the principal which causes a third party reasonably

4  to believe the agent has authority," not conduct of the agent.  *Lindsay-Field*, 36 Cal.

5  App. 4th at 1734.  In that case, horse breeders sued a racing syndicate for breach of

6  contract, claiming the syndicate—through the ostensible authority of its manager—

7  entered into a lease agreement to ship the syndicate's horse to Australia and breed it

8  there.  *Id*. at 1730.  Overturning a jury verdict against the syndicate, the appeals

9  court rejected the breeder's claim that the syndicate' agent had ostensible authority

10  to act beyond the limits of his actual authority.  The court observed that the plaintiff

11  breeders: (1) " repeatedly admitted [knowing] a vote of the membership was

12  required," and therefore had notice of the agent's limitations; and (2) nevertheless

13  "did not ask for written evidence of [the manager's] authority."  *Id*. at 1734.  As the

14  court explained, even though the agent may have said he received the syndicate's

15  approval, because the plaintiffs "did not act based upon the conduct of the

16  [syndicate] members," there was no ostensible authority.  *Id*.

17      At most, dcp can contend, as La Maina did at his deposition, that La Maina

18  discussed his interpretation of the "extensions" clause with Van Blaricom (which he

19  says that he did), and that she agreed with his interpretation.[33]  But La Maina

20  concedes that he did not discuss the provision with anyone else from the HFPA,

21  including the membership when it assembled on September 22, 1993 to approve the

22  proposed NBC and dcp deals.  (Undisputed Fact No. 8 [La Maina Depo. at 88:10–

23  13; 98:12–17; 98:21–99:12; 259:16–23; 266:19–25; 267:13–19; 267:22–268:4].)

24  Since dcp can point to no conduct on the part of the HFPA membership that led him

_____

25  [33] The HFPA expelled Ms. Van Blaricom during the second year of her presidency for
26  financial improprieties involving the acceptance of cash payments from dcp, and she has
since created an organization to compete with the HFPA.  (Diamond Decl., Ex. F [Soria
27  Depo. at 123:4-125:1].)  The HFPA attempted to serve Ms. Van Blaricom with a
deposition subpoena, but she left the country during the discovery period without making
28  herself available for deposition.

1  to believe that the HFPA president could grant self-renewing options, express or

2  implied statements by Van Blaricom concerning her authority do not constitute a

3  lawful basis to claim she had ostensible authority to make that deal. And La Maina

4  was not entitled to presume that if Van Blaricom acted beyond her authority, the

5  membership *must* have authorized it. California courts have declared as "a

6  fundamental rule, never to be lost sight of and not easily to be overestimated, that

7  persons dealing with an assumed agent . . . are bound at their peril, if they would

8  hold the principal, to ascertain not only the fact of the agency but the nature and

9  extent of the authority and in case either is controverted, the burden of proof is on

10 them to establish it." *S. Sacramento Drayage*, 220 Cal. App. 2d at 857-58; *see

11 also*, *McCullough*, 2011 WL 1585017, at *13 (summary judgment proper where no

12 evidence principal led plaintiff to believe agent had authority); *Bybee Farms, LLC

13 v. Snake River Sugar Co.*, 563 F. Supp. 2d 1184 (E.D. Wash. 2008) (same).

## IV.    CONCLUSION

15     For the foregoing reasons, the HFPA respectfully requests that the Court

16 enter summary judgment in its favor on Phase One and hold that there is no genuine

17 dispute that the 1993 Amendment authorized by the HFPA membership granted

18 dcp only eight options to produce and license for broadcast Golden Globes shows,

19 that dcp exercised the last of the options granted by the HFPA, and that the contract

20 between dcp and the HFPA is now at an end.

21     Dated:   June 20, 2011              Respectfully submitted,

22                                         LINDA J. SMITH
                                           ROBIN M. WALL
23                                         AMY. R. LUCAS
                                           O'MELVENY & MYERS LLP
24

25                                         By:  /s/ Linda J. Smith
                                                Linda J. Smith
26

27                                         Attorneys for Plaintiff
                                           Hollywood Foreign Press Association
28

HFPA'S MOT. FOR SUMMARY
JUDGMENT ON PHASE ONE
CASE NO. CV 10-8833 VBF (FMOx)