1  RONALD L. OLSON (State Bar No. 044597)
   Ron.Olson@mto.com
2  BRADLEY S. PHILLIPS (State Bar No. 085263)
   Brad.Phillips@mto.com
3  MANUEL F. CACHAN (State Bar No. 216987)
   Manuel.Cachan@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, 35th Floor
5  Los Angeles, CA 90071-1560
   Telephone:  (213) 683-9100
6  Facsimile:   (213) 687-3702

7  MARTIN D. KATZ (State Bar No. 110681)
   mkatz@sheppardmullin.com
8  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   1901 Avenue of the Stars, Suite 1600
9  Los Angeles, CA 90067-6017
   Telephone:  (310) 228-3700
10 Facsimile:   (310) 228-3701

11 Attorneys for Defendants and Counterclaimant

12             UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15 HOLLYWOOD FOREIGN PRESS          Case No. CV10-8833 VBF (FMOx)
   ASSOCIATION, a California
16 Corporation,                     **DEFENDANTS' MEMORANDUM
                                     OF CONTENTIONS OF FACT AND
17             Plaintiff,            LAW [LOCAL RULE 16-4]**

18      v.

19 RED ZONE CAPITAL PARTNERS        Complaint Filed:     November 17, 2010
   II, L.P., a Delaware Limited     FAC Filed:           March 9, 2011
20 Partnership, et al.,             Counterclaims Filed: March 28, 2011

21             Defendants.          Pre-Trial Conf.:     August 22, 2011
                                    Trial Date:          August 30, 2011
22 DICK CLARK PRODUCTIONS,          Courtroom:           9
   INC., a Delaware Corporation,
23                                  **Hon. Valerie Baker Fairbank**
               Counterclaimant,
24
        v.
25
   HOLLYWOOD FOREIGN PRESS
26 ASSOCIATION, a California
   Corporation,
27
               Counter-defendant.
28

1

2

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. - 1 -

II.   BIFURCATION .................................................................................... - 2 -

III.   HFPA'S FIRST CAUSE OF ACTION: CONTRACT
      INTERPRETATION AND DECLARATORY RELIEF........................... - 3 -

      A.   Elements Of HFPA's Contract Interpretation Claim........................ - 3 -

      B.   Key Evidence In Opposition To HFPA's Contract
           Interpretation Claim ........................................................................ - 7 -

           1.   The Plain Language Of The 1993 Amendment Supports
                Only dcp's Interpretation........................................................ - 7 -

           2.   The Relevant Extrinsic Evidence Confirms The Plain
                Meaning Of The Extensions Clause ...................................... - 10 -

IV.   HFPA'S SECOND CAUSE OF ACTION: CONTRACT
      REFORMATION ................................................................................ - 15 -

      A.   Elements Required To Prove Reformation ..................................... - 15 -

      B.   Evidence In Opposition To HFPA's Reformation Claim.............. - 15 -

V.   HFPA'S THIRD [UNPLEADED] CAUSE OF ACTION: PARTIAL
     INVALIDITY..................................................................................... - 16 -

      A.   Elements Required To Show Lack Of Authority .......................... - 16 -

      B.   HFPA's President Had Actual Authority To Execute The
           1993 Amendment........................................................................... - 17 -

      C.   HFPA's President Had Ostensible Authority To Execute The
           1993 Amendment........................................................................... - 18 -

      D.   HFPA Ratified The 1993 Amendment ........................................... - 19 -

VI.   DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE
      DEFENSES ........................................................................................ - 21 -

      A.   Counterclaim 1: Declaratory Relief Against HFPA ..................... - 21 -

           1.   Elements Of Declaratory Relief And Supporting Facts ...... - 21 -

      B.   First Affirmative Defense: Statute Of Limitations ........................ - 21 -

           1.   HFPA's "Eight Means Eight" Contract Interpretation Is
                Time Barred ......................................................................... - 22 -

           2.   HFPA's Reformation Claim Is Time Barred....................... - 22 -

# TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | 3. | HFPA's Partial Invalidity Theory Is Time Barred | - 23 - |
| C. | Second Affirmative Defense: Laches | | - 24 - |
| D. | Third Affirmative Defense: Waiver/Estoppel | | - 25 - |
| VII. | ANTICIPATED EVIDENTIARY ISSUES | | - 25 - |
| A. | Parol Evidence | | - 25 - |
| B. | Hearsay | | - 26 - |
| C. | Motions In Limine | | - 26 - |
| VIII. | JURY TRIAL | | - 27 - |
| IX. | ATTORNEY'S FEES | | - 28 - |
| X. | ABANDONMENT OF ISSUES | | - 28 - |

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

4

**FEDERAL CASES**

5

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.,*
6
    852 F.2d 493 (9th Cir. 1988) ............................................................. 29

7
*Appling v. State Farm Mut. Auto Ins. Co.,*
8
    340 F.3d 769 (9th Cir. 2003) ............................................................. 6

9
*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
10
    583 F.3d 832 (Fed. Cir. 2009) ......................................................... 21

11
*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.,*
12
    971 F.2d 272 (9th Cir. 1992) ......................................................... 5, 7

13
*Coleman v. Quaker Oats Co.,*
    232 F.3d 1271 (9th Cir. 2000) .................................................... 16, 17
14

15
*DeFeo v. Procter & Gamble Co.,*
    831 F. Supp. 776 (N.D. Cal. 1993) ............................................... 4, 21
16

17
*F.B.T. Prods., LLC v. Aftermath Records,*
    621 F.3d 958 (9th Cir. 2010) ......................................................... 4, 5

18
*Gov't Emps. Ins. Co. v. Dizol,*
19
    133 F.3d 1220 (9th Cir. 1998) ...................................................... 4, 21

20
*Guerra v. Sutton,*
21
    783 F.2d 1371 (9th Cir. 1986) ...................................................... 4, 21

22
*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,*
23
    896 F.2d 1542 (9th Cir. 1990) ......................................................... 21

24
*McCullogh v. Lennar Corp.,*
    2011 WL 1585017 (S.D. Cal. Apr. 26, 2011) ................................... 18
25

26
*Ortiz v. Lopez,*
    688 F. Supp. 2d 1072 (E.D. Cal. 2010) ...................................... 16, 17

27

28

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*,

4

    995 F. Supp. 1060 (D. Ariz. 1997)........................................................26

5

**S**TATE **C**ASES

6

*Bank of the West v. Super. Ct.*,

7

    2 Cal. 4th 1254 (1992)..................................................................5, 9

8

*Behniwal v. Mix*,

9

    133 Cal. App. 4th 1027 (2005).........................................................19

10

*Bradbury v. Higginson*,

    167 Cal. 553 (1914)......................................................................22

11

12

*Branch Banking and Trust Co. v. Chicago Title Ins.*,

    No. COA10-196, 2011 WL 2207563 (N.C. App. Jun. 7, 2011) ........15

13

14

*Cheek v. Jackson Wax Museum, Inc.*,

    220 P.3d 1288 (Wy. 2009) ............................................................14

15

16

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,

    43 Cal. 4th 375 (2008)....................................................................5

17

18

*County First Nat'l Bank of Santa Cruz v. Coast Dairies & Land Co.*,

    46 Cal. App. 2d 355 (1941).............................................................19

19

20

*Dictor v. David & Simon, Inc.*,

    106 Cal. App. 4th 238 (2003)..........................................................15

21

*Founding Members of the Newport Beach Country Club v. Newport Beach
    Country Club, Inc.*,

22

    109 Cal. App. 4th 944 (2003)............................................................5

23

*Higgins v. Standard Fed. Sav. & Loan Ass'n*,

24

    188 Cal. App. 2d 68 (1961).............................................................16

25

*Johnson v. City of Loma Linda*,

26

    24 Cal. 4th 61 (2000)....................................................................24

27

*Jolly v. Eli Lilly & Co.*,

28

    44 Cal. 3d 1103 (1998)..................................................................23

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

4

*Judelson v. Am. Metal Bearing Co.*,
    89 Cal. App. 2d 256 (1948) ............................................................ 16

5

6

*Laks v. Coast Fed. Sav. & Loan Ass'n*,
    60 Cal. App. 3d 885 (1976) ............................................................ 25

7

8

*Marani v. Jackson*,
    183 Cal. App. 3d 695 (1986) ............................................................ 7

9

10

*Marin Healthcare Dist. v. Sutter Health*,
    103 Cal. App. 4th 861 (2002) ........................................................ 21

11

*Monteleone v. S. Cal. Vending Corp.*,
    264 Cal. App. 2d 798 (1968) ........................................................ 19

12

13

*Morey v. Vannucci*,
    64 Cal. App. 4th 904 (1998) .......................................................... 4

14

15

*Moss v. Moss*,
    20 Cal. 2d 640 (1942) .................................................................. 21

