DANIEL M. PETROCELLI (S.B. # 097802)
dpetrocelli@omm.com
LINDA J. SMITH (S.B. # 78238)
lsmith@omm.com
ROBIN M. WALL (S.B. # 235690)
rwall@omm.com
AMY R. LUCAS (S.B. # 264034)
alucas@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035
Telephone:    (310) 553-6700
Facsimile:    (310) 246-6779

Attorneys for Plaintiff and Counter-defendant
Hollywood Foreign Press Association

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>RED ZONE CAPITAL PARTNERS II, L.P., a Delaware Limited Partnership; DICK CLARK PRODUCTIONS, INC., a Delaware Corporation; RED ZONE CAPITAL GP, LLC, a Delaware Limited Liability Company; RED ZONE CAPITAL MANAGEMENT COMPANY, LLC, a Delaware Limited Liability Company; DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.  CV10-8833 VBF (FMOx)<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT PURSUANT TO LOCAL RULE 16-4**<br><br>Complaint filed:    November 17, 2010<br>Counterclaims filed:    March 28, 2011<br><br>Discovery Cutoff:    May 20, 2011<br>Pre-Trial Conf.:    August 22, 2011<br>Trial Date:    August 30, 2011<br><br>Courtroom:    9<br><br>**Honorable Valerie Baker Fairbank** |
| DICK CLARK PRODUCTIONS, INC., a Delaware Corporation,<br><br>Counter-claimant,<br><br>v.<br><br>HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Corporation,<br>Counter-defendant. | |

1    Pursuant to Local Civil Rule 16-4 and this Court's Scheduling and Case

2    Management Order, Plaintiff Hollywood Foreign Press Association ("HFPA")

3    respectfully submits this Memorandum of Contentions of Fact and Law.

4    We have just completed the briefing on, and will argue tomorrow, HFPA's

5    motion for Phase I summary judgment and our opposition to Defendants' motion

6    for Phase I summary judgment.  In that briefing HFPA set forth in great detail its

7    contentions of fact and law to be included in Phase I of this case.  Specifically,

8    HFPA incorporates by reference its contentions of fact and law as set forth in its

9    Opposition Brief to Defendants' Motion for Phase I Summary Judgment, HFPA's

10   Separate Statement, the Declarations of Eric Weissmann, David Tenzer, Chantal

11   Dinnage, Charles Diamond, and Amy Lucas and the exhibits thereto, and HFPA's

12   Memorandum of Objections.[1]  HFPA further incorporates by reference its

13   contentions of fact and law as set forth in HFPA's own Motion for Summary

14   Judgment on Phase One, its Separate Statement, and the Declarations of Chantal

15   Dinnage, Charles Diamond, Elaine Wells-Gilboa and the exhibits thereto,[2] as well

16   as those set forth in HFPA's Summary Judgment Reply Brief, HFPA's

17   Supplemental Separate Statement, and the Supplemental Declarations of Chantal

18   Dinnage, Charles Diamond, and Eric Weissmann and the Exhibits thereto.[3]

19   HFPA hereby supplements those contentions of fact and law in accordance

20   with the format required by Local Rule 16-4.

21   **I.    INTRODUCTION**

22        **A.    The Parties**

23   The HFPA was created in 1944 by a group of foreign journalists dedicated to

24   bridging the international and entertainment communities, and hoping to provide a

25   distraction from the hardships of war through film.  It has grown into an

26   ───────────────

   [1] Dkt. Nos. 93–100.

27   [2] Dkt. No. 87.

28   [3] Dkt. Nos. 108–110.

1  organization that also supports the arts through charitable giving of millions of

2  dollars to non-profits, educational programs and scholarships, and cultural

3  preservation foundations.  And each year, it hosts the world-renowned Golden

4  Globe Awards to recognize outstanding achievements in film and television.

5       Defendant dick clark productions, inc. ("dcp") has produced the Golden

6  Globe Awards, one of the crown jewels of its television programming, since 1983.

7  The relationship between HFPA and dcp was initially a fruitful and collaborative

8  one that the parties chose to renew repeatedly over the years.  In 2002, however,

9  dcp was sold to a group of outside investors led by Mosaic Media.  In an

10  environment that was increasingly difficult for independent production companies

11  like dcp, dcp's President and CEO Francis La Maina engineered the nine-figure

12  sale, and a $14 million payday for himself, by claiming that dcp had perpetual

13  rights to the increasingly popular and profitable Golden Globe Awards.  Mosaic, in

14  turn, sold dcp in 2007 based on the same misrepresentations, this time to Red Zone

15  Capital Partners (one of several similarly named private equity entities owned and

16  controlled by billionaire Daniel Snyder).  Under its new owners, twice removed

17  from the events underlying this litigation, dcp bears little resemblance to the

18  company with whom HFPA originally contracted.  Since Red Zone's acquisition of

19  dcp, dcp has incurred $165 million of debt by issuing junk bonds (in part by

20  claiming "perpetual rights" to the Golden Globes), not to invest in the company, but

21  to fund a $105 million distribution to its latest owners.

22      **B.**    **The Litigation**

23       In 1987, dcp and HFPA entered into a new contract for the production and

24  licensing of the Golden Globes.  Over the years, that agreement was amended

25  several times to extend the parties' relationship by granting dcp additional options,

26  always for a finite number to be exercised during a finite number of years.  The

27  critical 1993 Amendment—which is at the core of the parties' dispute—followed

28  this practice by granting dcp an additional "eight (8)" options.  (dcp, however,

1  claims it granted this *plus* infinite, self-renewing options so long as dcp licensed the
2  show to NBC on whatever terms dcp chose.)  In 2001, when dcp brought HFPA a
3  lucrative new deal with NBC, HFPA again approved an extension of the parties'
4  agreement through the 2011 show.  In early 2010, as the end of that term loomed,
5  HFPA's President sent an email to dcp's CEO Mark Shapiro clearly stating that dcp
6  had no rights to any Golden Globes shows beyond 2011, and that dcp should not
7  pursue any broadcast license involving the Awards show "until we agree upon the
8  nature of any [] future relationship."  The following day Mr. Shapiro responded,
9  agreeing to initiate negotiations with HFPA and noting that there was "no need to
10 remind me or ask me not to seek a new license agreement for the property.  I would
11 never make a move on a network renewal or new home without your involvement."
12 His use of the words "network renewal" could only apply to NBC as it was the
13 Golden Globes current broadcaster.  These negotiations proceeded from March
14 through the end of October of 2010.  HFPA believed that dcp was negotiating in
15 good faith, and had both asked and been specifically told that dcp had not initiated
16 any negotiations with any network over the post-2011 rights to broadcast the show.
17 On October 29, 2010, dcp surreptitiously signed a television broadcast licensing
18 agreement with NBC for the Golden Globes through 2018, without HFPA's
19 knowledge, consent, or authorization.
20      HFPA immediately filed this lawsuit, asserting claims for breach of contract,
21 declaratory relief, breach of the implied covenant of good faith and fair dealing,
22 trademark infringement, false association, an accounting, declaration of copyright
23 co-ownership, unfair competition, intentional interference with prospective
24 economic advantage, and reformation.  The Court bifurcated the case, focusing
25 Phase One on the interpretation of the parties' contract and the core issue of
26 whether HFPA granted dcp limited or infinite options to produce the Awards show.
27 (Dkt. No. 38.)  As a result, Phase One is devoted to the parties' claims for
28 declaratory relief and HFPA's claims for reformation.

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

On March 7, 2011, the Court rejected Defendants' Motion to Dismiss, holding that, because HFPA had "sufficiently shown that the disputed provision is 'reasonably susceptible' to competing interpretations, extrinsic evidence may be used to resolve the ambiguity." (Dkt. No. 48 at 2; *see also* Dkt. No. 49.)  On June 20, HFPA and dcp filed cross motions for summary judgment, which are scheduled to be heard on August 2.  Trial is set for August 30.

## II.    HFPA'S PHASE ONE CLAIMS AND DEFENSES

### A.    Summary of HFPA's Claims

HFPA plans to pursue two claims in Phase One, both of which may be proven by alternative grounds.[4]  First, HFPA seeks declaratory relief stating that the 1987 Agreement, as subsequently amended, granted dcp eight—and only eight—options to produce and license the Golden Globes.  Second, to the extent the language of the Agreement is construed by this Court differently, it should be reformed to match this original intent because the document, as a result of either mutual mistake, unilateral mistake, or fraud, does not do so.

