1
2
3
4
5
6
7

o

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 HOLLYWOOD FOREIGN PRESS    ) CASE NO.  CV 10-8833 AHM (FMOx)
ASSOCIATION                 )
12                          )
            Plaintiff,      ) **COURT'S FINDINGS OF FACT AND**
13                          ) **CONCLUSIONS OF LAW**
    v.                      )
14                          )
RED ZONE CAPITAL PARTNERS   )
15 II, etc., et al.          )
                            )
16                          )
                            )
17 _____ )

18 **INTRODUCTION**

19     Resolution of the dispute that is at the core of this case should not have

20 required a trial.  It is a contract dispute over who has the right to license the

21 Golden Globes Award Show for television broadcast.  The parties could have

22 settled their differences even before the complaint was filed.  Certainly by the

23 autumn of 2011, after discovery had been completed and the main legal issues

24 fully briefed, they were in a position to promote and protect their respective

25 interests by entering into a reasonable compromise.  Indeed, they had

26 preliminarily explored some key concepts that could serve their main objectives.

27 (See Findings of Fact ¶¶ 134-146.)

28

1    Yet sometimes it does take a trial to enable litigants to reach a
2    compromise, and presiding over the trial was a pleasure for this Court:  excellent
3    lawyers on both sides, some colorful witnesses and numerous issues of law.

4    The Court concludes that the defendants, who will be referred to as "dcp"
5    (dick clark productions), are entitled to a declaration that their interpretation of
6    the parties' agreement is correct.  dcp has the right to license the Golden Globes
7    Award Show to NBC (but not to others) so long as NBC commits to broadcast
8    that show, and dcp may do so even without the approval of the Hollywood
9    Foreign Press Association ("HFPA").

10   What led to this conclusion?  The Court specifies the most important
11   factors and principles in the detailed findings of fact and conclusions of law that
12   follow.  What the Court is compelled to note here is that there is an overriding
13   feature of the lengthy relationship between dcp and HFPA that helps explain
14   how it came to pass that HFPA granted such sweeping rights to dcp.  That
15   feature is simply this:  HFPA suffered from the absence of sound, business-like
16   practices.  See, *e.g.*,  ¶¶ 83, 91 and 156-170.  It also lacked consistent leadership.
17   It elected a new President every year for a one year term, with a maximum of
18   two consecutive terms.  Some elections triggered bitter feelings.  HFPA
19   members have always been dedicated to the success of the Golden Globes
20   Award Show.  But often they succumbed to bouts of pronounced turmoil and
21   personal feuds.  (See, *e.g.*, Findings of Fact ¶ 356 and fn. 2)  In contrast, dcp
22   acted in a consistently business-like fashion, and for almost all of the 27 year
23   relationship it had with HFPA before this suit was filed dcp was represented by
24   one experienced executive who was adept at dealing fairly and effectively with
25   the often amateurish conduct of HFPA.

26   Because HFPA functioned in such an unusual fashion, the emphasis
27   devoted at trial to expert testimony about industry custom and practice proved to
28   be of little, if any, value to the Court.  Given that the legal principles applied in

this ruling are well-established, it would be surprising if the outcome of this ruling is viewed as a legal precedent.  For the story that follows is *sui generis*.

### FINDINGS OF FACT

**I.      BACKGROUND**

1.      Plaintiff Hollywood Foreign Press Association ("HFPA") is a registered not-for-profit association in California that comprises approximately 80 foreign journalists who cover the entertainment industry.  Intellectual property and contractual rights associated with the Golden Globes awards for excellence in film and television are the principal assets of HFPA.  The presentation of the Golden Globes Award has generated millions of dollars in annual revenues for the HFPA since the mid-1990s, which are used to fund its operations and charitable giving.  (Ex. 789) (Soria Decl. ¶¶ 5-9.)  The HFPA and its members expend substantial time and resources to make the Golden Globes Awards Shows successful.  (*Id.*, ¶¶ 19-22.)

2.      Defendant dick clark productions, inc. ("dcp") is an independent producer of television programming.  It produces shows such as the "American Music Awards," "So You Think You Can Dance," and the "Golden Globe Awards."  In that role, dcp produces an event or a program to be broadcast on television and secures a contract with a network or other outlet to broadcast the event or program to viewers.  In February 2002, dcp was sold to Mosaic Media Group.  In June 2007 the Red Zone defendants purchased dcp from Mosaic Media Group.  (In these findings and conclusion, the defendants collectively shall be referred to as "dcp" or "Defendants.")

3.      The Golden Globe Awards show aired on the National Broadcasting Company ("NBC") in the 1960s, but NBC declined to renew its license.  The show aired again on NBC in 1977 and 1978, and again NBC declined to renew its license.  The show aired on CBS in 1981 and 1982; CBS

declined, however, to renew its license following the 1982 broadcast, and the Golden Globe Awards show was in peril of not being televised in 1983.

4.     dcp agreed to become the producer of the Golden Globe Award show after CBS declined to renew its license for the show in 1982.  Shortly thereafter, dcp was able to secure a syndication deal for the Golden Globe Awards and the show was televised on local stations throughout the country in 1983.  Under agreements with HFPA, dcp has produced and distributed the Golden Globe Awards show and licensed that production for television ever since.  The parties split the net profits 50-50.  (Soria Decl., Ex. 789, ¶¶ 30, 32; RT 29:14-30:6 (La Maina 1/24/12).)  Since 1996, the Golden Globe Awards show has aired on NBC under a long-term license agreement that dcp and NBC entered into in 1993, which dcp and NBC extended in 2001 and 2010.

5.     dcp is responsible for the television-production aspects of the show, including writing the script, providing a television director, and managing the technical aspects of the production such as the stage, cameras, lighting, and sound.  dcp and HFPA have mutual control in connection with creative matters, but HFPA has final script approval and creative control over the Awards live presentation.  (Ex. 789 (Soria Decl. ¶ 23); RT 77:8-79:23 (La Maina 1/24/12); RT 1661:24-1662:917 (Takla-O'Reilly 2/7/12); Ex. 1; Ex. 5.)

6.     HFPA's bylaws require that all material contracts be approved by the Board of Directors and General Membership.  (Ex. 333.0040; Ex. 415:0038; RT 1538:12-21, 1540:16-1541:7 (Van Blaricom 2/3/12).)

7.     The principal terms of every production agreement between HFPA and dcp prior to 1993 were discussed and approved by the HFPA Board and/or Membership.  (RT 34:16-38:16 (La Maina 1/24/12); RT 485:22-25; 489:8-490:21; 492:1-11 (La Maina 1/26/12); 1983 Agreement: Ex. 100; Ex. 254; 1987 Agreement:  Ex. 560.0006; Ex. 328; Ex. 326; Ex. 496.0002; Ex. 322; Ex. 448; Ex. 321; Ex. 319; Ex. 318; Ex. 104.0001, 0003; Ex. 311; Ex. 103; 1989

Agreement: Ex. 154; Ex. 153.)

8.     In August 2001, in connection with what became the first extension of the  dcp-NBC license, dcp executed an exercise of options, directed to HFPA, to produce and distribute the Golden Globe Awards through 2011. Ex. 4.  In October 2010, dcp again executed another exercise of options directed to HFPA, which was identical but for the date to the 2001 document, to produce and distribute the Golden Globe Awards through 2018.  (Ex. 20.)

9.     HFPA claims that dcp had no right to enter into a broadcast license agreement with NBC for any year after 2011 and that the 2010 exercise of options by dcp to extend its agreement with HFPA is invalid.  Defendants disagree.  They contend that the parties' agreement, as amended in 1993, permitted both the 2010 extension of the dcp-NBC license and the 2010 exercise of options, just as it permitted the 2001 extension and exercise of options.

10.     The crux of the parties' dispute is whether the 1993 Amendment should be interpreted: (a) to permit dcp to exercise options beyond the eight options specified for the years 1998-2005 upon any "extensions, renewals, substitutions or modifications" of the dcp-NBC license agreement only if HFPA approves of any such "extensions, renewals, substitutions or modifications," as HFPA contends; (b) to permit dcp to exercise only the eight options specified for the period 1998-2005 during that time or thereafter only in the event of a *force majeure* event, as HFPA alternatively contends; (c) to permit HFPA to revoke any options granted in the 1993 Amendment, as HFPA alternatively contends; or instead (d) to permit dcp to exercise options beyond the eight specified for the years 1998-2005 upon any "extensions, renewals, substitutions or modifications" of the dcp-NBC license agreement even without HFPA's approval, as Defendants contend.

11.     This action was commenced by HFPA on November 17, 2010

5

1    (Dkt. No. 1), and an amended complaint was filed on March 9, 2011 (Dkt. No.

2    50).  Defendant dcp filed counterclaims for declaratory relief on March 28,

3    2011.  (Dkt. No. 53.)

4         12.    Pursuant to Court order (Dkt. No. 38), the case was bifurcated on

5    February 21, 2011.  Phase I is limited to: "[i]nterpretation of and declaratory

6    relief or equitable relief (*e.g.*, reformation) as to who has the rights and/or

7    options under the parties' 1987 'Golden Globe Awards' Agreement, as

8    amended, to produce and license the television broadcast of the Golden Globe

9    Awards Show after 2011."

10        13.    Both parties filed motions for summary judgment.  On August 8,

11   2011, Judge Fairbank granted Defendants' motion with respect to HFPA's

12   reformation claim, ruling that the claim is barred by the statute of limitations.

13   (*See* Dkt. No. 182 at 1-2, 5.)

14        14.    Based on these findings of fact and conclusions of law, HFPA's

15   claim for declaratory relief is denied, and Defendants' claim for declaratory

16   relief is granted.  The Court finds that, pursuant to the 1993 Amendment of the

17   1987 Agreement, (a) dcp has the rights to produce and distribute the Golden

18   Globe Awards show through the current term of the dcp-NBC Agreement (2018)

19   and (b) dcp also has irrevocable options granted by HFPA to do so for any

20   further "extensions, renewals, substitutions or modifications of the NBC

21   Agreement," with or without HFPA's approval.  (*See* Exs. 3, 576.)

22

23   **II.    THE SURROUNDING CIRCUMSTANCES AND THE PARTIES'**
     **COURSE OF DEALING PRIOR TO EXECUTION OF THE**
24   **1993 AMENDMENT**

25        **A.    The 1983 Agreement Between dcp And HFPA**

26        15.    At the commencement of the HFPA/dcp relationship, the parties

27   shared the objective of getting the Golden Globe Awards show back onto, and

28   maintaining it on, a national broadcast network. (RT 367:13-368:23, 382:14-23,

(La Maina 1/25/12); RT 1188:1-8 (Berk 2/1/12); RT 1078:20-25 (Orlin 2/1/12);
RT 1568:10-15, 1618:2-1619:6, 1631:13-1632:1 (Van Blaricom 2/3/12).)

16.     In January and February 1983, HFPA and dcp entered into and
documented an agreement in which HFPA granted dcp the right to produce and
distribute the January 1983 Golden Globe Awards show and four (4)
consecutive, exclusive, and irrevocable options to produce and distribute the
1984, 1985, 1986, and 1987 Awards shows.  The agreement is dated "as of"
January 7, 1983, revised January 19, 1983, January 27, 1983, and February 28,
1983 (the "1983 Agreement").  (Exs. 5 (agreement), 203; RT 361:12-364:2 (La
Maina 1/25/12).)  dcp did not receive what the parties referred to as "end-of-the-
deal protection," such as rights of first negotiation and first refusal.  (RT 357:21-
360:6 (La Maina 1/25/12).)  (These terms are defined or described below, in ¶
18.)

### B.     The 1987 Agreement Between dcp And HFPA

17.     On July 20, 1987, HFPA and dcp entered into an agreement by
which HFPA granted dcp five (5) consecutive, exclusive, and irrevocable
options to produce and distribute the Golden Globe Awards show for the years
1988 through 1992.  The agreement is dated "as of" March 13, 1987, revised
July 15, 1987 (the "1987 Agreement").  (Ex. 1 (agreement); RT 370:15-372:4
(La Maina 1/25/12).)

18.     In the 1987 Agreement, dcp sought and obtained end-of-the-deal
protection in the form of rights of first negotiation and first refusal.
Specifically, Paragraph 1(a) of the 1987 Agreement provides that, if dcp had
exercised all of its options under the agreement, dcp and HFPA must enter a 30-
day exclusive Negotiating Period 30 days "after the date of first broadcast of the
1992 Awards Presentation."  (Ex. 1.)  This is the "right of first negotiation."
Paragraph 1(b) of the 1987 Agreement provides that if the parties do not reach
an agreement during the Negotiating Period HFPA could offer rights to the show

to another party, but not on terms less favorable than dcp's last offer, and only after it gives dcp a right to accept those terms.  This is referred to as dcp's right of first refusal and it was to be "applicable until such time as HFPA shall have entered into an agreement with a third party pursuant to all of the foregoing provisions or July 15, 1992, whichever first occurs."  (Ex. 1.) These two provisions were the subject of negotiations between dcp and HFPA prior to the execution of the 1987 Agreement.  (Exs. 81, 103, 316; RT 372:6-13 (La Maina 1/25/12).)

19.    Paragraph 6 of the 1987 Agreement addresses "creative control" over the show and provides that HFPA shall have creative control unless dcp licenses the show for national television network broadcast, in which case "dcp and HFPA shall have mutual creative control . . . ." (Ex. 1; RT 372:14-18 (La Maina 1/25/12).)

20.    (a)  Paragraph 7 of the 1987 Agreement—which relates to "television production aspects" of the Golden Globe Awards and identifies dcp's rights with respect to distribution and exploitation of its "television production(s)"—provides that dcp alone shall "have control over all matters relating to the distribution and exploitation of the rights granted to it pursuant to this agreement."  (Ex. 1; RT 372:19-373:7 (La Maina 1/25/12).)

(b)  Paragraph 9 of the 1987 Agreement provides that dcp will "provide copies of all contracts relating to the exercise of its rights pursuant to this agreement to a designated representative of HFPA for informational purposes . . . ." (Ex. 1; RT 373:8-374:3 (La Maina 1/25/12).)

21.    The 1987 Agreement expressly provides HFPA a right of "prior approval" in Paragraph 10, but that approval right is limited to dcp's issuance of publicity relating to the show.  (Ex. 1; RT 374:4-11 (La Maina 1/25/12).)

22.    Paragraph 19 of the 1987 Agreement states: "This agreement

contains the entire agreement of the parties, supersedes all prior negotiations and/or agreements, and may only be or amended or modified by written instrument signed by the party to be charged.  Neither party has entered into this agreement in reliance upon any promise or representation not contained in this agreement." (Ex. 1.)

23.     In 1988, dcp secured an agreement with the national cable network TBS for a significantly higher license fee than had been available during the years of syndication.  In that agreement, dcp granted TBS rights to televise the Golden Globes Award Show for two additional years (1991 and 1992).  The agreement is dated June 17, 1988.  (Ex. 150.)

24.      In a letter to the HFPA Board dated August 30, 1988, Philip Berk, a longtime and key member of HFPA, wrote, in relevant part: "Of course we are indebted to Dick Clark for rescuing the Golden Globe Show in its darkest hours, but by the same token we shouldn't allow ourselves to be taken advantage of.  Perhaps we acted too hastily in giving Dick Clark a blanket endorsement of the Turner agreement.  We might have asked for tentative approval and additional time to study the deal before we gave them carte blanche.  I trust that our unanimous vote is not legal and binding."  (Ex. 641.)  Although there is no evidence that Berk or the HFPA actually took further steps to repudiate HFPA's consent to the TBS-dcp agreement, this communication is an early example of the unorthodox manner in which some of HFPA's key representatives sometimes acted in their dealings with dcp.

## C.     The 1989 Agreement Between dcp And HFPA

25.     In November 1989 dcp and TBS arranged to enter into another agreement.  The 1989 dcp-TBS Agreement provided TBS with rights to televise the show through 1995.  Under the 1987 Agreement, however, dcp had options to produce and distribute the Golden Globe Awards only through 1992.  To allow dcp to enter into and execute the 1989 TBS Agreement, HFPA and dcp

9

entered into an amendment to the 1987 Agreement, dated November 13, 1989, by which HFPA granted dcp five (5) additional options to produce and distribute the Golden Globe Awards show for the years 1993 through 1997.  The amendment is dated November 13, 1989 (the "1989 Amendment").  (Ex. 2 (agreement); RT 380:21-382:23 (La Maina 1/25/12).)

26.    On November 6, 1989, a meeting of the HFPA Membership was held.  dcp representatives were present, and HFPA's agreement with dcp was discussed.  (Ex. 154.)  At that meeting, HFPA's President stated that "[t]he [1989] agreement would essentially be the same terms as the last contract," and a vote was then taken by the Membership without the Membership having reviewed the written agreement.  (Exs. 154, 789 (Soria Decl. ¶ 35 ("The members were not shown a copy of the 1989 amendment.").)  The members approved the agreement.

27.    Consistent with HFPA's usual practice, the membership approval of  the 1989 Amendment took place outside the presence of dcp.  (Ex. 154; RT 1261:13-1262:10 (Berk 2/2/12).)

28.    In the 1989  Amendment, as in 1987, dcp secured end-of-the-deal protections.  They provided that dcp would continue to have rights of first negotiation and first refusal.  The 1989 Amendment modified the 1987 Agreement (and the rights of first negotiation and first refusal granted there) as follows: "This will also confirm that the reference in Paragraph 1(a) to '1992' shall be changed to '1997' and the reference to July 15, 1992 in Paragraph 1(b) of the Agreement shall be changed to 'July 15, 1997.'"  (Ex. 2.) In addition, the 1989 Amendment provided dcp with options sufficient to cover dcp's grant of rights to TBS under the 1989 TBS Agreement and two additional options for the years 1996 and 1997.  (Ex. 2; RT 70:19-73:5 (La Maina 1/24/12); RT 380:21-382:23 (La Maina 1/25/12).)  The 1989 Amendment provides: "Except as stated above, all of the terms of the [1987] Agreement shall remain in full force and

1    effect."  (Ex. 2.)

2

3    **III.    THE 1993 AMENDMENT AND THE EXTENSIONS CLAUSE**

4        **A.    dcp Secures An Agreement For The Golden Globe Awards To
               Air On NBC**

5

6        29.    In 1993, with four years still remaining on its contract with HFPA,

7    dcp informed HFPA of an opportunity to secure a network broadcast license for

8    the Golden Globe Awards show.  (Ex. 157; RT 72:18-73:23, 76:15-77:7 (La

9    Maina 1/24/12).)

10        30.    In April 1993, dcp asked HFPA's Board to grant it five additional

11    annual options so it could pursue that opportunity.  The HFPA declined to grant

12    additional options up front (Ex. 160) but HFPA did authorize dcp to "go ahead

13    with negotiations for the purpose of obtaining a multi-year contract for the

14    Golden Globe Awards Show with a television network" and stated that, "if such

15    a contract is achieved through [dcp's] efforts, [dcp's] contract with the

16    Hollywood Foreign Press Association will be renewed to cover the number of

17    years with the network."  (Exs. 105, 179.)

18        31.    On May 3, 1993, in a letter to active HFPA members, HFPA's

19    President asked those members to indicate their approval of the Board's decision

20    authorizing dcp to "research the possibilities of a more favorable deal for our

21    Golden Globe Awards—and, if such a deal is made with a network, to extend the

22    contract with the said production company [*i.e.*, dcp] to cover the network

23    contract."  (Ex. 6.)