16

17

*No. Natural Gas Co. v. Super. Ct.*,
    64 Cal. App. 3d 983 (1976) .......................................................... 15

18

19

*Pacific Gas & Electric Company v. G.W. Thomas Drayage & Rigging
Company*,
    69 Cal. 2d 33 (1968) ("PG&E") .............................................. passim

20

21

*Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*,
    521 S.E.2d 761 (Va. 1999) ........................................................... 15

22

23

*Reusche v. Cal. Pac. Title Ins. Co.*,
    231 Cal. App. 2d 731 (1965) ........................................................ 19

24

25

*Robertson v. Super. Ct.*,
    90 Cal. App. 4th 1319 (2001) ....................................................... 22

26

27

*StreetScenes, LLC v. ITC Entm't Group, Inc.*,
    103 Cal. App. 4th 233 (2002) ................................................. 19, 20

28

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3
4
*Tomerlin v. Canadian Indem. Co.*,
    61 Cal. 2d 638 (1964) ................................................................ 17, 18

5
6
*Universal Sales Corp. v. Cal. Press Mfg. Co.*,
    20 Cal. 2d 751 (1942) ...................................................................... 6

7
8
*Wagner v. Columbia Pictures Indus., Inc.*,
    146 Cal. App. 4th 586 (2007) .......................................................... 6

9
*Wolf v. Walt Disney Pictures & Television*,
    162 Cal. App. 4th 1107 (2008) ....................................... 4, 25, 27, 28

10
11

STATUTES AND RULES

12
Cal. Civ. Code § 1625 ............................................................................. 6

13
Cal. Civ. Code § 1636 ........................................................................... 10

14
Cal. Civ. Code § 1639 ............................................................................. 5

15
Cal. Civ. Code § 1641 ............................................................................. 8

16
Cal. Civ. Code § 1647 ............................................................................. 5

17
18
Cal Civ. Code. § 2307 ..................................................................... 16, 19

19
Cal. Civ. Code § 2310 ..................................................................... 19, 20

20
Cal. Civ. Code § 2316 ..................................................................... 16, 17

21
Cal. Civ. Code § 2317 ..................................................................... 16, 18

22
Cal. Civ. Code § 3399 ........................................................................... 15

23
24
Cal. Civ. Proc. Code § 337(1) .............................................................. 21

25
Cal. Civ. Proc. Code § 337(3) .............................................................. 21

26
Cal. Civ. Proc. Code § 338(d) ......................................................... 21, 22

27
Cal. Civ. Proc. Code § 343 ............................................................. 21, 22

28
Cal. Civ. Proc. Code § 1856(a) ......................................................... 6, 7

# TABLE OF AUTHORITIES
## (continued)

**Page**

Fed. R. Civ. P. 26 ................................................................................................ 27

Fed. R. Civ. P. 37 ................................................................................................ 27

Fed. R. Civ. P. 42(b) ............................................................................................. 2

Fed. R. Evid. 402 ................................................................................................ 27

Fed. R. Evid. 403 .......................................................................................... 26, 27

Fed. R. Evid. 602 ................................................................................................ 27

Fed. R. Evid. 701 ................................................................................................ 27

Fed. R. Evid. 702 ................................................................................................ 27

Fed. R. Evid. 802 ................................................................................................ 27

Fed. R. Evid. 1002 .............................................................................................. 27

L.R. 16-4 ........................................................................................................... 1, 2

L.R. 16-4.1 ............................................................................................................ 3

1   Pursuant to Local Rule 16-4, Defendants dick clark productions, inc. ("dcp"),

2   Red Zone Capital Partners II, L.P., Red Zone Capital GP, LLC, and Red Zone

3   Capital Management Company, LLC (collectively, "Defendants") respectfully

4   submit the following Memorandum of Contentions of Fact and Law.

5   **I.     INTRODUCTION**

6   In 1983, the Golden Globes were dropped by CBS. Without a producer to

7   distribute the show, it was unclear whether it would continue to be televised, until

8   dcp stepped in. Over the next decade, dcp—an established and successful

9   television production company—worked to win back credibility for the Golden

10  Globes. For the first five years that dcp produced the Golden Globes, the show was

11  sold via syndication and aired only after the winners had been announced.

12  Eventually, dcp was able to close a deal to air the show on Turner Broadcasting

13  System, Inc. ("TBS"), a national cable network. In 1993, dcp succeeded in

14  obtaining a broadcast agreement with the National Broadcasting Company

15  ("NBC") television network. HFPA and dcp thereafter agreed that dcp would

16  continue to have options to produce the Awards show under the terms of the 1987

17  Agreement for any extensions or renewals of the NBC Agreement. Since 1993, dcp

18  has extended its agreement with NBC twice, once in 2001 and again in 2010.

19  HFPA has reaped enormous financial and other benefits from dcp's expertise

20  and commitment of resources over the last almost-three decades years. Now,

21  however, HFPA asks the Court to undo the bargain it struck with dcp years ago,

22  and, in so doing, to void the most recent extension of NBC's license to broadcast

23  the Golden Globe Awards show beginning in 2012, running through 2018. The key

24  contract provision HFPA seeks to escape, and the one on which this phase of the

25  litigation turns, is found in the 1993 Amendment to the 1987 dcp-HFPA

26  Agreement. It provides:

27          This will confirm that the Agreement [between dcp and
            HFPA] is hereby further amended to provide that HFPA
28          grants to dcp eight (8) additional, consecutive, exclusive,

- 1 -                                  **DEFENDANTS' MEMORANDUM OF
                                       CONTENTIONS OF FACT AND LAW**

and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, *and for any extensions, renewals, substitutions or modifications of the NBC Agreement*, and to exploit such productions in all media throughout the world in perpetuity.

The italicized language (referred to here as the "extensions clause") is reasonably susceptible to only one construction: dcp has the option to extend its contract with HFPA for the term of its license agreement with NBC, including any "extensions, renewals, substitutions, or modifications" of that NBC agreement. Defendants will prevail at trial because HFPA's contrary legal theories are unsupported by fact or law. Even if extrinsic evidence is admitted, which it need not be, Defendants still will prevail, for the reasons explained below and in the parties' briefing to date.

Pursuant to Civil Local Rule 16-4, this Memorandum is organized to discuss the following:

- Bifurcation of issues;
- Summaries of HFPA's claims and their elements;
- Brief descriptions of Defendants' key evidence in opposition to each claim;
- Summaries of Defendants' counterclaims and affirmative defenses;
- Brief descriptions of Defendants' key evidence in support of its affirmative defenses;
- A list of anticipated evidentiary issues;
- Defendants' position on jury trial;
- Defendants' position on attorney's fees; and
- Issues that have been abandoned.

## II.  <u>BIFURCATION</u>

By Order dated February 21, 2011 (Dkt. No. 38), and pursuant to Federal Rule of Civil Procedure 42(b), this case was bifurcated. "Phase One" of the case addresses whether the 1987 Agreement between dcp and HFPA, as amended, is

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1   enforceable after January, 2011, the date on which HFPA claims the agreement
2   expired. Specifically, the parties will address: "Interpretation of and declaratory
3   relief or equitable relief (*e.g.*, reformation) as to who has the rights and/or options
4   under the parties' 1987 'Golden Globe Awards' Agreement, as amended, to
5   produce and license the television broadcast of the Golden Globe Awards Show
6   after 2011."

7       While HFPA's theory of the case has changed repeatedly, it appears that
8   HFPA's Phase One allegations boil down to three claims: First, HFPA seeks a
9   declaratory judgment that the 1993 Amendment should be read to provide only
10  eight fixed options, for the years 1998 to 2005. Second, and alternatively, HFPA
11  claims that the 1993 Amendment should be reformed to require HFPA's approval
12  of any "extensions, renewals, substitutions or modifications" of the broadcast
13  agreement between NBC and HFPA. Third, HFPA claimed for the first time at
14  summary judgment that its President when the 1993 Amendment was signed,
15  Mirjana Van Blaricom, possessed authority to execute the 1993 Amendment, but
16  that she lacked authority to agree to one phrase of that agreement; *i.e.*, the
17  extensions clause.[1] Each of these contentions is addressed in turn below.

18  **III.   HFPA'S FIRST CAUSE OF ACTION: CONTRACT**
19          **INTERPRETATION AND DECLARATORY RELIEF**

20      **A.    Elements Of HFPA's Contract Interpretation Claim**

21      HFPA seeks a judicial declaration that the 1993 Amendment granted dcp
22  only eight fixed options, from 1998 to 2005, and that the extensions clause was
23  intended solely to provide "flexibility" during that eight-year time period. (HFPA
24  MSJ at 2:3-12 (Dkt. No. 87).)