Although Defendants accuse HFPA of somehow changing its theory of the case to affirmatively assert an unpled agency theory, these accusations are pure hyberbole and have no merit.  Defendants, not HFPA, first raised the legal issue of

---

[4] Although Defendants accuse HFPA of somehow changing its theory of the case to assert an unpled agency theory, these accusations are pure hyberbole and have no merit.  Defendants, not HFPA, first raised the legal issue of Ms. Van Blaricom's authority.  Although the linchpin of Defendants' claim to unlimited unilateral options is Ms. Van Blaricom's authority, Defendants kept this theory hidden in their Answer and Cross-Claims.  (Cross-Compl. ¶ 5, Dkt. No. 53.)  Only once the parties were well into discovery did Defendants claim for the first time in an interrogatory, and later in deposition testimony, that Ms. Van Blaricom and dcp President Fran La Maina privately agreed that dcp should have unlimited option rights.  (Dkt. No. 108 at 8.)  If Defendants are to now be permitted to assert an unpled claim that Van Blaricom expressly ceded HFPA's rights in perpetuity, HFPA surely must be permitted to contend she did so without authority.  *See Wheat v. Bank of Louisville*, 5 S.W. 305 (1887) (where pleadings did "not aver that [a Bank's] president had authority to agree to [the alleged deal]," and instead alleged "that the Bank agreed to the [deal]," Bank's denial was sufficient to hold that "on this state of pleading the authority of [the Bank's] president to bind it by any such agreement must be regarded as in issue."); *see also Nat'l Lumber & Supply, Inc. v. Orange Commercial Credit 79*, 184 B.R. 74, 79 (9th Cir. 1995) ("In the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment.").

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

Ms. Van Blaricom's authority.  Although the linchpin of Defendants' claim to unlimited unilateral options is Ms. Van Blaricom's authority, Defendants kept this theory hidden in their Answer and Cross-Claims.  (Cross-Compl. ¶ 5, Dkt. No. 53.)  Only once the parties were well into discovery did Defendants claim for the first time in an interrogatory, and later in deposition testimony, that Ms. Van Blaricom and dcp President Fran La Maina privately agreed that dcp should have unlimited option rights.  (Dkt. No. 108 at 8.)  If Defendants are to now be permitted to assert an unpled claim that Van Blaricom expressly ceded HFPA's rights in perpetuity, HFPA surely must be permitted to contend she did so without authority.  *See Wheat v. Bank of Louisville*, 5 S.W. 305 (1887) (where pleadings did "not aver that [a Bank's] president had authority to agree to [the alleged deal]," and instead alleged "that the Bank agreed to the [deal]," Bank's denial was sufficient to hold that "on this state of pleading the authority of [the Bank's] president to bind it by any such agreement must be regarded as in issue."); *see also Nat'l Lumber & Supply, Inc. v. Orange Commercial Credit 79*, 184 B.R. 74, 79 (9th Cir. 1995) ("In the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment.").  Accordingly, the legal issues attendant to Defendants' assertions of agency, and HFPA's assertions of lack of authority, are discussed in the following sections.

### A.      Claim 1: Declaratory Relief – Contract Interpretation and Revocation/Consideration

#### 1.      *Elements of Declaratory Relief*

a.      An actual and substantial controversy has arisen, and now exists, between Plaintiff and Defendants concerning their respective rights and duties under the 1987 Agreement as amended;

b.      Plaintiff and Defendants have adverse legal interests;

      c.     The controversy sufficient immediacy and reality to warrant the issuance of a declaratory judgment;

      d.     Plaintiff desires a judicial determination of the parties' respective rights and duties under the 1987 Agreement as amended; and

      e.     A judicial declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties.[5]

### 2. *Elements of Revocation/Lack of Consideration*

      a.     dcp did not confer a benefit or suffer prejudice that was bargained for in exchange for the right to infinite unilateral options to produce the Golden Globe Awards so long as they are broadcast on NBC and the right to control the terms of any licenses with NBC; and

      b.     HFPA revoked any post-2011 options before dcp exercised them, or even began negotiating with NBC for a new broadcasting deal.[6]

### 3. *Issues of Law Regarding Contract Interpretation*

The paramount goal of contract interpretation is "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* § 1638; *see also Howe v. Am. Baptist Homes of the W., Inc.*, 112 Cal. App. 3d 622, 627 (1980) (courts refuse to interpret a contract as creating an "unusual and extraordinary" right "in the absence of clear and explicit language creating" it). If, on the other hand, the

---

[5] *See, e.g., Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942).

[6] *See* Cal. Civ. Code § 1605; *Bard v. Kent*, 19 Cal.2d 449, 451-52 (1942).

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

language of the contract is reasonably susceptible to more than one interpretation, extrinsic evidence is admissible to interpret the contract.  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004).  Extrinsic evidence to help interpret an ambiguous contract is admissible regardless of whether the agreement is integrated. *See Morey v. Vanucci*, 64 Cal. App. 4th 904 n.4 (1998). This evidence includes:

- evidence of industry custom and practice;[7]
- statements made during negotiations;[8]
- the parties' prior course of dealing;[9]
- the object, nature and subject matter of the contract;[10]
- the parties' subsequent course of performing the contract;[11] and
- a party's misrepresentations or concealment of information.[12]
- Evidence showing that one party's proffered interpretation would result in an absurdity[13]

In evaluating this extrinsic evidence, it is important to note that the view of an attorney who was not "involved in the negotiations" and thus "had no personal knowledge regarding the intent of the parties" is irrelevant in a judicial proceeding aimed at interpreting the contract.  *General Motors Corp. v. Superior Court*, 12 Cal.

---

[7] Cal. Civ. Proc. §§ 1856(b), 1861; Cal. Civ. Code §§ 1644, 1646.

[8] Cal. Civ. Code § 1647; *Morey v. Vanucci*, 64 Cal. App. 4th 904, 912, 914 (1998); *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 412 (1984).

[9] *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850-51 (1999).

[10] Cal. Civ. Code § 1647; *Wolf*, 114 Cal. App. 4th at 1351-52.

[11] *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 753-54 (1960).

[12] *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393-94 (2008) (concealment or misrepresentation of information relevant to show that the party "did not believe its asserted interpretation of the contract").

[13] *See Brawner v. Wilson*, 126 Cal. App. 2d 381, 384 (1954) (in contract for payment of cost of pumping water, "evidence from which it appears that the amount specified in the lease and claimed to be due them for the operation of the pump (60¢ per K.W.H.) was approximately 60 times the cost of operating the pump" admissible to show Defendants' "construction would involve an absurdity"); *Yeremian v. Turlock Dehydrating & Packing Co.*, 30 Cal. App. 2d 92, 95-97 (1938) (evidence of grape industry practice admissible to show that "the interpretation urged by defendant would render the contract unreasonable and unfair").

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

App. 4th 435, 439-42 (1993); *see also Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1127-28 (2008).

Any uncertainty in disputed language must be construed against the drafter, in this case dcp.  Cal. Civ. Code § 1654; *see also Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986).  This is because "[w]here one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party.  He is also more likely than the other party to have reason to know of uncertainty of meaning.  Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party." Restatement (Second) of Contracts § 206, comment (a).

In addition, "the court shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in absurdity."  *County of Humboldt v. McKee*, 165 Cal. App. 4th 1476, 1498 (2008); *see also Yamanishi v. Bleily & Collishaw, Inc.*, 29 Cal. App. 3d 457, 462 (1972) (contract should "not be construed so as to place one party at the mercy of another"); *Wu v. Interstate Consol. Indus.*, 226 Cal. App. 3d 1511, 1515 (1991) (courts reject interpretations that "would be economically and commercially unreasonable").

If the Court finds in HFPA's favor on the interpretation of the contract, it may rule for the HFPA since dcp has no cognizable defenses.  If, on the other hand, the Court finds in favor of dcp's interpretation of the contract, several issues remain: whether the deal was supported by adequate consideration, whether Van Blaricom had the authority to enter into the extraordinary deal dcp claims she did, and whether—even so—such a deal should be rescinded or reformed as a result of unilateral or mutual mistake.