24        32.    From April to September 1993, dcp and NBC negotiated the terms

25    of a proposed broadcast license agreement whereby NBC would agree to license

26    the rights to broadcast three Golden Globe Awards shows for the years 1996

27    through 1998, with an option in favor of NBC to broadcast three additional

28    shows for the years 1999 through 2001, and, if that option were exercised, an

additional option in favor of NBC to broadcast four additional shows for the years 2002 through 2005 (the "dcp-NBC Agreement"). (Exs. 158, 177.)  If NBC exercised both options, it would have a right of first negotiation and first refusal to seek to obtain continued broadcast rights to the Golden Globe Awards show beyond 2005. (Exs. 38, 575.)  The proposed 3-3-4 broadcast license could be accelerated two years if TBS relinquished its rights to televise the 1994 and 1995 Shows.  (RT 146:16-147:4 (La Maina 1/24/12); Ex. 177.0004.)  Thus, the proposed broadcast license was subject to many permutations.  It could begin in 1994 or 1996.  It could run three years if NBC exercised no option, six years if NBC exercised only its first option, and 10 years if NBC exercised both of its options.  (Exs. 110.0004-05, 177; RT 107:8-108:23 (La Maina 1/24/12).)  Accordingly, NBC's commitment to televise the show could expire as early as 1996 (if the contract was accelerated to 1994 and NBC did not exercise any options) and as late as 2005 (if the contract commenced in 1996 and NBC exercised both of its options).  (Exs. 110.0004-05, 177; RT 146:16-147:4 (La Maina 1/24/12).)

33.    On September 2, 1993, meetings of the HFPA Membership and Board were held.  The status of the dcp-NBC negotiations regarding a proposed agreement was discussed.  (Exs. 7 ("She [Mirjana Van Blaricom, who was HFPA's President at the time] said NBC network is in negotiations with Dick Clark Productions… Dick Clark and the board of directors will discuss the details and it will be brought to the membership" and reflecting that "[q]uite a number of members participated in the discussion of the NBC Golden Globe Award subject."), 107 ("She said in the very near future there will be a meeting of the General Membership with Dick Clark Production to discuss the NBC network ---- Golden Globe Award deal."); RT 1554:15-1555:8, 1619:7-1621:12 / / /

(Van Blaricom 2/3/12).)  The future meeting Van Blaricom referred to was held

on September 22, 1993.

**B.    The September 22, 1993 Meeting**

34.    A most unusual feature of this contract dispute is that there is an undisputed verbatim transcript of the September 22, 1993 HFPA Members meeting that La Maina attended.  (Ex. 110.)  Understandably, the parties attach critical importance to what was said – and not said – at that meeting, and they referred to the transcript in their extensive questioning of the several trial witnesses who were there:  La Maina, Berk, Orlin, Soria and Van Blaricom. Both sides agree that what the transcript reflects is relevant to understanding the very language of the 1993 Amendment, the parties' respective communicated intent, and the object and nature of the 1993 Amendment.

35.    Certain aspects of the September 22, 1993 meeting bear on the degree to which it supports or refutes each side's contentions.

(a)  First, Dick Clark was present and he spoke enthusiastically (and with no small amount of pride) about the breakthrough dcp had achieved in the proposed NBC deal.  Ex. 110, p.9.[1]  It is highly likely that for many of the HFPA attendees, whose professional lives revolved around the personalities and lives of celebrities, Clark's very presence induced or fueled a sense of euphoria. The potential deal with NBC - - a multi-year network commitment for the Golden Globes Award Show, after so many years of second-tier broadcasts – was extremely important and exciting to HFPA.

(b)  Second, both before and after the statements that the Court has summarized below were made, many of the HFPA members spent inordinate amounts of time focusing on trivial matters.  They fussed about the start time for the broadcasts; the length of the show (2 v. 3 hours); the format (how much entertainment? dinner setting v. theatre?); what day of the week the show would

---

[1]  References to the pages are not to the Bates stamp, but to the original transcript.

13

be broadcast; and whether to serve soup or caviar (p. 19), etc.  Moreover, they bickered about whether members were hogging the floor (p. 16).   This unbusiness-like display of misplaced priorities was characteristic of how HFPA often functioned throughout the years,[2] and it is consistent with the inference – which this Court draws – that on September 22, 1993 most of the HFPA members were far less interested in the terms of the dcp-HFPA contract that La Maina left behind for them to review than they were with the heady prospect of being on NBC.  This is confirmed persuasively by the testimony of Van Blaricom, who stressed that - - referring to the fact that HFPA's previous deal with CBS had been cancelled - - the members' biggest concern was "not to be cancelled; that we behave."  (RT 1626:6 (Van Blaricom 2/3/12).)

        (c) Third, La Maina indicated that he understood that the HFPA members looked to him to provide full and accurate information.  (RT 173:2-11; 183:22-184:11 (La Maina 1/24/12).)  Although La Maina described the principal terms of the "NBC Agreement" he did not provide HFPA with a copy of the dcp-NBC agreement.  (As is shown below, however, he did leave copies of the amendment

---

[2] The conduct of HFPA members at many of the meetings for which there are tapes, transcripts or minutes is astounding.  As Van Blaricom acknowledged, "We had arguments on everything . . . [such as] furniture . . . ."  (RT 1631 (Van Blaricom 2/3/12).)  For example, at a general membership meeting held on October 7, 1995, "Judy Solomon moved that the Minutes be dispensed with.  There was a loud roar of Nos from the floor."  (Ex. 263-1.)  There then ensued such disagreement that the president called a recess and "then stormed out of the room. [Then] members began shouting from the floor that the Minutes be read."  (*Id.*)  A few weeks previously, a number of members had noted in writing that the president had "belittled and attacked" another member at a meeting.  (Ex. 629-2.)  Even when there were no outbreaks of hostility and acrimony, HFPA members would get side-tracked by minutiae.  For example, an attendee at one of the 2009 discussions with dcp about the parties' relationship noted, "To my surprise the discussion moved to the 6 or 12 tickets they [dcp] are entitled to.  That was a diversion uncalled for and the cost just a drop in the bucket."  (Ex. 257.)

to the dcp-HFPA Agreement that dcp sought.)

(d) Fourth, although there are references to the 1993 Amendment in the transcript of the September 22, 1993 meeting, nowhere does any witness actually recite any of the language in that agreement.  At trial, counsel sought to have the witnesses who were present on September 22, 1993 give testimony supportive of their respective side's position on the meaning of the extensions clause.  While that questioning was entirely appropriate, the September 22, 1993 meeting occurred more than 18 years ago.  To the extent that witnesses were, in essence, being asked to go beyond the transcript and recount from their memories what they believed was "really going on," the Court finds that such testimony is of limited value, especially the testimony of the HFPA witnesses (as opposed to La Maina throughout his stint on the stand, who was the most consistently credible witness).

36.     In any event, the Court finds that in the transcript (Ex. 110) each side can point to statements that support its contentions about the 1993 Amendment.  Here is a summary.

| Item | Speaker | Statement | Original Transcript Page |
|------|---------|-----------|--------------------------|
| 1 | La Maina | NBC contract not firm for 10 years. 3 + 3 + 4.  "A ten year term if they [NBC] exercise all their options." | 11 |
| 2 | "Avik" | You [dcp] negotiate [with NBC] and you tell us and we more or less deal with you. | 15 |
| 3 | La Maina | And always subject to your approval. | 15 |

| 4 | La Maina | I'm asking that the contract be extended for the period of time necessary to fulfill the NBC agreement. | 18 |
|---|---|---|---|
|   | Jean | It sounds fair. | 18 |
| 5 | Orlin | The integrity of the show and the financial terms both sound very advantageous to us, but . . . "How long are we associated with Dick Clark Productions?" | 20 |
| 6 | Orlin | " . . . how is our tie-in with Dick Clark working?" | 20 |
| 7 | La Maina | " . . . we're asking you to extend our contract for as long as necessary to satisfy the NBC term and not longer than that . . . I hope it's ten years." | 20 |

| 8 | La Maina | "Our deal with NBC is finished. This is as a result of six months negotiation guaranteed so long as you say it's a deal." | 21 |
|---|---|---|---|
| | Berk | "I'm 100% for it." | 21 |
| | Van Blaricom | "What you should understand. Dick Clark is us.  We do share everything with them so whatever they sign; whatever they get we get half of it so it's in their interest to achieve the best deal so you should understand it's the same like (Inaudible).  Their signing is like our signing." | 21 |
| | La Maina | "Yes." | 21 |
| 9 | La Maina | "The sequence of events that everyone understands is you execute an amendment with us that says we extend Dick Clark for as long as necessary to fulfill the NBC deal.  The minute that's signed, I sign an NBC contract and we're finished." | 23 |

| 10 | Van Blaricom | "Let's - - who approves of their presentation can raise their hands so these guys can go ahead and - - with the presentation.  Who approves and that they go ahead and they have to sign.  Approve the contract." | 26 |
| 11 | La Maina | "We need a - - all right.  Let me do it again.  We need a - - we need a verbal approval right now to close our deal with NBC." | 26 |
| 12 | La Maina | "So we - - we now have a favorable approval to close our deal with NBC.  The second thing we have - - unanimous.  The second thing we need is a formal extension of our contract.  The minute that's signed, I sign the NBC deal and we're finished so you now have the papers to discuss with your attorneys or whoever you'd like to discuss them with." | 26 |

| 13 | "Yani" | "To make it for the record, could we have a signed . . . instead of a verbal?" | 27 |
|----|--------|--------------------------------------------------------------------------------|----|
|    | Van Blaricom | "Everybody can just put a yes on a sign-in sheet by their name. Everybody put yes.  Okay? | |
| 14 | | The sign-in sheet (Ex. 111) contained 31 outright "yes" votes and two "yes" votes with not entirely legible qualifications.  No one voted "no." | |

37.    Items 1 and 7 of the foregoing summary support Plaintiff's contention that the separately-executed 1993 Amendment must be interpreted to have had a maximum ten year duration.  In addition, items 4 and 9 could be viewed as consistent with that construction, given La Maina's statements in items 1 and 7.  Moreover, item 3 supports Plaintiff's contention that HFPA did not give up its right of approval over any deal with NBC (or any entity, for that matter) that dcp may have negotiated.

38.    On the other hand, items 2, 4 and 9 support dcp's view that so long as there was or would be an NBC deal, dcp could not and would not be put out of or kept out of the picture.  Moreover, items 5 and 8 reflect just how pleased HFPA was with the deal that dcp had secured from NBC, and items 10 and 13 show that the huge benefits of that deal were far more important to almost all of the members than were the precise terms or duration of the "papers" that La

Maina was leaving for them to discuss with their attorneys (item 12).  In addition, that La Maina understood and accepted that the membership had to approve those papers, and that he was perfectly receptive to having the membership discuss those papers in his absence and with their own attorneys, utterly refutes the notion that he or dcp were intent on deceiving HFPA or taking advantage of it.  Finally, La Maina's comments in items 11 and 12 indicate that the deal with NBC was approved orally before he left the meeting.

39.   HFPA's then-president Van Blaricom testified that on September 22, 1993 the HFPA members continued to meet after La Maina left, that the 1993 Amendment was read and explained to members, (it is not clear whether it was read "by" or read "to" them), and that a half-hour discussion ensued.  (RT 1601:11-17; 1602:13-15 (Van Blaricom 2/13/12).)  Van Blaricom further testified that while the specific scenario of dcp extending the NBC deal without HFPA's knowledge or consent was not then discussed, what *was* said did reflect an understanding by the members that as long as dcp kept the show on NBC, dcp had the rights to the show.  ("It was like till death do us part.  Nobody is – we're all happy that we had a deal.  We had nothing at that point.")  (RT 1605:17-1606:3 (Van Blaricom 2/3/12).)

40.   Van Blaricom has a long history of animus towards and bias against HFPA stemming from her separation from HFPA in the mid-1990s.  In 1994, the HFPA determined that Van Blaricom had violated HFPA rules and standards by taking HFPA funds without approval and by secretly invoicing and accepting payment from dcp without approval.  (Exs. 346, 497, 629, 702; 789 (Soria Decl. ¶ 51).)  Van Blaricom was later expelled from the HFPA, unsuccessfully sued for reinstatement, established a rival international press organization, and threatened publicly to embarrass HFPA.  (Exs. 348, 349, 350, 351, 626, 789 (Soria Decl. ¶ 52).)  (*See* ¶¶ 158-160.)

41.     Van Blaricom's grievances concerning HFPA were evident in her trial testimony, and her testimony about this membership discussion on September 22, 1993 was not corroborated by any other HFPA member who was present nor by any documentation.  Nevertheless, her demeanor, the post-September 22, 1993 circumstances described below and the behavior of the HFPA members reflected in Exhibit 110 and discussed above make this portion of her testimony  plausible.

42.     Prior to or during the September 22, 1993 meeting, dcp provided HFPA three copies of the 1993 amendment to the 1987 Agreement that it had drafted.  All were signed by La Maina on behalf of dcp and given to Van Blaricom.  (Exs. 3, 110, 111, 506, 577; RT 395:24-396:5; 396:21-397:20 (La Maina 1/25/12); RT 1573:9-12; 1574:14-1575:24 (Van Blaricom 2/3/12).) As noted above, La Maina told the Membership at the September 22, 1993 meeting: "so you now have the papers to discuss with your attorneys or whoever you'd like to discuss them with." (Ex. 110 at 26.)

43.     There is no evidence that at the September 22, 1993 discussion following La Maina's departure that Van Blaricom testified about, she distributed copies of the 1993 Amendment that La Maina left behind at the meeting, either to the HFPA Board or to the Membership.  But even if the document was not distributed at that time, it was viewed soon thereafter by some HFPA members and accessible to all of them, as the following findings demonstrate.

## C.     1993 Events Post-September 22

44.     On September 24, 1993, La Maina and Van Blaricom spoke, and, at Van Blaricom's request, La Maina recommended three experienced entertainment attorneys to Van Blaricom.  (Ex. 344.)

45.     On September 24, 1993, Van Blaricom, as President of HFPA, placed and  dated her signature on the 1993 Amendment, "9•24•1993." (Exs. 3

(agreement), 577, 648; RT 1589:18-20 (Van Blaricom 2/3/12).) Van Blaricom
returned the countersigned 1993 Amendment to dcp five days later, on
September 29, 1993. (RT 1590:1-11, 1593:6-1601:10 (Van Blaricom 2/3/12);
RT 400:2-16 (La Maina 1/25/12).)

46.     Van Blaricom signed and dated two of the three copies of the 1993
Amendment.  She returned one copy to dcp (Ex. 577) and kept one copy in
HFPA's files (Ex. 3).

47.     Before Van Blaricom returned an executed copy of the 1993
Amendment to dcp, she consulted with Eric Weissmann  (who was not one of
the lawyers recommended by La Maina) of the law firm of Weissmann, Wolff,
Bergman, Coleman & Silverman.  (Ex. 794 (4/26/11 Van Blaricom Decl., Dkt.
No. 270-1, ¶ 6); RT 1590:1-11, 1592:2-14, 1593:6-1601:17, 1622:25-1624:15
(Van Blaricom 2/3/12).) On September 27, 1993, Van Blaricom left a message
with a secretary of attorney Weissmann. (Ex. 502.) Then, on September 29,
1993, Weissmann and Van Blaricom met for approximately 30 minutes.  (Ex.
503.)

48.     Weissmann was a highly respected, sophisticated entertainment
attorney. (RT 400:17-401:7 (La Maina 1/25/12); RT 1582:9-1583:6, 1622:25-
1623:9 (Van Blaricom 2/3/12).)

49.      At or before the September 29, 1993 meeting with Weissmann,
Van Blaricom gave him the third copy of the 1993 Amendment, which was
executed by dcp, but not HFPA.  (Ex. 506 (copy of 1993 Amendment produced
from files of Weissmann Wolff); RT 1598:19-1600:4, 1623:12-1624:15 (Van
Blaricom 2/3/12).)

50.     After meeting with Weissman, Van Blaricom returned the
countersigned 1993 Amendment to dcp's President (La Maina).  (Ex. 180; RT
400:2-16 (La Maina 1/25/12); RT 1593:18-25, 1601:4-10 (Van Blaricom
2/3/12).)  However, Weissman did not testify at trial, and other than Van

1   Blaricom's testimony that she did not return the contract to La Maina until

2   "when I got okay from Eric Weissman", (RT 1593:10-20), (Van Blaricom

3   2/3/12), there is no evidence that he reviewed the 1993 Amendment with Van

4   Blaricom before she returned it, with her signature affixed, to La Maina.

5        51.    Prior to trial, La Maina had never seen HFPA's bylaws.  (RT

6   479:5-9 (La Maina 1/26/12).)  Nevertheless, La Maina was aware that Board or

7   Membership approval of contracts was required, but not how it was given.  (RT

8   192:10-12 (La Maina 1/24/12).)

9        52.    When La Maina received the countersigned 1993 Amendment (Ex.

10  180), he reasonably believed that all necessary conditions for Van Blaricom's

11  execution of the document had been satisfied and that she had authority to

12  execute the document.  RT 222:24-223:16 (La Maina 1/24/12); (La Maina

13  1/25/12); RT 492:25-494:13 (La Maina 1/26/12).)  Indeed, Van Blaricom's

14  actions in this instance (*i.e.*, signing the agreement in her capacity as President

15  of HFPA) were consistent with La Maina's prior dealings with HFPA, where he

16  relied on the signature of the designated HFPA representative as confirmation

17  that all necessary internal steps had been taken by HFPA to permit it to enter

18  into an agreement with dcp. (RT 35:19-39:3, 154:22-155:16 (La Maina 1/24/12);

19  RT 442:3-443:3 (La Maina 1/26/12).)  At the time he received the countersigned

20  1993 Amendment from HFPA, La Maina also had reason to believe that Van

21  Blaricom had consulted with counsel, given his recommendation that she do so.

22  (Ex. 344; RT 396:15-401:13 (La Maina 1/25/12).)  In any event, La Maina did

23  not consider the 1993 Amendment "approved" until he received the signed copy

24  of the amendment from Van Blaricom.  (RT 492:25-495:5 (La Maina 1/26/12).)

25       53.    After receiving the countersigned 1993 Amendment from Van

26  Blaricom on September 29, 1993, La Maina sent a letter to Van Blaricom

27  thanking her for sending the executed 1993 Amendment "as authorized by

28  [HFPA's] membership . . . ."  He informed Van Blaricom that "based on that

extension [i.e., the 1993 Amendment], we have executed the NBC agreement."
In this letter he also mentioned that he understood Weissmann was functioning
as HFPA's lawyer.  (Ex. 180.)

54.    There is no evidence that before 2002 - - more than eight  years
later - - any representative of HFPA ever contacted dcp to correct or contradict
the statement in La Maina's September 29, 1993 letter (Ex. 180) that the
executed 1993 Amendment was "authorized by [HFPA's] membership." (RT
421:12-18 (La Maina 1/25/12).)

55.    Van Blaricom had kept the HFPA membership apprised of
developments regarding both the proposed dcp deal with NBC and the
HFPA/dcp relationship, including dcp's desire to continue to produce and
distribute the Golden Globe Awards so long as it remained on NBC, both before
and after September 22, 1993.  (RT 1554:2-1556:3, 1564:10-1565:15, 1566:9-
18, 1577:18-1578:9, 1596:24-1597:4, 1601:4-1608:21 (". . . and members
understood it perfectly – as long as Dick Clark keep us on NBC, he have right to
show.  It was like till death do us part . . . ."), 1617:14-1621:12, 1624:24-1626:6
(Van Blaricom 2/3/12).)  The Membership's primary concern at the time was to
remain on the network.  (RT 1578:15-25, 1618:18-1619:6, 1625:24-1626:6 (Van
Blaricom 2/3/12).)