25  _____

26  [1] Local Rule 16-4.1 provides that this memorandum should contain "a summary
    statement of the claims Plaintiff *has pleaded* and plans to pursue." (Emphasis
    added.) HFPA never pleaded its partial invalidity theory; thus, HFPA should not be
27  permitted to assert this theory at trial. Nonetheless, Defendants provisionally
    respond to this new theory in order to establish that it is also contrary to the facts
28  and law. *See* Part V, *infra*.

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1   The elements of a claim for declaratory relief are (1) the existence of a
2   justiciable controversy, and (2) that the claim involves a proper subject for
3   declaratory relief. *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir.
4   1998). Declaratory relief is appropriate where the judgment will "serve a useful
5   purpose in clarifying and settling the legal relations in issue, and . . . will terminate
6   and afford relief from the uncertainty, insecurity, and controversy giving rise to the
7   proceeding." *DeFeo v. Procter & Gamble Co.,* 831 F. Supp. 776, 778 (N.D. Cal.
8   1993) (quoting *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986)).

9   Contract interpretation is a judicial function, the rules of which are well
10   settled. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1134
11   n.18 (2008). In the broadest sense, "[t]he fundamental goal of contractual
12   interpretation is to give effect to the mutual intention of the parties." *Morey v.*
13   *Vannucci*, 64 Cal. App. 4th 904, 912 (1998). While the principal focus of contract
14   interpretation is on the specific words of an agreement and their plain meaning,
15   courts recognize that the words chosen by contracting parties can sometimes be
16   susceptible to more than one reasonable interpretation. In California, the rule is that
17   a trial court must *consider* all relevant extrinsic evidence *provisionally* in order to
18   determine whether the words of a contract are ambiguous, before any extrinsic
19   evidence is actually *admitted* into evidence to assist in interpretation of the
20   contract. If the court concludes, after provisionally considering the extrinsic
21   evidence, that the words of a contract are reasonably susceptible to more than one
22   interpretation, it then admits extrinsic evidence to interpret those words in
23   accordance with the rules of construction for ascertaining the mutual intent of the
24   parties. This basic procedure was articulated by the California Supreme Court in
25   *Pacific Gas & Electric Company v. G.W. Thomas Drayage & Rigging Company*,
26   69 Cal. 2d 33, 39-40 (1968) ("*PG&E*"). *See also Wolf*, 162 Cal. App. 4th at 1126-
27   27; *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010).

28

- 4 -

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

The rules of construction that govern interpretation of a written agreement vary from case to case, depending on the specific facts. The following four rules of construction are of particular importance here:

First, if contractual language is clear and explicit, it controls. To the extent possible, therefore, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone." Cal. Civ. Code § 1639. *See also id.* § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). Of course, a court must construe the language in context. *Id.* § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992) ("[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*.") (emphasis in original) (internal quotations removed); *F.B.T. Prods., LLC*, 621 F.3d at 963. Because an agreement is to be interpreted as a whole, it is assumed that no part of it is superfluous. *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992).

Second, insofar as extrinsic evidence is concerned, "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647. While evidence of communicated intent may be admissible to aid a court in its interpretation of the words chosen by the parties, evidence of the undisclosed, subjective intent of a party is irrelevant and inadmissible. *See, e.g., Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003).

Third, the post-contracting, pre-dispute conduct of the parties is admissible to aid a court in the interpretation of disputed words or phrases. *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393 (2008). Courts have long

- 5 -

1    considered such evidence a powerful indicator of the contracting parties' intent. *See*

2    *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal. 2d 751, 761 (1942).

3         Fourth, the applicable rules of construction may be used only to *interpret* the

4    *specific words* chosen by the parties in their contract, not to supplement or

5    contradict those words based on some claimed intent that is divorced from the

6    words used in the written agreement. *See Wagner v. Columbia Pictures Indus., Inc.*,

7    146 Cal. App. 4th 586, 592 (2007) ("Parol evidence cannot . . . be admitted to show

8    intention independent of an unambiguous written instrument . . . [Thus] [e]ven if

9    the Wagners and SPG intended the Wagners would share in the net profits 'from

10   any and all sources,'" evidence of such intention was inadmissible to interpret the

11   agreement); *PG&E*, 69 Cal. 2d at 39 ("Extrinsic evidence is not admissible to add

12   to, detract from, or vary the terms of a written contract.").[2] That rule is of special

13   force in the case of integrated agreements that, like the 1987 Agreement, as

14   amended, expressly provide they "contain[] the entire agreement of the parties" and

15   that "[n]either party has entered into this agreement in reliance upon any promise or

16   representation not contained in this agreement." *See* Cal. Civ. Code § 1625 ("The

17   execution of a contract in writing, whether the law requires it to be written or not,

18   supersedes all the negotiations or stipulations concerning its matter which preceded

19   or accompanied the execution of the instrument."); Cal. Civ. Proc. Code § 1856(a)

20   ("Terms set forth in a writing intended by the parties as the final expression of their

21   agreement with respect to such terms as are included therein may not be

22   contradicted by evidence of any prior agreement or of a contemporaneous oral

23   agreement."); *id*. § 1856(b) ("The terms set forth in a writing described in

24   subdivision (a) may be explained or supplemented by evidence of consistent

25   _____

26   [2] *See also Appling v. State Farm Mut. Auto Ins. Co.*, 340 F.3d 769, 778 (9th Cir.
     2003) (district court correctly held there was no genuine issue of material fact as to

27   the meaning of a termination provision where "[t]he Agents have not introduced
     any extrinsic evidence that interprets specific words in the Termination Provision;

28   instead, the Agents have sought to introduce evidence grafting on a good cause
     requirement, a practice that [*PG&E*] prohibits).

- 6 -                                       **DEFENDANTS' MEMORANDUM OF
                                            CONTENTIONS OF FACT AND LAW**

additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement."); *id.* § 1861 ("The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly.").[3]

B.   **Key Evidence In Opposition To HFPA's Contract Interpretation Claim**

1.   The Plain Language Of The 1993 Amendment Supports Only dcp's Interpretation

This case may be resolved by reference to the parties' agreements alone, including the 1983 Agreement between dcp and HFPA (Ex. 5)[4] and the 1987 Agreement between dcp and HFPA (Ex. 1), which was amended in 1989 (Ex. 2), 1993 (Ex. 3), and 1997 (Ex. 10). The grant of options provisions in the 1983, 1987, 1989, and 1993 agreements are structured identically: The 1983 Agreement granted dcp "four consecutive, exclusive, irrevocable options . . . for 1984, 1985, 1986 and 1987." The 1987 Agreement granted dcp "five (5) consecutive, exclusive, irrevocable options . . . for 1988, 1989, 1990, 1991 and 1992." And the 1989 Amendment provided dcp with "five (5) additional consecutive, exclusive, irrevocable options . . . for 1993, 1994, 1995, 1996[,] and 1997." The 1993 Amendment, while keeping this wording, adds a new term, granting dcp "eight (8)

---

[3] *See also Marani v. Jackson*, 183 Cal. App. 3d 695, 701 (1986) (when an agreement is fully integrated, no "evidence of additional oral understandings" is relevant or admissible to supplement or contradict the meaning of the contractual language '*no matter how persuasive*' it may be") (emphasis in original); *Brinderson-Newberg Joint Venture*, 971 F.2d at 277 ("[P]arol evidence of terms not specifically included in [a completely integrated] written contract is not admissible.").

[4] Exhibit references are to the parties' trial exhibits. The parties initial joint trial exhibit list has been filed with the Court contemporaneously with this memorandum.

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

additional, consecutive, exclusive, and irrevocable options . . . for each of the years

1998 through and including 2005, *and for any extensions, renewals, substitutions or*

*modifications of the NBC Agreement*." (Emphasis added.) This new term is

reasonably susceptible to only one meaning: that dcp has options after 2005 to

produce the Golden Globe Awards show so long as it extends or renews its

broadcast agreement with NBC.

       Any doubt as to whether the extensions clause provided dcp with additional

options, beyond 2005, may be resolved by viewing the clause in light of the 1987

Agreement (as amended) in its entirety, as the rules of contract interpretation

require. *See* Cal. Civ. Code § 1641. In addition to adding the extensions clause, the

1993 Amendment revised paragraphs 1(a) and (b) of the parties' 1987 Agreement

relating to the parties' contractual negotiation period and right of first refusal.

Whereas the 1987 and 1989 Agreements provided a date certain for the negotiation

period, which corresponded with the exercise of the last option under the contract

(*i.e.*, 1992 and 1997, respectfully), the 1993 Amendment anticipated options

beyond the date of the last fixed option (*i.e.*, 2005). The 1993 Amendment stated:

> This will also confirm that the reference to "1997" in
> Paragraph 1(a) of the [Main Show] Agreement as
> amended [by the 1989 Amendment] shall be changed to,
> "2005, *or the date of the broadcast of the last Awards
> under the NBC Agreement, whichever is later . . .*"

> This will also confirm that the reference to "July 15,
> 1997" in paragraph 1(b) of the [Main Show] Agreement
> as amended [by the 1989 Amendment] shall be changed
> to read: "July 15, 2005, *or July 15 after the last broadcast
> of the Awards under the NBC Agreement, whichever is
> later.*"

       The emphasized language in these provisions—particularly the phrase,

"whichever is later"—makes sense only if the parties intended to grant dcp the right

to exercise options *beyond 2005* in the event of any "extensions, renewals,

substitutions or modifications of the NBC Agreement." *See* Cal. Civ. Code § 1641

- 8 -

("The whole of a contract is to be taken together, so as to give effect to every part . . . ."); *Bank of the West*, 2 Cal. 4th at 1265.