1

### 4.   *Issues of Law Regarding Consideration*

2   An option unsupported by consideration is nothing more than a continuing

3   offer and can be withdrawn at any time prior to exercise. *See, e.g., Steiner v.*

4   *Thexton*, 48 Cal. 4th 411, 420 (2010); WITKIN, SUMMARY OF CAL. LAW,

5   CONTRACTS, § 51.  Labeling an option as irrevocable will not suffice to make it so.

6   *See Torlai v. Lee*, 270 Cal. App. 2d 854, 858 (1969).  Rather, the offeree must (1)

7   "confer a benefit or suffer prejudice" that (2) was "actually . . . bargained for as the

8   exchange" for the offer.  *Steiner*, 48 Cal. 4th at 421.  Extrinsic evidence is always

9   admissible to prove lack of consideration.  *See, e.g.,* Cal. Civ. Proc. § 1856(f);

10   *Richardson v. Lamp*, 209 Cal. 668, 670 (1930).

11   To be valid, "an option requires evidence of its own consideration separate

12   from the underlying contract."  *WSB Walnut Assocs., LLC v. United States*, 2006

13   WL 1348520, at *6 (N.D. Cal. May 17, 2006) (citing *Torlai v. Lee*, 270 Cal. App.

14   2d 854, 858 (1969)).  And an extension of option creates new option "complete

15   within itself" that is void without additional consideration.  *See Sheveland v. Reed*,

16   159 Cal. App. 2d 820, 822 (1958).

17

### 5.   *Key Evidence in Support of HFPA's Claims for Declaratory Relief*

18
19   In brief, and without waiving its right to rely on any other evidence, HFPA

   summarizes its key evidence as follows:

20
21   First, the parties' longstanding course of dealing prior to the 1993

   Amendment involved grants of finite options.  This fact is undisputed.  The 1983

22
23   Agreement granted finite options (*i.e.*, 4 options).  (Ex. 304 [1983 HFPA-dcp

   Agreement].)[14]  The 1987 Agreement granted finite options (*i.e.*, 5 options).  (Ex. 1

24
25   [1987 HFPA-dcp Awards Agreement].)  And the 1989 Amendment granted finite

   options (*i.e.*, 5 options).  (Ex. 2 [1989 HFPA-dcp Amendment].)

26

27   _____

28   [14] All exhibits numbers referenced herein are trial exhibits.  (*See* Dkt. No.155.)

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

1       <u>Second</u>, unimpeachable documentary evidence from the very day dcp

2   presented and signed the 1993 Amendment shows that the parties intended a limited

3   grant of "eight (8)" options.  There is a verbatim transcript of the September 22,

4   199 which Defendants have authenticated and adopted, 1993 meeting at which dcp

5   presented both the NBC deal and the proposed 1993 Amendment necessary to

6   effectuate that deal to the HFPA membership.  The transcript clearly establishes

7   dcp's express intent in agreeing to the 1993 Amendment and the basis for HFPA's

8   understanding and approval of that Amendment.  dcp's then-President, Fran La

9   Maina, described the proposed deal with NBC as lasting, *at most*, 10 years.  (Ex.

10  110 [Sept. 22, 1993 Tr. of HFPA General Membership Meeting]; La Maina Depo.)

11  When quizzed as to how long the HFPA-dcp relationship would be extended if

12  HFPA approved the NBC deal, La Maina stated in no uncertain terms:  "Our tie-in

13  at the moment as proposed to the Hollywood Foreign Press is that we're -- we're

14  asking you to extend our contract for as long as necessary to satisfy *the NBC term*

15  *and not longer than that*."  An HFPA member asked: "Is that ten years or three

16  years?"  La Maina replied:  "I hope it's ten years.  I hope it's ten years."  At the

17  same time, the transcript shows that La Maina *never* requested rights to the Golden

18  Globes so long as NBC cared to air it—self-renewing options over which HFPA

19  would have no control and that could last in perpetuity.  Had such a dramatic

20  change in the parties' relationship (and one wholly at odds with television industry

21  custom and practice) been contemplated, dcp surely would have revealed its intent

22  to the membership, particularly in response to members' pointed questions about

23  the duration of the Amendment.  This was not a mere "detail" to be left to the

24  ironing out of contractual language.  This was requesting that the rights-holder

25  surrender its control over all of its rights in its sole asset for as long as and on

26  whatever terms as dcp desired.  There is no dispute as to what dcp representatives

27  said at that meeting—and what they did not say.

28

1    Based on La Maina's representations, the HFPA membership approved the

2    NBC license and the 1993 Amendment granting dcp the necessary options to

3    effectuate the NBC license.  The transcript is clear, undisputed, and irrefutable

4    proof that the *only* contract authorized by the HFPA membership on September 22,

5    1993—and the only one it intended to enter—was one granting dcp eight options.

6    The meeting of the minds of the parties to the contract occured at that meeting

7    when dcp presented the amendment, was questioned by the membership, and the

8    membership approved the 1993 Agreement.  La Maina left the pre-signed 1993

9    Amendment and two days later HFPA's President signed that Amendment.  (Ex. 3,

10   [1993 Amendment]; La Maina Depo.)  As attorney Eric Weissmann will testify (if

11   necessary), HFPA's then-President signed the Amendment without the benefit of

12   counsel.[15]

13   There is no question that dcp understood that the contract required the

14   membership's authorization and that authorization occurred on September 22, 1993

15   on the basis of the transcribed conversation.  HFPA's bylaws are clear on that point

16   requiring that "all material agreements" must be approved by the membership prior

17   to being executed by HFPA's officers.  (Ex. 333 [1991 HFPA Bylaws]; Ex. 420,

18   [2010 HFPA Bylaws].)  More importantly, in a letter acknowledging receipt of the

19   signed amendment, La Maina wrote:  "Thank you for sending me the signed

20   extension of the Hollywood Foreign Press agreement with dick clark productions,

21   inc., *as authorized by your membership on September 22, 1993.*"  (Ex. 180 [Sept.

22   29, 1993 Letter from F. La Maina to M. Van Blaricom].)  And, at deposition, La

23   Maina testified repeatedly that he knew in 1993 that all HFPA contracts "have to be

---

[15] Weissmann spoke with Van Blaricom for the first time on September 29, 1993, nearly a week after Van Blaricom signed the 1993 Amendment, and for only a half-hour.  (Ex. 346, Time Entry of Attorney Eric Weissmann.)  As Weissmann will testify, the two discussed a fee issue involving HFPA's prior attorney and not the 1993 Amendment.  In fact, Weissmann did not even see the 1993 Amendment until weeks later, when dcp sent him copies of all HFPA-dcp contracts and dcp's agreements with NBC and Turner.  (Ex. 348 [Oct. 12, 1993 Letter from dcp SVP of Business Affairs Aviva Bergman to Eric Weissmann]; Weissmann Decl.)  And even then he and Van Blaricom had no discussions about it.

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

1  approved by the Board and the membership." (La Maina Depo.) Defendants even

2  admitted in their Answer to HFPA's First Amended Complaint that the source of

3  Van Blaricom's authority was the HFPA membership's authorization on September

4  22, 1993. (Answer ¶ 32) ("Defendants admit that the HFPA membership held a

5  meeting on or about September 22, 1993, *at which it authorized an amendment to*

6  *the Main Show Agreement*." (emphasis added))

7       La Maina conceded at deposition that he never discussed dcp's alternative

8  interpretation of the grant of rights with anyone from HFPA other than Van

9  Blaricom. Even with respect to Ms. Van Blaricom, neither she nor Mr. La Maina

10  has provided any testimony bearing on exactly what they said to one another, or

11  when they said it. There is also no evidence that Van Blaricom ever informed

12  anyone at the HFPA that she made a deal granting dcp unlimited self-renewing

13  options for the Globes.