56.    Van Blaricom reasonably believed she was authorized to execute
the 1993 Amendment based on the meetings on September 22, 1993 (RT
1569:20-1572:22, 1589:1-10, 1609:6-1610:13 (Van Blaricom 2/3/12)), and on
the communications she had with HFPA  members that preceded September 22,
1993 (RT 1554:2-1556:3, 1564:10-1565:15, 1566:9-18, 1577:18-1578:9,
1596:24-1597:4 1601:4-1608:21, 1624:24-1626:6, 1617:14-1621:12 (Van
Blaricom 2/3/12)).

57.    On October 1, 1993, NBC delivered to dcp an executed copy of the

dcp-NBC Agreement, which granted NBC rights to broadcast three Golden Globe Awards shows for the years 1996 through 1998, an option to broadcast three additional shows for the years 1999 through 2001, and, if that option were exercised, an additional option to broadcast four additional shows for the years 2002 through 2005.  The agreement provided that, if NBC exercised both options (for a 10-year commitment), it would have rights of first negotiation and first refusal for continued broadcast rights to the Golden Globe Awards beyond 2005.  (Ex. 575.)  The dcp-NBC Agreement is dated "as of" September 9, 1993, as revised September 24, 1993.  (Ex. 575.)

58.    Unbeknownst to dcp, on October 5, 1993, HFPA member Ika Panajotovic, who now is deceased, wrote to Van Blaricom, expressing concerns about the 1993 Amendment and suggesting that "the entire membership should be given a copy of the written proposal to evaluate, agree and/or not agree by voting, or to improve on the deal by saying 'yes' or 'no' or by a legal fax" and that "HFPA should not sign a one sided long term deal unless it is irrevocably guaranteed for three years."  (Ex. 8.)  Given that this document is the only piece of written evidence from 1993 reflecting a concern by an HFPA member about the terms of the 1993 Amendment, it is telling that what Panajotevic was concerned about was not the duration of the agreement, but whether HFPA could obtain an assurance that NBC would not pull out.

59.    On October 5, 1993, HFPA's attorney, Weissmann, met with HFPA representatives.  Panajotovic was unable to attend the meeting.  (Exs. 8, 504; RT 1587:16-1589:10 (Van Blaricom 2/3/12).)

60.    On October 7, 1993, a meeting of the HFPA Membership was held. This time Panajotovic was there.  The dcp-NBC Agreement and HFPA's agreement with dcp were discussed among other things, and "a detailed explanation" of the relationship with dcp was given.  No one from HFPA questioned or disaffirmed the 1993 Amendment.  (Ex. 263-2; RT 1624:16-

25

1  1626:6 (Van Blaricom 2/3/12).)

2      61.    On October 12, 1993, dcp sent HFPA's attorney (Weissmann)

3  executed copies of the 1993 Amendment, the 1989 Amendment, the 1987

4  Agreement, the dcp-NBC Agreement, and the dcp-TBS agreements. (Ex. 676;

5  RT 421:19-422:21.  (La Maina 1/25/12).)

6

7      **D.    The Negotiation, Drafting And Execution Of The 1993
Amendment**

8

9      62.    In conjunction with dcp's negotiations with NBC in 1993, dcp and

10  HFPA agreed on an amendment to the 1987 Agreement (as amended by the

11  1989 Amendment).   The entire text of the 1993 Amendment (Ex. 3) is attached

12  to this document as Exhibit 2.

13      63.    (a)  The 1993 Amendment provides, in relevant part:

14      "This will confirm that the Agreement [between dcp and HFPA] is hereby

15  further amended to provide that HFPA grants to dcp eight (8) additional,

16  consecutive, exclusive, and irrevocable options to acquire the exclusive right to

17  produce a live television broadcast of and to produce on tape or film the Awards

18  for each of the years 1998 through and including 2005, and *for any extensions,*

19  *renewals, substitutions or modifications of the NBC Agreement*, and to exploit

20  such productions in all media throughout the world in perpetuity."  The

21  emphasized language is referred to as the "extensions clause."

22      (b)  The 1993 Amendment also modified Paragraph 1(a) of the

23  1987 Agreement, as amended by the 1989 Amendment, as follows: "This will

24  also confirm that the reference to '1997' in Paragraph 1(a) of the Agreement as

25  amended shall be changed to, '2005, or the date of the broadcast of the last

26  Awards under the NBC Agreement, whichever is later…'"  (Exs. 3, 577.)

27  Paragraph 1(a) of the 1987 Agreement had originally provided that, if dcp has

28  exercised all of its options under the agreement, dcp and HFPA would enter a

26

30-day exclusive Negotiating Period 30 days "after the date of first broadcast of the 1992 Awards Presentation."  (Ex. 1; RT 386:11-387:13 (La Maina 1/25/12).)

(c)  The 1993 Amendment also modified Paragraph 1(b) of the 1987 Agreement, as amended by the 1989 Amendment, as follows: "This will also confirm that the reference to 'July 15, 1997' in Paragraph 1(b) of the Agreement as amended shall be changed to read: 'July 15, 2005, or July 15 after the last broadcast of the Awards under the NBC Agreement, whichever is later.'" (Exs. 3, 577.)  Paragraph 1(b) of the 1987 Agreement had originally provided that, after the Negotiating Period, dcp's right of first refusal "shall be applicable until such time as HFPA shall have entered into an agreement with a third party pursuant to all of the foregoing provisions or July 15, 1992, whichever first occurs."  (Ex. 1; RT 386:11-387:13 (La Maina 1/25/12).)

(d)  The 1993 Amendment provides that "[e]xcept as stated above, all of the terms of the [1987 Agreement, as amended] shall remain in full force and effect."  (Exs. 3, 577.)

64.    Unlike in 1983, 1987 and 1989, although La Maina and Van Blaricom discussed the 1993 amendment with each other (see below), the parties did not exchange drafts or written communications about the specific language of the 1993 Amendment.  dcp drafted that document.  (RT 134:1-138:7) (La Maina 1/24/12).

65.    La Maina told Van Blaricom (in his words): "Hey Mirjana, you know, if we're successful on NBC, we don't -- we don't -- we do not want to be cut out of the deal.  We want to be part of the future of the show."  (RT 122:4-24 (La Maina 1/24/12); *see also* RT 155:22-156:15 (La Maina 1/24/12).) La Maina could not remember dates or provide other specific details concerning what he said to Van Blaricom or what she said to him.  When asked whether he could remember anything more about their conversation beyond what he described, La Maina indicated he did not recall anything else.  La Maina

admitted that, whatever was said, he did not understand his conversation with Van Blaricom to have resulted in a binding contract.  (RT 122:4-123:2, 124:2-4 (La Maina 1/24/12).)

66.    La Maina and Van Blaricom both testified that the extensions clause was put in the 1993 Amendment to ensure that dcp would remain the producer and distributor of the Golden Globe Awards show on the terms set forth in the 1987 Agreement for as long as the show was broadcast on NBC. (Ex. 794 (4/26/11 Van Blaricom Decl., Dkt. No. 270-1, ¶¶ 6-7); RT 122:4-123:11, 123:21-25; 155:22-156:15 (La Maina 1/24/12); RT 1605:17-1606:3, 1607:18- 1608:2, 1616:22-1617:8 (Van Blaricom 2/3/12).)

67.    La Maina also admitted he never discussed with Van Blaricom the actual words of the so-called "extensions clause" in the 1993 Amendment, nor did he disclose that, under his view, dcp would have the unilateral discretion to extend, renew, substitute, or modify the broadcast license with NBC on whatever terms and for whatever duration it deemed appropriate, without HFPA's knowledge or participation, and even over HFPA's strenuous objection.  (RT 135:5-22; 151:17-153:20; 156:16-157:3; 192:10-193:4 (La Maina 1/24/12).)

68.    The 1993 Amendment was drafted "in-house " by dcp, with the assistance of its outside counsel, Joel Behr,  who was the source for the "extensions clause."  (Ex. 790 (Behr Decl. ¶ 7); RT 138:21-140:10, 143:4-23 (La Maina 1/24/12); RT 1770:4-1774:3 (Behr 2/7/12).)  Behr was familiar with extensions clauses, as he had seen them in contracts between "talent" (*e.g.*, actors, musicians, producers) and talent agents or talent agencies (*e.g.*, William Morris, Creative Artists Agency, International Creative Management).  The language Behr supplied for use in the 1993 Amendment (*i.e.*, the extensions clause) was taken from a talent agency contract that was located in the office of

the law firm at which he was employed in 1993.  (Ex. 790 (Behr Decl. ¶ 7).)

69.     Behr's understanding at the time he supplied the wording of the extensions clause for the 1993 Amendment and at all times thereafter was as follows: A talent agency contract enables a talent agency to negotiate and procure employment on behalf of the agency's client. In return, the talent agency receives a commission on the employment contracts it secures on behalf of its client during the term of the talent agency contract.  If there is an extensions clause in the talent agency contract, the talent agency receives a commission on monies earned under any extension, renewal, substitution, or modification of those employment contracts secured by the agency during the term of the talent agency contract, whether such extensions, renewals, substitutions, or modifications were entered into during or after the term of the talent agency contract.  (Ex. 790 (Behr Decl. ¶ 8).)  An extensions clause protects the talent agency and ensures that it enjoys the full benefit of the relationship that it generated for the client.  Behr's understanding was consistent with industry custom and practice with respect to the use of extensions clauses in talent agency contracts, as outlined below.  (Ex. 790 (Behr Decl. ¶ 8); Ex. 792 (Brooks Decl. ¶¶ 11-13); RT 1851:12-1857:13, 1863:14-1865:7 (Brooks 2/7/12).)

70.     Language substantially similar to the phrase "for any extensions, renewals, substitutions, or modifications" has been used in the entertainment industry in the context of agency agreements, including agency agreements to which dcp had been a party prior to 1993.  (Exs. 550, 696, 697, 792 (Brooks Decl. ¶¶ 11-13); RT 138:9-140:10, 143:4-23 (La Maina 1/24/12); RT 402:13-406:21 (La Maina 1/25/12); RT 1851:12-1857:13, 1863:14-1865:7 (Brooks 2/7/12).)  In those agreements, the phrase was used to ensure that an agent receives commissions not only for any deal secured by the agency during the term of the agency relationship, but also for any extensions, renewals,

substitutions, or modifications of those deals that are obtained after the termination of the agency relationship.  (Ex. 792 (Brooks Decl. ¶¶ 11-13); RT 1407:16-20 (Tenzer 2/2/12); RT 1851:12-1857:13 (Brooks 2/7/12).)

71.    A producer that brokers (or "sources") a deal with an exhibitor of a show, such as dcp did here when it secured a deal with NBC to broadcast the Golden Globe Awards, is acting in a manner somewhat similar to a talent agency that obtains a deal on behalf of a client.  (RT 1863:14-1865:7 (Brooks 2/7/12).) There are, however, differences.  Such a provision typically would not prevent the client from terminating the agent, nor grant the agency the ability to extend, renew, substitute or modify the client's contracts without the client's specific agreement.  (Ex. 778 (Tenzer Decl. ¶ 17); RT 1449:13-16 (Tenzer 2/2/12); RT 1486:17-1487:11 (Tenzer 2/3/12); RT 142:13-143:3 (La Maina 1/24/12).)  Both sides' experts testified that they have never seen the extensions clause, or language like it, used in a television contract or other contract for the purpose of granting additional, potentially perpetual, options or rights to produce a television program.  (Ex. 778 (Tenzer Decl. ¶ 18); RT 1447:7-13 (Tenzer 2/7/12); RT 1799:9-1800:10, 1817:13-19 (Brooks 2/7/12).)  Because of the limitations of the talent agent analogy, and because the language of the extensions clause is not typical in television rights agreements, the Court places minimal weight on the expert testimony.

72.    In the entertainment industry, ensuring that a party is not cut out of a deal after having devoted its resources to developing and securing opportunities for another party is not unique to talent agencies.  Defendants introduced evidence that producers and exhibitors that devote substantial resources to the development, promotion and exploitation of a property (*e.g.*, a film or television show) also desire contractual protection against being cut out of the deal at a later point in time, when the property may have increased in

value.  This may take various forms, including rights of first negotiation and first or last refusal, perpetual options or a grant of rights in perpetuity.  (Ex. 792 (Brooks Decl. ¶¶ 15, 16); RT 740:13-742:17 (Graboff 1/27/12); RT 1846:10-1849:9 (Brooks 2/7/12).)  Thus, absent the extension clause and assuming compliance with the then-existing - - *i.e.*, as of autumn 1993 - - rights of first negotiation/refusal, HFPA could have jettisoned dcp after the end of the last option and entered into a new contract directly with NBC.

73.     Cognizant of this risk,, dcp also sought to protect its investment in other properties it developed and produced, including other recurring events programs such as the Academy of Country Music Awards and Family Friendly Programming, for so long as it continued to exploit those properties.  (Exs. 753, 754; RT 431:17-432:2 (LaMaina 1/26/12).)  dcp's agreement with the Academy of Country Music grants dcp the right to produce and distribute the Awards show for so long as the show is presented by the Academy of Country Music.  (Ex. 753.)

74.      Of all the recurring event programming known to HFPA's expert David Tenzer, the Academy of Country Music Awards and the Golden Globe Awards are the only two instances in which a rights holder has licensed its distribution rights to a production company such as dcp rather than broadcast rights directly to a network.  (RT 1388:8-1389:8, 1422:11-1423:19 (Tenzer 2/2/12); 1488:10-1492:25 (Tenzer 2/3/12).)

75.     There is no evidence of any industry custom or practice that the phrase "and for any extensions, renewals, substitutions or modifications," or variants thereof, is limited to circumstances of *force majeure.*  (*See, e.g.*, Ex. 792 (Brooks Decl. ¶ 20); RT 423:4-10 (La Maina 1/25/12); RT 1407:16-20 (Tenzer 2/2/12).)

## IV.   THE PARTIES' COURSE OF PERFORMANCE SUBSEQUENT TO 1993

### A.   HFPA Representatives Review The 1993 Amendment And Operate Under It Without Objection Until 2002

76.   The Golden Globe Awards show was televised on NBC from 1996 through 2011 under the dcp-NBC Agreement, as extended in 2001, and the 1987 Agreement between dcp and HFPA, as amended in 1989 and 1993.

77.   HFPA's contracts, including the 1987 Agreement and the 1993 Amendment, have been kept in HFPA's offices and were available for review by HFPA members at any time.  (*See*, *e.g.*, Exs. 3 (1993 Amendment produced from HFPA's files), 116 (1995 letter from La Maina forwarding copy of 1993 Amendment to HFPA President Takla-O'Reilly), 576 (1993 Amendment produced from HFPA's files); 648 (redacted January 1997 letter from Weissmann forwarding copy of 1993 Amendment to HFPA President Berk, with extensions clause underlined).[3]

78.   On February 16, 1995, acting on behalf of dcp and in response to a request by HFPA's then- (and current) President Aida Takla-O'Reilly, La Maina provided to HFPA additional executed copies of the 1987 Agreement and all Amendments.  His letter states that "originals and/or copies had been sent to the Hollywood Foreign Press Association and to the various attorneys for the Hollywood Foreign Press on a number of occasions previously."  (Exs. 116

---

[3] Phillip Berk is the current Chairman of HFPA's Board; he was previously a member of HFPA's Board, President of HFPA from 1990-1992, 1996-1998, 2005-2007, and 2009-2011, Vice-President of HFPA from 1986-1988, and Treasurer of HFPA from 2000-2002 and 2003-2005.  Berk was President of HFPA during dcp's and HFPA's 2010 negotiations at the time dcp executed the 2010 dcp-NBC extension and the 2010 Exercise of Options and when HFPA filed this lawsuit.  (Ex. 777 (Berk Decl. ¶ 2).)

(1995 letter from La Maina forwarding copy of 1993 Amendment to HFPA President Takla-O'Reilly), 755; RT 434:11-435:13 (La Maina 1/26/12); RT 1658:1-24 (Takla-O'Reilly 2/7/12).)

79.    In or around 1997, HFPA's outside counsel, Robert Yoshitomi reviewed the 1993 Amendment. (Exs. 10, 134 (1993 Agreement produced from the files of Yoshitomi's law firm); 790 (Behr Decl. ¶ 9); RT 1151:19-1152:21 (Yoshitomi 2/1/12).)[4]

80.    On May 20, 1997, dcp and HFPA entered into a further amendment of the 1987 Agreement. The amendment is dated May 20, 1997 (the "1997 Amendment"). The 1997 Amendment provides that "[e]xcept for these amendments, all other terms of the Agreement remain in full force and effect." (Exs. 10 (agreement), 134 (1993 Amendment produced from the files of Yoshitomi's law firm); 790 (Behr Decl. ¶ 9); RT 435:16-436:16 (La Maina 1/26/12).)

81.    The 1997 Amendment expressly refers to the 1993 Amendment, was drafted by Yoshitomi (with input from dcp) and was executed by Yoshitomi on behalf of HFPA. (Ex. 10; RT 1149:19-1151:8 (Yoshitomi 2/1/12).)

/ / /

/ / /

82.    On March 3, 1998, NBC exercised its first option under the dcp-NBC Agreement, committing to broadcast the Golden Globe Awards from 1999 to 2001.  (Ex. 498.)

_____

[4]Yoshitomi was outside counsel for HFPA from 1997 to the early 2000s when the 1997 Amendment, the 1999 Pre-Show Agreement, the 2001 dcp-NBC Agreement, and the 2001 Exercise of Options all were executed. (Exs. 725-727, 752; RT 809:22-811:25 (Dinnage 1/31/12); RT 1262:19-21 (Berk 2/2/12).)

83.     On October 12, 1999, Helmut Voss, then-President of HFPA, wrote three HFPA representatives (including then-Secretary Dagmar Dunlevy and Managing Director Chantal Dinnage) and asked that they "please try very hard to find the following Board and General Membership minutes in the office until Friday: July 1993, August 1993 and September 1993. If you cannot find them I want to be reasonably certain that they—like so many others—have been lost." (Ex. 11; RT 818:21-820:24 (Dinnage 1/31/12).)

84.     In response to Voss's request, a partial transcript of the September 22, 1993 Extraordinary General Membership Meeting at which the 1993 Amendment was discussed was faxed to Voss on October 13, 1999.  (Exs. 111, 725.0022; RT 853:19-854:16 (Dinnage 1/31/12).)

**B.     The 2001 Extension Of The NBC License**

85.     On May 18, 2001, NBC exercised its second option under the 1993 dcp-NBC Agreement, committing to broadcast the Golden Globe Awards from 2002 through 2005.  (Exs. 186, 187.)

86.     In 2001, dcp saw an opportunity to extend the dcp-NBC Agreement and to secure an even higher license fee for the Golden Globe Awards from NBC.  (RT 248:3-249:9 (La Maina 1/25/12).)

87.     From April to July 2001, dcp and NBC negotiated the terms of a midterm amendment to and extension of the dcp-NBC Agreement, pursuant to which NBC would broadcast the Golden Globe Awards through 2011 in exchange for substantially higher license fees.  (Exs. 186, 194, 294; RT 248:3-249:9, 253:20-25 (La Maina 1/25/12).)