HFPA has introduced no evidence in support of its contrary theory, that the extensions clause was intended to provide "flexibility" to the parties or to substitute as a *force majeure* provision. Even if HFPA were able to muster evidence for its "flexibility" theory, it would be inadmissible, because the plain language of the 1993 Amendment is not susceptible to this interpretation, which requires that the court subtract language (*i.e.*, the extensions clause) or add language (*i.e.*, a *force majeure* provision) to the contract, in clear violation of the rules of contract interpretation. *See, e.g., PG&E*, 69 Cal. 2d at 39. Under HFPA's construction of the 1993 Amendment, the language of the extensions clause would read:

> This will confirm that the Agreement [between dcp and HFPA] is hereby further amended to provide that HFPA grants to dcp eight (8) additional, consecutive, exclusive, and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, ~~and for any extensions, renewals, substitutions or modifications of the NBC Agreement~~ **[however, in the event of a force majeure, the option exercise deadline would be extended for the same period of time that might equal the length of the force majeure]**, and to exploit such productions in all media throughout the world in perpetuity.

Finally, HFPA is bound by its own judicial admissions, which run expressly contrary to its new-found legal theory. In HFPA's original complaint, and again four months later in its First Amended Complaint ("FAC"), HFPA alleged that "based on its own reading of the words of the 1993 Amendment, and on statements [made] by dcp representatives in 1993, HFPA understood at the time of contracting (and still understands) that provision [*i.e.*, the extensions clause] to merely anticipate the possibility of HFPA extending further options to dcp to remain involved in the Golden Globe Awards show in the event that the NBC broadcast license is extended, renewed, substituted or modified with HFPA's approval." (FAC ¶ 129; *see also id.* ¶¶ 37, 130(a).) Given that the purpose of contract

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1  interpretation is to give effect to the mutual intention of the parties at the time the

2  contract was executed, Cal. Civ. Code § 1636, HFPA's admission fatally

3  undermines its theory that the 1993 Amendment was meant to provide dcp with

4  eight fixed options and no more, or that the extensions clause was meant to serve as

5  a *force majeure* provision.

6          2.      The Relevant Extrinsic Evidence Confirms The Plain Meaning

7                  Of The Extensions Clause

8          Even if admitted, the uncontested extrinsic evidence of the parties'

9  communicated intent, HFPA's admissions, and the parties' post-contracting, pre-

10  dispute conduct confirms that dcp's interpretation of the extensions clause is the

11  only possibly correct one.

12          First, the circumstances leading up to the parties' various contracts supports

13  dcp's interpretation of the extensions clause and shows why it made logical sense

14  for both parties. In 1982, the CBS television network, on which the Awards show

15  had previously aired, dropped the broadcast following press reports that HFPA had

16  awarded a Golden Globe award to an unheralded actress named Pia Zadora, after

17  Ms. Zadora's husband, a wealthy businessman, had fêted HFPA voters. Neither

18  ABC nor NBC picked up the show. After a potential producer backed out of a

19  proposed deal with HFPA only months before the show's traditional January air

20  date, it appeared that the Golden Globe Awards show might not be televised in

21  1983. With that background, dcp and HFPA entered discussions for dcp to acquire

22  (and dcp in fact did acquire) the rights to produce and distribute the show. As of

23  March 13, 1987, dcp and HFPA entered into a second agreement (*i.e.*, the 1987

24  Agreement) for dcp to produce and exploit the Globe Awards show for five

25  additional years, through 1992.

26          The Golden Globes aired in syndication until 1988, when dcp secured an

27  agreement with a national cable network, TBS, for a significantly higher license fee

28  than what dcp had previously obtained in syndication. TBS was granted the right to

- 10 -

1    televise the Golden Globes for two years (1989 and 1990) and one option for a third

2    and fourth year (1991 and 1992). In 1989, dcp secured an extension of the TBS deal

3    whereby, in exchange for agreeing to pay a higher license fee (in addition to other

4    consideration), TBS exercised its options to televise the Golden Globes in 1991 and

5    1992 and obtained additional exclusive rights for the 1993, 1994, and 1995 Golden

6    Globe Award shows. Because dcp's rights to produce and distribute the show

7    extended only to 1992, HFPA and dcp amended the 1987 Agreement to grant dcp

8    five additional options to produce and distribute the Golden Globe Awards show

9    for the years 1993 through 1997; *i.e.*, options sufficient to cover the TBS extension,

10   plus an additional two years.

11          In 1993, with two years still remaining on the TBS license, dcp saw an

12   opportunity to license the Golden Globe Awards show to NBC in a long-term deal,

13   following the end of the TBS contract. At the time, however, dcp's rights extended

14   only to 1997, and the underlying agreement between dcp and HFPA needed to be

15   amended to provide dcp additional rights. Having spent a decade reviving the

16   Golden Globes to the point where the show would once again be televised on a

17   major broadcast network like NBC, the parties agreed to the extensions clause in

18   the 1993 Amendment to reward, incentivize, and protect dcp so that it could

19   produce and distribute the Golden Globe Awards show so long as the show

20   remained on NBC.

21          Second, dcp's understanding of the extensions clause is the only one that

22   makes sense in light of the parallel broadcast agreement between dcp and NBC.

23   While the Syndicast and TBS Agreements (for the distribution of the Golden Globe

24   Awards shows from 1983 to 1995) contained fixed terms, the NBC Agreement

25   between dcp and HFPA provided that, if NBC exercised its two options (for a 10-

26   year commitment), it would then also have a right of first negotiation and first

27   refusal for continued broadcast rights to the Golden Globes, beyond 2005. (Ex. 38.)

28   Under this provision, NBC was entitled to negotiate with dcp for post-2005 rights

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1   to the Golden Globes first; if no agreement could be reached during the first

2   negotiation period, NBC would still have the contractual right to match any

3   competing offer for the show made by a third-party broadcaster. Thus, the

4   extensions clause was needed for dcp to synchronize its rights to produce the show

5   with its obligations under the NBC Agreement.

6        Third, extrinsic evidence of statements made during negotiations for the 1993

7   Amendment is consistent only with dcp's interpretation of the extensions clause. It

8   is undisputed that, at the time dcp and HFPA entered into the 1993 Amendment,

9   their respective Presidents discussed the clause and its meaning. Other evidence

10  confirms the parties' shared interpretation. For example, in April 1993, HFPA

11  authorized dcp to negotiate a license with a national broadcast (rather than cable)

12  network, assuring dcp in a letter dated April 15, 1993, that, "if such a contract is

13  achieved through [dcp's] efforts, [dcp's] contract with the Hollywood Foreign Press

14  Association will be renewed to cover the number of years with the network." In a

15  letter dated May 3, 1993 sent to the HFPA membership, HFPA's then-President

16  asked HFPA members to indicate their approval of HFPA's decision authorizing

17  dcp to "research the possibilities of a more favorable deal for our Golden Globe

18  Awards—and, if such a deal is made with a network, to extend the contract with the

19  said production company [*i.e.*, dcp] to cover the network contract." Then, at a

20  September 22, 1993 membership meeting of the HFPA membership, HFPA was

21  provided with a copy of the proposed 1993 Amendment. dcp's representative at the

22  meeting stated, "you now have the papers to discuss with your attorneys or whoever

23  you'd like to discuss them with."

24       HFPA, by contrast, has not provided evidence to support its theory that the

25  parties intended the 1993 Amendment to give dcp eight and only eight options to

26  produce and distribute the Golden Globes. For example, HFPA has not pointed to

27  any evidence, nor even alleged, that anyone understood the extensions clause to

28  provide "flexibility" in case dcp substituted CBS for NBC, or as protection against

- 12 -

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

a *force majeure* event. At most, HFPA's evidence shows that the extensions clause was never discussed by its membership, but this has no probative value; *i.e.*, it does not suggest that the words of the 1993 Amendment are susceptible to the alternative meaning HFPA proffers.