14       There is ample reason for the jury to question the credibility of Fran La

15  Maina and Mirjana Van Blaricom and the vague claims that they discussed the

16  1993 Amendment and their intention to grant dcp options so long as NBC cared to

17  air the Golden Globes. The record establishes that neither La Maina nor Van

18  Blaricom shared their purported private understanding of potentially endless

19  options with the HFPA membership, even though they both knew the membership

20  had to approve the deal. Moreover, La Maina has a significant stake in the outcome

21  of this litigation. He admitted in his deposition that, when dcp was up for sale in

22  2001, he represented that dcp's rights in the Golden Globes were perpetual "as long

23  as we were on NBC." That representation helped seal a sale that personally netted

24  La Maina over $14 million. If that representation proves false, La Maina may be

25  the cause of multiple lawsuits brought by dcp's subsequent purchasers as well as

26  NBC. (Ex. 493 [2/16/2011 Letter from T. Hoff to R. Olson and M. Katz].)

27       Van Blaricom's credibility is equally suspect. In 1994, Van Blaricom

28  resigned as President after the HFPA discovered that she had forged checks to pay

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

1   herself money from the HFPA treasury while at the same time accepting thousands

2   of dollars, unreported, from dcp.  (Ex. 349, April 20, 1994 HFPA Fact Finding

3   Report; Ex. 350, April 26, 2004 Resignation Letter from Mirjana Van Blaricom to

4   the HFPA Membership.)  Van Blaricom *admitted* taking these actions, claiming

5   only that she deserved the payments.  She then filed—and lost—a lawsuit seeking

6   reinstatement.  (Ex. 351, Aug. 9, 1996 Judgment.)  Disgraced and ousted from the

7   organization she once led, Van Blaricom sent out press releases and gave interviews

8   declaring the HFPA and the Golden Globes a "farce," and she now heads what she

9   calls a "competing organization" of foreign journalists that hands out "Golden

10  Satellite" awards.  Not only does Van Blaricom have personal and commercial

11  motives to lie, her declaration submitted in support of summary judgment contains

12  material falsehoods.  For example, she swears she consulted with counsel before

13  returning to dcp the executed 1993 Amendment, but according to the attorney she

14  supposedly consulted with, Eric Weissmann, it never happened.  In fact,

15  Weismann's records show he did not even receive a copy of the 1993 Amendment

16  until weeks later.  (Ex. 348, Oct. 12, 1993 Letter from dcp SVP of Business Affairs,

17  Aviva Bergman, to HFPA outside counsel, Eric Weissmann.)

18        <u>Third</u>, HFPA's interpretation is confirmed by the language of the 1993

19  Amendment itself, which explicitly granted only "eight (8) … options."

20  Defendants' interpretation requires the addition of words the parties never wrote:

21  "and [*additional options*] for any extensions, renewals, substitutions or

22  modifications of the NBC Agreement."  (Ex. 3 [1993 Amendment].)  HFPA

23  rejected these proposals.  Instead, HFPA wrote back stating that if dcp successfully

24  negotiated "a multi-year contract" with NBC (not an infinite deal at dcp's whim),

25  dcp's contract would "be renewed to cover the number of years with the network"

26  (not some indefinite, potentially endless period).  (Ex. 179, April 15, 1993 Letter

27  from Mirjana Van Blaricom to Dick Clark, Gene Weed, and Fran La Maina.)

28

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

Fourth, HFPA's interpretation gains further support from the documentary evidence of the negotiations between the parties for additional options as early as April 1993.  These exchanges show that dcp repeatedly sought an additional *five* options in order to negotiate with NBC.[16]

Fifth, 27-year television industry veteran, David Tenzer, will testify that custom and practice supports HFPA's interpretation of the contract and completely undermines dcp's interpretation.  (Expert Report of David Tenzer; Tenzer Decl.) He will testify that in the television industry rights in "Event Programs" like the Golden Globes are invariably granted for only a finite number of years.  The rights-holder always retains ultimate control over the program.  Both NBC Chairman Marc Graboff and dcp's own Dick Clark admitted this at deposition.  (Graboff Depo.; Clark Depo.)  Graboff testified that NBC always "believed the HFPA was intimately involved in all of dcp's and NBC's discussions and was participating in the negotiations through dcp and that they were -- they would have to approve any deal that got made."  He expressly clarified that his understanding was rooted in industry custom and practice as well as the parties' prior course of dealing. Similarly, dcp's Dick Clark testified that, throughout the time dcp was producing the Globes, dcp had to get approval from the HFPA, and specifically that he "think[s] they approved" of the 2001 NBC extension.

According to Mr. Tenzer, dcp's interpretation would stand custom and practice on its head by creating a perverse incentive for the producer *not* to maximize the value of the show.  In fact, this very scenario played itself out.  As the NBC deal was set to expire, CBS President Les Moonves made an overture to dcp's Mark Shapiro, offering $25 million per year for the show—an *opening* offer that was far more lucrative than NBC's *final* offer that Shapiro accepted.  Yet, dcp's

---

[16] (Ex. 157 [April 6, 1993 Letter from Gene Weed to Mirjana Van Blaricom;] Ex. 160 [April 14, 1993 Memo from Gene Weed to Mirjana Van Blaricom]; Ex. 161 [April 14, 1993 Memo from Gene Weed to Mirjana Van Blaricom].)

1    Mark Shapiro brushed it aside since, as he later told Moonves, a deal with CBS—

2    even one materially more lucrative and beneficial to all parties—would, under

3    Shapiro's interpretation of the 1993 Amendment, require dcp to renegotiate its

4    relationship with HFPA.

5         Custom and practice also requires parties who seek to deviate from these

6    industry standards to memorialize the agreement clearly and unmistakably.  Had

7    dcp truly made the precedent-setting deal it claims, dcp's contract would have said

8    so in clear and unmistakable terms.  dcp's business affairs specialists and outside

9    counsel would not have chosen to memorialize such an agreement using ambiguous

10   and oblique language.  Nor would they have been so careless in amending the

11   negotiation and refusal provisions, as those provisions are now nonsensical.

12        Sixth, when NBC sought in 2001 to extend the NBC deal to 2011 and beyond

13   dcp's options, on June 11, 2001, dcp came to HFPA and presented to the HFPA

14   leadership NBC's proposal to extend its broadcast rights through the 2011 Awards

15   show and the need for the options necessary to effectuate that extension.  (Ex. 190

16   [HFPA calendar]; Ex. 22 [June 12, 2001 HFPA Board Meeting Minutes].)  This

17   meeting is undisputed.  As HFPA members will testify, dcp *sought HFPA's*

18   *approval* at this meeting.  Indeed, at deposition La Maina admitted to telling NBC

19   that HFPA had approved the deal (although he minimized it as saying the HFPA

20   had "not objected").  And during the NBC negotiations, he justified a last-minute

21   change by telling NBC that, unless it acquiesced, HFPA would never authorize the

22   deal.  (Ex. 294 [July 13, 2001 Email from dcp's F. La Maina to NBC's D.

23   Gadsden].)  When asked whether HFPA's approval was required for the 2001 NBC

24   deal, Dick Clark testified: "I would assume they had to agree," and he "think[s]

25   they approved."  The NBC extension was then dated "as of June 11, 2001"—the

26   same date that Mr. La Maina and other dcp executives successfully pitched the

27   NBC extension to the HFPA.  (Ex. 38 [June 11, 2001 Agreement between NBC and

28   dcp].)  There is no other explanation for the NBC extension being dated "as of June

15

11," as dcp and NBC did not even exchange a *draft* of the deal until June 21.  (Ex.
193 [Fax from R. Nathan to A. Suser re: draft of NBC extension].)

HFPA's lawyer at the time, Robert Yoshitomi, who was not retained until
three years *after* the 1993 Amendment was signed, subsequently prepared an
Exercise of Options for La Maina's signature for the six additional options that
would be necessary for the 2005 to 2011 shows.  (Ex. 4, August 21, 2001 Exercise
of Options.)  This document is the cornerstone of Defendants' case, but at
deposition, dcp lawyer Joel Behr admitted that *he* was the source of the language in
that Exercise of Options that dcp now claims as an HFPA admission, not Yoshitomi
and not HFPA.  Behr testified that "*I suggested to [Yoshitomi]* that it would be
good to recite the history of this -- of the transactions that came up to this point
between the parties *including that reference that it would be deemed extended* and it
shows up in what he drafted."

The following spring, the Mosaic transaction closed much to HFPA's
surprise, as the membership had no prior knowledge of Mr. Clark's and Mr. La
Maina's intentions of selling the company.  When HFPA asked dcp executives
whether the merger had started before or after dcp entered the 2001 NBC extension,
dcp told HFPA it was "long after," even though the merger started well *before* the
NBC extension.  (Ex. 19 [April 9, 2002 HFPA-dcp meeting transcript].)

After retaining an experienced entertainment lawyer, HFPA realized that dcp
was construing the 1993 Amendment to create potentially limitless self-renewing
options, the HFPA promptly sent a letter to dcp repudiating Yoshitomi's Exercise
of Options.  (Ex. 14 [Sept. 11, 2002 Letter from HFPA President Dagmar Dunlevy
to dcp President Francis La Maina].)  A flurry of letters ensued.  When dcp
threatened multimillion dollar litigation, both HFPA and dcp agreed to withdraw
their letters, but HFPA reserved its rights and remained resolute in rejecting dcp's
interpretation of the 1993 Amendment.  (Ex. 51 [Sept. 25, 2002 Letter from dcp
outside counsel, Bert Fields, to HFPA outside counsel, Bryan Freedman].)  For

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

example, when dcp sought "unequivocal written assurance that the [HFPA] affirms the new contract and will perform it," the HFPA refused.  (Ex. 71 [Dec. 11, 2002 Letter from dcp outside counsel, Bert Fields, to HFPA outside counsel, Kenneth Kleinberg].)  Instead, HFPA stated that it would "continue to honor all legally binding contractual obligations" and "reserve[d] all rights and remedies."  (Ex. 72, Dec. 13, 2002 Letter from HFPA outside counsel, Peter Lopez, to dcp outside counsel, Bert Fields.)