/ / /

88.     On June 11, 2001, after the principal terms of an agreement for NBC to broadcast the Awards show after 2005 had been settled between NBC and dcp (RT 450:9-20 (La Maina 1/26/12); RT 739:11-740:12

(Graboff 1/27/12), a meeting of the HFPA Board was held. Representatives of dcp were present.  La Maina was there, and according to Berk and Soria, so was Dick Clark.  La Maina's "talking points" internal memorandum prepared for the June 11, 2001 meeting reflect that he was planning to announce the NBC extension to HFPA's Board and congratulate HFPA on the achievement.  (Exs. 698, 699.)  Nothing in La Maina's notes suggests he was planning to seek approval, which is consistent with his testimony that he did not think approval was necessary.  (Exs. 698, 699.)  La Maina did not bring copies of any contracts or other legal documents and there was no discussion about any of the contract provisions related to dcp and HFPA nor of any term beyond 2011.  (RT 253:4-7, 267:7-14 (La Maina 1/25/12).)

89.    At the June 11, 2001 meeting, dcp made an "informal presentation" to the HFPA Board regarding the amendment and extension of the dcp-NBC Agreement. (RT 250:12-251:3 (La Maina (1/25/12); RT 449:21-450:14 (La Maina 1/26/12).)  At the time, dcp already had annual options to produce the Golden Globes through 2005.  Therefore, dcp needed six additional options—through 2011—to ensure it could completely fulfill the proposed extended broadcast license with NBC.  (Ex. 3.)  Nevertheless, dcp did not ask for, and HFPA did not explicitly provide, approval of the amendment to and extension of the dcp-NBC Agreement.  (Exs. 513, 562, 698, 699; RT 267:15-269:6, 287:3-288:25 (La Maina (1/25/12); RT 453:24-454:22 (La Maina 1/26/12); RT 1700:3-1704:9, 1705:20-1706:13, 1744:8-1746:17 (Dunlevy 2/7/12).)

///

90.    La Maina presented the term of the NBC agreement, what NBC was paying and the need for confidentiality.  (RT 267:2-6 (La Maina 1/25/12). ) He warned the Board that the proposed 10-year extension with NBC was not

executed and could be at risk if it was made public.  (RT 264:9-266:12 (La Maina 1/25/12); Exs. 79-11, 194-9, 195, 329.)  The Board members were extremely enthusiastic and supportive of the news.  (RT 252:25-253:3 (La Maina 1/25/12).)  Berk, Soria and Orlin testified that the Board members voiced their approval.  (Exs. 777 (Berk Decl. ¶ 21); 789 (Soria Decl. ¶¶ 55-60); 776 (Orlin Decl. ¶¶ 12-16.)

91.   HFPA has not found or produced any transcript or minutes of this June 11, 2001 Board meeting.

92.   In June and July 2001, other documented meetings of the HFPA Board (June 12, June 21, June 28, July 9, July 11) and Membership (July 11) were held.  (Exs. 204, 513, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 644.)

93.   The Minutes of the June 12, 2001 meeting of HFPA's Board reflect that "the new dick clark productions contract informally introduced to the Board on June 11, 2001 was discussed.  In addition, the Board agreed to ask its outside counsel, Robert Yoshitomi, to "review all current and new contracts between the Hollywood Foreign Press Association, dick clark productions and NBC" and "to get back to us and advise."  (Exs. 204, 561, 562, 644; RT 1699:17-23 (Dunlevy 2/7/12).)

94.   Soria testified that the new NBC deal was discussed repeatedly at other HFPA Board meetings.  (Ex. 789 (Soria Decl. ¶ 62).)  There are minutes and agendas for the Board meetings on June 12, (Ex. 562), June 21 (Ex. 563), June 28 (Ex. 565), July 9 (Ex. 567), July 11 (Ex. 569) and for a general membership meeting on July 11 (Ex. 571).  Although the agendas for the June 28 and July 9 meetings refer to the proposed NBC deal, there are no notations or references to the NBC deal in any of the minutes.

95.   On June 21, 2001, dcp sent a fax to NBC acknowledging receipt of

NBC's "proposed draft of the new NBC/dick clark productions, inc. Golden
Globes Agreement." (Ex. 193.)

96.     On July 9, 2001, HFPA's outside counsel, Yoshitomi, sent an email
to dcp's outside counsel, Behr, asking about the status of the dcp-NBC
negotiations.  (Exs. 136, 790 (Behr Decl. ¶ 13).)

97.     On July 13, 2001, dcp and NBC executed an amendment and
extension of the dcp-NBC Agreement, dated "as of" June 11, 2001.  (Ex. 79
(agreement).)  It was the custom and practice at NBC for the "as of" date on an
agreement to reflect the date that principal deal terms were reached, even if the
agreement were documented or executed on a subsequent date.  (RT 739:16-
740:12 (Graboff 1/22/12).)  The 2001 NBC Extension granted NBC broadcast
rights for six years (*i.e.*, for years 2006 through 2011) beyond the existing dcp-
NBC agreement. Those years were not covered by the eight specified options
(*i.e.*, for years 1998 through 2005) granted to dcp in the 1993 Amendment.  (Ex.
79.)  The source of dcp's options for the six additional years through 2011 was
the extensions clause of the 1993 Amendment.  (Exs. 3, 4.)

98.     On July 16, 2001, Behr sent Yoshitomi a fully executed copy of
the 2001 NBC Extension. (Exs. 23, 79, 790 (Behr Decl. ¶ 13); RT 1158:23-
1159:25 (Yoshitomi 2/1/12).)

99.     On July 19, 2001, HFPA's President Dagmar Dunlevy sent a
letter to the HFPA Membership stating: "We have just been informed by dick
clark productions that NBC has firmly committed to telecasting the Golden
Globe Awards for the next ten years. In this uncertain show biz climate, this is
/ / /
certainly considered extremely good news." (Ex. 21; RT 1705:16-1706:13
(Dunlevy 2/7/12).)

100.   Notwithstanding the testimony of Soria, there is no documentary

evidence that any presentation was made to the HFPA Board or to HFPA's
Membership in June or July 2001 regarding the 2001 amendment and extension
of the dcp-NBC Agreement, other than the June 11, 2001 "informal
presentation" of La Maina discussed above.  (*See* Exs. 562 (6/12/01 HFPA
Board meeting minutes), 563 (6/21/01 HFPA Board meeting minutes), 565
(6/28/01 HFPA Board meeting minutes), 567 (7/09/11 HFPA Board meeting
minutes), 569 (7/11/01 HFPA Board meeting minutes), 571 (7/11/01 HFPA
Membership meeting minutes); *see also* Exs. 698, 699; RT 267:15-269:6, 287:3-
288:25 (La Maina (1/25/12); RT 453:24-454:22 (La Maina 1/26/12); RT 845:11-
24, 846:12-847:20 (Dinnage 1/31/12); RT 958:8-14, 976:19-978:25, 985:9-
986:12 (Soria 1/31/12); RT 1003:10-1004:11 (Soria 2/1/12); RT 1125:4-16,
1126:20-1128:21, 1137:19-1144:2 (Orlin 2/1/12); RT 1700:3-1704:9; 1705:20-
1706:13; 1744:8-1746:17 (Dunlevy 2/7/12).)  Nor is there written evidence
showing that either the HFPA Board or the HFPA Membership was asked to or
did approve the 2001 amendment and extension of the dcp-NBC Agreement.
(*Id.*)

101.   The parties disagree vehemently whether HFPA approved the
2001 amendment and extension of the dcp-NBC Agreement.  HFPA points to
the testimony of Berk, Soria and Orlin about what happened at the June 11, 2001
meeting to show that it did grant approval.  dcp asserts that HFPA did not do so,
thereby demonstrating that HFPA understood that the 1993 Amendment granted
options to dcp to extend the NBC deal without HFPA's approval.  dcp points to
the following evidence to support its view that HFPA never even took it upon
itself to approve the NBC-dcp deal:

(a) the minutes of the Board and Membership meetings for June and July
2001 do not reflect any discussions concerning the 2001 amendment and
extension of the dcp-NBC agreement except for the minutes of the June 12, 2001

Board meeting, (*see* Exs. 562, 563, 565, 567, 569, 571); (b) the minutes of the Board and Membership meetings for June and July 2001 do not reflect a vote taken regarding the 2001 amendment and extension of the dcp-NBC agreement (*see* Exs. 562, 563, 565, 567, 569, 571); (c) HFPA's President at the time, Dagmar Dunlevy, testified that she did not direct the preparer of the minutes to omit anything material from the minutes and, as President, she would not have signed or otherwise approved the minutes if they had omitted anything material (*see* RT 1700:3-1702:13, 1703:12-1704:9, 1745:23-1746:17 (Dunlevy 2/7/12)); (d) based on past practice, any concern about confidentiality of the amendment and extension of the dcp-NBC agreement would not have resulted in material omissions from the minutes, as shown by other HFPA minutes which reflect that confidentiality concerns were often stressed to the Board and Membership and, on occasion, were dealt with by a motion to enter into an "executive session," (*see* Ex. 639-1, RT 839:8-842:18 (Dinnage 1/31/12)); (e) Dunlevy's July 19, 2001 letter, which is dated six days after the dcp-NBC amendment and extension was executed and three days after Behr sent the executed dcp-NBC amendment and extension to Yoshitomi (Ex. 79), states that "[w]e have just been informed by dick clark productions that NBC has firmly committed to telecasting the Golden Globes for the next ten years… this is certainly considered extremely good news," that "[t]he dcp company will be available to supply additional details at the next general membership meeting," and that "we will be sending you NBC's formal press release tomorrow." (Ex. 21); and (f) there is no evidence of any communication from HFPA to dcp stating that HFPA had, in fact, approved the dcp-NBC amendment and extension. (RT 267:15-269:6, 287:3-288:25 (La Maina (1/25/12); RT 453:24-454:22 (La Maina 1/26/12).)

102.   The Court finds that both sides have taken internally inconsistent positions in certain respects.  For example, HFPA argues that in

1   1993 it did not knowingly approve the extensions clause because, apart from

2   Van Blaricom's testimony, there is no evidence – certainly no documentation –

3   that the Board of Directors and the general Membership were aware of and

4   approved such a material provision, as required by HFPA's bylaws.  Yet HFPA

5   also argues that it did approve the 2001 extension, notwithstanding the absence

6   of such documentation.  For its part, dcp basically argues that by virtue of its

7   actual customs and practices, HFPA could and did approve the 1993

8   Amendment and extensions clause, notwithstanding any failure of HFPA to

9   adhere to its By-Laws, but that in 2001 the very failure of HFPA to follow its

10  bylaws in supposedly approving the 2001 extension of the dcp-NBC Agreement

11  proves that HFPA did not in fact approve it.

12          103.   The Court finds that although HFPA did not formally approve

13  the 2001 extension, viewed realistically it clearly accepted it.  The new 2001

14  NBC deal that La Maina described at the June 11, 2011 meeting was such a clear

15  "home run" for HFPA that its members proceeded as if there was no need to

16  adhere to HFPA's  own by-laws to effectuate approval for dcp to enter into that

17  agreement; what HFPA member would possibly object?  On the other hand, this

18  finding of *de facto* approval by HFPA does not necessarily mean that HFPA

19  thought La Maina was seeking approval of the 2001-dcp NBC deal on June 11th

20  or that dcp was required to seek HFPA approval of any extensions under the

21  1993 Agreement.

22  / / /

23  / / /

24          C.     **The 2001 Exercise Of Options**

25          104.   Prior to the execution of the 2001 NBC Extension, dcp had—under

26  the 1987 Agreement, as amended by the 1993 Amendment—exercised its

27  options to produce and distribute the Golden Globe Awards on an annual basis.

28

40

(*See*, *e.g.*, Ex. 790 (Behr Decl. ¶ 14); RT 28:15-29:13 (La Maina 1/24/12); RT
447:9-17 (La Maina 1/26/12).)  After the execution of the 2001 NBC Extension,
dcp could have continued to exercise its options to produce and distribute the
Golden Globe Awards on an annual basis, as it had done before.  (Ex. 1, ¶ 1.)
But in or about early August, 2001, HFPA's outside counsel (Yoshitomi) and
dcp's outside counsel (Behr) discussed what could happen if dcp exercised
all of its options for the full ten-year period covered by the 2001 NBC
Extension, but NBC then breached its agreement with dcp.  (Ex. 790 (Behr Decl.
¶ 15).)  Behr testified that Yoshitomi explained that HFPA wanted its rights fully
vested for the duration of the NBC Agreement.  (*Id.*)

105.   Yoshitomi asked if dcp would exercise all of its options at once for
the full ten-year period covered by the 2001 NBC Extension (*i.e.*, through the
2011 broadcast).  (Ex. 790 (Behr Decl. ¶ 15); RT 458:16-460:4 (La Maina
1/26/12); RT 1161:22-1163:15 (Yoshitomi 2/1/12).)  Yoshitomi agreed to draft a
document for dcp to execute that would confirm the exercise by dcp of all those
options for the full-ten year period of the 2001 NBC Extension.  (Exs. 790 (Behr
Decl. ¶ 15), 791 (Cline Decl. ¶¶ 5, 6, 7); RT 1149:3-8 (Yoshitomi 2/1/12).)

106.   Behr suggested that the document Yoshitomi agreed to prepare
should include a recitation of the relevant history of the dcp-HFPA contractual
relationship that authorized dcp's exercise of options for the full ten-year period.
(Ex. 790 (Behr Decl. ¶ 15); RT 1781:5-25 (Behr 2/7/12).)

/ / /

107.   Behr assigned an associate of his at the time, Dennis Cline, to
further interact with Yoshitomi regarding the exercise of options that HFPA was
requesting dcp to exercise.  (Exs. 790 (Behr Decl. ¶ 15), 791 (Cline Decl. ¶ 5).)

108.   On August 9, 2001, Cline spoke with Yoshitomi on the telephone
about Yoshitomi's request that dcp exercise all of its options for the full ten-year

1  period of the 2001 NBC Extension; *i.e.*, through the 2011 broadcast. (Exs. 636,

2  791 (Cline Decl. ¶ 6-7); RT 1161:24-1163:15 (Yoshitomi 2/1/12).) During that

3  conversation, Yoshitomi stated that in the event that NBC breached its

4  agreement with dcp, HFPA wanted to be a co-claimant with dcp in any suit

5  against NBC.  He reiterated that he would draft an appropriate document

6  memorializing the exercise of options and send it to Cline for review. (*Id.*)

7  109.   As agreed, Yoshitomi drafted the initial version of what became the

8  2001 Exercise of Options.  He sent that draft to Cline on August 14, 2001 via

9  email, with a copy to HFPA's then-President (Dagmar Dunlevy) and HFPA's

10  former President and then-current board member (Helmut Voss).  (Exs. 24, 791

11  (Cline Decl. ¶ 8); RT 1164:4-14, 1166:10-1168:7 (Yoshitomi 2/1/12); RT

12  1706:24-1708:23 (Dunlevy 2/7/12).)

13  110.   On August 21, 2001, Yoshitomi emailed Behr a revised draft of the

14  2001 Exercise of Options and he sent a copy to Dunlevy.  (Exs. 25, 790 (Behr

15  Decl. ¶ 18); RT 1708:24-1709:12 (Dunlevy 2/7/12).) Later that day, Yoshitomi

16  emailed Dunlevy, with a copy to Behr, another draft of the 2001 Exercise of

17  Options.  (Exs. 26, 790 (Behr Decl. ¶ 18).)  Each draft of the document,

18  including the initial draft, contemplated that it would be signed only by dcp, not

19  by HFPA. (Exs.  4, 24, 25, 26, 27; RT 1165:24-1169:25 (Yoshitomi 2/1/12).)

20  The next day, August 22, 2001, Yoshitomi sent an email to La Maina, with a

21  copy to Dunlevy and Behr, discussing the 2001 Exercise of Options and the

22  / / /

23  2001 Pre-Show Amendment (discussed below).  (Exs. 27, 790 (Behr Decl. ¶

24  19).)

25  111.   On August 22, 2001, dcp executed the 2001 Exercise of Options

26  dated "as of" August 21, 2001.  The 2001 Exercise of Options contains the

27  following language, in the fourth WHEREAS clause: "WHEREAS, the [HFPA-

28

1   dcp Agreement] is deemed extended for any extension of the NBC/dcp

2   Agreement." (Ex. 4).  This language also appeared in each draft of the

3   document, including the initial draft prepared by HFPA's counsel.  The

4   document also states that dcp was exercising options to produce and distribute

5   the Golden Globe Awards show through 2011.  (Exs. 4, 24, 25, 26, 27; RT

6   462:20-24 (La Maina 1/26/12).)   It was signed only by dcp.

7          112.   By the time Yoshitomi drafted the 2001 Exercise of Options, he

8   was well versed in the legal and business affairs of HFPA, including HFPA's

9   relationship with dcp.  Among other things, he had negotiated and drafted the

10   1997 Amendment to the 1987 Agreement, been involved with HFPA's audit of

11   dcp, and negotiated and drafted the 1999 pre-show agreement.  (RT 1149:3-

12   1156:9 (Yoshitomi 2/1/12).)  Yoshitomi also had received the 1987 Agreement

13   between the parties, the 1989 Amendment to the 1987 Agreement, the 1993

14   Amendment to the 1987 Agreement (RT 1151:19-1152:21 (Yoshitomi 2/1/12).)

15   and the transcript of the September 22, 1993 Membership meeting.  (RT

16   1152:22-1153:15 (Yoshitomi 2/1/12).)   He also had received and reviewed a

17   copy of the 2001 NBC Extension between dcp and NBC.  (RT 1156:10-1161:21

18   Yoshitomi 2/1/12)).  Yoshitomi believed that the fourth "WHEREAS" clause he

19   drafted in the 2001 Exercise of Options ("WHEREAS, the Agreement is deemed

20   extended for any extension of the NBC/dcp Agreement.") was accurate. (Exs.

21   24, 25, 26, 27; RT 1165:24-1168:7 (Yoshitomi 2/1/12).)

22   / / /

23          113.   The evidence does not show that any presentation was

24   made to the HFPA Membership regarding the 2001 Exercise of Options (*See* Ex.

25   267), or that either HFPA's Board or its Membership was asked to or did

26   approve the 2001 Exercise of Options.

27          114.   No member of the HFPA ever objected to the fourth "WHEREAS"

28

clause in the 2001 Exercise of Options.  (Exs. 24, 25, 26, 27; RT 1707:24-1709:12 (Dunlevy 2/7/12).

115.   Concurrent with dcp's execution of the 2001 Exercise of Options, "as of" August 21, 2001, HFPA and dcp also entered into an agreement whereby, among other things, HFPA granted dcp the right to produce and distribute the preshow for the 2002 Awards show and further granted dcp one option to produce and distribute the pre-show for the 2003 Awards show (the "2001 Pre-Show Amendment").  (Exs. 573, 603 (agreement), 636; RT 462:20-463:19 (La Maina 1/26/12).) The 2001 Pre-Show Amendment was also drafted by Yoshitomi.  (Exs. 24, 25, 26, 27, 790 (Behr Decl. ¶¶ 21-23), 791 (Cline Decl. ¶ 9); RT 1161:22-1164:7 (Yoshitomi 2/1/12).)

116.   Unlike the 2001 Exercise of Options, which was executed only by dcp, the 2001 Pre-Show Amendment was executed both by dcp and by HFPA's then-President and then-Treasurer, and is affixed with a proxy for the HFPA seal.  (*Compare* Ex. 4 and Ex. 603; RT 482:14-23 (La Maina 1/26/12); RT 1164:15-1166:9; 1168:8-1169:25; 1172:1-10 (Yoshitomi 2/1/12).) Unlike the 2001 Exercise of Options, the 2001 Pre-Show Amendment was approved by HFPA's Board.  (Exs. 266, 573.)