Fourth, extrinsic evidence of the parties' post-contracting conduct is undisputed and likewise demonstrates that the extensions clause was intended to permit dcp to extend its contract with HFPA for any "extensions, renewals, substitutions or modifications of the NBC Agreement." The fixed (eight) options in the 1993 Amendment ran only through 2005. But the evidence will show that dcp was able to extend its contract with NBC through 2011, without any further amendment to the dcp-HFPA agreement, only because of the extensions clause. To exercise its rights under the extensions clause in connection with the extending the NBC broadcast agreement in 2001, dcp needed only to execute an "Exercise of Options" with HFPA. That document, which was drafted by HFPA's counsel for dcp's signature alone, clearly states that the contract between dcp and HFPA is "deemed extended for any extensions of the NBC-dcp Agreement"—precisely dcp's position in this litigation and over the last two decades.

Moreover, the many years that the parties have operated under the 1993 Amendment, and the multiple occasions on which HFPA has sought to renegotiate what it terms the "perpetuity clause," is powerful evidence that HFPA understood the extensions clause the same way dcp did. HFPA would not seek a way out of the extensions clause—for example, by considering trading it for a 30-year exclusive deal with dcp, as HFPA did in May, 2009—if it did not believe itself bound by the parties' shared interpretation of the clause. HFPA's repeated admissions concerning the meaning of the extensions clause provide additional support for dcp's plain-language reading of the clause, to wit:

- HFPA's statement in the 2001 Exercise of Options that the 1987 Agreement is "deemed extended for any extensions of the NBC-dcp agreement";

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

- the statement by a former HFPA President and Board member at an HFPA
  Board meeting in December, 2002, that dcp had "an extension" of its contract
  with HFPA "[un]til 2005 or as long as NBC wants it";

- the multiple references by HFPA Presidents to the "perpetuity clause," and
  HFPA's efforts to extricate itself from that clause; and

- the July, 2010 email from the former President of HPFA, who admitted that
  "our agreement with dcp does not expire[,] only the one that dcp has with
  nbc."

Fifth, evidence of industry custom and practice, to the extent admissible, *see
infra* Part VII.C (Defs' MIL No. 6, Dkt. No. 127), confirms dcp's interpretation.
dcp's expert will testify that the words of the 1993 Amendment, including the
extensions clause, do not have a special or technical meaning unique to the
entertainment industry. Additionally, evidence will show that the extensions clause
was consistent with dcp's need for additional options, beyond 2005, that would
enable it to grant NBC rights of first negotiation and first refusal. Otherwise, dcp
would have been unable to comply with its obligations under the NBC agreement,
had NBC invoked either of those rights. HFPA's expert argues that an agreement
between a production company (like dcp) and a rights-holder (like HFPA) must be
synchronized with the agreement between the production company and the network
licensee (*i.e.*, NBC), yet only under dcp's interpretation of the 1993 Amendment
does the dcp/HFPA contract achieve that synchronicity.

Finally, evidence of industry custom and practice will show that language
similar or identical to that of the extensions clause in the 1993 Amendment is used
in talent agency agreements to ensure that an agency, having devoted its resources
to securing an opportunity for its client, receives a commission on the original lease
and on "any extensions or renewals" of it. *See, e.g.*, *Cheek v. Jackson Wax Museum,
Inc.*, 220 P.3d 1288, 1289, 1292-93 (Wy. 2009) (although the "renewal provision of
the brokerage agreement was 'entirely open-ended' and, theoretically, would entitle

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1  the broker to a commission every time the lease was renewed on into the future

2  [*i.e.*, potentially in perpetuity]," "the parties to a contract are free to incorporate . . .

3  whatever lawful terms they desire, and the courts are not at liberty, under the guise

4  of judicial construction, to rewrite the contract"); *Pollard & Bagby, Inc. v. Pierce*

5  *Arrow, L.L.C.,* 521 S.E.2d 761, 763-74 (Va. 1999). Other courts have interpreted

6  this language the same way outside the context of agency commission agreements.

7  *See Branch Banking and Trust Co. v. Chicago Title Ins.*, No. COA10-196, 2011

8  WL 2207563, at *1-*2, *6 (N.C. App. Jun. 7, 2011) (title insurance policy that

9  covered "all renewals or extensions" of a 2003 deed of trust applied to a 2005 deed

10  of trust on the identical property; "the language," *i.e.*, "all renewals or extensions,"

11  was "clear, and . . . only one reasonable interpretation exists").

12      In sum, the only reasonable (indeed, the only possible) conclusion is that the

13  extensions clause means that the 1987 Agreement (as amended) between dcp and

14  HFPA is extended to cover any "extensions, renewals, substitutions or

15  modifications" of the NBC license.

16  **IV.   HFPA'S SECOND CAUSE OF ACTION: CONTRACT**

17  **REFORMATION**

18      **A.   Elements Required To Prove Reformation**

19      To sustain a claim for reformation, HFPA must present clear and convincing

20  evidence that through (1) fraud, (2) a mutual mistake of the parties, or (3) a mistake

21  of one party, which the other party knew or suspected at the time, its written

22  contract does not truly express the intention of the parties. Cal. Civ. Code § 3399;

23  *Dictor v. David & Simon, Inc.*, 106 Cal. App. 4th 238, 253 (2003). HFPA cannot

24  meet this standard.

25      **B.   Evidence In Opposition To HFPA's Reformation Claim**

26      It is undisputed that the President of HFPA understood the extensions clause

27  before returning an executed copy of the 1993 Amendment to dcp. HFPA is

28  charged with the knowledge of its President. *See No. Natural Gas Co. v. Super. Ct.*,

- 15 -

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

64 Cal. App. 3d 983, 993 (1976); *Higgins v. Standard Fed. Sav. & Loan Ass'n*, 188 Cal. App. 2d 68, 72-73 (1961); *Judelson v. Am. Metal Bearing Co.*, 89 Cal. App. 2d 256, 265 (1948). It is likewise undisputed that HFPA's President was advised by dcp to consult with counsel prior to returning the 1993 Amendment to dcp in executed form. There is no evidence from which a rational trier-of-fact could conclude, by clear and convincing evidence, that the extensions clause was the product of mistake, either unilateral or mutual, or the result of fraud. HFPA's reformation claim fails as a matter of law. HFPA's reformation claim is also time barred. *See infra* Part VI.A.

## V.    HFPA'S THIRD [UNPLEADED] CAUSE OF ACTION: PARTIAL INVALIDITY

### A.    Elements Required To Show Lack Of Authority

To establish that the 1993 extensions clause is invalid for want of authorization, HFPA must show that HFPA's then-President, Mirjana Van Blaricom (the agent) lacked actual and ostensible authority to contract on behalf of HFPA (the principal) and that HFPA never ratified Van Blaricom's allegedly unauthorized actions. Cal Civ. Code. §§ 2307, 2316-17. Moreover, HFPA must establish that the supposedly unauthorized acts (here, Van Blaricom's execution of the extensions clause) "can be plainly separated from those which are authorized" (*i.e.*, the eight options of the 1993 Amendment that HFPA claims Van Blaricom had authority to exercise). *Id.* § 2333. HFPA has cited no authority that would support splitting a contract in such a manner—*i.e.*, finding that certain words in an otherwise valid written instrument are authorized, but that other words appearing in the same sentence are not.

As a threshold matter, HFPA is barred from pursuing this new theory because it was not alleged in its FAC or Answer to Defendants' Counterclaims. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal. 2010). This is true whether the new theory is

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

presented affirmatively, as a reason for liability (*Coleman*, 232 F.3d at 1292), or defensively, as a defense to liability (*Ortiz*, 688 F. Supp. 2d at 1082). Moreover, HFPA's judicial admissions—including, but not limited to, admissions in its FAC and Answer that the 1993 Amendment was a valid contract and that HFPA was aware of and had a specific understanding of the extensions clause when the 1993 Amendment was executed—are binding and conclusively refute HFPA's partial invalidity claim.

### B.   HFPA's President Had Actual Authority To Execute The 1993 Amendment

"Actual authority is such as a principal intentionally confers upon the agent, or unintentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316. To establish actual authority, there need not be evidence of express consent by the principal. *Tomerlin v. Canadian Indem. Co.*, 61 Cal. 2d 638, 644 (1964). Rather, "[a]ctual authority arises as a consequence of conduct of the principal which causes *an agent* reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal." *Id*. at 643. HFPA's argument that Van Blaricom lacked authority relies on

Section 13.2 of HFPA's then-operative Bylaws, which provides: "All material agreements . . . shall be executed by the President and the Treasurer under the seal of the Association, but only after said documents or contracts so to be executed shall have been submitted to and approved by the Board of Directors and approved by a majority of all the Active members." The argument fails.

First, the evidence will show that HFPA rarely, if ever, followed this provision of its own Bylaws. HFPA and dcp had entered into at least three prior agreements with respect to the Golden Globe Awards. The 1987 agreement and the 1989 amendment were executed only by HFPA's President and not by the Treasurer, and none of the agreements was executed under the seal of the HFPA, in direct contradiction to the express terms of the Bylaws. In light of that, a

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1   reasonable person could believe that HFPA did not require strict compliance with

2   its Bylaws.