In the ensuing years, dcp repeatedly sought to persuade HFPA to drop its objections—all to no avail.  With each royalty check it sent, dcp sought "unequivocal assurance," insisting that by cashing the check, HFPA would be reaffirming the agreement, including the Exercise of Options.[17]  Each time, HFPA replied that it was cashing the checks unconditionally, and HFPA told dcp that dcp's attempts "to inject legal provisions in what appear to be benign cover letters addressed to non-lawyers is not constructive."[18]

This state of affairs continued until 2010.  On February 8, 2010, the President of the HFPA sent dcp CEO Mark Shapiro a letter stating that dcp's rights would expire with the 2011 show and that dcp should not pursue any broadcast license involving the Globes "until we agree upon the nature of any [] future relationship."[19]  dcp's CEO assured the HFPA that dcp "would never make a move on a network renewal or new home without [HFPA's] involvement."  (Ex. 228 [Feb. 9, 2010 email from Mark Shapiro to Philip Berk].)  The parties then entered into negotiations over a new deal, which are reflected in copious back-and-forth correspondence and notes of telephone conversations.[20]

---

[17] *See, e.g.*, Ex. 399 [Oct. 8, 2004 Letter from dcp CEO William Simon to HFPA Treasurer Philip Berk].

[18] *E.g.*, Ex. 76 [May 21, 2003 Letter from HFPA President Dagmar Dunlevy to dcp President Francis La Maina]; Ex. 398 [July 18, 2004 Letter from HFPA President Lorenzo Soria to dcp President Francis La Maina].

[19] Ex. 227 [Feb. 8, 2010 Letter from HFPA President, Philip Berk, to dcp CEO, Mark Shapiro].

[20] *E.g.*, Ex. 229 [March 26, 2010 Email chain between HFPA outside counsel, Joe Calabrese, and

At the same time as dcp was telling the HFPA that it would *never* make a move without HFPA, dcp was also representing to NBC that HFPA would need to approve any new NBC extension.  None of these facts is disputed.  They are testified to by HFPA, dcp, and NBC and reflected in contemporaneous documents.[21]  Both Shapiro and NBC's Marc Graboff confirmed that, in order to close the unauthorized NBC deal, Mark Shapiro found himself making statements to both HFPA and NBC that could only be true under HFPA's interpretation of the 1993 Amendment.

### B.   Claim 2: Reformation – Mutual Mistake and Unilateral Mistake or Fraud

#### 1.   *Elements of Reformation for Mutual Mistake*

a.   The HFPA and dcp entered into the 1993 Agreement;

b.   With the shared understanding that HFPA was granting dcp only eight options, and that additional options would require HFPA approval; and

c.   Through a mutual mistake of the parties, the written contract does not truly express the intention of the parties.[22]

---

dcp General Counsel, Michael Kohn, thanking dcp "for agreeing to get started with negotiations well in advance of the 2011 Golden Globe Awards"]; Ex. 231 [Minutes of June 10, 2010 HFPA Board of Directors Meeting, reporting that dcp's "Shapiro made another proposal … regarding their contract with the HFPA"]; Ex. 438 [July 29, 2010 Notes of teleconference between Joe Calabrese and Mark Shapiro]; Ex. 439 [Aug. 13, 2010 Letter from Joe Calabrese to Mark Shapiro, and notes of Aug. 17, 2010 teleconference between Joe Calabrese and Mark Shapiro]; Ex. 441 [Aug. 18, 2010 Notes of teleconference between Joe Calabrese and Mark Shapiro]; Ex. 285 [Sept. 23, 2010 Email chain between Joe Calabrese and Mark Shapiro].

[21] *E.g.*, Ex. 219 [Sept. 27, 2010 Email from NBC's Masami Yamamoto to NBC's Marc Graboff, including handwritten notes of conversations with dcp's Mark Shapiro]; Ex. 220 [Sept. 29, 2010 Notes of Teleconference between NBC and dcp's Mark Shapiro]; Ex. 221 [Oct. 15, 2010 Email from NBC's Marc Graboff to dcp's Mark Shapiro, stating "you convinced us that the HFPA would accept nothing more than an extension of the existing deal, other than the term and price"]; Ex. 225 [Nov. 5, 2010 Email from NBC's Marc Graboff stating that "We don't have official approval of the extension deal from the HFPA and,until we do, the deal is not officially closed."]; Ex. 226 [Nov. 9, 2010 NBC Notes of teleconference with Mark Shapiro, stating that "HFPA had the meeting & we're all good."].

[22] Cal. Civ. Code § 1578(1).

2.  ***Elements of Reformation for Unilateral Mistake or Fraud***

      a.      The HFPA and dcp entered into the 1993 Agreement;

      b.      HFPA understood that it was granting dcp only eight options, and that additional options would require HFPA approval; and

      c.      Through dcp's fraud or HFPA's mistake, which dcp at the time knew or suspected, the written contract does not truly express the intention of the parties.[23]

3.  ***Issues of Law Regarding Reformation***

      a.   **Mutual Mistake**

When both parties misunderstand the contract in the same way, a mutual mistake of law has occurred. Cal. Civ. Code § 1578(1). For example, in *R.M. Stafford v. California Canning Peach Growers*, the peach-growing plaintiffs and the defendant association entered into an agreement where the Association would pay a higher price for plaintiff's peaches. 11 Cal. 2d 212, 215 (1938). Although the written terms of the standard contract did not indicate it, the Association agreed to treat the plaintiff as a particular type of grower and give them a higher price. *Id*. The members of the Association's Board changed and they decided to pay the plaintiffs the lower regular price for their peaches. *Id*. at 216. Plaintiff sued and the Court held they were entitled to the higher price the parties had agreed upon–a mutual mistake had been made as to the legal effect of the contract between them. *Id*. at 217-18. "At the moment of execution and for some time thereafter, if either of the contracting parties had been asked as to their intention and legal relationship they would have agreed that [the higher peach price] was their intention." *Id*. The Court reformed the contract to reflect the parties' understanding since a strict interpretation of the language was not what the parties' intended. *Id*. at 220.

---

[23] Cal. Civ. Code § 1578(2).

But parties are not permitted to reinvent their understanding of a contract after it has been executed.  *Murray v. Drake*, 46 Cal. 644, 647-648 (1873).  The relevant time period for determining if there has been a mistake is at the time of execution, not years later.

b.    **Unilateral Mistake**

A court will not rescind or reform a contract simply because one party has misunderstood the agreement they signed.  *Hedging Concepts v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1421 (1996).  It is only when one party misunderstands the contract and the other party is aware of that confusion but does nothing to correct it and instead takes advantage of it, that a unilateral mistake of law occurs.  Cal. Civ. Code § 1578(2).  The key aspect of a unilateral mistake is whether the unmistaken party knew or reasonably should have known his counterpart was confused.  *Hedging Concepts*, 41 Cal. App 4th at 1422.  Since parties rarely admit to taking advantage of their confused counterpart in a contract negotiation, the court can look at the conduct of the parties to determine their subjective intentions at the time of contracting.

In determining whether one party was or reasonably should have been aware of the other's confusion the court will look at:

- The questions posed by the confused party given during the presentation of a potential contract; *Merced*, 188 Cal. App. 3d at 673.
- Whether the answers would have misled the confused party into believing they correctly understood the agreement;  *Id.*
- Whether the terms of the contract are reasonably susceptible to more than one interpretation; *Id.* at 673-74.
- Whether one party irrationally sacrifices substantial rights without adequate consideration;  *Estate of Peterson*, 259 Cal. App. 2d 492, 502 (1968).