/ / /

/ / /

/ / /

/ / /

### D.   In 2002, HFPA Becomes Unhappy With The Parties' Relationship

117.   In February 2002, dcp was sold to Mosaic Media Group and Capital Communications CDPQ, Inc.  (Ex. 28.)

44

118.   On February 18, 2002, HFPA notified dcp that it had engaged Alex Hershtik, a certified public accountant and HFPA's corporate accountant at the time, to conduct the annual audit of dcp's Golden Globe Awards show accounts, pursuant to HFPA's audit rights contained in the 1987 Agreement, as amended. (Ex. 83; RT 1711:14-1712:20 (Dunlevy 2/7/12).)

119.   On April 2, 2002 La Maina sent an email to himself to make a note to exercise additional options following the 2011 Golden Globe Awards show. (Ex. 191.)  This was consistent with dcp's interpretation of the 1993 Amendment, and before any dispute arose between the parties regarding the import of the extensions clause in that amendment.

120.   On April 9, 2002, a meeting of the HFPA Membership was held. Representatives of dcp were present, and the sale of dcp was discussed.  (Ex. 19; 467:24-468:22 (La Maina 1/26/12).)

121.   At around this time, certain HFPA members grew unhappy with the existing dcp-NBC Agreement and, more generally, with HFPA's business relationship with dcp, as a result of issues unrelated to the terms of the 1993 Amendment. These members were displeased that HFPA was not forewarned of the sale of dcp to Mosaic Media Group in 2002 (RT 292:12-25, 297:4-9 (La Maina 1/25/12); RT 463:20-467:23 (La Maina 1/26/12); RT 1709:18-1711:13 (Dunlevy 2/7/12); were unhappy with the scope and application of the audit provision in the 1987 Agreement (RT 297:10-15 (La Maina 1/25/12); RT 468:23-470:11 (La Maina 1/26/12); RT 1711:14-1712:25, 1714:2-23 (Dunlevy 2/7/12); and were unhappy that HFPA was not consulted about an agreement that dcp entered into with Telemundo (a Spanish-language NBC subsidiary) to simulcast the Golden Globe Awards show. (*See, e.g.*, RT 297:16-298:1 (La Maina 1/25/12); RT 470:12-472:24 (La Maina 1/26/12); RT 1718:2-1719:4 (Dunlevy 2/7/12).)

122.   HFPA's then-President, Dunlevy, believed that, because the Golden Globe Awards show had become far more successful since dcp took it over in 1983, that the overall agreement between HFPA and dcp was outdated, that the 50/50 split of profits was too favorable to dcp, and that the extensions clause in the 1993 Amendment was no longer "fair" to HFPA.  (RT 1720:13-1723:2 (Dunlevy 2/7/12) (Dunlevy testifying that it was her opinion that the "starlet had become the star" and that the terms of the dcp-HFPA contract were no longer fair).)

123.   On July 11, 2002, HFPA's accountant Alex Hershtik wrote an email to Dunlevy stating that the 1983 Agreement is "totally unfavorable to the HFPA. Luckily, the contract was written by the Dick Clark Company. The courts, usually, favor the underdog. I also think you should get, very soon, a good contract attorney."  (Ex. 84; RT 1714:24-1716:8 (Dunlevy 2/7/12).)

124.   Soon thereafter HFPA retained Bryan Freedman, a litigator, as outside counsel.  (RT 1714:24-1716:8, 1723:3-1724:24 (Dunlevy 2/7/12).)

125.   On September 11, 2002, Dunlevy sent a letter to dcp stating that Freedman had concluded that the 2001 Exercise of Options was "not valid," and attaching an unsigned letter from him to the same effect, dated September 4, 2002.  (Ex. 14; RT 307:5-308:10, 309:20-23 (La Maina 1/25/12); RT 1668:11-1671:13 (Freedman 2/7/12); RT 1723:3-1724:24, 1729:4-1731:24 (Dunlevy 2/7/12).)   This was done in the hopes of renegotiating HFPA's agreement with dcp.  (Ex. 14; RT 1723:21-1724:2, 1731:12-24 (Dunlevy 2/7/12).)

/ / /

126.   On September 19, 2002, dcp responded.  Its letter stated that the 2001 Exercise of Options was "prepared by [HFPA's] counsel and its signing was coordinated with the signing of the NBC Agreement, again at the

1   specific request of [HFPA] and its counsel."  (Ex. 48.)

2      127.   From September 19, 2002 to September 25, 2002, the parties

3   exchanged correspondence regarding the September 11, 2002 letter and the

4   validity of the 2001 Exercise of Options.  (Exs. 48, 50, 51; RT 310:11-314:8 (La

5   Maina 1/25/12); RT 1671:14-1674:11 (Freedman 2/7/12).)

6      128.   On October 3, 2002, in a letter signed by Dagmar Dunlevy and

7   nine other members of the HFPA Board, the HFPA Board withdrew its prior

8   repudiation of the 2001 Exercise of Options, including "[the] letter of

9   September 11, 2002, and the letter of September 23, signed by Bryan

10  Freedman."  (Ex. 57.)  HFPA noted in this letter that dcp had offered to

11  withdraw two letters it had sent to HFPA in the course of this dispute.

12     129.   Thereafter, HFPA again changed counsel, replacing Freedman with

13  Peter Lopez, a transactional entertainment lawyer.  Lopez and litigation counsel

14  for dcp exchanged further correspondence regarding the validity of the contract

15  between dcp and HFPA.  (Exs. 72, 74; Ex. 790 (Behr Decl. ¶ 28); RT 321:25-

16  322:4 (La Maina 1/25/12); RT 1733:3-1735:15 (Dunlevy 2/7/12).)

17     130.   On December 10, 2002, a meeting of certain HFPA Board members

18  (President Dunlevy, Vice-President Lorenzo Soria and Chairman of the Board

19  Lawrie Masterson), a past President (Judy Solomon) and HFPA's outside

20  counsel, Lopez, was held. Representatives of dcp were present.  According to the

21  incomplete and somewhat garbled transcript, various aspects of HFPA's

22  relationship with dcp were discussed, with considerable emphasis on the

23  / / /

24  / / /

25  Telemundo Agreement.  (Ex. 70; 475:22-478:1 (La Maina 1/26/12); RT 1019:8-

26  25, 1063:21-1064:16 (Soria 2/1/12).)  At one point, past HFPA President and

27  Board member Judy Solomon stated that:

28

Yeah, but, I mean, excuse me for asking a stupid question, you know.  I don't know very much legal and so on but how can you sign a contract with NBC on something which you only own half a voice, 50%.  I don't know.  Because if I am mistaken, I mean two lawyers in one room, [a]ccordingly if you will go through the contract to the extension, excuse me, from 1993 it says that we—you have an extension 'til 2005 or as long as NBC wants it.  Okay. I am not going to argue that this was not even brought up because we have minutes of the meeting where you ask only for 2005 as was the mistake of a  president at that time to allow that particular sentence.  Unfortunately, she also signed that (Inaudible) which is also not legal as far as but that's binding. There's no seal. All those things. We have no choice but to accept it but it says NBC.  (Ex. 70-5.)

131.   Although the tape recording apparently was interrupted at that point, no member of HFPA contradicted Solomon's statements at the December 10, 2002 meeting that "we – you have an extension 'til 2005 or as long as NBC wants it" or "[w]e have no choice but to accept it . . . . "  (RT 476:11-478:1 (La Maina 1/26/12); RT 1061:17-1065:7 (Soria 2/1/12).)

132.   By no later than 2002, HFPA was aware that dcp interpreted the "extensions clause" in the 1993 Amendment to permit dcp to exercise options for any extensions, renewals, substitutions, or modifications of the dcp-NBC Agreement.  (Ex. 70; RT 936:12-937:13 (Soria 1/31/12); RT 1017:25-1018:4, 1064:17-1065:7 (Soria 2/1/12).)  Consistent with this, in ruling on dcp's Phase I Motion for Summary Judgment, Judge Fairbank concluded that "[t]he undisputed facts adequately show that Plaintiff would have discovered any mistake no later than 2002, when a dispute arose over the source of Defendant dcp's options."  (Dkt. No. 182, at 5.)

133.   Notwithstanding such knowledge, HFPA continued to perform under the 1993 Amendment and accept dcp's performance, including for the years 2006 through 2011 (which amounted to options nine through fourteen under the 1993 Amendment).  (Exs. 271, 272; RT 1021:19-1023:12 (Soria 2/1/12).)  However,  between April 2003 and July 2005, when dcp submitted letters to HFPA with monetary payments for HFPA's percentage of profits from the exploitation of the Golden Globes, dcp asserted in substance that "deposit of the check will constitute HFPA's affirmation of the continuing validity of the [1987] Agreement as amended and extended."  HFPA sent a letter in response to each letter from dcp stating in substance:   "Contrary to the position taken in your letter, the HFPA's deposit of sums due to it is not conditioned on our affirmation of any agreements.  dcp has no right to withhold or condition these payments, and we are depositing the check unconditionally and without implication to any contracts or other legal matters (except, of course, our acknowledgment that these payments have been received.)"  (Ex. 789 (Soria Decl. ¶ 74); RT 333:2-335:18 (La Maina 1/25/12); *e.g.*, Exs. 271, Ex. 515.)

### E.   HFPA Seeks To Negotiate An End To The Extensions Clause In The 1993 Amendment

134.   Between June and August 2004, meetings of the HFPA Board and Membership were held. HFPA's agreement with dcp was discussed.  (Exs. 118, 119, 120, 467.)  The August 4, 2004 minutes of the HFPA Board and HFPA  Membership reflect that HFPA's then-President, Lorenzo Soria,[5] stated that dcp's then-CEO, Allen Shapiro, had "expressed a desire to retain the so-

---

[5] Lorenzo Soria is a current member of HFPA and was previously a member of HFPA's Board; HFPA President from 2003-2005; and HFPA Vice-President from 2000-2002.  (RT 914:3-915:4 (Soria 1/31/12).)

49

called 'perpetuity clause' in dcp's contract with the HFPA. He was, however, willing to offer the HFPA a more attractive profit-sharing arrangement."   Soria added that "Mr. Shapiro was informed that the 'perpetuity clause' was a major irritant to the HFPA and promised to seek solutions." (Exs. 118, 119, 120; RT 1027:3-23 (Soria 2/1/12); RT 1128:22-1129:24 (Orlin 2/1/12).)

135.   While Soria was President of the HFPA, a position he held from June 2003 to June 2005, he tried to negotiate a way out of the extensions clause. (RT 1015:2-1017:22 (Soria 2/1/12).)

136.   In June 2007, Red Zone purchased dcp from Mosaic Media Group. (Ex. 490.)

137.   On May 6, 2009, a meeting of HFPA's Board was held. HFPA's agreement with dcp was discussed. Then-HFPA President Jorge Camara[6] stated that a suggestion had been "made by dcp to exchange the existing Contract between dcp and HFPA which is 'for perpetuity' by a Contract binding for 30 years." (Ex. 233.)

138.   Between  October 2009, and continuing to early 2010 HFPA sought legal advice and formulated a business strategy to try to negotiate a way out of the extensions clause.  (RT 1026:6-25, 1028:9-1029:2 (Soria 2/1/12); RT 1291:19-1294:3 (Berk 2/2/12).)

/ / /

139.   On November 24, 2009, former HFPA Board member Frances Schoenberger transmitted an email to one S. Bizio attaching a letter to the HFPA Membership drafted by Jorge Camara, which purported to recite the history of the Golden Globe Awards show.  Among other things, Camara wrote:

---

[6] Jorge Camara attended various HFPA meetings with and regarding dcp. Camara executed the 1983 Agreement on behalf of the HFPA.  (*See. e.g.*, Exs. 5, 120.)

After two networks dropped us, dcp came to the rescue . . . .
However, either because we didn't know, we were in need, we had
bad advice or poor representation, we signed a contract that is
construed for perpetuity.  Now, dcp has not been all that bad for us.
They produced very good shows, and they did bring us back to
network television.  NBC again.  It is because of this NBC contract
that we have a building, that we can travel all over the world to two
Film Festivals every year, that we have a staff that facilitates our
work.  (Ex. 251.)

140.   On July 18, 2010, an HFPA member named Theo Kingman sent
an email to various HFPA members in which he asked, "If a network shows
interest in the Globes, what prevents us from cutting a similar deal as our
agreement with dcp is set to expire anyway?"  That same day former HFPA
President Solomon responded as follows:   "[R]ead the contracts, our agreement
with dcp does not expire[,] only the one that dcp has with nbc."  (Ex. 542.)

141.   On February 8, 2010, HFPA's President Philip Berk sent dcp
CEO Mark Shapiro an email notifying dcp that dcp's right to produce the
Golden Globes expired after the next show—in January 2011—and inquiring "as
to whether it would be in our best interest to begin exploring the nature of our
relationship after the January 2011 Globes."  Ex. 228, (Berk Decl. ¶ 25).  Berk's
letter also stated: "Of course, until we agree upon the nature of any such future
relationship, I want to ensure that dcp does not seek or agree to any subsequent
broadcast licensing agreement with NBC (or anyone else, for that matter) as
dcp's options obviously also expire with that last broadcast in January 2011.
(Ex. 228.)

142.   Shapiro responded by email the next day, stating "[a]bsolutely,
we should sit down for a series of meetings to get the ball rolling on our future
network options and our overall strategy and approach."  Shapiro added: "btw

[by the way], no need to remind me or ask me not to seek a new licensing agreement for the property.  I would never make a move on a network renewal or new home without your involvement.  We're together on this."  (Ex. 228.)

143.   From February to October 2010, representatives of dcp and HFPA discussed possible revisions to their existing 1987 Agreement, as amended, for the production and licensing of Golden Globe Awards shows after 2011, including a potential revision to the 1987 Agreement, as amended in 1989, 1993, and 1997.  (Exs. 132, 228, 231, 245; RT 524:21-525:9, 543:6-544:20 (Shapiro 1/26/12); RT 1301:10-1303:10 (Berk 2/2/12).)  Those discussions did not result in any revisions to the parties' agreement.

144.   As part of these discussions, dcp sought from HFPA additional rights not previously granted to dcp, so that dcp could attempt to "monetize" those rights.  (RT 543:2-544:11, 545:14-21, 552:4-10, 603:13-604:7 (Shapiro 1/26/12).)  The additional rights dcp sought included, among others, digital rights, pre-show rights, post-show rights, excerpt rights, archival rights, and commercial integration rights.  (*Id.*)  In exchange, dcp was willing to consider altering the 50-50 split of profits from the exploitation of the Golden Globe Awards show and replacing its rights under the extensions clause of the 1993 Amendment with a fixed grant of options.  (*Id.*)

145.   dcp also sought the right to shop the Golden Globe Awards to other networks in the event that NBC and dcp were unable to agree to extend the dcp-NBC Agreement prior to the expiration of either the term of that agreement or the negotiating period during which NBC had rights of first negotiation.  (RT 584:22-585:9, 586:7-24, 613:1-5, 616:7-20 (Shapiro 1/26/12).)

146.   In the course of negotiating with NBC, Shapiro told NBC executives that dcp could not conclude a new broadcast license agreement through 2018 without HFPA's consent and approval.  (Exs. 217, 219, 221, 223, 226; RT 559:12-562:11; 565:14-566:14; 571:6-572:5 (Shapiro 1/26/12); RT

717:3-720:25; 723:3-724:1 (Graboff 1/27/12).)  This statement is flatly in conflict with dcp's legal arguments in this case.  Shapiro testified that these statements were merely part of a negotiation strategy to obtain the best terms possible from NBC, not because he believed HFPA approval was actually necessary.  (RT 559:12-560:13 (Shapiro 1/26/12).)[7]

### F.   In 2010, Dcp Extends The NBC Broadcast License And Exercises Additional Options In The Same Manner As In 2001

147.   On May 3, 2010, dcp and NBC "enter[ed] into early discussions . . . regarding an extension of the term of NBC's rights" under the dcp-NBC Agreement beyond 2011.  (Ex. 214.)

148.   During dcp and NBC's negotiations in 2010, NBC sought from dcp rights that NBC had not previously been given, including, among others, digital rights, preshow rights, post-show rights, rights to select the venue, and rights to select the date of the Awards show.  (RT 729:6-732:16 (Graboff 1/27/12).)  For some of these new rights NBC sought, dcp in turn sought those rights from HFPA, in conjunction with the ongoing discussions between dcp and HFPA about the restructuring of their relationship.  (RT 608:6-609:19 (Shapiro 1/26/12).)

149.   In July 2010, while dcp and HFPA were in discussions about restructuring their relationship, HFPA's then-President Berk and CBS's Chief Executive Officer Leslie Moonves met in person. (RT 1305:7-1307:10 (Berk 2/2/12); Ex. 779 at 16-18, 52:1-58:7 (Moonves 2/2/12).)  At the time, Berk

---

[7] This prompted NBC's Marc Graboff to criticize him for being untrustworthy. (See Ex. 221-3.)  Although Shapiro may have forfeited any right to complain about such criticism, perhaps his negotiating tactics may boost his "street cred" as a shrewd executive in the fabled world of Hollywood deal-making.

understood that, under paragraph 1(a) of the 1987 Agreement, HFPA was prohibited from "discuss[ing] with any third party the production, sale, or licensing" of the Golden Globe Awards until after the expiration of dcp's rights of first negotiation with HFPA.  (RT 771:21-772:9 (Calabrese 1/27/12); RT 1305:7-1307:10, 1308:1-10, 1311:16-1312:22 (Berk 2/2/12).)  Nevertheless, in what Berk characterized as an "off the record" discussion, Berk solicited an offer from Moonves.  (RT 1306:8-1307:10, 1311:16-1312:22, 1315:2-23 (Berk 2/2/12); Ex. 779 at 16-18, 52:1-58:7 (Moonves 2/2/12).)  Berk's conduct in this regard was consistent with the view he expressed in 1988 that perhaps a "unanimous vote [by HFPA] is not legal and binding."  (*See* ¶ 24.)

150.  dcp was not aware of Berk's conversations with Moonves. (RT 629:5-631:2 (Shapiro 1/26/12).)

151.  In September 2010, dcp pressured NBC to close negotiations and begin documentation of an extension of the dcp-NBC Agreement. dcp was eager to close the deal because it believed that a number of looming marketplace activities threatened to decrease the value of the Golden Globe Awards show, including: (i) Comcast's impending acquisition of NBC; (ii) then-NBC Chief Executive Officer Jeff Zucker's anticipated departure from NBC following Comcast's acquisition of NBC; (iii) the possibility that the National Football League might announce that its regular season would be extended to 18 games; and (iv) the possibility that the Academy Awards might move its show to earlier in the year.  (RT 615:10-622:13 (Shapiro 1/26/12); RT 730:22-731:21 (Graboff 1/27/12).)

/ / /

152.  On October 29, 2010, dcp and NBC executed an extension of the dcp-NBC Agreement, pursuant to which NBC would broadcast the Golden Globe Awards show from 2012 through 2018. In exchange, NBC agreed to pay

substantially larger license fees – an average annual license fee of $21.5 million. The extension is dated October 21, 2010, "as of" September 30, 2010. (Ex. 211 (agreement).)