3        Second, while, under the HFPA Bylaws, material contracts must be

4   "submitted to and approved by the HFPA Board of Directors," they need only be

5   "approved" by the membership. There is no evidence that the 1983, 1987, and 1989

6   contracts between dcp and HFPA in fact "were submitted to," as opposed to

7   "approved by" the HFPA membership before being executed by the President.

8   Indeed, with regard to the 1983 and 1987 Agreements, there is no evidence that the

9   contract was even discussed by the membership *at all* before being executed.

10       Third, the HFPA membership never questioned or challenged its Presidents'

11  deviation from the Bylaws' procedure. The membership's failure to do so would as

12  a matter of law have caused a reasonable person acting as President of the HFPA to

13  believe she had authority to execute the 1993 Amendment. *See Tomerlin*, 61 Cal.

14  2d at 644 (holding that the principal's silence in the face of a history of the agent's

15  exercising authority in similar circumstances reasonably caused the agent to believe

16  that he possessed actual authority).

17       **C.    HFPA's President Had Ostensible Authority To Execute The**

18            **1993 Amendment**

19       Ostensible authority is such authority as "a principal, intentionally or by want

20  of ordinary care, causes or allows a third person to believe the agent to possess."

21  Cal. Civ. Code § 2317. "[O]stensible authority arises as a result of conduct of the

22  principal which causes the third party reasonably to believe that the agent possesses

23  the authority to act on the principal's behalf." *McCullogh v. Lennar Corp.*, 2011

24  WL 1585017, at *12 (S.D. Cal. Apr. 26, 2011).

25       First, there is no evidence that dcp had access to HFPA's Bylaws to know

26  the process by which the HFPA membership gave approval to contracts. Moreover,

27  dcp officials rarely attended meetings and, when they did, they most often left the

28

- 18 -

room before a vote (if any) was taken and thus lacked knowledge of the mechanics by which HFPA approved contracts.

Second, for the reasons recited above, even if dcp had access to the Bylaws, it would have no reason to believe HFPA followed them, and every reason to believe it did not. None of the contracts between dcp and HFPA was executed under the seal of the Association, as the Bylaws require, and only one of the HFPA's many contracts (the 1983 Agreement) was signed by the Treasurer, as the Bylaws likewise require.

Third, ostensible authority is shown by the fact that the HFPA membership, though unquestionably aware their President had executed these contracts, accepted the contracts' benefits and never questioned their enforceability. *See, e.g.*, *County First Nat'l Bank of Santa Cruz v. Coast Dairies & Land Co.*, 46 Cal. App. 2d 355, 366-67 (1941).

### D.   HFPA Ratified The 1993 Amendment

Ratification occurs where the principal becomes aware of the unauthorized contract and either accepts its benefits or performs under its terms. Cal. Civ. Code §§ 2307, 2310; *Monteleone v. S. Cal. Vending Corp.*, 264 Cal. App. 2d 798, 806-07 (1968). Even where the principal does not expressly affirm a contract, ratification may be inferred from a principal's acquiescence in the results of an unauthorized act. *StreetScenes, LLC v. ITC Entm't Group, Inc.*, 103 Cal. App. 4th 233, 242 (2002). Ratification equally results when the principal fails to inquire about the contract when facts arise that suggest its existence. *See Behniwal v. Mix*, 133 Cal. App. 4th 1027, 1041-42 (2005) (even if the principal has not seen the unauthorized contract, the principal ratified it by signing related documents that referenced the unauthorized contract); *Reusche v. Cal. Pac. Title Ins. Co.*, 231 Cal. App. 2d 731, 738 (1965) (principal's failure to make "reasonable inquiries" after accepting the benefits of an unauthorized contract and learning of some surrounding details constituted ratification even though the principal never saw the contract).

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

HFPA had actual or constructive knowledge of the 1993 Amendment, including the extensions clause or, at a minimum, facts sufficient to suggest its existence as early as 1993. HFPA's failure to repudiate Van Blaricom's execution of the Amendment at that time constituted ratification. *See, e.g.*, *StreetScenes*, 103 Cal. App. 4th at 242. For example, at an October 7, 1993 HFPA General Membership meeting that occurred shortly after HFPA's execution of the 1993 Amendment, "a detailed explanation" of the 1993 Amendment was given. Yet no one questioned, let alone took action to disaffirm, the amendment.

Not only did HFPA fail to disaffirm the extensions clause, it affirmatively assented to the provision in 2001 by first requesting, then having its own counsel draft, and finally accepting the 2001 Exercise of Options. The 2001 Exercise of Options expressly ratified the extensions clause in the 1993 Amendment, stating: "WHEREAS, the Agreement is deemed extended for any extension of the NBC/dcp Agreement." (Ex. 4.) In addition, the 2001 Exercise of Options functionally ratified the extensions clause because—without any further amendment to the parties' agreements—dcp exercised options through the 2010/2011 broadcast, including options for six years (2006 to 2011) beyond the fixed term that HFPA claims its membership agreed to in 1993.

One year later, in 2002, HFPA purported to repudiate the 2001 Exercise of Options, but then withdrew that repudiation, thereby again ratifying the 1993 Amendment. It is undisputed that, no later than 2002, HFPA Board members knew about and discussed the extensions clause in the 1993 Amendment, recognizing that "[w]e have no choice but to accept it." HFPA continued to accept the benefits of its allegedly unauthorized contract with dcp by cashing its share of the license fees from the 2006, 2007, 2009, 2010, and 2011 Golden Globes, all of which were produced by dcp. *See, e.g.*, Cal. Civ. Code § 2310.

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

## VI.   DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

### A.   Counterclaim 1: Declaratory Relief Against HFPA

#### 1.   Elements Of Declaratory Relief And Supporting Facts

The elements of a claim for declaratory relief are (1) a justiciable controversy; and (2) the claim is a proper subject for declaratory relief. *Gov't Emps. Ins. Co.*, 133 F.3d at 1222. Declaratory relief is appropriate where the judgment will "serve a useful purpose in clarifying and settling the legal relations in issue, and . . . will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *DeFeo*, 831 F. Supp. at 778 (quoting *Guerra*, 783 F.2d at 1376)). The rules of contract interpretation, which is a judicial function, are discussed in Part III.B.1, *supra*. The evidence in support of HFPA's First Counterclaim is summarized in Part III.B.2, *supra*.

### B.   First Affirmative Defense: Statute Of Limitations

Under California law, the statute of limitations for declaratory relief claims relating to a contract is four years. *See Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 846 (Fed. Cir. 2009); Cal. Civ. Proc. Code §§ 337(1), 343. The statute of limitations for claims of reformation is three years. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1548-49 (9th Cir. 1990); Cal. Civ. Proc. Code § 338(d). Actions for cancellation of contract and rescission are governed by the four-year statutes of limitations. *See Moss v. Moss*, 20 Cal. 2d 640, 644 (1942) (cancellation); Cal. Civ. Proc. Code § 343 (cancellation); Cal. Civ. Proc. Code § 337(3) (rescission).

As a general rule, a statute of limitations accrues when the act which gives rise to the claim occurs; that is, when "the plaintiff sustains actual and appreciable harm. Any 'manifest and palpable' injury will commence the statutory period." *Marin Healthcare Dist. v. Sutter Health*, 103 Cal. App. 4th 861, 879 (2002).

- 21 -

Regardless of whether HFPA structures its argument as one for declaratory relief or equitable relief, its claims are time barred.

1.     <u>HFPA's "Eight Means Eight" Contract Interpretation Is Time Barred</u>

HFPA's claims it is entitled to declaratory relief on the grounds that the 1993 Amendment granted dcp only eight options, for the years 1998 to 2005. *See* HFPA Opp. to Defs.' MSJ at 5:5-9. Under this theory, HFPA suffered manifest and palpable injury in 2001 when it contracted for options (thereby giving up the rights to produce or license the show) beyond 2005. HFPA was again injured in 2005 and 2006, when dcp continued to produce a show to which, under HFPA's theory of the case, it had no legal right. Yet, HFPA did not bring suit. Instead, HFPA acquiesced to dcp's production of the show from 2006 to 2011.

HFPA should have brought an action for declaratory relief or cancellation of contract by January 16, 2010, at the latest, but, by failing to do so, its action is now barred by the four-year statute of limitations applicable to claims arising under contract. Cal. Civ. Proc. Code § 343; *Robertson v. Super. Ct.*, 90 Cal. App. 4th 1319, 1326 (2001) (declaratory relief action seeking to establish a contract was void is subject to statute of limitations defense).

2.     <u>HFPA's Reformation Claim Is Time Barred</u>

HFPA also claims the 1993 Amendment should be reformed. Reformation claims are subject to a three-year statute of limitations, Cal. Civ. Proc. Code § 338(d). The statute begins to run from the time a plaintiff discovers or should in the exercise of reasonable diligence have discovered its claim. *Bradbury v. Higginson*, 167 Cal. 553, 558 (1914).