- The believability and factual support of the knowing party's explanation of the confused party's conduct had there not been a mistake. *Id.*

4.    ***Key Evidence in Support of HFPA's Reformation Claims***

HFPA's reformation claim relies on substantially the same key evidence laid out above.  In particular, the transcript of the September 22, 1993 meeting and other critical documentary evidence from 1993 illuminates the true intent of the parties— and in any case the intent of HFPA based on dcp's representations and the questions and answers during the September 22, 1993 meeting—that their relationship be extended through 2005 by a grant of eight options.  For example, when an HFPA member asked La Maina, "How long a contract do you have with us now?", he replied: "I'm asking that the contract be extended for the period of time necessary to fulfill the NBC agreement."  La Maina then repeatedly referred to the NBC agreement as lasting at most "[a] total of ten years."  La Maina did *not* say that dcp would be able to unilaterally extend the NBC agreement for whatever number of years and on whatever terms dcp wished which, in turn, would allow dcp to automatically extend the dcp/HFPA relationship.  Another HFPA member reinforced the point, asking *again* how long the "tie-in" between HFPA and dcp would be given the new NBC deal:  "Is that ten years or three years?"  Her question highlights that perpetual options were never contemplated.  La Maina confirmed her understanding:  "I hope it's ten years.  I hope it's ten years."  At his deposition, La Maina admitted that he never presented—or even mentioned—his understanding of the so-called "extensions clause" to the members, even though he knew their approval was necessary for any material agreement regarding the Globes.  Nor is there any dispute that it was on the basis of this presentation, and at this very meeting, that the HFPA approved the NBC deal and the dcp/HFPA contract extension.  Having agreed on the eight-year grant of options (dcp had two left from

1   HFPA's last grant of options, for a total of ten).  La Maina left the pre-signed 1993

2   Amendment with the HFPA's President.

3        Equally important to what dcp executives said is what dcp executives did *not*

4   say.  Despite claiming to have made an unprecedented deal, and despite having

5   twice sold the company based on the rights dcp obtained under that deal,

6   Defendants have not produced a single document corroborating their story.  The

7   record is replete with talking points La Maina used when meeting with the HFPA

8   members and Board, correspondence between HFPA and dcp, and internal dcp

9   documents.  But Defendants cannot point to a single document in which anyone at

10   dcp unequivocally told HFPA that the deal they had made gave dcp has the

11   breathtaking and unprecedented rights Defendants now claim.  In fact, Defendants'

12   own executives have written HFPA letters stating that the 1993 Amendment altered

13   the parties agreement "to add exclusive irrevocable options through 2005."  (Ex.

14   373 [Letter from W. Simon to D. Dunlevy dated 4/30/2003].)

15        Also critical to HFPA's reformation claim is the fact that, as it had in the

16   past, dcp sought HFPA's approval for the NBC deal in 1993 and in 2001.  Approval

17   was a necessary prerequisite to HFPA's grant of options to dcp of the license to

18   produce the Golden Globes show.  In accordance with that prerequisite, in February

19   2010, HFPA's President wrote to dcp's CEO "to ensure that dcp does not seek to

20   agree to any subsequent broadcast licensing agreement . . . as dcp's options

21   obviously also expire with the last broadcast in January 2011," dcp's CEO did *not*

22   object.  (Ex. 227 [Feb. 8, 2010 Letter from HFPA President, Philip Berk, to dcp

23   CEO, Mark Shapiro].)  Instead of responding that dcp had infinite rights and

24   needed no HFPA approval and no HFPA grant of option, Shapiro assured HFPA

25   that dcp "would never make a move on a network renewal or new home without

26   your involvement," and agreed to enter into negotiations for a "new relationship."

27   (Ex. 228 [February 9, 2010 Email from dcp CEO Mark Shapiro to HFPA President

28   Philip Berk].)  The October 29, 2010 NBC deal extension was the first time dcp had

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

acted without HFPA's approval and purported to exercise options HFPA never granted. HFPA filed suit promptly thereafter.

## III.   DEFENDANT'S PHASE ONE COUNTERCLAIM AND AFFIRMATIVE DEFENSES

### A.   Summary of Defendants' Counterclaim and Affirmative Defenses

Defendants' declaratory relief claim is the mirror image of HFPA's declaratory relief claim, and therefore is surplusage.   Moreover, despite previously castigating HFPA for purportedly asserting unpled claims for lack of agency, Defendants now claim that they are relying on two new affirmative defenses—laches and waiver/estoppel. These affirmative defenses are new, and as such HFPA does not address them here.

### B.   Defendants' Affirmative Defense No. 1: Statute of Limitations

#### 1.   *Elements of Statute of Limitations*

a.   Defendants contends that HFPA's lawsuit was not filed within the time set by law. To succeed on this defense, Defendants must prove that HFPA's claimed harm occurred before November 17, 2006.[24]

#### 2.   *Issues of Law Regarding Defendants' Affirmative Defense Statute of Limitations*

The statute begins to run on a contract-related claim for declaratory relief only "when the wrongful act is done and the obligation or the liability arises." *United Pacific-Reliance Ins. Co. v. DiMomenico*, 173 Cal. App. 3d 673, 676 (1985) (statute of limitations on declaratory relief does not start until contract is breached); *accord Maguire v. Hibernia Sav. & Loan Soc'y*, 23 Cal. 2d 719, 734 (1944).  As alleged in the Complaint, dcp's wrongful act occurred "on October 29, 2010, [when] dcp surreptitiously signed a television broadcast license agreement with [NBC] for the Golden Globe Awards shows through 2018, without HFPA's consent

---

[24] *See* JUDICIAL COUNCIL OF CALIFORNIA, CIVIL JURY INSTRUCTIONS (2010), CACI No. 338.

1   or authorization." (Dkt. No. 50, ¶ 5; see also id. ¶¶ 49-56, 84(b), 88(a), 88(c).)  dcp

2   committed no actionable breach in 1993, as Defendants have suggested, because

3   making a contract that later becomes disputed is not a breach.  *See Maguire*, 23 Cal.

4   2d at 734.

5   Defendants are also incorrect to assert that the statute of limitations began in

6   2002, when a dispute arose regarding the 1993 Amendment. A dispute over

7   interpretation by itself does not start the statute of limitations. Until one party

8   *actually acts* in derogation of the other party's claimed rights, simply disputing the

9   meaning of a contract triggers no claim that must be asserted or lost. *See Romano v.*

10  *Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996) (claim for breach did not accrue

11  until 1991 despite defendants' unequivocal notification in 1988 that it intended fire

12  plaintiff in 1991 in violation of his alleged rights).  "There is no anomaly in the fact

13  that a party may have a right to sue for declaratory relief without setting in motion

14  the statute of limitations." *Maguire*, 23 Cal. 2d at 734.  Just because a controversy

15  may ripen the right to declaratory relief, "it would be most undesirable to start the

16  statute running at the moment a controversy arises." *DiMomenico*, 173 Cal. App. 3d

17  at 677 (quoting 3 Witkin Cal. Proc. Actions § 685 (2008)).  Were the rule

18  otherwise, dcp's right to assert its contract interpretation would have expired along

19  with HFPA's, since dcp also did not file suit when the controversy first arose in

20  2002.

21  Defendants distort the nature of dcp's own claim for declaratory relief in

22  contending that the statute of limitations bars HFPA's authority-based argument.

23  dcp is "seeking affirmatively to interpose and enforce" an agreement "in

24  extinguishment of a right . . . to which, in the absence of such agreement, [HFPA]

25  would have been entitled."  *In re Cover's Estate*, 188 Cal. 133, 140 (1922).  The

26  statute of limitations is inapplicable in these circumstances,  since "the result the

27  [HFPA] seeks is simply that [it] owes no obligations under an agreement." *Styne v.*

28  *Stevens*, 26 Cal. 4th 42, 52 (2001).  Defendants effectively seek "to misuse the

statute of limitations as a prohibited sword instead of the shield as it is intended."
*Maretzki v. Hengstler*, 2002 WL 1677712, at *2 (Cal. App. 4th July 24, 2002).

### C.      Defendants' Counterclaim for Declaratory Relief

#### 1.      *Elements of Defendants' Counterclaim for Declaratory Relief*

a.      An actual and substantial controversy has arisen, and now exists, between Plaintiff and Defendants concerning their respective rights and duties under the 1987 Agreement as amended;

b.      Plaintiff and Defendants have adverse legal interests;

c.      The controversy sufficient immediacy and reality to warrant the issuance of a declaratory judgment;

d.      Plaintiff desires a judicial determination of the parties' respective rights and duties under the 1987 Agreement as amended; and

e.      A judicial declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties.