153.   In exchange, NBC did not receive any of the additional rights it attempted to acquire during the negotiations.  (Ex. 211; RT 608:6-609:19 (Shapiro 1/26/12); RT 729:6-732:16 (Graboff 1/27/12).)  NBC's lead negotiator, Graboff, testified that the average annual license fee of $21.5 million that NBC agreed to pay was higher than the market value of the rights licensed.  (RT 730:22-732:16, 737:23-739:10 (Graboff 1/27/12).)  It thus appears that by deceiving NBC, or at least attempting to, Shapiro managed to obtain more money for HFPA (and for dcp).

154.   On October 29, 2010, dcp executed a document entitled "Exercise of Options," stating that dcp was exercising its options to produce and distribute the Golden Globe Awards show through 2018.  (Ex. 210.)  The text of the 2010 Exercise of Options is identical to the 2001 Exercise of Options, except for the date.  (Ex. 210 at 2.)

155.   HFPA filed this lawsuit on November 17, 2010. (*See* Complaint, Dkt. No. 1.)  Since that time, dcp has produced and distributed the Golden Globe Awards show in both 2011 and 2012.  For both shows, dcp and HFPA collaborated effectively, and all sides considered both shows a success.  (RT 597:10-598:6 (Shapiro 1/26/12); RT 1662:23-1663:5 (Takla O'Reilly 2/7/12).)

/ / /

/ / /

/ / /

/ / /

**V.    THE MANNER IN WHICH HFPA HAS OPERATED DURING THE RELEVANT PERIODS**

156.   As noted above (*see* ¶ 6), HFPA's bylaws state that "[a]ll material

agreements, contracts or any instruments transferring or in any manner affecting the real or personal property owned or held by the Association, or the title thereto, shall be executed by the President and the Treasurer under the seal of the Association, but only after the said documents or contracts so to be executed shall have been submitted to and approved by the Board of Directors and approved by a majority of all the Active members." (Ex. 333 § 13.2 (1991 HFPA Bylaws); RT 807:6-25 (Dinnage 1/31/12).)

157. Notwithstanding these requirements, HFPA has sometimes operated in a manner over the course of many years that is inconsistent with these bylaws. (*See, e.g.*, Exs. 1 (1987 Agreement: not executed by Treasurer; no seal); 2 (1989 Amendment: not executed by Treasurer; no seal); 3 (1993 Amendment: not executed by Treasurer; no seal); 10 (1997 Amendment: not executed by President or Treasurer; no seal); 560 (less than a majority of active members present to approve 1987 Agreement); 111 (less than a majority of active members were present); RT 479:10-482:13 (La Maina 1/26/12); RT 807:8-808:11 (Dinnage 1/31/12); RT 1070:3-1071:24 (Orlin 2/1/12); RT 1245:3-1249:9 (Berk 2/2/12).)

158. Prior to execution of the 1993 Amendment, some members of HFPA believed its then-President (Van Blaricom) had violated HFPA's bylaws and exceeded the scope of her authority in a variety of ways. Complaints unrelated to the 1993 Amendment were made against Van Blaricom between July and September 1993. (Exs. 628, 629; RT 924:7-25, 931:8-932:4 (Soria 1/31/12); RT 1194:19-1196:2 (Berk 2/1/12).) These complaints were discussed by the HFPA Grievance Committee meeting on September 17, 1993. (Exs. 497, 630, 631.) dcp was unaware of the complaints and the Grievance Committee meeting. (RT 222:6-23 (La Maina 1/24/12); RT 406:22-415:12 (La Maina 1/25/12); RT 937:14-938:5 (Soria 1/31/12); RT 1197:19-1199:5 (Berk 2/1/12).)

159. In addition, following Van Blaricom's signing the 1993

56

Amendment, on April 20, 1994, HFPA's Fact Finding Committee issued a report stating that Van Blaricom and a colleague "invoiced DCP directly, without telling the HFPA" for certain work they had performed. The report characterized this "a brech [*sic*] of fiduciary obligation."  (Ex. 346; RT 1117:4-1120:4 (Orlin 2/1/12).)  However, the Fact Finding Committee Report also concluded that: "[T]here is widespread disregard of the bylaws: Nobody seems to care about the check writing limits . . . We were repeatedly told that this had been going on for years and decades. We do not know if this is an excuse for continuation of such practices." (Ex. 346.)

160.   On April 26, 1994, Van Blaricom relinquished her responsibilities, but not her title, as President of HFPA. She also relinquished her right to serve on the Board after her term as President ended.  (Exs. 347, 702; RT 225:8-11, 228:5-8 (La Maina 1/24/12); RT 424:3-425:16 (La Maina 1/25/12).)  In 1996, HFPA revoked Van Blaricom's membership privileges. She sued for reinstatement, and a judgment in favor of HFPA and against Van Blaricom was entered.  (Exs. 348, 349, 351.)

161.   The 1993 Amendment — executed by Van Blaricom on HFPA's behalf — was available for review by HFPA's Membership prior to and following its execution.  Despite various internal complaints against Van Blaricom that she violated HFPA's bylaws and exceeded the scope of her authority, and despite HFPA's later revocation of her membership privileges, HFPA never claimed before December 10, 2002 that Van Blaricom agreed to the extensions clause in the 1993 Amendment in derogation of her duties or in excess of her authority as President.  (Ex. 70; RT 421:2-18 (La Maina 1/25/12).)
/ / /

162.    On various occasions prior to 2002, a fully executed copy of the 1993 Amendment was provided to and reviewed by successor Presidents, including Takla-O'Reilly in 1995, Berk in 1997, and Voss in 1999; by other

members and officers of HFPA; and by HFPA's outside counsel.  (Exs. 10, 11, 116, 134, 648.

163.   Although by no later than 2002, HFPA was aware of dcp's understanding of the 1993 Amendment, as well as Van Blaricom's execution of it purportedly in excess of her authority, as well as other acts by Van Blaricom that HFPA believed were in violation of its Bylaws or in excess of her authority, HFPA failed to take legal action against Defendants until November 17, 2010. (Dkt. No. 1; (RT 936:12-937:13 (Soria knew of dcp's interpretation in 2002) (Soria 1/31/12); 1120:5-19 (Orlin did not review the 1993 Amendment even though he knew of a series of grievances against Van Blaricom  for violating the bylaws) (Orlin 2/1/12).)

164.   During the period in which HFPA delayed filing suit: (i) documentary evidence has been lost and memories have undoubtedly faded;  (ii) some witnesses such as Gene Weed and Ika Panjotovic, have become unavailable due to death, illness, or other reason; (iii) dcp has invested significant time, money, effort, and reputation in producing the Golden Globe Awards show.  (*See, e.g.*, Ex. 472 (4/9/2008 HFPA Membership meeting minutes reflecting dcp's efforts to expand opportunities for HFPA and the Golden Globe Awards); RT 369:2-370:1, 382:24-383:20 (La Maina 1/25/12).)

165.   HFPA's regular practice is to tape record its meetings, including its Board and Membership meetings.  (RT 812:15-814:9, 882:21-885:4 (Dinnage 1/31/12); RT 1688:25-1690:18 (Dunlevy 2/7/12).)  Sometimes transcripts of the meetings, or partial transcripts of the meetings, are prepared from the tape recordings.  (Exs. 19, 64, 729, 730; RT 812:15-814:9, 815:15-817:25 (Dinnage 1/31/12).)  HFPA's Executive Secretary then prepares minutes of the meetings with the assistance of either the tape recording or the transcript. (RT 812:15-814:9, 882:21-885:4 (Dinnage 1/31/12); RT 1688:25-1690:18 (Dunlevy 2/7/12).)

166.   In August 1999, HFPA moved offices to where it is located today. (Ex. 582; RT 872:23-873:11, 874:20-876:22 (Dinnage 1/31/12).)  In or around that time, then-HFPA President Voss instructed Chantal Dinnage, HFPA's officer manager, to assist in collecting and organizing HFPA's historical records, including HFPA's records of its past Board and Membership meetings.  (Exs. 11, 731; RT 818:3-822:13, 874:20-876:22 (Dinnage 1/31/12).)  During HFPA's organization of its historical records, Voss created a list of General Membership meetings for the period 1989 to 1998 and indicated on that list whether the minutes for those meetings either existed or were missing.  (Ex. 731.)

167.   The list reflects the existence of minutes for the September 22, 1993 Membership meeting.  (Ex. 731; RT 821:2-8 (Dinnage 1/31/12).)  Indeed, at the next Membership meeting on October 7, 1993, the members debated whether to read aloud the minutes from the previous Membership meeting (September 22, 1993) and the Board meeting of September 17, 1993.  (Ex. 263; RT 820:8-821:21, 823:11-826:25 (Dinnage 1/31/12).) The members "made a compromise, that the minutes of the last membership meeting could be dispensed with, but they insisted that the minutes taken at the special Board meeting be read."  (Ex. 263.) The minutes of these meetings are missing. (RT 820:8-821:21, 823:11-826:25 (Dinnage 1/31/12).)

168.   There is conflicting evidence with respect to what happened to HFPA's tape recordings of the Board and Membership meetings prior to 1999. Dinnage testified that, in 1999, then-HFPA President Voss ordered then-HFPA Executive Secretary Dunlevy to destroy all of HFPA's tape recordings of its past Board and Membership meetings.  (RT 895:6-896:4 (Dinnage 1/31/12).) Dunlevy testified that no such order was given and that "[t]here is no need to have anything destroyed or disappear."  (RT 1690:23-1692:10 (Dunlevy 2/7/12).)  In any event, all of HFPA's tape recordings of its Board and Membership meetings prior to 1999 are missing.  (RT 895:6-896:4 (Dinnage

1/31/12).)  In addition, numerous tape recordings of HFPA's Board and Membership meetings after 1999, which likely involved discussions germane to the dispute between dcp and HFPA, are missing.  (RT 887:6-888:7; 889:2-890:12 (Dinnage 1/31/12).)

169.   Tape recordings are missing of the following Board and Membership meetings, which likely involved discussions germane to the dispute between dcp and HFPA: (1) the April 8, 1993 Board Meeting with dcp representatives; (*see* Ex. 105; RT 822:12-823:10 (Dinnage 1/31/12)); (2) the September 2, 1993 Board and Membership meetings at which Van Blaricom updated the Board and Membership about dcp's ongoing negotiations with NBC (Exs. 7, 107; RT 895:13-896:4 (Dinnage 1/31/12)); (3) the September 22, 1993 Board and Membership meetings (Exs. 109, 110; RT 820:8-821:21, 895:13-896:4 (Dinnage 1/31/12)); (4) the October 7, 1993 Membership meeting at which a "detailed explanation" of the 1993 Amendment was given (Ex. 263; RT 895:13-896:4 (Dinnage 1/31/12)); (5) the June 11, 2001 informal Board Meeting at which La Maina informed the Board of the 2001 NBC Extension (RT 850:25-851:3 (Dinnage 1/31/12)); (6) the June 12, 2001 Board meeting at which HFPA's Board discussed the 2001 NBC Extension (Ex. 562; RT 851:4-6 (Dinnage 1/31/12)); (7) the Board meetings on June 21, 2001, June 28, 2001, July 9, 2001, and July 11, 2001, as to which the minutes reflect no discussion of dcp or the 2001 NBC Extension (Exs. 563, 565, 567, 569; RT 851:6-20 (Dinnage 1/31/12)); (8) the July 11, 2001 Membership meeting for which the minutes reflect no discussion regarding either dcp or NBC (Ex. 571; RT 851:20-852:2 (Dinnage 1/31/12)); (9) the December 10, 2002 Board Meeting where Solomon stated that dcp has "an extension 'til 2005 or as long as NBC wants it" (*see* Ex. 70); (10) the August 4, 2002 Board and Membership meetings at which the "'perpetuity clause' in dcp's contract with the HFPA" was described by HFPA as "a major irritant" (*see* Exs. 118, 120); and (11) the May 6, 2009 Board

meeting during which then-HFPA President Camara discussed a suggestion "made by dcp to exchange the existing Contract between dcp and HFPA which is 'for perpetuity' by a Contract binding for 30 years" (*see* Ex. 233.)

170.   In late 2002, then-HFPA Executive Secretary Theo Kingma failed to prepare minutes for various Board meetings, including the minutes for Board meetings on June 19, 2002, July 10, 2002, August 1, 2002, September 4, 2002, October 1, 2002, and October 3, 2002. (Exs. 47; RT 827:3-830:22, 834:21-835:9 (Dinnage 1/31/12).) Tape recordings are also missing from several meetings for which minutes were not prepared, including the September 4, 2002 Board Meeting which preceded Dunlevy's September 11, 2002 letter to dcp repudiating the 2001 Exercise of Options (*see* Ex. 47; RT 834:24-835:6 (Dinnage 1/31/12)); the October 1, 2002 Board Meeting at which matters relating to Dunlevy's September 11, 2002 letter were discussed (*see* Ex. 47; RT 834:24-835:6 (Dinnage 1/31/12)); and (5) the October 3, 2002 Board Meeting at which an HFPA resolution was discussed regarding the withdrawal of Dunlevy's September 11, 2002 letter to dcp.  (*see* Exs. 14, 47, 55; RT 850:14-23 (Dinnage 1/31/12).)

## **CONCLUSIONS OF LAW**

In Phase I of this litigation, the parties dispute their respective rights with regard to a single clause in the 1993 Amendment, which provides that "HFPA grants to dcp eight (8) additional, consecutive, exclusive and irrevocable options to acquire the exclusive right to produce a live television broadcast of and to produce on tape or film the Awards for each of the years 1998 through and including 2005, *and for any extensions, renewals, substitutions or modifications of the NBC Agreement*, and to exploit all productions in all media throughout the world in perpetuity."  (Ex. 3.)  The italicized words constitute what the parties have referred to as "the extensions clause."

Plaintiff HFPA seeks a judicial declaration that the disputed clause of the

1993 Amendment: (a) permits dcp to exercise options beyond the eight specified for the years 1998-2005 upon any "extensions, renewals, substitutions or modifications" of the dcp-NBC license agreement only if HFPA approves of any such "extensions, renewals, substitutions or modifications"; and/or (b) permits dcp to exercise any of the eight options specified after the period 1998-2005 in the event of a *force majeure* event; and/or (c) permits HFPA to revoke any options granted in the 1993 Amendment under the extensions clause. To the declaration HFPA requests, Defendants assert defenses of: statute of limitations, laches, waiver, unclean hands, and ratification.

Defendants also seek a judicial declaration – namely, that the extensions clause permits dcp to exercise options beyond the eight specified for the years 1998-2005 upon *any* "extensions, renewals, substitutions or modifications" of the dcp-NBC license agreement, with or without HFPA's approval. To the declaration dcp seeks, HFPA asserts affirmative defenses of: lack of consideration, mistake, unclean hands, estoppel, and lack of authority.

In the event Defendants' contract interpretation is adopted by the Court, HFPA seeks a ruling that the 1993 Amendment is invalid and should be cancelled or otherwise not enforced on the ground that Mirjana Van Blaricom, the HFPA President who negotiated and executed the 1993 Amendment on behalf of HFPA, lacked authority to do so.

The parties agree that this Court has subject matter jurisdiction over the Phase I claims, affirmative defenses and counterclaims. The parties also agree that these disputes are governed by California law. The burden of proof lies with the party asserting each claim, counterclaim or defense, except for the burden of proving agency and the scope of the agent's authority, which rests upon the party asserting the existence thereof. *Cal. Viking Sprinkler Co. v. Pac. Indem. Co.*, 213 Cal. App. 2d 844, 850 (1963).

### A.     dcp's Interpretation Is The Most Reasonable

### 1.    The Elements Of A Claim For Declaratory Relief

The elements of HFPA's and Defendants' respective claims for declaratory relief are: (a) an actual and substantial controversy has arisen, and now exists, between Defendants and HFPA concerning their respective rights and duties under the 1987 Agreement, as amended; (b) Defendants and HFPA have adverse legal interests; (c) the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment; (d) the parties desire a judicial determination of the parties' respective rights and duties under the 1987 Agreement as amended; and (e) a judicial declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties.  *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998); Cal. Prac. Guide: Fed. Civ. Pro. Before Trial § 10:24 (The Rutter Group 2012). Declaratory relief is appropriate where the judgment will "serve a useful purpose in clarifying and settling the legal relations in issue, and . . . will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *DeFeo v. Procter & Gamble Co.,* 831 F. Supp. 776, 778 (N.D. Cal. 1993) (quoting *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986)).

There is a justiciable controversy between HFPA and dcp regarding the meaning of the 1993 Amendment, and declaratory relief is appropriate because it will clarify and settle the parties' rights and obligations with respect to the 1993 Amendment, and eliminate uncertainty, insecurity and doubt as to the meaning of the 1993 Amendment.

Under the applicable rules of contract interpretation and for the reasons explained below, Defendants are entitled to a judicial declaration that the 1993 Amendment grants dcp the option to extend its rights to produce and distribute the Golden Globe Awards show beyond 2005 for "any extensions, renewals, substitutions or modifications of the NBC Agreement," with or without HFPA's approval.

## 2.    The Applicable Rules Of Contract Interpretation

### (a)    Discerning The Parties' Intent

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contracting.  Cal. Civ. Code § 1636; *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998).  A court must determine what the parties meant by the words used, in light of all the circumstances.  *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 38 (1968) ("*PG&E*"); Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"); *Id.* § 1639 ("the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title."); *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 852 (1999) (while "it is assumed that each term of an agreement has a reasonable rather than an unreasonable meaning . . . . parties are free to make agreements which seem unreasonable to others." (internal quotations and citation omitted)); *South-Western Pub. Co. v. Simons*, 651 F.2d 653, 657 (9th Cir. 1981) (rejecting argument that an agreement to revise text in perpetuity was absurd where author might have purposely agreed to that provision in order to find a publisher).

### (b)    The Role Of Extrinsic Evidence

Under California law, the court first provisionally considers relevant extrinsic evidence in order to determine whether the words of a contract are reasonably susceptible to a particular meaning urged by either party, before actually admitting any such evidence to assist with interpretation.  *PG&E*, 69 Cal. 2d at 39-40; *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126-27 (2008); *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010); *see also Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992) ("*language in a contract* must be construed in the context of that

instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*.") (emphasis in the original).  If the court concludes that the words are reasonably susceptible to more than one interpretation, it admits extrinsic evidence to interpret those words.  *PG&E*, 69 Cal. 2d at 39.

Admissible extrinsic evidence includes:  (1) the circumstances, under which it was made and the matter to which it relates (Cal. Civ. Code § 1647); (2) the parties' statements during negotiations and communicated intent (*Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 412 (1984)); (3) the parties' "course of dealing" and "course of performance," including pre-dispute conduct (Cal. Code Civ. Proc. § 1856(c); *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393 (2008)); and (4) usage of trade (*Id.*; *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442, 451 (1988) ("industry custom binds those engaged in the business even though there is no specific proof that the particular party to the litigation knew of the custom") (citation omitted)).

### (c)     Limitations On The Use Of Extrinsic Evidence

The use of extrinsic evidence is limited. First, a party's undisclosed intent or understanding is not relevant.  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (1992).

Second, extrinsic evidence and other rules of construction may be used to interpret the words chosen, but not to add, subtract, or vary the words used in the written agreement. *See Wagner v. Columbia Pictures Indus., Inc.*, 146 Cal. App. 4th 586, 592 (2007) (extrinsic evidence not credible because "it does not explain the contract language, it contradicts it."); *Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1364-65 (1999) (party cannot "smuggle extrinsic

evidence to add a term to an integrated contract"); *Appling v. State Farm Mut. Auto Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) (extrinsic evidence cannot be used to graft on a "good cause" requirement); *Levi Strauss & Co. v. Aetna Cas. & Surety Co.*, 184 Cal. App. 3d 1479, 1486 (1986) ("[t]he court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there.") (citation omitted).