The evidence will show that the statute of limitations began to run in 1993, when HFPA's President received the 1993 Amendment and executed it. Moreover, the evidence will show that all HFPA members had access to the contract, which was stored at HFPA's offices, even if most members chose not to read it. Thus,

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1   HFPA had constructive and actual knowledge that the 1993 Amendment lacked

2   approval language as early as 1993 and, in any event, more than four years before

3   HFPA filed a complaint in this action. *See also infra* Part 3.

4                3.      HFPA's Partial Invalidity Theory Is Time Barred

5          HFPA's motion for summary judgment asserts for the first time that—

6   because HFPA's president in 1993 did not have authority to agree to the extensions

7   clause of the 1993 Amendment, and because that clause was never agreed to by the

8   HFPA membership—it should be severed and rendered unenforceable. This claim,

9   seeking either declaratory relief or cancellation of the contract, is time barred. The

10  applicable four-year limitation period accrued when HFPA had any suspicion of

11  "wrongdoing" and, therefore, an incentive to sue. *Jolly v. Eli Lilly & Co.*, 44 Cal.

12  3d 1103, 1111 (1998) (granting summary judgment—under a one-year statute of

13  limitations—based on Plaintiff's uncontroverted admission that she suspected

14  defendants' conduct was wrong well over a year before she filed suit).

15         Here, HFPA sustained its alleged "injury" more than seventeen years before

16  this action was filed—in 1993, when HFPA's President executed the allegedly

17  invalid contract provision, supposedly without authority to do so. From September

18  22, 1993 to the present day, HFPA has had a physical copy of the 1993 Amendment

19  (including, obviously, the extensions clause) in its possession. The 1997

20  amendment to the 1987 Agreement and the 2001 Exercise of Options, which was

21  requested by and drafted by HFPA's counsel, both rely on the 1993 Amendment.

22  Moreover, HFPA has admitted it had knowledge of dcp's view of the extensions

23  clause as early as 2002. For example, in its Motion for Summary Judgment, HFPA

24  argued that "a dispute arose" in 2002 "over the source of dcp's rights to produce

25  and license the additional six shows [for the years 2006 to 2011]—revealing for the

26  first time the parties' conflicting interpretations of the 'extensions' clause of the

27

28

- 23 -

1   1993 Amendment."[5] (HFPA MSJ at 10; *see also* HFPA's MIL No. 2 at 5.) From

2   2002 onwards, HFPA members discussed the extensions clause among themselves,

3   with one former HFPA president characterizing the extensions clause as a "mistake

4   of our President" (referring to Ms. Van Blaricom). At various times, dating as far

5   back as 2004, HFPA members referred to the extensions clause as a "perpetuity

6   clause." Thus, whether the statute of limitations began to run in 1993, 2001, 2002,

7   or 2004, HFPA's partial invalidity claim was time-barred years ago.

8       **C.    <u>Second Affirmative Defense: Laches</u>**

9           The doctrine of laches bars a cause of action when (1) the plaintiff

10  unreasonably delays in asserting or diligently pursuing the cause, and (2) the

11  plaintiff has acquiesced in the act about which the plaintiff complains or the delay

12  has prejudiced defendant. *Johnson v. City of Loma Linda*, 24 Cal. 4th 61 (2000).

13  Here, HFPA was aware of dcp's interpretation of the contract no later than in 2002,

14  and perhaps as early as 1993, but failed to take legal action until November, 2010.

15  *See supra* Part VI.B.

16

17

18

19  _____

    [5] Although HFPA argues that a dispute over the extensions clause arose in 2002,
    Defendants did not (and do not) have any indication that the "dispute" in 2002 was

20  over the extensions clause—or any other issue, for that matter. Rather, dcp received
    an unreasoned repudiation of the 2001 Exercise of Options (Compendium of

21  Exhibits i/s/o Defs.' MSJ, Ex. 14 at 33-34 (Dkt. No. 84-1))—with no grounds
    specified. Discovery in this case has shed no light on the basis for HFPA's

22  September, 2002 repudiation. The December 10, 2002 transcript of HFPA Board

23  meeting that dcp representatives attended, also did not reveal the existence of a
    dispute, just HFPA's unhappiness with the extensions clause and a recognition that

24  "[w]e have no choice but to accept [the 1993 Amendment] but it says NBC." (*Id.,*
    Ex. 70 at 73 (Dkt. No. 84-3).) While that unhappiness persisted, and HFPA

25  attempted to negotiate its way out of the extensions clause several times over the
    years (*see id.*, Ex. 120 at 205 (Dkt. No. 84-6)), the dispute over the extensions

26  clause arose in August, 2010, when HFPA's lawyer sent a letter repudiating the
    provision (*See id.*, Ex. 239 at 240-241 (Dkt. No. 84-7).) Even if a "dispute" arose

27  over the extensions clause in 2002, as HFPA urges, HFPA's post-2002 conduct and
    statements are inconsistent with HFPA's proffered interpretations of the clause.

28

**DEFENDANTS' MEMORANDUM OF
                                 CONTENTIONS OF FACT AND LAW**

### D.   Third Affirmative Defense: Waiver/Estoppel

The required elements for promissory estoppel are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) that the reliance have been reasonable and foreseeable; and (4) that the party asserting the estoppel must be injured by its reliance. *Laks v. Coast Fed. Sav. & Loan Ass'n,* 60 Cal. App. 3d 885, 890 (1976).

By drafting, exercising, and then accepting the 2001 Exercise of Options, without any additional written grant of options, HFPA represented to dcp that it understood the extensions clause to apply to any extensions of the dcp/NBC deal. Then, in 2002, HFPA repudiated the Exercise of Options, claiming it was "invalid." But, only two weeks later, HFPA retracted its repudiation and acquiesced to the parties' contractual relationship (for example, cashing the checks provided by dcp). HFPA even referred to the extensions clause as a "perpetuity clause." While HFPA members commented, at times, that they would like to renegotiate the parties' contract to remove the "perpetuity clause," they never represented to dcp that they believed the underlying agreement was invalid. Relying on HFPA's assurances that the 1987 Agreement, as amended, was valid and granted dcp perpetual options for any extensions or renewals of the NBC deal, dcp extended its contract with NBC in 2010. Under the circumstances, HFPA has waived its right to claim the contract is unenforceable or should be reformed.

## VII.   ANTICIPATED EVIDENTIARY ISSUES

### A.   Parol Evidence

It is the Court's responsibility to interpret the relevant contract provisions in this case. *Wolf*, 162 Cal. App. 4th at 1134 & n.18. The Court "must ascertain and give effect to [the intention of the parties] by determining what the parties meant by the words they used." *PG&E,* 69 Cal. 2d at 38. Parol evidence is only admissible if the offered evidence is relevant to prove a meaning to which the contract language is reasonably susceptible. *Id.* at 37. Parol evidence is inadmissible if it is "feasible

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    to determine the meaning the parties gave to the words from the instrument alone."

2    *Id.* at 38.

3          Because the plain language of the 1993 Amendment does not support any of

4    HFPA's various proffered contractual interpretations, extrinsic evidence is not

5    admissible to support those claims. If the Court admits and considers extrinsic

6    evidence, the parties will dispute what pieces of extrinsic evidence have any

7    bearing on the meaning of the 1993 Amendment. Most of HFPA's extrinsic

8    evidence consists of evidence unrelated to what the parties intended when they

9    entered in to the 1993 Amendment. For example, HFPA has offered no evidence

10   that the parties intended the extensions clause to apply to instances of *force*

11   *majeure*; thus, extrinsic evidence regarding industry custom and practice on this

12   topic is unrelated to the parties' intent and is inadmissible.

13        **B.     Hearsay**

14        Defendants will object (among other grounds, including without limitation

15   lack of relevance or Fed. R. Evid. 403) to any attempt by Plaintiffs to introduce

16   hearsay evidence.

17        **C.     Motions *In Limine***

18        Defendants filed six timely *in limine* motions on July 25, 2011. Those

19   motions are:

20        1.     To exclude evidence and argument that contradicts HFPA's judicial

21   admissions, including the admission in HFPA's FAC that, at the time of

22   contracting, HFPA read and understood the extensions clause to be the source of

23   additional options after 2005, in the event HFPA approved an extension of the NBC

24   broadcast license. *See, e.g.*, *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995

25   F. Supp. 1060, 1065 (D. Ariz. 1997).

26        2.     To exclude evidence and argument regarding the potential liability of

27   dcp's chief negotiator with respect to the 1993 Amendment, Francis La Maina,

28   because it is irrelevant to the interpretation of the 1993 Amendment and because its

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1    probative value is substantially outweighed by the danger of unfair prejudice,

2    confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 402, 403.