#### 2.      *Legal Issues Regarding Defendants' Counterclaim for Declaratory Relief*

a.      **Agency**

dcp will have to prove that Van Blaricom had either actual or ostensible authority to enter into the extraordinary deal they claim—granting potentially limitless options based on dcp's sole discretion.  *See Van't Rood v. County of Santa Clara*, 113 Cal. App. 4th 549, 573 (2003) ("principal cannot be held when an actual agent acts beyond the scope of his actual or ostensible authority").  Under California law, "the burden of proving agency, as well as scope of the agent's authority, rests upon the party asserting the existence thereof and seeking thereby to

charge the principal upon representations of the agent." *Cal. Viking Sprinkler Co. v. Pac. Indem. Co.*, 213 Cal. App. 2d 844, 850 (1963).

### b.   **Actual Authority**

"Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316; *see also S. Sacramento Drayage Co. v. Campbell Soup Co*., 220 Cal. App. 2d 851, 856 (1963).

Where a principal's governing documents set forth requirements for the exercise of the agent's authority and those requirements are not fulfilled, there is no actual authority.  *See Lindsay-Field v. Friendly*, 36 Cal. App. 4th 1728, 1735 (1995).  And when a principal has authorized its agent to execute a contract with specified terms, but the agent exceeds her authority by entering into a contract with different or additional terms, the "principal is bound by his authorized acts so far only as they can be plainly separated from those which are unauthorized." Cal. Civ. Code § 2333; *see also DeBoer Const., Inc. v. Reliance Ins. Co*., 540 F.2d 486, 491–93 (10th Cir. 1976) (affirming trial court's decision to reduce a $925,000 surety contract signed by an agent to $500,000 where principal had limited agent to the latter amount); *Wynn v. Hoffman*, 82 So. 32, 34 (Ala. 1919) ("[I]f authority is only given to do a specific act, the limit of which is known to the person with whom the agent contracts, and, notwithstanding this limited authority and its knowledge, the authority is exceeded or materially varied, the principal is bound only to the extent of the specific authority given and exercised by his agent.").

### c.   **Ostensible Authority**

"Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ. Code § 2317.  However, this theory is unavailable to one having "actual or constructive notice of the restriction upon [the agent's] authority." *Id*. § 2318; *see, e.g., McCullough v. Lennar Corp*., 2011 WL 1585017, at *13 (S.D. Cal. Apr. 26,

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

2011) (summary judgment proper where plaintiff knew agent had no authority and failed to inquire with principal); *Lindsay-Field*, 36 Cal. App. 4th at 1734 ("Plaintiffs could not show ostensible authority. Porter repeatedly admitted that he knew a vote of the membership was required" to enter the contract.).

Ostensible authority must arise from "conduct by the principal which causes a third party reasonably to believe the agent has authority"—not conduct of the agent.  For example, in *Lindsay-Field*, the court found there was no ostensible authority where the plaintiff "repeatedly admitted [knowing] a vote of the membership was required," and therefore had notice of the agent's limitations, and nevertheless "did not ask for written evidence of [the agent's] authority."  36 Cal. App. 4th at 1734.  While the agent may have said he received the membership's approval, because the plaintiff "did not act based upon the conduct of the members," there was no ostensible authority.  *Id*.  This rule—that a party cannot rely on an agent's representation that the principal has enlarged her authority—is particular salient where the agent makes extreme and unprecedented concessions. *See Title Guar. & Trust Co*., 178 Cal. 375, 379 (1918) (no ostensible authority if the agent changes a material term to create "a different and less favorable contract," and "no power to . . . vary [the] agreement is to be inferred from the general power to make it"); *Jesup v. City Bank of Racine*, 14 Wis. 331, 338 (1861) (cannot rely on agent's representation of authority where contract is unusual or "of a severe and extraordinary nature, amounting to a conditional defeasance of the entire objects of the contract, so far as one of the parties are concerned").

### d.  <u>**Ratification**</u>

Defendants claim that, even if Van Blaricom exceeded her authority by granting dcp self-renewing options, HFPA (or its tax attorney) ratified that grant by its subsequent conduct. A principal may ratify the originally unauthorized act of an agent.  Cal. Civ. Code § 2307.  However, an agent cannot not ratify the unauthorized act of a prior agent.  *See L.A. Dredging Co. v. Long Beach*, 210 Cal.

348, 360 (1930); *See Lindsay-Field v. Friendly*, 36 Cal. App. 4th 1728, 1736 (1995).

Ratification further "requires that the principal have full knowledge of all of the facts, particularly of the acts of the person claiming to act as agent. The principal must also have full knowledge of his rights in the matter, which implies a knowledge of the legal effect of the acts." *In re Estate of Fletcher*, 36 Cal. App. 2d 567, 573 (1940); *see also Lindsay-Field*, 36 Cal. App. 4th at 1736-37 (members could not have ratified by silence where "the members were not fully informed until July meeting" where they rejected authority); *Brown v. Rouse*, 104 Cal. 672, 675-76 (1894) (where principal knew of unauthorized mortgage of her property and made payments under mistaken belief that "note and mortgage were valid instruments which effectually bound her, and from which she could not escape," principal's payments on mortgage were not ratification). The "doctrine of constructive knowledge of material facts or imputation of knowledge of such facts" is inapplicable "of ratification, and ordinarily it is what the principal knows, and not what he has mere legal notice of, that is to be considered in determining whether there has been a ratification." *Gallagher v. Cal. Pac. Title & Trust Co.*, 13 Cal. App. 2d 482, 492 (1936); *see also, e.g.*, *Allen v. San Francisco Wholesale Dairy Produce Exch.*, 59 Cal. App. 93, 98-99 (1922). In addition, a short delay between acquiring knowledge and repudiation is not ratification by silence. *See Rayonier, Inc. v. Polson*, 400 F.2d 909, 916 (9th Cir. 1968) (delay of over one year was "reasonable under the circumstances").

No ratification arises from a principal's continued performance of a contract made by an agent partially in excess of his authority if the performance is limited to the authorized terms. *See Kerr Gifford & Co. v. Am. Dist. Co.*, 35 Cal. App. 2d 390 (1939) (no ratification results from repudiating other contracting party's claim, continuing to carry out the agreement as the principal had originally understood the terms while reserving "settlement of the question about a different price having

been set by the [agent's] purported contract"); *Palo Alto Mut. Bldg. & Loan Ass'n v. First Nat'l Bank*, 33 Cal. App. 214 (1917) ("when the principal first acquires knowledge of the facts, conditions are such that he cannot in justice to himself repudiate the whole of the agent's acts, *he may stand upon what he has authorized*, and the third person must bear the loss resulting from his dealing with an agent without learning the extent of his authority"). California courts appreciate that "[i]n the course of commercial transactions numerous instances may be found of disputes between parties regarding a particular term," but such a dispute does "not preclude the conduct of further business relations while the settlement of the contested matter remains in abeyance." *Gates v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 120 Cal. App. 2d 571, 576 (1953).

Even if the Court finds that the HFPA ratified Van Blaricom's originally unauthorized deal, it will still need to address HFPA's mistake defense.

### 3.   *HFPA's Key Evidence in Opposition to Defendants' Claim for Declaratory Relief*

Since the Defendants' declaratory relief claim is the mirror image of HFPA's declaratory relief claim, HFPA relies on the same key evidence outlined above in defense.  HFPA also plans to assert four affirmative defenses in response to Defendants' claim: lack of consideration, mistake, unclean hands, and estoppel.

### D.   **HFPA's First Affirmative Defense – Lack of Consideration**

#### 2.   *Elements of Lack of Consideration*

        a.   dcp did not confer a benefit or suffer prejudice that was bargained for in exchange for post-2011 options; and

        b.   HFPA revoked any post-2011 options before dcp exercised them, or even began negotiating with NBC for a new broadcasting deal.[25]

---

[25] *See* Cal. Civ. Code § 1605; *Bard v. Kent*, 19 Cal.2d 449, 451-52 (1942).

### 3. *Key Evidence in Support of HFPA's Affirmative Defense of Lack of Consideration*

HFPA intends to rely on the key evidence discussed in the declaratory-relief section above.  Specifically, by their own terms the 1987 Agreement and 1993 Amendment show that dcp never provided any consideration for any grant of options, including the infinite stream of options dcp now claims.  Instead, dcp committed to split 50% of the net profits for HFPA in exchange for the right—not the option—to produce the Golden Globes.  Unsupported by consideration, the options granted could be revoked any time prior to exercise.