Third, a written agreement "supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument" (Cal. Civ. Code § 1625), and those terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Code Civ. Proc. § 1856(a).

Fourth, the terms of a writing may be "explained or supplemented by extrinsic evidence of consistent additional terms," but not if "the writing is intended also as a complete and exclusive statement of the terms of the agreement."  Cal. Code Civ. Proc. § 1856(b).

### 3.    The Plain Language of the 1993 Amendment Supports dcp's Interpretation

The plain language of the 1993 Amendment supports dcp's interpretation. The 1993 Amendment extends dcp's "consecutive, exclusive, irrevocable options" through 2005, and beyond 2005 "for any extensions, renewals, substitutions or modifications" of the dcp-NBC Agreement.  (Ex. 3.)  It provides that "HFPA grants to dcp" not only the specified options for each of the specified years, but also for any "extensions, renewals, substitutions or modifications of the NBC Agreement . . . in perpetuity." There is no operative intervening verb between "HFPA grants" and the clause "and for any extensions . . . ."  HFPA accepted this language and is bound by it.  Absent is any language

requiring HFPA's consent.  The extensions clause gives dcp the right to produce and distribute the Golden Globe Awards show so long as the show remains on NBC as the result of any extensions, renewals, substitutions or modifications of the NBC Agreement.

The plain meaning of the extensions clause is consistent with the entirety of the parties' agreement.  *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

The grant of options provisions in the 1983 Agreement, the 1987 Agreement and the 1989 Amendment are structured identically.  Each grants dcp only a specified number of options with a finite expiration date.[8]  Nevertheless, the Court concludes that the parties intended the 1993 Amendment to go further.  In addition to listing eight years by date (*i.e.*, options for the years 1998 through 2005) and using the same wording in the 1987 Agreement and 1989 Amendment, the 1993 Amendment added a new term.  It granted dcp not only "eight (8) additional, consecutive, exclusive, and irrevocable options . . . for each of the years 1998 through and including 2005, but also options "*for any extensions, renewals, substitutions or modifications of the NBC Agreement.*" (Ex. 3 (emphasis added).)  This new language is reasonably susceptible to the interpretation that dcp was granted options for the years after 2005 to produce and distribute the Golden Globe Awards show, so long as dcp extends, renews, substitutes or modifies its broadcast agreement with NBC.

In addition to adding the extensions clause to the parties' agreement, the 1993 Amendment also revised paragraphs 1(a) and (b) of the 1987 Agreement

---

[8] The 1983 Agreement granted dcp "four consecutive, exclusive, irrevocable options . . . for 1984, 1985, 1986 and 1987." (Ex. 5.)  The 1987 Agreement granted dcp "five (5) consecutive, exclusive, irrevocable options . . . for 1988, 1989, 1990, 1991 and 1992, " and the 1989 Amendment granted dcp "five (5) additional consecutive, exclusive, irrevocable options . . . for 1993, 1994, 1995, 1996[,] and 1997." (Ex. 1; Ex. 2.)

relating to the parties' contractual negotiation period and right of first refusal. Whereas the 1987 Agreement and 1989 Amendment provided a date certain for commencement of the negotiation period, which corresponded with the final year in which dcp could exercise its last option under the contract (*i.e.*, 1992 and 1997, respectively), in the 1993 Amendment the parties could not and did not conform all date references merely by replacing the old final option year with a specific later year (*e.g.*, 2005). That is because, under the extensions clause in the 1993 Amendment, the dcp-HFPA contract could and would continue for an indefinite number of additional years, so long as the dcp-NBC Agreement remained in effect as a result of any "extensions, renewals, substitutions or modifications" of that agreement. Thus, the 1993 Amendment stated:

> This will also confirm that the reference to "1997" in Paragraph 1(a) of the [Main Show] Agreement as amended [by the 1989 Amendment] shall be changed to, "2005, *or the date of the broadcast of the last Awards under the NBC Agreement, whichever is later* . . ."

> This will also confirm that the reference to "July 15, 1997" in paragraph 1(b) of the [Main Show] Agreement as amended [by the 1989 Amendment] shall be changed to read: "July 15, 2005, *or July 15 after the last broadcast of the Awards under the NBC Agreement, whichever is later*."

Ex. 3 (emphases added).)

The emphasized language in these provisions—particularly the phrase, "whichever is later"—supports dcp's interpretation that the parties intended to grant dcp the right to exercise options beyond 2005 in the event of any "extensions, renewals, substitutions or modifications of the NBC Agreement." *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part . . . .").

Other courts interpreting language similar to the extensions clause have similarly held that it has the same plain meaning that the Court adopts here. *See,*

*e.g., Branch Banking & Trust Co. v. Chicago Title Ins. Co.,* 714 S.E.2d 514, 520 (N.C. Ct. App. 2011) (title insurance policy that covered "all renewals or extensions" of 2003 deed of trust applied to a 2005 deed of trust on the identical property because "the language" – *i.e.*, "all renewals or extensions" – was "clear, and . . . only one reasonable interpretation exists"); *Cheek v. Jackson Wax Museum*, 220 P.3d 1288, 1292-93 (Wyo. 2009) (although the "renewal provision of the brokerage agreement was 'entirely open-ended' and, theoretically, would entitle the broker to a commission every time the lease was renewed on into the future," the court held that "the parties to a contract are free to incorporate within their agreement whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the contract."); *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*, 521 S.E.2d 761, 763 (Va. 1999) ("Paragraph 15(A) of the leases is unambiguous and [] the plain meaning of its terms obligate the [landlord] to pay commissions to [the Leasing Agent] on all rental payments received from tenants procured by [the Leasing Agent]. Under that language, this obligation continues during the term of the original lease and 'during any renewal and extension thereof or during the term of any new lease' . . . This obligation remains unchanged if an existing tenant executes a new lease for the leased premises.").

A key HFPA contention, stressed very effectively by its counsel during closing argument, is that it is not reasonable to adopt dcp's construction of the 1993 Amendment and the extensions clause, because no one would grant the production and broadcast rights in question to another in perpetuity.  Appealing as that proposition is in the abstract, it is nevertheless misplaced.  To be sure, the duration of the agreement is indefinite, but it is dependent on the continuation of dcp's agreement with NBC.  NBC could terminate the agreement, or not renew

its commitment to broadcast the show.  If that happened, dcp would have no options to exercise.

### 4.   The Extrinsic Evidence Supports The Plain Meaning Of The 1993 Amendment

#### (a)   Surrounding Circumstances

In interpreting a contract, the Court may also consider "the circumstances under which [the contract] was made, and the matter to which it relates."  Cal. Civ. Code § 1647.  Here, the circumstances surrounding execution of the 1993 Amendment further support dcp's interpretation of the extensions clause and demonstrate why both parties would agree that dcp would have options to produce the show so long as NBC continued to broadcast it.

#### (i)   The Importance of a Network Deal

Prior to 1983, the Golden Globe Awards had been televised on a national television network only three times (twice on NBC and once on CBS), and all three times it was dropped by the network. (Ex. 200.)  In late 1982, HFPA attempted to negotiate with a producer to produce and distribute the 1983 Golden Globe Awards show, but the producer backed out of a proposed deal with HFPA on the eve of the January 1983 date scheduled for the event.  (Ex. 99, 202, 254.) In December 1982, just weeks before the hoped-for January 1983 broadcast, HFPA and dcp entered into their first agreement.  (Exs. 5, 254.)  At that time, an important goal of HFPA was to get the show back on television. (*See* Exs. 202, 254 (Membership meeting minutes indicating that members believed it was "critical" and "very important to be on TV even if it costs [HFPA] money.")

During the five-year term of that 1983 agreement in which the show was televised in national syndication, the popularity and stature of the Golden Globe Awards began to increase.  During that time, the Golden Globe Awards went

1    from almost having no broadcaster for the 1983 show (before the agreement

2    with dcp was reached), to being televised in syndication from 1983 to 1988, to

3    being televised on TBS, a national cable network, in 1989.  (Ex. 200.)  Then, in

4    1993, dcp secured a network deal for the show with a broadcast network, NBC.

5    This history and background shows that the extensions clause was intended to

6    protect and reward dcp, so long as dcp arranged to keep the show on NBC. (RT

7    112:12-17 (La Maina 1/24/12).

8              **(ii)    dcp's Repeated Attempts To Obtain End-Of-**
9                       **Deal Protection**

10          As dcp succeeded in securing television broadcasts, it continually sought

11   increasing end-of-deal protection from HFPA.  At the outset of the parties'

12   relationship in 1983, dcp unsuccessfully sought rights of first negotiation and

13   first refusal from HFPA. In 1987, however, after dcp succeeded in distributing

14   the Golden Globe Awards in syndication, HFPA granted dcp rights of first

15   negotiation and first refusal.  In 1989, when dcp obtained a licensing deal with

16   TBS, a national cable network, HFPA granted dcp options to produce and

17   distribute the Golden Globe Awards for two additional years beyond the network

18   deal (in addition to the rights of first negotiation and first refusal).  Finally, in

19   1993, when dcp secured a contract with NBC, dcp sought and obtained from

20   HFPA the extensions clause.

21          The extensions clause was an additional form of end-of-deal protection for

22   dcp.  It ensured that dcp would continue to receive the benefits of having

23   obtained, and committed to maintaining, a network broadcasting deal for the

24   Golden Globe Awards.

25

26

27

28

1

### (iii)   The Source Of The Language In Dispute

2

The language of the extensions clause in the 1993 Amendment was

3

supplied by Joel Behr, dcp's outside counsel. Behr had seen such clauses used in

4

talent agency contracts, and he took the disputed language in the 1993

5

Amendment directly from a talent agency contract.  (Ex. 238 (Behr Decl. ¶¶ 7-

6

8).)

7

Behr's understanding at the time he supplied the wording of the

8

extensions clause for the 1993 Amendment (and today) is that such clauses are

9

designed to protect the talent agency by ensuring that it enjoys the full benefit of

10

the business relationship and opportunity that it generated for the client.  (*Id.*)

11

While undisclosed, subjective intent is not relevant to contract interpretation,

12

Behr's understanding, as discussed further below, is consistent with (1) the

13

parties' communicated intent, and (2) industry custom and practice with respect

14

to the use of similar language in talent agency contracts.  (Ex. 240 (Brooks Decl.

15

¶¶ 11-13).)

16

17

### (b)   Communicated Intent At The Time Of Contracting

18

The Court may consider extrinsic evidence of the parties' communicated

19

intent at the time that they negotiated and entered into a contract to aid in the

20

interpretation of the words in that contract.  *See Heston v. Farmers Ins. Group*,

21

160 Cal.App.3d 402, 412 (1984).

22

As the Court found above, prior to entering the 1993 Amendment, the

23

main negotiators for each party — Francis La Maina, on behalf of dcp, and

24

Mirjana Van Blaricom, on behalf of HFPA — discussed what Behr understood

25

to be the purpose of the extensions clause:  namely, that if dcp obtained and

26

continued to maintain a broadcast deal with NBC, so long as that deal remained

27

in place, dcp could continue to produce and distribute the show.  According to

28

La Maina, his objective in using the specific phrase "for any extensions,
renewals, substitutions or modifications of the NBC Agreement" in the 1993
Amendment was to ensure that dcp would have options to produce the Golden
Globe Awards show so long as it aired on NBC, a matter he discussed with
HFPA's President.  The evidence establishes that Van Blaricom had the same
understanding.  Both of them knew what the extensions clause would
accomplish at the time of contracting.  Although HFPA mounted a serious
challenge to Van Blaricom's testimony because of her bias, the Court finds her
testimony credible as to the fact that she and La Maina understood that HFPA
was bound to dcp so long as the show remained on NBC.  (Ex. 794 (4/26/11 Van
Blaricom Decl., Dkt. No. 270-1, ¶¶ 6-7); RT 122:4-123:11, 123:21-25, 155:22-
156:15 (La Maina 1/24/12); RT 1605:17-1606:3, 1607:18-1608:2, 1616:22-
1617:8 (Van Blaricom 2/3/12.)

La Maina's September 22, 1993 presentation to HFPA's Membership
does not conflict with his testimony or that of Van Blaricom.  His statement that
dcp's proposal was to extend the dcp-HFPA contract "for as long as necessary to
satisfy the NBC term," general and unspecific as that statement was, is
consistent with dcp's interpretation.  (Ex. 110-20.)  Although the only duration
that was enumerated was ten years, that was because (or at least a reflection of
the fact that) ten years was all that NBC had committed to at that point.  That is
not the same as, and need not necessarily be construed to be an assurance that,
the deal with NBC, and thus any corresponding grant by HFPA of options to
dcp, would be limited to those ten years.  Although La Maina did not touch upon
what would happen if NBC exercised all its options and then agreed to extend
the term further, the absence of such further discussion does not undermine what
was communicated by and between Van Blaricom and La Maina.  Nor does it
vitiate the plain language of the written amendment provided to HFPA.

### (c)     Post-Contracting Conduct

A court may also consider the post-contracting, pre-dispute conduct and statements of the parties to aid in the interpretation of disputed words or phrases in a contract.  *See City of Hope Nat'l Med. Ctr.*, *supra*, 43 Cal. 4th at 393 (2008); *Oceanside 84, Ltd.*, 56 Cal. App. 4th 1441, 1449 (1997).

Here, the parties' conduct demonstrates that the extensions clause was understood to permit dcp to unilaterally extend its contract with HFPA for the period of any "extensions, renewals, substitutions or modifications of the NBC Agreement."  In particular, dcp's extension of the NBC broadcast deal in 2001 — and its unilateral exercise of options pursuant to that extension — is critical evidence of the parties' pre-dispute interpretation of the 1993 Amendment.

The options specified by year in the 1993 Amendment ran only through 2005. Nonetheless, dcp entered into the 2001 NBC Extension (extending the term of the dcp-NBC Agreement from 2006 to 2011) without any further amendment to the dcp-HFPA agreement.  Although the HFPA Membership may have been informally told of the dcp-NBC deal before dcp executed the extension with NBC, there is no evidence to suggest that any such membership approval was sought by dcp.  (Exs. 21, 79.)  To the extent that members of the HFPA Board voiced approval of the deal at the June 11, 2001 meeting or during the ensuing weeks, the Court concludes that there is inadequate basis in the contract or extrinsic evidence to determine that such approval was required.

Over the prior two decades, each time HFPA granted new or additional options to dcp the parties executed a new agreement or an amendment to their existing agreement.  That was done in 1983, 1987, 1989 and 1993.  But in 2001, the parties neither entered into a new agreement nor amended their existing

agreement.  To the contrary, the language of the 2001 Exercise of Options and the fact that it was exercised unilaterally by dcp confirms that the parties understood the extensions clause in the 1993 Amendment to automatically provide dcp with the rights to additional options to cover the 2001 NBC Extension.  (Ex. 4.)  The 2001 Exercise of Options was drafted by HFPA's counsel with the knowledge of HFPA's President.  It plainly states that the contract between dcp and HFPA is "deemed extended for any extensions of the NBC/dcp Agreement."  (Ex. 4, 24-27.)  In order to obtain additional options from HFPA to produce and distribute the Golden Globe Awards show for the years 2006 to 2011, dcp needed only to extend its contract with NBC, and then exercise its rights to additional options, and dcp proceeded accordingly.

Finally, statements made by various HFPA members, officers and directors over the span of years prior to the filing of this lawsuit provide additional support for both dcp's plain language reading of the clause and for the Court's determination that HFPA interpreted the extensions clause of the 1993 Amendment to mean that dcp had the right to exercise its options to produce the Golden Globe Awards for so long as NBC agreed to televise the show.  For example, at the December 10, 2002 HFPA Board meeting attended by representatives of dcp, past HFPA President and Board member Judy Solomon stated: "[A]ccordingly if you will go through the contract to the extension, excuse me, from 1993 it says that we – you have an extension 'til 2005 or as long as NBC wants it."  (Ex. 70.)  In July 2010, Solomon informed another HFPA member that "[HFPA's] agreement with dcp does not expire[,] only the one that dcp has with nbc."  (Ex. 542.)  In addition, HFPA's Presidents made more than one reference to the "perpetuity clause" (which dcp was told was a "major irritant" to the organization) and they made several attempts to extricate HFPA from that clause.  (*See* Exs. 118, 120, 252.)  These statements and actions

further support the finding that the parties understood the 1993 Amendment to permit dcp to extend its contract with HFPA for any "extensions, renewals, substitutions or modifications of the NBC Agreement."

### (d)    Evidence Of Industry Custom And Practice

Evidence of industry "custom or standard practice is admissible to interpret the terms of a contract," *Midwest TV*, 205 Cal. App. 3d at 451, as contracts "are to be read on the assumption that . . . the usages of trade were taken for granted when the document was phrased." Cal. Code Civ. Proc. § 1856(b), Law Rev. Comm. Comment. Industry usage becomes "an element of the meaning of the words used" unless it is "carefully negated." *Id.* Evidence of custom and practice applies regardless of whether the signatories are industry insiders, because "when there is a custom in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears." *Midwest TV*, 205 Cal. App. 3d at 451 ("industry custom binds those engaged in the business even though there is no specific proof that the particular party . . . knew of the custom").

In the entertainment industry, talent agency agreements typically contain the language of the extensions clause, or similar language, to ensure that an agent continues receiving a commission on a contract that he secured on behalf of a principal in the event that the contract is extended, renewed, substituted or modified. (Ex. 240 (Brooks Decl. ¶¶ 11-13).) Thus, to the extent the language of the extensions clause has been used within the entertainment industry to define the rights of talent agents and "talent," it is consistent with dcp's interpretation of the 1993 Amendment. However, talent agent contracts do not typically allow the agent to extend a contract without the principal's consent. (Ex. 244 (Tenzer Decl. ¶¶ 16-18.) The Court concludes that the dcp-HFPA relationship is sufficiently unique in several respects, and the testimony of the

opposing experts about industry custom and practice sufficiently distinguishable or inapposite, as to make this factor inconsequential in the Court's overall ruling.

**(e)  There Is Inadequate Extrinsic Evidence To Support HFPA's Interpretations Of The 1993 Amendment, And dcp's Interpretation Is The Most Reasonable Interpretation**

HFPA contends that the parties intended that the broadcast license agreement between dcp and NBC, and dcp's options, could not be extended "without HFPA's prior knowledge and approval." (FAC, Dkt. No. 50 ¶ 88(c).) However, such interpretation is untenable because it would require the contract to be construed as if it contained language requiring HFPA approval – and it does not. Therefore, HFPA's interpretation is contrary to the settled principles of contract interpretation. *See Wagner*, 146 Cal. App. 4th at 592.

Next, there also is inadequate evidence to support HFPA's second theory that the parties intended to have the extensions clause apply only as a *force majeure* provision "drafted to provide dcp flexibility to assure that . . . it would get to produce and license for broadcast the eight Awards show it had optioned" in the event unforeseen circumstances caused the cancellation of a show. There is no evidence that this was on the mind of either La Maina or Van Blaricom (or anyone else at their respective organizations). The *force majeure* interpretation is squarely at odds with evidence of what the parties who negotiated and entered into the 1993 Amendment testified that they intended the extensions clause to mean. (Ex. 794 (4/26/11 Van Blaricom Decl., Dkt. No. 270-1, ¶¶ 6-7); RT 122:4-123:11, 123:21-25, 155:22-156:15 (La Maina 1/24/12); RT 1605:17-1606:3, 1607:18-1608:2, 1616:22-1617:8 (Van Blaricom 2/3/12).)