3            3.      To exclude evidence and argument regarding payments made by dcp

4    to HFPA's former president, because they are irrelevant to the interpretation of the

5    1993 Amendment and because their probative value is substantially outweighed by

6    the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See*

7    Fed. R. Evid. 402, 403.

8            4.      To exclude testimony of HFPA's former lawyer, Eric Weissmann,

9    because he seeks to testify regarding the content of documents that have been

10   improperly withheld, in whole or in part. *See* Fed. R. Evid. 602, 701, 802 & 1002.

11           5.      To exclude testimony of CBS Chairman and Chief Executive Officer

12   Leslie Moonves because his testimony is irrelevant to any Phase One issue, because

13   any potential relevance of his testimony is substantially outweighed by its

14   prejudicial effect, because of the danger of confusing and misleading the jury, and

15   because HFPA failed to timely disclose Moonves as a witness. *See* Fed. R. Evid.

16   402, 403; Fed. R. Civ. P. 26, 37.

17           6.      To exclude the testimony of HFPA's putative expert on entertainment

18   issues, David Tenzer, on the grounds that he may not offer opinion testimony on

19   legal issues, that his testimony is not proper industry custom and practice evidence,

20   and that his opinions lack proper foundation. *See* Fed. R. Evid. 402, 702.

21   **VIII.  JURY TRIAL**

22           Plaintiffs requested a jury trial, but not every issue in this case is triable to the

23   jury. The proper interpretation of the 1993 Amendment is for this Court to decide.

24   *See Wolf*, 162 Cal. App. 4th at 1125; Cal. Civ. Jury Instructions 10.75 ("The issue

25   of the interpretation of a contract, or a provision thereof, may arise in a jury trial. If

26   the contract is not ambiguous or uncertain, interpretation is a matter of law. If the

27   contract is ambiguous or uncertain, and uncontradicted extrinsic evidence has been

28   received to explain the uncertainty or ambiguity, the interpretation is also a matter

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

1   of law. In both of these situations, the jury performs no function. The interpretation
2   must be made by the Court.").

3         The jury decides questions of fact related to the construction of the 1993
4   Amendment, but only if those questions give rise to conflicts in the evidence that a
5   finder-of-fact must resolve. *Wolf*, 162 Cal. App. 4th at 1134 & n.18. If the only
6   conflict concerns the inferences to be drawn from evidence—and not the truth *vel*
7   *non* of a piece of factual evidence—the Court decides what inference is properly
8   drawn. *Id*. Moreover, the Court must exclude parol evidence offered to prove an
9   unreasonable interpretation of the contract. *PG&E*, 69 Cal. 2d at 37-38. Here, as
10  described above, the Court must interpret without parol evidence the 1993
11  Amendment because HFPA's proffered interpretation is unreasonable.

12  **IX.   ATTORNEY'S FEES**

13        The 1987 Agreement between dcp and HFPA provides attorney's fees to the
14  prevailing party in a dispute. (Ex. 1, ¶ 19.) Defendants will seek attorney's fees
15  upon prevailing at trial. Defendants assume the attorney's fees proceeding will be
16  based on an evidentiary submission and briefing according to the relevant
17  standards, with an evidentiary hearing if the Court believes one is necessary.

18  **X.   ABANDONMENT OF ISSUES**

19        As discussed above, HFPA's complaint and FAC claim that the extensions
20  clause of the 1993 Amendment should be interpreted to provide dcp additional
21  options for any extensions, renewals, substitutions, or modifications of the
22  dcp/NBC broadcast agreement, but only *with HFPA's approval* (hereinafter,
23  "approval theory"). (FAC ¶¶ 88, 129, 130(a), 132.) HFPA has since alleged an
24  entirely new, inconsistent, and unpleaded interpretation of the 1993 Amendment;
25  *i.e.* that the Amendment provides dcp *only* eight fixed options, for the years 1998
26  to 2005, and no more. HFPA did not assert its "approval" theory in opposing
27  Defendants' motion to dismiss, *see* HFPA Opp. to Defs.' MTD at 16:8-12 (Dkt.
28  No. 28), nor did it argue it in its summary judgment papers, *see* HFPA MSJ at 9

- 28 -

n.20 (Dkt. No. 87) (preserving only the argument that "the 1993 Amendment can fairly be read only as granting dcp the eight options that Clark and La Maina requested"); HFPA Opp. to Defs.' MSJ at 2:8-12 (Dkt. No. 93) (suggesting that the plain meaning of the extensions clause was to grant dcp "only eight options and flexibility in the time period over which they must be exercised"). Thus, HFPA should be precluded at trial from arguing that its approval was needed for any extensions of the broadcast agreement between dcp and NBC. In any case, HFPA's approval theory is unsupported:

First, the parol evidence rule prohibits a court from relying on extrinsic evidence to add a new term to the parties' agreement. *PG&E*, 69 Cal. 2d at 39 ("Extrinsic evidence is *not* admissible to add to, detract from, or vary the terms of a written contract."); *see also A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493 (9th Cir. 1988) (holding that extrinsic evidence, including oral statements made by defendants, is inadmissible to add a warranties provision to an integrated contract that had no term reasonably susceptible to a warranties provision). HFPA's approval theory does just that, adding the following bolded words to the extensions clause:

> This will confirm that the Agreement is hereby further amended to provide that HFPA grants to dcp eight (8) additional, consecutive, exclusive, and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, and for any extensions, renewals, substitutions or modifications of the NBC Agreement ***entered into with HFPA's approval***, and to exploit such productions in all media throughout the world in perpetuity.

Because HFPA's approval theory runs contrary to the rules of contract interpretation, it fails. *See PG&E*, 69 Cal. 2d at 39.

Second, there is no evidence that either HFPA or dcp understood, or expressed, that extensions of the NBC deal would require "HFPA's approval" at the time the 1993 Amendment was entered into.

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    Third, HFPA's approval theory is flatly contradicted by the parties' prior

2  course of dealing and course of performance. dcp routinely entered into and

3  extended agreements without HFPA's approval. Indeed, dcp amended its 1993

4  Agreement with NBC at least three times without HFPA's approval, including by

5  amendments dated April 20, 2001 (amending the date by which NBC must exercise

6  its option to broadcast the Golden Globe awards), June 11, 2001 (extending the

7  NBC Agreement through the 2010/2011 broadcast year), and August 6, 2002

8  (granting Telemundo, an NBC company, an exclusive right to broadcast the

9  Golden Globe awards in Spanish in exchange for an increased license fee). HFPA

10  members also did not approve the 1983 Agreement (if they approved it at all) until

11  after dcp had performed under the 1983 Agreement, by producing the January 29,

12  1983 Golden Globe Awards show.

13    Fourth, HFPA's "approval theory" is contradicted by the express terms of

14  the parties' various contracts, which demonstrate that, when they wanted to require

15  a party's approval, the parties explicitly so provided in their contract. The 1983 and

16  1987 Agreements both provide as follows:

17      dcp shall have the sole right to administer and exploit the
       rights [in the Golden Globes Awards television
18      production] and to execute in dcp's name any and all
       distribution agreements, license agreements and such
19      other agreements as may relate to the production and
       exploitation of dcp's television production(s) of the
20      Awards presentation(s) and the copyright(s) relating
       thereto." (Ex. 5, ¶ 8; Ex. 1, ¶ 7.)
21
22      dcp agrees to provide copies of all contracts relating to the
       exercise of its rights pursuant to this agreement to a
       designated representative of HFPA *for informational*
23      *purposes*, including without limitation, television
       syndication agreements, network license agreements and
24      the like." (Ex. 5, ¶ 10; Ex. 1, ¶ 9 (emphasis added).)

25    Neither provision says anything about "approval" by HFPA; to the contrary,

26  they make clear that decisions about license agreements are in the sole discretion of

27  dcp. What is more, these same agreements expressly require HFPA's or dcp's

28  "prior approval" for other actions, including the issuance of publicity and the use

- 30 -

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

of clips or excerpts from motion pictures or television programs in the Awards

presentations (Ex. 1, ¶¶ 10, 12; Ex. 5, ¶¶ 11, 12.)


DATED: August 1, 2011        Munger, Tolles & Olson LLP
                             RONALD L. OLSON
                             BRADLEY S. PHILLIPS
                             MANUEL F. CACHÁN

                         Sheppard, Mullin, Richter & Hampton LLP
                             MARTIN D. KATZ


                         By:       /s/ *Bradley S. Phillips*
                                      Bradley S. Phillips

                         Attorneys for Defendants and
                         Counterclaimant

- 31 -

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that this document(s) filed through the CM/ECF system will

3   be sent electronically to the registered participants as identified on the Notice of

4   Electronic Filing (NEF).

5

6   Date: August 1, 2011

7                                              /s/ *Manuel F. Cachán*
                                              MANUEL F. CACHÁN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -

**DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**