On February 8, 2010, well before dcp even attempted to secure a new broadcasting commitment from NBC and almost eight months before dcp purported to exercise additional options through 2018, HFPA revoked any post-2011 options. HFPA's President sent dcp's CEO an email stating in no uncertain terms that the 2011 Globes would be dcp's "last show."  (Ex. 227 [Feb. 8, 2010 Letter from P. Berk to M. Shapiro; Ex. 214 [May 5, 2010 Letter from NBC's M. Yamamoto to dcp's General Counsel agreeing to enter into early discussions for an extension of the NBC broadcast deal; Ex. 210 [October 29, 2010 purported Exercise of Options].)  HFPA's President continued: "until we agree upon the nature of any such future relationship, I want to ensure that dcp does not seek or agree to any subsequent broadcast licensing agreement with NBC (or anyone else, for that matter) as dcp's options obviously also expire with that last broadcast in January 2011."  The following day, the CEO of dcp himself acknowledged the revocation: "Absolutely we should sit down for a series of meetings to get the ball rolling on our future network options."  (Ex. 228 [Email from M. Shapiro to P. Berk].)  The parties then entered into negotiations for a new agreement.  On August 13, 2010— still over two months before dcp purported to enter into a new broadcast license and unilaterally exercise options it did not have —HFPA sent another letter reminding

dcp that the terms of the parties' contract "will be expiring soon and are not acceptable to HFPA."

**B.     HFPA's Second Affirmative Defense –Mistake**

  1.     ***Elements of Mutual Mistake***

       a.     The HFPA and dcp entered into the 1993 Agreement;

       b.     With the shared understanding that HFPA was granting only eight options, such that additional options would require HFPA approval; and

       c.     HFPA would not have agreed to enter into this contract if it was aware that it was granting dcp perpetual, self-renewing options on whatever terms dcp wanted.[26]

  2.     ***Elements of Unilateral Mistake***

       a.     The HFPA and dcp entered into the 1993 Agreement;

       b.     With dcp knowing that HFPA intended to grant only eight options, such that additional options would require HFPA approval;

       c.     dcp knew HFPA was mistaken and used that mistake to take advantage of HFPA; and

       d.     HFPA would not have agreed to enter into this contract if it was aware that it was granting dcp perpetual, self-renewing options on whatever terms dcp wanted.[27]

  3.     ***Key Evidence in Support of HFPA's Affirmative Defense of Mistake***

For both its unilateral and mutual mistake affirmative defenses, HFPA intends to rely on the key evidence discussed in the declaratory-relief section above.

---

[26] *See* JUDICIAL COUNCIL OF CALIFORNIA, CIVIL JURY INSTRUCTIONS (2010), CACI No. 331.

[27] *See* JUDICIAL COUNCIL OF CALIFORNIA, CIVIL JURY INSTRUCTIONS (2010), CACI No. 330.

HFPA'S CONTENTIONS
OF LAW AND FACT
CASE NO. CV 10-8833 VBF (FMOx)

1   Even if the Court finds that the only reasonable interpretation of the contractual

2   language is the one granting infinite unilateral that dcp puts forth, HFPA's evidence

3   shows that HFPA always believed that it was granting a finite number of options,

4   such that any grant of additional options would require HFPA's approval.  And dcp

5   always acted in accord with that belief, at least until October 29, 2010.

### C.   **HFPA's Third Affirmative Defense – Unclean Hands**

6

7        1.   ***Elements of Unclean Hands***

8             a.   dcp's conduct was inequitable (violated conscience, good

9                  faith, or other equitable standards); and

10            b.   dcp's conduct was in connection with the matters in

11                 controversy[28]

12       2.   ***Key Evidence in Support of HFPA's Affirmative Defense of***
             ***Unclean Hands***
13

14       HFPA intends to rely on the key evidence discussed in the declaratory relief

15  section above.  In particular, this evidence shows that—*even if* it was not dcp's

16  intention in 1993 to enter into a limited eight year option deal—it concealed its true

17  intention from the HFPA and misrepresented the nature of the deal on the very day

18  it presented the signed contract to the membership.  This is amply attested to by the

19  transcript of the September 22, 1993 meeting between the HFPA membership and

20  representatives of dcp.  dcp did this even though it knew the HFPA's membership

21  approval was required for all contracts relating to the Globes.  There can be no

22  doubt, based on the evidence outlined above, that  HFPA did not contemplate an

23  endless grant of options on whatever terms dcp chose and would never have agreed

24  to it.  (*See, e.g.,* April 14, 1993 Memo from Gene Weed to Mirjana Van Blaricom

25  with handwritten notation rejecting dcp's proposal for a five-year deal extension.)

26

27  _____

28  [28] *Jay Bharat Developers, Inc. v. Minidis*, 167 Cal.App.4th 437, 445-46 (2008) (quoting *Kendall-Jackson Winery, Ltd. v. Sup. Ct.*, 76 Cal. App. 4th 970, 979 (1999).

**D.      HFPA's Fourth Affirmative Defense – Estoppel**

      1.      ***Elements of Estoppel to Assert Statute of Limitations***

          a.      Defendants said or did something that caused HFPA to believe that it would not be necessary to file a lawsuit;

          b.      HFPA relied on Defendants' conduct and therefore did not file the lawsuit within the time otherwise required;

          c.      A reasonable person in HFPA's position would have relied on Defendants' conduct;

          d.      After the limitation period had expired, Defendants' representations by words or conduct proved to not be true; and

          e.      HFPA proceeded diligently to file suit once it discovered the actual facts.

          f.      It is not necessary that Defendants have acted in bad faith or intended to mislead HFPA.[29]

      2.      ***Issues of Law Regarding Estoppel to Assert Statute of Limitations on HFPA's Reformation Claim***

Claims for reformation are subject to a three-year statute of limitations. *See* Cal. Civ. Proc. Code § 338(d).  Defendants, however, are estopped from asserting statute of limitations as a defense to HFPA's reformation claim, because, Defendants lulled HFPA into believing the parties' shared understanding was still operative.  Since their conduct "induce[d] the belated filing of the action," Defendants are estopped from raising limitations.  *Holdgrafer v. Unocal Corp.*, 160 Cal. App. 4th 907, 925-26 (2008). "[E]stoppel . . . is a question of fact," *Cal. Ins. Guarantee Ass'n v. Workers' Comp. Appeals Bd.*, 163 Cal. App. 4th 853, 865

---

[29] *See* JUDICIAL COUNCIL OF CALIFORNIA, CIVIL JURY INSTRUCTIONS (2010), CACI No. 456.

(2008), and at trial the jury must decide dcp went so far as to assure HFPA in writing of dcp's good faith.

### 3. *Key Evidence in Support of HFPA's Affirmative Defense of Estoppel to Assert Statute of Limitations*

For both its estoppel affirmative defenses, HFPA intends to rely on the key evidence discussed in the declaratory-relief section above.

## IV.   EVIDENTIARY ISSUES

The key evidentiary issues are outlined in the parties' respective motions in limine (filed July 25, 2011), and noted in their objections in the Joint Exhibit List. In addition, the HFPA raised a number of objections to particular evidence its Memorandum of Objections to Evidence in response to Defendants motion for summary judgment.  (*See* Dkt. No. 94.)  Pending the Court's ruling on the pending motions and objections, HFPA will renew its objections as appropriate throughout the course of trial.

## V.   BIFURCATION OF ISSUES

The Court has already addressed bifurcation of issues.  (Dkt. No. 38.)

## VI.   JURY TRIAL

HFPA timely made a demand for a jury trial.  All of HFPA's Phase One claims are triable to a jury.

## VII.   ATTORNEY'S FEES

HFPA seeks to recover its attorneys' fees and costs of suit pursuant to the contract between the parties, which states that "[i]n the event of litigation between the parties, the prevailing party shall be entitled to recover its attorneys' fees and costs from the other."  1987 Agreement, ¶ 19; *see also* Cal. Civ. Code § 1717 (permitting recovery of attorneys' fees and costs where provided for by contract).

## VIII.  ABANDONED ISSUES

The HFPA abandons its mootness affirmative defense.  Additionally, Defendants have abandoned their affirmative defense of statute of frauds.  (Dkt. No. 151 at 21-25.)


Dated:   August 1, 2011          Respectfully submitted,

DANIEL M. PETROCELLI
LINDA J. SMITH
ROBIN M. WALL
AMY. R. LUCAS
O'MELVENY & MYERS LLP


By:  /s/ Daniel M. Petrocelli
          Daniel M. Petrocelli
Attorneys for Plaintiff and Counter-defendant
Hollywood Foreign Press Association