The *force majeure* theory must be rejected for other reasons as well. The possibility that a show could be delayed by *force majeure* existed under the prior

dcp-HFPA agreements, yet these contracts contain no express provision dealing with such an event.  Moreover, HFPA's own expert acknowledged that the basic agreement does not have a *force majeure* clause, and that he would not expect to see such a clause in the 1993 Amendment. (RT 1344:3-6, 1370:4-10 (Tenzer 2/2/12).)  In any event, HFPA's primary contention that it understood the extensions clause to require HFPA's prior informed approval is inconsistent with its *force majeure* theory.  (FAC, Dkt. No. 50 ¶ 88(c).)

Next, although HFPA has challenged the relevance of the 2001 Exercise of Options, including by arguing that Yoshitomi's views have no bearing on the interpretation of the 1993 Amendment (citing *General Motors Corp. v. Superior Court*, 12 Cal. App. 4th 435, 442 (2008)), HFPA has provided no persuasive alternative contractual or legal explanation for dcp's continued licensing of the Golden Globe Awards to NBC from 2006 to 2011.  Under HFPA's "only with HFPA approval" and "*force majeure*" interpretations of the contract, in the absence of a further written amendment of the 1987 Agreement, dcp's options would necessarily have been exhausted or expired in 2005.  To be sure, HFPA argues that it "approved" the 2001 NBC Extension, but it cannot point to any contractual language which could serve as the basis of dcp's post-2005 options even with that purported approval.  Nor can HFPA claim that its "approval" was an oral amendment of "eight" options to "fourteen," because the parties' agreement explicitly forbids oral amendments. (Ex. 1 ¶ 19.)

In sum, the extrinsic evidence supports the conclusion that HFPA's unhappiness with the extensions clause stems from post-1993 events. The evidence reflects that, at the time of the 1993 Amendment, HFPA's main goal was to obtain and maintain a broadcast network deal. The extensions clause embodied the direction HFPA gave to dcp, which was to obtain and maintain a broadcast network deal with NBC, in which event we will continue to operate

under the existing agreement.  Thereafter, the show "took off" and by 2002 HFPA had begun to think beyond its previous objective.  HFPA realized that it might achieve greater benefits, including a better profit split with dcp or even a more lucrative deal with another network.  Moreover, the relationship between HFPA and dcp became strained by issues such as the sale of dcp to Mosaic Media Group in 2002, the dispute over the scope and application of the audit provision in the 1987 Agreement, and dcp's failure to consult with HFPA about a simulcast agreement with Telemundo.  So in 2002, when HFPA sought to escape the application of the extensions clause by repudiating the 2001 Exercise of Options and attempting to negotiate its way out of the provision, there were a number of factors explaining its conduct.

For all the foregoing reasons, the Court concludes that the extensions clause means what dcp says it does: dcp may exercise options beyond the eight options specified for the years 1998-2005 upon any "extensions, renewals, substitutions or modifications" of the dcp-NBC license Agreement, even without HFPA's approval.

**B.      HFPA's Affirmative Defenses Lack Merit**

**1.      The Post-2011 Options Provided In The Extensions Clause Are Irrevocable And Supported By Adequate Consideration**

In order for an option to be irrevocable, the offeree must (1) "confer a benefit or suffer prejudice" that (2) was "actually . . . bargained for as the exchange" for the offer.  *See, e.g., Steiner v. Thexton*, 48 Cal. 4th 411, 420-21 (2010).  The options granted in the 1993 Amendment were described explicitly as "irrevocable."  (Ex. 3.)  An option unsupported by consideration may be withdrawn at any time prior to exercise.  *Steiner*, 48 Cal. 4th at 420.  Where an option contract as a whole is supported by consideration, each option contained therein need not be supported by separate consideration. *See Brawley v. Crosby*

79

*Research Foundation*, 73 Cal. App. 2d 103, 118 (1946) ("It is not necessary that the provision giving to one party an option . . . be supported by a consideration different from considerations supporting the entire agreement."); *Crossman v. Fontainbleau Hotel Corp.*, 273 F.2d 720, 727 (5th Cir. 1959) (if an option is "part and parcel of the main agreement, it requires no separate consideration").

The 1993 Amendment was supported by consideration because dcp had negotiated and secured a commitment from NBC to broadcast the Golden Globe Awards show.  That was consideration for dcp receiving options to produce the show so long as it remained on NBC.  (Ex. 293.)  Because no separate consideration was required for the contingent post-2005 options contained in the 1993 Amendment, those options are irrevocable and cannot be unilaterally revoked by HFPA.

In addition to the consideration dcp provided in connection with the 1993 Amendment at the time of contracting, dcp's performance over the next seventeen years provided consideration for the 1993 Amendment and all of the options contained therein.  *See Steiner*, 48 Cal. 4th at 422 (holding that part performance "created sufficient consideration to render the option irrevocable").  It is undisputed that dcp continued to perform under the parties' agreement, as amended by the 1993 Amendment.  Among other things, it maintained the show on NBC, negotiated higher license fees with NBC in 2001 and 2010, and continued to account for profits generated under the dcp-NBC Agreement, half of which were paid to HFPA.

dcp's subsequent performance provided HFPA with consideration for all of the options granted in the 1993 Amendment, including those granted in the extensions clause, further rendering those options irrevocable.  Accordingly, HFPA lacked the right to revoke dcp's options on February 8, 2010, when it

purported to have done so.

Additionally, a conditional promise is valid consideration for another promise. *See Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1454 (9th Cir. 1996) (under California law, "[a]ny valid promise, whether absolute or conditional, is valid consideration for another promise") (quoting Witkin, § 215).  Here, the options granted to dcp beyond 2005 were conditioned on dcp securing an extension of the NBC deal, and supported by the promise that, if dcp exercised those options, it would pay HFPA half of the net profits from any exploitation of the broadcast. (Ex. 1 ¶ 3.)

For all the foregoing reasons, the extensions clause is part of a valid contract supported by consideration, and the "irrevocable options" granted under it are, in fact, irrevocable.

## 2.    HFPA Has Not Proved Its Defenses Based On Mistake

HFPA has not presented adequate evidence to support its affirmative defense of mistake, brought in opposition to dcp's counterclaims.   To prove mistake, HFPA must show that the parties attach materially different meanings to their manifestations of mutual assent, or a misapprehension of the law by both parties, or a misapprehension of the law by HFPA not caused by its own excessive carelessness and of which dcp was aware at the time of contracting but failed to rectify. *Merced County Sheriff's Empls' Ass'n v. County of Merced*, 188 Cal. App. 3d 662, 675-76 (1987); Restatement (Second) of Contracts § 20(1); California Advisory Committee on Jury Instructions ("CACI") §§ 330, 331; Cal. Civ. Code § 1578; 1 Witkin, Summary 10th (2005) Contracts , § 273, p. 304; 1 Witkin, Summary 10th (2005) Contracts, § 274, p. 305.

As dcp contends, the evidence shows that both parties understood the contract to grant eight specified options and additional options beyond 2005 in the event dcp procured extensions, renewals, substitutions or modifications of

1   the NBC deal.

2         First, La Maina and Van Blaricom both testified that La Maina

3   communicated and Van Blaricom understood that HFPA was tied to dcp so long

4   as dcp kept the show on NBC.  (RT 122:22-123:25 (La Maina 1/24/12); RT

5   1617:1-6 (Van Blaricom 2/3/12).)

6         Second, while HFPA is correct that La Maina did not state or explain at

7   the September 22, 1993 Membership meeting that dcp might have "perpetual"

8   options, he did state that dcp and HFPA would be tied together for "as long as

9   we're doing the NBC deal" and "for as long as necessary to fulfill the NBC deal

10  . . . ."  (Ex. 110 at 20.)  That language is consistent with dcp's assertion and the

11  other evidence cited above showing that both sides understood that the HFPA-

12  dcp deal would be extended if dcp extended the NBC deal.

13        In addition, the events of 2001 confirm that the parties understood the

14  1993 Amendment to extend additional options to dcp automatically in the event

15  of any extensions, renewals, substitutions or modifications of the NBC deal.

16  First, HFPA cannot point to any evidence showing that prior to the signing of

17  the NBC deal, HFPA's Membership formally voted to approve or generated a

18  written record conveying approval of the deal.  Nor did it refute La Maina's

19  testimony that he did not need approval.  (Exs. 698, 699.)  Second, after the dcp-

20  NBC deal was signed, the parties collaboratively prepared the "Exercise of

21  Options," which was drafted by HFPA's lawyer with the knowledge of HFPA's

22  President.  That key document states that the dcp-HFPA agreement is "deemed

23  extended for any extension of the NBC/dcp Agreement" and provides for a

24  signature only by dcp with no mention of HFPA approval being required.  (Exs.

25  4, 24-27.)  The Exercise of Options corroborates that the parties understood the

26  HFPA-dcp contract to provide automatic options to dcp for any extension of the

27  dcp-NBC contract.

28

Finally, there is no evidence entitling the Court to infer that dcp knew of
and intended to take advantage of any HFPA mistake.  Indeed, during or
following the September 22, 1993 Membership meeting, La Maina left copies of
the draft 1993 Amendment with HFPA, and so informed the members (Exs. 3;
110 at 21); he suggested names of respected attorneys with whom HFPA might
review the document (Ex. 344); and he allowed HFPA adequate opportunity to
consult with counsel before Van Blaricom returned the signed document on
September 29, 1993 (Ex. 503).

Accordingly, the Court concludes that HFPA has not proven either
unilateral or mutual mistake.

**3.      HFPA Has Not Proved Its Defense Of Unclean Hands**

To succeed on its unclean hands defense to dcp's counterclaim, HFPA
must show: (1) dcp's conduct was inequitable, violated the conscience or other
equitable principles, or was not undertaken in good faith; (2) dcp's conduct
relates directly to the cause at issue or was taken in acquiring the rights it now
asserts; and (3) dcp's conduct, if permitted, would prejudice HFPA.  *See Jay
Bharat Developers, Inc. v. Minidis*, 167 Cal. App. 4th 437, 445 (2008); *Cal.
School Employees Ass'n v. Tustin Unified School Dist.*, 148 Cal. App. 4th 510,
523 (2007).[9]

This defense also fails, because HFPA has not shown any conduct by dcp
in the course of acquiring its rights under the extensions clause that was
inequitable, violated the conscience, or was in bad faith.  HFPA's unclean hands
defense is premised on HFPA's allegation that dcp misrepresented the nature of
the 1993 Amendment when dcp presented it to the HFPA Membership for

---

[9] Any inequitable or bad faith conduct by dcp at the time of the 2010 NBC extension
is insufficient to support the defense of unclean hands because it was subsequent to
and has no bearing on the acquisition of the rights at issue in the 1993 Amendment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

approval.  However, even though the Court has found that several aspects of what La Maina said at the September 22, 1993 meeting could be construed to support HFPA's contentions, there is no basis to find that dcp acted intentionally to mislead HFPA.  After all, La Maina provided the proposed 1993 Amendment to HFPA for its review, encouraged HFPA to seek independent counsel, and specifically told the HFPA President that dcp understood the deal to provide options to dcp so long as the show was or is on NBC.   Accordingly, the evidence does not support HFPA's defense of unclean hands.

### 4.      HFPA's Defense of Estoppel Is Also Without Merit

The parties do not dispute that, in order to prevail on its estoppel defense, HFPA must show that: (1) dcp made a representation of fact by words or conduct, intending HFPA to rely on it; (2) dcp knew the true state of facts; (3) HFPA was ignorant of the true state of facts; and (4) HFPA reasonably relied on dcp's representation to HFPA's injury.

HFPA argues that Defendants should be estopped from asserting their interpretation of the 1993 Amendment because of certain statements La Maina made at the September 22, 1993 meeting.  As explained above, La Maina's general statement that dcp's proposal was to extend the contract "for as long as necessary to satisfy the NBC term" is consistent with dcp's interpretation. (Ex. 110-20.)  His presentation to HFPA's Membership did not touch upon what might happen if NBC exercised all its options and then agreed to extend the term further.  Similarly, La Maina's informal presentation to the HFPA Board on June 11, 2001 did not touch upon what might happen if NBC exercised all its options and then agreed to extend the term beyond 2011.  Finally, to the extent that HFPA also relies on Shapiro's assurance in February 2010 that dcp would seek to involve HFPA in any new network deal, his conduct does not estop dcp from relying on and enforcing the interpretation of the 1993 Amendment that dcp had

relied on and that HFPA had acknowledged by no later than 2002. Moreover, according to NBC's executive Graboff, Shapiro's devious conduct inured to HFPA's benefit because he was able to extract more favorable terms from NBC. Thus HFPA cannot establish injury.

### C.   Van Blaricom Was Authorized To Enter The Agreement On Behalf Of HFPA

HFPA contends that, even if dcp's interpretation of the extensions clause is correct, that portion of the 1993 Amendment is invalid because then-HFPA President Mirjana Van Blaricom did not have authority to agree to the extensions clause.

This partial invalidity claim fails because Van Blaricom had both actual and ostensible authority to contract on behalf of HFPA.

### 1.   Van Blaricom Had Actual Authority To Execute The 1993 Amendment

Actual authority is what a principal (here, for purposes of this analysis, HFPA) intentionally confers upon the agent (here, Van Blaricom), or what the principal intentionally or by want of reasonable care, allows the agent to believe she possesses. Cal. Civ. Code § 2316; *see also S. Sacramento Drayage*, 220 Cal. App. 2d at 856; *Tomerlin v. Canadian Indem. Co.*, 61 Cal. 2d 638, 644 (1964) ("[a]ctual authority arises as a consequence of conduct of the principal which causes an agent reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal"). An agent's failure to follow the necessary organizational bylaws for approval of a contract could mean a contract was unauthorized. *See Lindsay-Field v. Friendly*, 36 Cal. App. 4th 1728, 1735 (1995).

HFPA's argument that Van Blaricom lacked authority relies on Section 13.2 of HFPA's then-operative Bylaws, which provided that: "All material

agreements . . . shall be executed by the President and the Treasurer under the seal of the Association, but only after said documents or contracts so to be executed shall have been submitted to and approved by the Board of Directors and approved by a majority of all the Active members."  (Ex. 333-40.)

Notwithstanding these requirements, in its relationship and contracts with dcp, over the course of many years HFPA operated in a manner inconsistent with its bylaws.  For example, it disregarded the requirements in the bylaws that HFPA's contracts be executed by both its President and Treasurer, executed under the seal of HFPA, approved by a majority of all of its Active members, and submitted to and approved by HFPA's Board.  (*See, e.g.*, Exs. 1, 2, 3, 5, 109, 110, 111.)

In light of HFPA's prior conduct and the Membership's silence regarding several of its Presidents' prior actions, Van Blaricom could reasonably conclude that HFPA did not require strict compliance with its Bylaws regarding the execution of contracts. She also could reasonably conclude on the basis of the events and meetings of September 22, 1993 that she had authority to execute the 1993 Amendment in its entirety.  *See Tomerlin*, 61 Cal. 2d at 644 (holding that the principal's silence in the face of a history of the agent's exercising authority in similar circumstances reasonably caused the agent to believe that he possessed actual authority).

In addition, in late September 1993, the Membership allowed Van Blaricom to believe that she had actual authority to execute the contract by failing to read the contract or raise any issue with regard to approval of the extensions clause.  The Membership was aware that dcp gave HFPA a draft of the 1993 Amendment "to discuss with your attorneys or whoever you'd like to discuss them with." (Ex. 110.)  HFPA cannot, on the one hand, argue that only HFPA's Membership (and not Van Blaricom) was capable of entering into the

86

1993 Amendment, and at the same time, argue that the contract should be partially cancelled or otherwise avoided because the Membership misunderstood the import of that agreement by neglecting to read the contract.  *See Tomerlin*, 61 Cal. 2d at 644 ("[a]ctual authority arises as a consequence of conduct of the principal which causes an agent reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal."); (Ex. 652.)

Accordingly, Van Blaricom had actual authority to enter into the 1993 Amendment.

### 2.   Van Blaricom Had Ostensible Authority To Execute The 1993 Amendment

Van Blaricom also had ostensible authority to execute the 1993 Amendment.  Ostensible authority is what a "principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ. Code § 2317.  However, an agent cannot have ostensible authority "as to persons who have actual or constructive notice of the restriction upon his authority."  *Id.* § 2318; *Lindsay-Field*, 36 Cal. App. 4th at 1734 (no ostensible authority where opposing party "knew a vote of the membership was required" and "did not ask for written evidence of [the agent's] authority").

Ostensible authority cannot arise from conduct by the agent, but rather must arise from conduct by the principal which causes a third party to reasonably believe that the agent has authority.  *Lindsay-Field*, 36 Cal. App. 4th at 1734; *see also Jones v. Title Guarantee & Trust Co.*, 178 Cal. 375, 379 (1918).  Where a principal acts in disregard of its duties for many years and accepts the benefits of a transaction, this may support a finding of ostensible authority.  *See County First Nat. Bank of Santa Cruz v. Coast Dairies & Land Co.*, 46 Cal. App. 2d 355, 366-67 (1941) (where two directors made no attempt to discover what third director was doing and allowed him to manage the affairs

of the company, the two directors cannot later claim that third director lacked authority thirteen years after the transaction in question, when it turned out poorly).

Here, La Maina reasonably believed that Van Blaricom, as President of HFPA, had authority to enter into the 1993 Amendment and to agree to the extensions clause. First, La Maina was present when the Membership voted to approve the terms of the contract. Before that vote he told the members that dcp and HFPA would be contractually bound so long as the show is televised on NBC. (Ex. 110.) While La Maina and other dcp representatives may have known the general process by which the HFPA Membership approved contracts, there is no evidence that they knew the exact terms of HFPA's Bylaws or whether HFPA strictly followed them. As noted above, HFPA operated in a manner inconsistent with its bylaws over the course of many years.

Second, La Maina left copies of the draft 1993 Amendment with HFPA, and if the Membership had objected to the terms of the written contract, he could reasonably have expected the Membership would have so communicated. (Ex. 110.)

Third, La Maina relied on the signature of the designated HFPA representative, Van Blaricom, as confirmation that all internal steps had been taken at HFPA to permit HFPA to enter into and execute the 1993 Amendment.

Accordingly, Van Blaricom had ostensible authority to enter into the 1993 Amendment.[10]

---

[10] The Court need not reach the issue of ratification.

## **CONCLUSION**

Because the plain meaning and the extrinsic evidence support dcp's interpretation of the 1993 Amendment, dcp's counterclaim for declaratory relief is granted and HFPA's claim for declaratory relief is denied.

HFPA's affirmative defenses of lack of consideration, mistake, unclean, hands, estoppel, and lack of authority fail on the merits, as does HFPA's lack of authority claim.    The Court need not and does not reach dcp's affirmative defenses.

The Court recognizes that some of the foregoing Findings of Fact may also be considered Conclusions of Law, and *vice-versa*.  The Court intends that all of the preceding findings and rulings be given appropriate and applicable classification and weight.

\*\*\*

Because Judge Fairbank bifurcated this dispute, the Court may not enter judgment.  Accordingly, by not later than May 14, 2012, the parties shall file a Joint Status Report containing their respective views on any further proceedings in this case.

IT IS SO ORDERED.

Dated:  April 30, 2012

_____
A. HOWARD MATZ
Senior U.S. District Judge